BOREN, OSHER & LUFTMAN LLP
Jeremy J. Osher (SBN 192109)
josher@bollaw.com
Saba Zafar (SBN 271963)
szafar@bollaw.com
222 North Pacific Coast Highway, Suite 2222
El Segundo, CA 90245
Telephone: (310) 322-2021
Facsimile: (310) 322-2228

Attorneys for Plaintiff
IRISH ROVER ENTERTAINMENT, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| IRISH ROVER ENTERTAINMENT, LLC, a California limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> AARON SIMS, an individual; MATT DUFFER, an individual; ROSS DUFFER, an individual; NETFLIX, INC., a Delaware corporation; NETFLIX STREAMING SERVICES, INC., a Delaware corporation; 21 LAPS ENTERTAINMENT, a business entity, form unknown; and DOES 1 through 50, inclusive, <br><br> Defendants. | Case No.: 2:20-CV-06293-CBM-PLA (Assigned to Hon. Consuelo B. Marshall) <br><br> **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. PROC. 12(b)(6)** <br><br> [Declaration of Jeffrey Kennedy filed concurrently herewith] <br><br> Date:     January 26, 2021 <br> Time:     10:00 a.m. <br> Courtroom:  8B |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

I.      INTRODUCTION...…….....………………………………………………....1

II.     SUMMARY OF WORKS AT ISSUE…………....……….....……………………3

III.    LEGAL STANDARD…....……………………………………………………....5

    A. Rule 12(b)(6)………………....…………………………………………………5

    B. Copyright Infringement…....……………………………………....……………5

        1. Dismissal of Infringement Claims Involving Literary Property At
        The Pleading State Is "Highly Disfavored"…………………………………6

        2. The Ninth Circuit's "Selection or Arrangement" Standard………………….7

        3. Dissimilarities and/or Elements Added By a Defendant Are
        Immaterial…..........................................................................................7

        4. Dismissal at the Pleading Stage Is Only Appropriate Where No
        Reasonable Juror Could Find Substantial Similarity………………….........7

IV.    LEGAL ARGUMENT……………………………………………………………8

    A. Defendants' Concession Of Access For Purposes Of The Instant
    Motion Strengthens Plaintiff's Substantial Similarity Argument………....….9

    B. Plaintiff Has Sufficiently Alleged that Totem and Stranger Things
    Are Substantially Similar……………………………………………………9

        1. Plot…………………………………………………………....….10

        2. Sequence…………………………………………………....…13

        3. Characters…………………………………………………15

        4. Theme…………………………………………………....……19

        5. Dialogue…………………………………………………..20

        6. Mood, Tone, and Place………………………………………21

        7. Setting…………………………………………………....…21

        8. Additional Shared Elements…………………………………22

    C. Plaintiff Satisfies The "Selection And Arrangement" Test………………..22

    D. Defendants Cite To Numerous Cases That Are Inapposite……………..…23

E. Dismissal Of Plaintiff's Claims Regarding Its Copyrighted Artwork
Is Not Appropriate At The Pleading Stage…………………………...…..24

F. Leave To Amend Should Be Granted…………………………..……….25

V.    CONCLUSION……………………………………………...……………25

1

## **<u>TABLE OF AUTHORITIES</u>**

2

### **<u>FEDERAL CASES</u>**

3

*Althouse v. Warner Bros. Entm't, Inc.*

4

2014 WL 2986939 (C.D. Cal. Apr. 28, 2014).............................................23

5

*Alfred v. Walt Disney Co.*

6

821 Fed.Appx. 727 (9th Cir. 2020) .............................................1, 7, 8, 22

7

*Astor-White v. Strong*

8

733 Fed.Appx. 407 (9th Cir. 2018) .............................................................1

9

*Basile v. Warner Bros. Entm't, Inc.*

10

2016 WL 5867432 (C.D. Cal. Jan. 4, 2016)................................................23

11

*Balistreri v. Pacifica Police Dep't*

12

901 F.2d 696 (9th Cir. 1988).......................................................................5

13

*Baxter v. MCA, Inc.*

14

812 F.2d 421 (9th Cir. 1987).......................................................................8

15

*Benay v. Warner Bros. Entm't, Inc.*

16

607 F.3d 620 (9th Cir. 2010).....................................................................24

17

*Cabell v. Zorro Prods. Inc.*

18

2017 WL 2335597 (N.D. Cal. May 30, 2017) ..............................................6

19

*Cavalier v. Random House*

20

297 F.3d 815, 822 (9th Cir. 2002)........................................................6, 24

21

*Christianson v. West Pub. Co.*

22

149 F.2d 202 (9th Cir. 1945) .......................................................................1

23

*Danjaq, LLC v. Universal City Studios, LLC*

24

2014 WL 7882071 (C.D. Cal. Oct. 2, 2014) ..............................................16

25

*DC Comics v. Towle*

26

802 F.3d 1012, 1025 (9th Cir. 2015).........................................................15

27

*Fleener v. Trinity Broadcast Network*

28

2013 F.Supp.2d 1142 (C.D. Cal. 2001)........................................................6

*Kouf v. Walt Disney Pictures & Television*

   16 F.3d 1042, 1045 (9th Cir. 1994) ................................................................6

*Litchfield v. Spielberg*

   736 F.2d 1352 (9th Cir. 1984) ....................................................................9

*Metcalf v. Bochco*

   294 F.3d 1069 (9th Cir. 2002) ......................................................2, 7, 9, 23

*Moss v. U.S. Secret Serv.*

   572 F.3d 962 (9th Cir.2009) ........................................................................5

*Olson v. NBC*

   855 F.2d 1446 (9th Cir.1988) ................................................................9, 20

*Rentmeester v. Nike, Inc.*

   883 F.3d 1111 (9th Cir. 2018) ..............................................................1, 5, 6

*Satava v. Lowry*

   323 F.3d 805 (9th Cir. 2003) ........................................................................7

*Shaw v. Lindheim*

   919 F.2d 1353 (9th Cir. 1990) ....................................................6, 7, 8, 15, 23

*Sheldon v. Metro-Goldwyn Pictures*

   81 F.2d 49 (2d Cir. 1936) ..............................................................................3

*Sid & Marty Krofft Television Prods.*

   562 F.2d 1157, 1166-67 (9th Cir. 1977)....................................................15

*Swirsky v. Carey*

   376 F.3d 841 (9th Cir. 2004) ........................................................................8

*Three Boys Music Corporation v. Bolton*

   212 F.3d 477 (9th Cir. 2000) ........................................................................7

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*

   715 F.2d 1327 (9th Cir. 1983) ....................................................................8

*Usher v. City of Los Angeles*

   828 F.2d 556 (9th Cir.1987) ........................................................................5

*Zindel v. Fox Searchlight Pictures, Inc.*

  815 Fed.Appx. 158 (9th Cir. 2020) ........................................................................ 3, 6, 7

# <u>OTHER AUTHORITIES</u>

4 *Nimmer on Copyright*, § 3.04 ................................................................................... 7, 8

Plaintiff Irish Rover Entertainment, LLC (hereafter, "Plaintiff") hereby submits its Opposition to the Motion to Dismiss the First Amended Complaint (the "FAC") filed by Defendants Aaron Sims, Matt Duffer, Ross Duffer, Netflix, Inc., Netflix Streaming Services, Inc., and 21 Laps Entertainment (collectively, "Defendants").

## I.   **INTRODUCTION**

By the instant Motion, Defendants ask this Court to dismiss Plaintiff's infringement claims at the pleading stage, without the benefit of discovery, expert testimony, or a fully developed factual record. Defendants argue dismissal is appropriate at this early stage based on a lack of substantial similarity between Plaintiff's original copyrighted *Totem* screenplays (and related copyrighted artwork) and the Netflix series *Stranger Things*. However, Defendants ignore the well-settled legal principle—set forth in a case to which they repeatedly cite—that the extrinsic test raises "an inherently factual question which is often reserved for the jury, and **rarely for a court to decide at the motion to dismiss stage**". *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1127 (9th Cir. 2018) [hereafter, "*Rentmeester*"].

It is perhaps not surprising that the Ninth Circuit "has never affirmed the dismissal of a case alleging infringement of a literary work without discovery in a published opinion." *Astor-White v. Strong*, 733 Fed.Appx. 407, 409 n.2 (9th Cir. 2018) [Wardlaw, J., concurring]. In fact, the only published cases affirming a 12(b)(6) dismissal for lack of substantial similarity compared two photographs (*Rentmeester*) and maps (*Christianson v. West Pub. Co.*, 149 F.2d 202 (9th Cir. 1945)). Unlike these cases, which involve a far less sophisticated substantial-similarity analysis, with few elements to evaluate, the analysis is far more subtle and complex when applied to literary works such as Plaintiff's *Totem* scripts and the television series *Stranger Things*.

Courts must not only evaluate whether the protectible elements in two works are substantially similar, but also "compare the original selection and arrangement of the unprotectible elements between the two works". *Alfred v. Walt Disney Co.*, 821 Fed.Appx. 727, 729 (9th Cir. 2020) [hereafter, "*Alfred*"]. Here, the FAC identifies a

myriad of similarities between the two works in terms of characters, plot, sequence, setting, mood, tone, pace, dialogue, as well as numerous additional similarities, which taken together, "belies any claim of literary accident". And where—as here—Plaintiff has sufficiently alleged that the two works share countless elements, generic and otherwise, and that the selection and arrangement of these elements is similar, the Court can—and should—find that Plaintiff has satisfied the extrinsic test. *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002) [hereafter, "*Metcalf*"].

Importantly, Defendants are not challenging access to Plaintiff's protected works because they know the Duffers clearly had access through their association with Defendant Sims. FAC, ¶¶ 57-58. This concession—even if only for purposes of this motion—strengthens Plaintiff's argument that the two works are substantially similar. Indeed, if the trier of fact were to believe that the Duffers actually read the *Totem* scripts—which is likely—"it could easily infer that the many similarities between [the two works] were the result of copying, not mere coincidence". *Metcalf*, *supra* at 1075.

Although Defendants would like to explain away the similarities identified by Plaintiff as "random elements, cherry-picked from the works, and disassociated from the extrinsic analysis"—which is not the case—the question for this Court is whether, after viewing the two works and Plaintiff's well-plead allegations in the FAC, the determination of substantial similarity should be resolved on a Rule 12(b)(6) motion. The Court should decline Defendants' invitation to do so.

The Court also should reject Defendants' self-serving and repeated attempt to paint *Totem* as nothing more than dark Native American folklore[1] and *Stranger Things* as "lighthearted and sentimental" with "fun-loving teenagers". These characterizations oversimplify the two works, grossly ignore the elements they share, and improperly focus on dissimilarities and additions that Defendants have made in *Stranger Things*, rather than the similarities they share. But as Judge Learned Hand aptly stated, an

---

[1] Similarly, Defendants falsely contend that all of the characters in *Totem* are Native American.

infringer may not "excuse the wrong by showing how much of his work he did not pirate". *Sheldon v. Metro-Goldwyn Pictures*, 81 F.2d 49, 56 (2d Cir. 1936).

Plaintiff respectfully submits that a comparison of *Totem* and *Stranger Things* at this early stage of the proceedings is not warranted and that additional evidence, including a more developed factual record and expert opinions, "would aid in the objective literary analysis needed to determine the extent and qualitative importance of the similarities" that Plaintiff has identified in great detail in the FAC. *Zindel v. Fox Searchlight Pictures, Inc.*, 815 Fed.Appx. 158, 159 (9th Cir. 2020) [hereafter, "*Zindel*"]; *Alfred*, 821 Fed.Appx. at 729. Numerous decisions in this District counsel against dismissal at the pleading stage, precisely because the determination of substantial similarity is such a fact-driven inquiry.

Finally, Defendants' claim that "there is absolutely no protectable expression between Plaintiff's concept art and the characters or artwork included in *Stranger Things*" is objectively false. The Court need only review the examples included in Exhibit 9 to the FAC to see the obvious objective similarities and to determine for itself that Defendants borrowed heavily from Plaintiff's copyrighted artwork. This is not surprising given that Defendant Sims created the concept art for both works.

The Court should deny Defendants' Motion. However, if the Court is inclined to grant the instant Motion, Plaintiff should be afforded an opportunity to amend the FAC to cure any deficiencies. In this regard, Plaintiff has prepared three (3) exhibits that further expound upon (i) similarities between the two works that are directly tied to Defendants Sims's involvement (Exhibit 1); (ii) similarities in selection and arrangement of protected and unprotected elements (Exhibit 2); and (iii) similarities in dialogue (Exhibit 3).

## II.   <u>SUMMARY OF WORKS AT ISSUE</u>

Defendants' attempt to differentiate between *Totem* and *Stranger Things* falls short because they ignore critical plot lines and characters that are similar between the two works. To be clear, Plaintiff is not alleging that the works are identical—nor is this

required to establish infringement. And notwithstanding that there are some elements the works do not share, the number of shared elements, protectable and otherwise, is astounding and easily satisfies the extrinsic test.

Central to both works is the specter of a monster, Azrael in *Totem* and Shadow Monster/Mind Flayer in *Stranger Things*, that escapes through the ruptured "veil" between two dimensions, invades human reality with its monster minions, and wreaks havoc in an effort to enslave humanity for motives that seem beyond the sphere of reason. FAC, Ex. 7 at 21-24, 35; Declaration of David Grossman [hereafter, "DG Decl."], Ex. A, Ep. 1.

In both projects, a pubescent girl, Kimi in *Totem* and Eleven in *Stranger Things*, is responsible for the rupture that allows the respective monsters to enter into the human realm. Kimi has omniscient spiritual powers and Eleven has profound psionic powers. Kimi is the prime mover of her tribe. Eleven becomes the prime mover of her group. FAC, Ex. 7 at 21-24, 35; DG Decl., Ex. A, Ep. 1.

In both works, the respective protagonists, Jackson in *Totem* and Joyce in *Stranger Things*, have extremely similar quests which mirror each other's motives, actions, and unrelenting resolve to rescue a loved one that has been abducted by the monster, Autumn Chance in *Totem* and Will Byers in *Stranger Things*. FAC, Ex. 7 at 46; DG Decl., Ex. A, Ep. 1. While the protagonists are steadfast in their quest, their respective allies, Nerowe, a doctor in *Totem*, and Hopper, a detective in *Stranger Things*, are steeped in professions that rely on evidentiary knowledge and are trained to question situations that appear circumstantial. FAC, Ex. 7 at 6; DG Decl., Ex. A, Ep. 1. In both works, these allies evolve from skepticism for the respective protagonists' cause to belief in their quest. FAC, Ex. 7 at 46, 77-79; DG Decl., Ex. A, Ep. 5.

The Jackson-Nerowe duo in *Totem* and the Joyce-Hopper duo in *Stranger Things* both enter the carbon-copy alternate dimension, Jackson-Nerowe from Lynx Valley and Joyce-Hopper from a Government underground lab. FAC, Ex. 7 at 99-106; DG Decl., Ex. A, Ep. 8. Both teams wend their way through the respective alternate dimensions

and come to an ominous carbon copy of the respective protagonists' homes where they rescue their respective loved ones. FAC, Ex. 7 at 99-106; DG Decl., Ex. A, Ep. 8. At the end of each of the works, the "gate" to the alternate supernatural carbon copy dimension is closed, and the monsters cease their activities in the human dimension.

As alleged at length in the FAC, the two works share numerous additional elements, including plot devices (*e.g.*, upside down imagery, lightning and electrical aberrations that announce the presence of the monsters, seizures) and settings (*e.g.*, backyard sheds, sweat lodges, dark bluish tunnels), that are integral to *Totem* and also appear in *Stranger Things*. FAC, ¶¶ 144-163. Taken alone, each one could be considered coincidental. However, because there are so many of these elements that are common to both projects, when taken together, it becomes tantamount to copying.

## III.   LEGAL STANDARD

### A. Rule 12(b)(6).

Pursuant to Federal Rule of Civil Procedure 12(b)(6), "[d]ismissal may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory". *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1988). The court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir.1987). "[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.,* 572 F.3d 962, 969 (9th Cir.2009).

### B. Copyright Infringement.

To withstand a motion to dismiss a copyright infringement claim under Rule 12(b)(6) a plaintiff must plausibly allege two things: (1) that it owns a valid copyright; and (2) that the defendants copied protected aspects of the plaintiff's work. *Rentmeester, supra*, 883 F.3d at 1116-17. Defendants do not challenge the first element.  The second element has two distinct components: "copying" and "unlawful appropriation". *Id.*

5

"Copying may be established by showing that the infringer had access to plaintiff's copyrighted work and that the works at issue are substantially similar in their protected elements." *Cavalier v. Random House*, 297 F.3d 815, 822 (9th Cir. 2002). "To prove unlawful appropriation … the similarities between the two works must be substantial and they must involve protected elements of the plaintiff's work". *Id.*

"[W]hether works are substantially similar involves a two-part analysis consisting of the extrinsic test and the intrinsic test." *Rentmeester*, *supra*, at 1118. "Only the extrinsic test's application may be decided … on a motion to dismiss". *Id.* Under the extrinsic test, the court looks to specific, "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events". *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994). Substantial similarity is not required as to all of these categories. *Shaw v. Lindheim* (hereafter, "*Shaw*"), 919 F.2d 1353, 1357-61 (9th Cir. 1990), *overruled in part*, 952 F.3d 1051 [genuine issues of material fact existed as to plot, dialogue, and some but not all characters].[2] In applying the extrinsic test, courts are guided by the following legal principles, which Defendants largely ignore in their moving papers:

## 1. Dismissal of Infringement Claims Involving Literary Property At The Pleading State Is "Highly Disfavored".

Although dismissal of infringement claims at the pleading stage is not *per se* prohibited, such a ruling is frowned on, particularly in cases involving literary works. *See Zindel*, *supra*, 815 Fed.Appx. at 159 ["[D]ismissal of a complaint for lack of substantial similarity before any discovery is virtually unheard of."]. The Ninth Circuit has "long held that '[s]ummary judgment is 'not highly favored' on questions of substantial similarity'" and that "[c]ourts must be just as cautious before dismissing a

---

[2] *See also Fleener v. Trinity Broadcast Network*, 2013 F.Supp.2d 1142, 1150 (C.D. Cal. 2001) ["overlap of important plot developments combined with thematic and setting similarities" precluded summary judgment]; *Cabell v. Zorro Prods. Inc.*, 2017 WL 2335597 at *8 (N.D. Cal. May 30, 2017) [denying 12(b)(6) motion; plaintiff alleged sufficient facts regarding only four extrinsic elements to support infringement].

1    case for lack of substantial similarity on a motion to dismiss." *Id*.

2         Where, as here, a court is being asked to evaluate substantial similarity between

3    two literary works, it is critical the court has the benefit of expert analysis of the works'

4    extrinsic elements. *Alfred*, *supra*, 821 Fed.Appx. at 729 ["expert testimony would aid

5    in determining whether the similarities Plaintiffs identify are qualitatively different"];

6    *Zindel, supra*, at 160 ["[A]dditional evidence, including expert testimony, would aid in

7    the objective literary analysis needed to determine the extent and qualitative importance

8    of the similarities that Zindel identified in the works' expressive elements, particularly

9    the plausibly alleged shared plot sequences."]; *Shaw*, *supra*, 919 F.2d at 1357-58

10   ["expert's analysis reveals substantial similarities" and "illustrates how the plots …

11   share a common sequence and rhythm" precluding summary judgment].

### 2.  The Ninth Circuit's "Selection or Arrangement" Standard.

12

13        Defendants largely ignore the rule that the original "selection or arrangement" of

14   allegedly unprotected elements itself supports substantial similarity. 4 *Nimmer on*

15   *Copyright*, § 3.04 at 3:24-32; *Metcalf*, *supra,* 294 F.3d at 1073-74 ("The particular

16   sequence in which an author strings together a significant number of unprotectable

17   elements can [satisfy the extrinsic test]."]. More specifically, "if those elements be

18   numerous enough and their selection and arrangement original enough that their

19   combination constitutes an original work of authorship". *Metcalf*, *supra*, 294 F.3d at

20   1074 ["However, the presence of so many generic similarities and the common patterns

21   in which they arise do help the Metcalfs satisfy the extrinsic test."]; *Satava v. Lowry*,

22   323 F.3d 805, 811 (9th Cir. 2003) ["a combination of unprotectable elements may

23   qualify for copyright protection"]; *Three Boys Music Corporation v. Michael Bolton,*

24   212 F.3d 477, 485 (9th Cir. 2000) ["selection and arrangement" of unprotected elements

25   supported substantial similarity]*; Shaw*, *supra*, 919 F.2d at 1356.

### 3.  Dissimilarities and/or Elements Added By a Defendant Are Immaterial.

26

27

28   The Court should not consider elements that a defendant has added or changed,

7

but must focus on the works' shared elements:

> It is entirely immaterial that, in many respects, plaintiff's and defendant's works are dissimilar, if in other respects, similarity as to a substantial element of plaintiff's work can be shown. … [T]he defendant will not be immunized from liability by reason of the addition in his work of different characters or additional and varied incident, nor generally by reason of his work proving more attractive or saleable than the plaintiff's.

4 *Nimmer on Copyright*, 13.03 at 13:67-68. "Even if the copied portion is relatively small in comparison with the rest of the work, if the copied portion is qualitatively important, then the finder of fact may find substantial similarity". *Shaw, supra*, 919 F.2d at 1363; *Swirsky v. Carey*, 376 F.3d 841, 852 (9th Cir. 2004). This point is particularly pertinent here, where Defendants argue that the "alternative formulation of the substantial similarity test is unavailable because [the works] **do not share *many* similarities**, protectable or not". Memo. P&As at 23:6-8. However, the holdings in *Shaw* and *Swirsky* counsel that **it is the *quality* of the shared elements and not the quantity**. Defendants' argument "ignores the fundamental notion that no bright line rule exists as to what quantum of similarity is permitted before crossing into the realm of substantial similarity". *Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir. 1987).

### 4. <u>Dismissal at the Pleading Stage Is Only Appropriate Where No Reasonable Juror Could Find Substantial Similarity.</u>

Courts must not impose their own subjective judgment in evaluating works, and may dismiss only if "no reasonable jury could find that the works are substantially similar using the objective criteria of the extrinsic test". *Alfred*, *supra*, 821 Fed.Appx. at 729; *Shaw*, *supra*, 919 F.2d at 1357. The question on a 12(b)(6) motion is not whether a court finds no substantial similarity but instead whether there is enough to demonstrate that a reasonable jury could so find. *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1329 n.5 (9th Cir. 1983).

## IV. <u>LEGAL ARGUMENT</u>

In urging dismissal at the pleading stage, Defendants largely ignore the well plead allegations in the FAC and the legal principles that govern early dismissal of

8

infringement claims involving literary works.

### A. Defendants' Concession Of Access For Purposes Of The Instant Motion Strengthens Plaintiff's Substantial Similarity Argument.

Defendants do not challenge—and thus concede—access to Plaintiff's copyrighted scripts. This is not surprising given the obvious access Defendants had via their relationship with Defendant Aaron Sims. Specifically, Sims had worked with Plaintiff for years (*i.e.*, 2009 to 2013) on the *Totem* project and was intimately familiar with the script and concept art. FAC, ¶¶ 44-58. Plaintiff provided Sims with copies of his copyrighted screenplays (including the 2013 script) and Sims was privy to—and in fact assisted with—the development of the concepts, ideas, and elements in the scripts. Sims ultimately was hired to create the art and the monsters for *Stranger Things* and it is no mere coincidence that *Stranger Things* borrows heavily from *Totem*. FAC, ¶¶ 53-58. Plaintiff's claims of substantial similarity are "strengthened considerably by [Defendants'] concession of access to [his] works". *Metcalf*, *supra*, 294 F.3d 1075.

### B. Plaintiff Has Sufficiently Alleged that *Totem* and *Stranger Things* Are Substantially Similar.

As defendants in infringement cases often do, Defendants inaccurately contend that Plaintiff "has cobbled together lists of claimed 'similarities'" and has "cherry-picked" "random elements" that are "disassociated from the extrinsic analysis".[3] Not so. Plaintiff has carefully articulated substantial similarities for characters, plot, sequence, themes, setting, mood/tone, pace, and dialogue. Defendants intentionally de-emphasize critical similarities between the two works, to mislead the Court concerning

---

[3] Defendants cite *Olson v. NBC*, 855 F.2d 1446 (9th Cir.1988) and *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984) to argue that Plaintiff's "lists" should be disregarded. In *Olsen*, however, the plaintiff's "list" **was not disregarded**; instead, the district court gave less weight to an expert's testimony because he only included a list of similarities and failed to identify any dissimilarities between the works. *See Olsen* at 1450. *Litchfield* is inapposite because the plaintiff in that case provided a list that "emphasize[d] random similarities scattered though the works"; here, Plaintiff has methodically articulated countless examples of shared elements, which are infused throughout the two works and drive and animate the characters, plot, sequence, themes, etc.

the substantial similarities that exist.

### 1. **Plot.**

Numerous comparable elements at the core of both projects create an extremely similar plot through-line between them. Stripping away the secondary characters and plot lines necessary to expand the *Stranger Things* series into multiple episodes and seasons, the core plots of both stories parallel each other.

***Totem* versus *Stranger Things* (Season 1)**: In *Totem*, Kimi, imbued with great spiritual powers, allows a totem to be removed from its watery tomb and planted in such a way that it opens a gateway between this dimension and an alternate dimension. This creates a gateway between the two dimensions, through which a powerful monster (Azrael) and its minions (Blackwolf Indians/Black Wolves) are released into this dimension to prey upon humans. FAC, Ex. 7 at 21-24, 35. Similarly, in *Stranger Things*, Eleven, imbued with great psionic powers (psychokinetic, telepathic, and remote viewing), ruptures the "veil" between this dimension and an alternate dimension. This creates a gateway between the two dimensions through which a powerful monster (Shadow Monster/Mind Flayer) and its minions (Demogorgons/Demo-Dogs) are released to prey upon humans. DG Decl., Ex. A, Ep. 1.

In *Totem,* Azrael abducts Autumn Chance from the tool shed in the Chances' back yard and imprisons her in the dark, alternate dimension, a reflected copy of the human dimension. FAC, Ex. 7 at 35, 115. Her disappearance motivates Jackson, her husband, to go on an obsessive quest to bring her back. FAC, Ex. 7 at 42-46. In *Stranger Things,* the Demogorgon abducts Will from the tool shed in the Byers' back yard and imprisons him in the dark, alternate dimension, a reflected copy of the human dimension. His disappearance motivates Joyce, his mother, to go on an obsessive quest to bring her son back. DG Decl., Ex. A, Ep. 1.

In *Totem,* acquaintances consider Jackson to be mentally unbalanced, including Nerowe, Jackson's doctor and his long-time friend. FAC, Ex. 7 at 42-46. Similarly, in *Stranger Things,* acquaintances consider Joyce to be mentally unbalanced, including

10

Hopper, the Chief of Police and Joyce's long-time friend. DG Decl., Ex. A, Ep. 4.

In *Totem,* Nerowe ultimately resolves his skepticism and becomes convinced that something strange regarding Autumn's seeming death is happening. Despite the funeral held for Autumn, Nerowe feels he must assist Jackson in his quest to find her. FAC, Ex. 7 at 75-79. Similarly, in *Stranger Things,* Hopper ultimately resolves his skepticism and becomes convinced that something strange regarding Will's seeming death is happening. Despite the funeral held for Will, Hopper feels he must assist Joyce in her quest to find him. DG Decl., Ex. A, Ep. 5.

In *Totem,* Jackson and Nerowe enlist Kimi and her protector, Thunderbear, to help them. Kimi is able to guide Jackson and Nerowe to Autumn in the carbon copy alternate dimension. FAC, Ex. 7 at 99-106. Similarly, in *Stranger Things,* Joyce and Hopper enlist Eleven and her protector, Mike Wheeler, to help them. Eleven is able to guide Joyce and Hopper to Will in the carbon copy alternate dimension. DG Decl. Ex. A, Eps. 7-8.

***<u>Totem</u>* **versus** *<u>Stranger Things</u>* **(<u>Season 2</u>)**: In *Stranger Things*, Season 2, the monster reboots itself. While in the screenplay *Totem*, the monster's defeat is the climax of the story, one can understand that, with *Stranger Things*, a series with the monster being the primary antagonist, the creators of *Stranger Things* must bring the monster back after its seeming defeat to extend the story. Because of the monster's attachment to Will, Joyce's and Hopper's quest continues into Season 2 in their effort to keep Will safe, without which there would be no series. Joyce remains the proactive protagonist as she pursues the answer to Will's distractions, seizures, and possession.[4] (DG Decl. Ex. B, Ep. 1.)

In both projects, the device of seizures is used to reveal the other-worldly danger that threatens the human race. In *Totem*, Jackson, the Protagonist archetype, is afflicted

---

[4] The kids/teens follow Joyce's lead with regard to the primary storyline. Otherwise, their stories are secondary and typical of the usual teen angst of romances, family issues, and social dilemmas, which are used to fill out the series' episodes.

with seizures which give him visions of the alternate dimension, carbon-copy world. FAC, Ex.7 at 3, 9, 16, 33, 46, 73, 102. In *Stranger Things*, this character trait of seizures and visions of evil is attributed to Will, as a motive for the Protagonist archetype, Joyce, to continue her quest. DG Decl. Ex. B, Eps. 1, 3-6. Because of the monster's relationship with Will in Season 1, a twist is created in the final sequence of Season 1 to allow the Shadow Monster to obtain control over Will and make him its "spy". DG Decl. Ex. A, Ep. 8. As it gains more influence over him, Will, like Jackson in *Totem,* has seizures that give him visions of the Shadow Monster's alternate-dimensional world. DG Decl. Ex. B, Eps. 1, 3-6.

In *Totem*, Jackson and Nerowe use Autumn's drawings from a dream to locate "a dark, bluish toned cavern" in the alternate dimension that leads to Azrael's "vast, cavernous, brimstone sanctuary." FAC, Ex. 7 at 110. Likewise, in *Stranger Things*, Season 2, Joyce Byers and friends use Will's drawings of his visions to locate a maze of dark bluish tunnels in the alternate dimension that lead to the Shadow Monster's central mind from which it controls its Demogorgon/Demo-Dog minions. DG Decl., Ex. B, Eps. 4-5.

In *Totem*, by using a sweat lodge, a cancer is chased from Nerowe's body which allows him to fully embrace Jackson's quest to free Autumn from Azrael. FAC, Ex. 7 at 83-85, 87. Jackson, Nerowe, and Kim evade the attacking army of Blackwolf Indians/Black Wolves and uproot the grounded totem, thereby closing the gateway to Azrael's alternate dimension, which ends the monster's threat to humanity. In *Stranger Things*, by using a makeshift sweat lodge, Joyce and friends are able to free Will from the Shadow Monster's possession by chasing it out of his body. Joyce Byers and friends evade the attacking army of Demogorgons/Demo-Dogs. Eleven closes the gate to the Upside Down, which ends the Shadow Monster's threat to humanity. DG Decl., Ex. B, Ep. 9.

**_Totem_ versus _Stranger Things_ (Season 3):** In *Stranger Things*, Season 3, the monster finds its way back into the human dimension. This time psychopathic Russians

replace the psychopathic scientists in Seasons 1 and 2. They reopen the gate to the dark, alternate dimension, and release the Shadow Monster/Mind Flayer. DG Decl. Ex. C, Ep. 1. Although there are new characters and new settings, the interplay between monster (Shadow Monster/Mind Flayer) and monster slayer (Eleven) is the same interplay between Azrael, the monster, and Kimi, the monster slayer in *Totem*.

In *Totem*, FBI Agent Sam Miller, a bully character, crashes his car in an industrial area. FAC, Ex. 7 at 49. Azrael then overwhelms Sam and forces him to do its bidding, the primary objective being to kill Kimi and her friends. FAC, Ex. 7 at 52. Sam helps Azrael capture and take possession of human souls in the earthly plane which are then called "Grims". Sam and Azrael pursue Kimi and her friends. FAC, Ex. 7 at 57-59.

In *Stranger Things,* Billy Hargrove, a bully character introduced in Season 2, crashes his car in an industrial area. DG Decl. Ex. C, Ep. 1. The Shadow Monster/Mind Flayer then overwhelms Billy and forces him to do its bidding, the primary objective being to kill Eleven and her friends. DG Decl. Ex. C, Ep. 2, 6. This becomes a driving plot point for Season 3. Billy helps the Shadow Monster/Mind Flayer capture and take possession of human souls in the earthly plane which are then called "The Flayed". DG Decl., Ex. C, Eps. 2-4

In *Totem,* Sam, Azrael, and minions pursue Jackson, Nerowe, and Kimi, ultimately arriving at a cave in the Valley of Death, where the final battle ensues. FAC, Ex. 7 at 97-98. Wounded, Kimi encourages Nerowe to rise up against Azrael. Nerowe destroys Azrael's totem as a result of Kimi's influence. Sam is killed in the final battle. FAC, Ex. 7 at 107. In *Stranger Things,* Billy and the Mind Flayer pursue Eleven and her friends, ultimately arriving at a mall where the final battle ensues. Wounded, Eleven encourages Billy to rise up against the Mind Flayer. Billy turns against the Mind Flayer due to Eleven's influence and then Joyce and Hopper close the gate which defeats the Shadow Monster/Mind Flayer. Billy is killed in the final battle. DG Decl., Ex. C, Ep. 8.

### 2. **Sequence.**

Notably, although Defendants include a section in their Motion entitled "Plot and

13

Sequence of Events" there is no discussion of sequence at all. Memo. P&As at 12:8-16:10. That said, a screenplay and a streaming series are different modalities of storytelling. Although the sequence of events in *Totem* occurs in a mere 119 pages of a screenplay, this same sequence in *Stranger Things*, interrupted by multiple secondary and tertiary characters, story lines, and false endings, takes three seasons to accomplish. When the secondary and tertiary storylines and characters are stripped away, both *Totem* and *Stranger Things* share the same core sequence of events:

   a.  Both Kimi in *Totem* and Eleven in *Stranger Things* are preteen girls, who are imbued with powers and cause a gateway to an alternate universe/dimension to open, *i.e.*, a rupture in the veil between the two worlds. FAC, Ex. 7 at 21-24, 35; DG Decl., Ex. A, Ep.1.

   b.  When the gateways are opened, a powerful monster—Azrael in *Totem* and Shadow Monster/Mind Flayer in *Stranger Things*—and its minions, Blackwolf Indians/Black Wolves and Demogorgons/Demo-Dogs, respectively, are released into this dimension to prey upon humans. FAC, Ex. 7 at 21-24, 35; DG Decl., Ex. A, Ep. 1.

   c.  The monster abducts someone from a shed in the back yard[5]—Autumn in *Totem* and Will in *Stranger Things*—and carries them into the alternate carbon-copy dimension, which motivates the protagonist (and close family members of the abducted characters), Jackson in *Totem* and Joyce Byers in *Stranger Things*, to go on an obsessive quest to bring their loved one back. FAC, Ex. 7 at 35, 115; DG Decl., Ex. A, Ep. 1.

   d.  After overcoming the stigma of alleged mental disorder, the protagonist—Jackson in *Totem* and Joyce Byers in *Stranger Things*—enlists an ally, William Nerowe in *Totem* and Jim Hopper in *Stranger Things*, who is initially skeptical and does not believe that Autumn/Will is alive, but begins to believe them and then joins their quest to find and save their loved one. FAC, Ex. 7 at 75-79; DG Decl., Ex. A, Ep. 5.

   e.  The monster conspires to destroy the young girl—Kimi in *Totem* and Eleven

---

[5] Curiously, Defendants suggest that "Will is abducted while riding his bike home near his friend's house". Memo P&As at 16 n.4. This is not accurate. Like Autumn in *Totem*, Will is abducted from a backyard tool shed. DG Decl., Ex. A, Ep. 1.

in *Stranger Things*—to keep the gateway between the two dimensions open. FAC, Ex.7 at 52; DG Decl. Ex. C, Eps. 2, 6.

f.   The monster is assisted by a human they enslave after a car accident at an industrial site—Agent Sam Miller in *Totem* and Billy Hargrove in *Stranger Things*—and the enslaved human is ultimately destroyed. FAC, Ex. 7 at 49; DG Decl., Ex. C, Ep. 1.

g.   The gateway is closed with the ally's assistance. In *Totem*, this is accomplished by Nerowe and Kimi. FAC, Ex. 7 at 107. In *Stranger Things*, Season 2, this is accomplished by Hopper and Eleven and in *Stranger Things*, Season 3, this is accomplished by Hopper and Joyce. DG Decl., Ex. B, Ep. 9 & Ex. C, Ep. 8

h.   In both projects, as a result of the closed gateway, the monster ceases its activities in the human world.

### 3.   <u>Characters</u>

As an initial matter, Defendants ignore the importance of examining character tendencies and behaviors, which can be represented by different archetypal functions (*e.g.*, protagonist, antagonist, ally, mentor, conscience character, tempter character, skeptic, shapeshifter, love interest, child archetype). These archetypes can change from character to character and allow for a rebooting of the same story over and over again, which is precisely what Defendants have done from season to season in *Stranger Things*. FAC, ¶¶ 70-71.

Importantly, differences in character traits do not preclude a finding of substantial similarity.[6] *See DC Comics v. Towle*, 802 F.3d 1012, 1025 (9th Cir. 2015) [rejecting argument that substantial similarity not shown because film "[film] versions of the [character] look substantially different]; *Sid & Marty Krofft Television Prods.*, 562 F.2d 1157, 1166-67 (9th Cir. 1977) [infringers do not avoid liability by inserting different "features and mannerisms" among characters]; *Danjaq, LLC v. Universal City Studios,*

---

[6] In addition, not all characters between the two works at issue have to be duplicated, and the addition or subtraction of characters "is not of major significance when considering both stories in their entirety". *See Shaw*, *supra*, 919 F.2d at 1358.

1    *LLC*, 2014 WL 7882071 at *3-4 (C.D. Cal. Oct. 2, 2014) [dismissal not warranted

2    despite "many differences between [main] characters"].

3                          **Jackson Chance / Joyce Byers**

4            Jackson Chance is the protagonist (story driver) of the screenplay *Totem*. He

5    initiates and sustains an obsessive search for his wife, Autumn, in the face of great

6    resistance from everyone around him. FAC, Ex. 7 at 42-46. He is considered borderline

7    psychotic and is treated as such by medical professionals, authorities, and friends. FAC,

8    Ex. 7 at 42-46, 59. Jackson also experiences resistance from FBI Agent Sam Miller who

9    has something to hide about his relationship with Autumn. Jackson's quest to find

10   Autumn is fueled by his unconditional spousal love for her. FAC, Ex. 7 at 59-60.

11           Joyce Byers is the protagonist (story driver) of *Stranger Things*. She initiates and

12   sustains an obsessive search for her son, Will, in the face of great resistance from

13   everyone around her. DG Decl., Ex. A, Ep. 1. She is considered borderline psychotic

14   and is treated as such by friends, family, and acquaintances. Joyce also experiences

15   resistance from Dr. Brenner and his subordinates, who would rather keep the existence

16   of the Upside Down a secret. Joyce's quest to find Will is fueled by her unconditional

17   motherly love for him. DG Decl., Ex. A, Eps. 4-5.

18           In a desperate attempt to distinguish the two works, Defendants suggest that

19   Joyce Byer is not a protagonist in *Stranger Things*, and that instead, the "primary

20   protagonists are four nerdy twelve-year old boys who like to play Dungeons &

21   Dragons".[7] Memo P&As at 16:22-24. Defendants also minimize Joyce's role by simply

22   leaving her out of their lengthy description of *Stranger Things*. *See, e.g.*, *id.* at 4:9-7:25.

23   The two main characters of the primary plot line in *Stranger Things* are Joyce Byers

24   and Jim Hopper, both adults, and Defendants cannot escape the obvious conclusion that

25

26   ───────────────
     [7] Similarly, Defendants argue "most of the main characters are children". *See id.* at 16:21-17:15. But

27   this argument ignores the primacy of Joyce Byers and Jim Hopper as plot drivers and is based on a
     comparison of secondary and tertiary characters who happen to be children, *e.g.*, Jonathan, Robin,

28   Mike, Dustin, and Lucas.

she is the protagonist and primary driver of the story.

**Dr. William Nerowe / Jim Hopper**

In *Totem*, Dr. William Nerowe is a long-time friend of Jackson's and is also his doctor. When Jackson insists to Nerowe that Autumn is still alive, Nerowe grows concerned for Jackson's mental stability. FAC, Ex. 7 at 44-45. Despite a funeral for Autumn, Nerowe becomes convinced she is alive and in danger. FAC, Ex. 7 at 38, 75-79. Nerowe joins Jackson in his quest even though they experience resistance from FBI Agent Sam Miller who has something to hide. FAC, Ex. 7 at 38, 75-79. Nerowe has been diagnosed as having terminal cancer. FAC, Ex. 7 at 71. In the process of assisting Jackson on his improbable quest, Nerowe saves himself from his own cancer and other afflictions. FAC, Ex. 7 at 83-85, 87.

In *Stranger Things*, Hopper is a long-time friend of Joyce's and also the Chief of Police of Hawkins, Indiana. When Joyce insists to Hopper that her son Will is still alive, Hopper grows concerned for Joyce's mental stability. DG Decl., Ex. A, Ep. 4. Despite a funeral for Will, Hopper becomes convinced that he is alive and in danger. DG Decl., Ex. A, Ep. 5. Hopper joins Joyce in her quest to find Will even though they experience resistance from Federal Authorities who have something to hide. Hopper has been diagnosed as clinically depressed as a result of having lost his only child to cancer. In the process of assisting Joyce on her improbable quest, Hopper resolves his depression and addictive behavior. DG Decl., Ex. A, Eps. 4-5.

**Autumn Chance / Will Byers**

In *Totem*, Autumn Chance has schizophrenia and was physically and emotionally abused as a child by the caretakers at Evergreen Orphanage. FAC, Ex. 7 at 32, 62. She believes in the power of dream catchers to protect her and assist her communication with the Great Spirit in the alternate supernatural carbon copy dimension. FAC, Ex. 7 at p. 11. She is an artist and draws her visions and dreams. FAC, Ex. 7 at 43-44. When she is considered dead, a funeral is held for her. FAC, Ex. 7 at 38. She is the motive for Jackson's quest to find and reunite with her at all cost. FAC, Ex. 7 at 42-46. In *Stranger*

17

*Things*, Will Byers was emotionally abused by his father. He is an artist and draws his visions and dreams. DG Decl., Ex. A, Eps. 4-6. He disappears and is considered dead. A funeral is held for him. He is the motive for Joyce's quest to find and reunite with him at all cost. DG Decl., Ex. A, Ep. 1.

### Kimi / Eleven

In *Totem*, Kimi is a young girl with an old soul who functions well beyond her age. She has great spiritual power and is revered by those around her. FAC, Ex. 7 at 14, 115. She is responsible for the creation of a gateway that allows Azrael, a demon entity, to enter this world. FAC, Ex. 7 at 22-23, 35, 54. Her death would result in allowing Azrael to destroy humankind. She is wounded during the climax but convinces Nerowe that only he can destroy Azrael, which he does. FAC, Ex. 7 at 107.

In *Stranger Things*, Eleven is a young girl with an old soul who functions well beyond her age. She has great psionic powers (psychokinetic, telepathic, and remote viewing). She is revered by the group of kids around her. She is responsible for opening the 'Gate' that allows the Demogorgon/Shadow Monster/Mind Flayer to enter this world. DG Decl., Ex. A, Ep. 1. Her death would result in allowing the Shadow Monster/Mind Flayer to destroy humankind. In Season 3, she is wounded near the climax, but convinces Billy to stand against the Shadow Monster/Mind Flayer which gives Joyce and Hopper time to close the gate and again defeat the Shadow Monster/Mind Flayer. DG Decl., Ex. C, Ep. 8.

### Thunderbear / Mike Wheeler

Defendants argue that *Stranger Things* character Mike Wheeler has nothing in common with the *Totem* character Thunderbear because they are different ages and, whereas "Thunderbear provides guidance and advice to *Totem*'s main characters, Mike is an awkward teenager smitten with a girl". This ignores critical similarities between the two characters. First, Thunderbear is the unofficial chief of the Lynx tribe and is willing to sacrifice himself to save Kimi from harm. Similarly, Mike Wheeler is the unofficial leader of his group of friends, becomes Eleven's protector, and puts himself

18

in harm's way to save Eleven from danger. FAC, Ex. 7 at 19, 51, 93; DG Decl., Ex. A, Ep. 1 and Ex. C, Ep. 7. Second, Mike provides guidance and advice to Eleven, while protecting her from the "bad people" who pursue her.

### Azrael / Shadow Monster-Mind Flayer

In *Totem*, Azrael is an evil figure that is released from the carbon-copy alternate dimension as a result of a totem gift shared by Kimi. Azrael's goal is to enslave humanity. FAC, Ex. 7 at 21-24, 35. He does that by directing his Blackwolf Indian minions to kill humans and he imprisons their souls in a cloak of purple feathers thereby trapping them in a limbo and turning them into Grims. FAC, Ex. 7 at 44, 52, 54, 88, 92. He must kill Kimi, the Eternal Light of creation and the only one that can defeat him, in order to fulfill this quest. FAC, Ex. 7 at 53.

In *Stranger Things*, the Shadow Monster/Mind Flayer is an evil figure that is released from the carbon-copy alternate dimension as a result of a burst of energy from Eleven that ruptures the "veil" between the two dimensions. DG Decl., Ex. A, Ep. 1. The Shadow Monster's goal is to enslave humanity. In Seasons 1 and 2, it does that by directing its Demogorgon minions to abduct or consume humans and take them to the alternate dimension. In Season 3, it absorbs their bodies, which become part of its hive mind. DG Decl., Ex. C, Ep. 4. It must kill Eleven, the only one with power greater than its power, to fulfill its quest. DG Decl., Ex. C, Ep. 6.

### 4. Theme.

Defendants state that the "primary themes of *Totem* are overcoming the grief of a loved one dying and the fight between good and evil in the Native American spirit world" whereas "[t]he primary theme of *Stranger Things* is friendship and romance between teenagers working together to defeat monsters". Memo. P&As at 20:2-5. This is a drastic oversimplification of the many themes shared by the works and ignores the common story elements and characters that help animate and drive these themes.

Rather than address the well-plead allegations in the FAC regarding themes (FAC, ¶¶ 94-110), Defendants instead argue, in conclusory fashion, that the themes

identified by Plaintiff are "stock" and "not depicted in a substantially similar manner". Memo. P&As at 20:6-16. Defendants also ignore Plaintiff's allegations regarding the personal thematic arcs shared by the characters in the two works, as well as their use of the "steadfast protagonist". FAC, ¶¶ 96-110. Defendants' failure to engage in any meaningful analysis regarding themes should be viewed as a concession that the themes shared by the two works are in fact substantially similar.

### 5. Dialogue.

As with theme, Defendants' arguments concerning dialogue are conclusory and fail to address the numerous similarities identified in the FAC. Although cases in this District generically refer to "the type of extended similarity of dialogue needed to support a claim of substantial similarity" (*Olsen v. National Broadcasting Co.*, 855 F.2d 1446, 1450 (9th Cir.1988)), the meaning of this expression is far from clear, although there are no cases that suggest that dialogue must be verbatim for there to be substantial similarity.

The similarities in dialogue between *Totem* and *Stranger Things* are in part the product of the similarities between other extrinsic elements, including plot, theme, and characters. For example, because the protagonists (Jackson and Joyce) are on extremely similar quests to rescue loved ones who have been abducted by a supernatural monster, they also share similar impulses and intents, which results in similar dialogue. Because the stories are fundamentally similar at their foundation, there are similarities found in their dialogue that affect the core of the stories themselves.

Plaintiff has identified numerous side-by-side examples of dialogue in the two works that share numerous, articulable similarities. *See* FAC, ¶¶ 136-143. Defendants fail to meaningfully address any of these examples. In addition to this list, and in response to Defendants' arguments, Plaintiff has prepared a far more extensive list of similarities in dialogue, which is attached as Exhibit "3" to the Kennedy Declaration. If needed, Plaintiff could amend to supplement its allegations regarding dialogue.

/ / /

### 6. **Mood, Tone, and Pace.**

Defendant describes the mood for *Totem* as dark and serious throughout and *Stranger Things* as "quirky and lighthearted, following the adventures of innocent, fun-loving teenagers". Memo. P&As at 21:4-8. Neither description is accurate. Both works would be categorized as supernatural horror. They each start with pleasant life in rural America, which is interrupted when a main character is abducted by the respective monsters from the alternate plane. This alternate dimension is a dark foreboding carbon copy of the reality where the protagonist exists.

Each work reflects an air of family cohesion that devolves into anxiety, desperation, and tension as a result of the abductions. The pace of each story accelerates when the abductions take place and the distress increases when the relative protagonists are not believed. Throughout both stories, the horror, the action, and the violence escalate in parallel fashion as the respective protagonists pursue their loved one. This escalation is complemented by the growing physical darkness of scenes and sequences.

In both works, there is an alternate dimension that is a dark, bluish-tinted, and foreboding carbon copy of the reality where the protagonist exists. The monsters in both stories escape from the dark, reflective alternate dimension and create chaos and havoc in the human realm. In *Totem*, descriptions of darkness often signal things to come. *See* FAC, ¶ 126 & Ex. 7 at 5, 16, 23. In *Stranger Things*, the growing darkness is manufactured technically and with a growing number of scenes shot at night. The monster (Demogorgon) appears mostly when it is dark outside.

### 7. **Setting**

The homes of the protagonists in both stories, Jackson Chance in *Totem* and Joyce Byers in *Stranger Things*, are set in nearly identical locations. They both live in small towns and reside in humble houses, which have large yards and are surrounded by forests. Both have a shed in the back yard in the midst of overgrown vegetation that can be seen from the kitchen window, which become the nexus for abduction into the alternative dimension.

In both stories there is an industrial-corporate setting on or near the outskirts of town where dramatic scenes take place. In *Totem*, the Psychiatric Hospital is the setting that establishes Jackson's seizures, his breakout, and his escape from Sam and other Federal Agents, the Blackwolf Indians/Black Wolves, and Azrael. In *Stranger Things*, Hawkins National Laboratory is the setting where the Demogorgons/Demo-Dogs and Shadow Monster/Mind Flayer escape from the alternate dimension and from where Joyce, Hopper, Mike, and Will escape the attacking Demogorgons/Demo-Dogs.

In *Totem*, there is a dark, blue-tinted cave that leads to caverns and tunnels that are an opening to the alternate dimension and to Azrael and his minions. In *Stranger Things*, there exists a vast maze of dark, blue-tinted tunnels that are an opening to the Upside Down and to the Shadow Monster/Mind Flayer and its minions.

Defendants' use of so many similar settings is no mere coincidence. Afterall, the small town in *Stranger Things* could have been in the middle of a desert, or next to a beach, but Defendants chose to place it in a small town, surrounded by forests, just like in *Totem*. Defendants could have chosen to have Will Byers abducted from his bathroom, bedroom, or any other place, but they chose a tool shed just like in *Totem*.

### 8. Additional Shared Elements.

Plaintiff identified numerous additional elements that appear in both works, including similar plot devices, settings, and other integral elements. FAC, ¶¶ 144-163. Defendants simply ignore these additional elements in their moving papers.

### C. Plaintiff Satisfies The "Selection And Arrangement" Test.

Defendants repeatedly argue that the elements identified by Plaintiff are unprotectable because they are "generic", "generalized", or overly "broad". Plaintiff obviously disagrees, but even assuming some or all of the shared elements are unprotectable, the Court still should deny the instant Motion because, as demonstrated above, the selection and arrangement of elements concerning plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in both works is "more than de minimis"; this fact, by itself, satisfies the extrinsic test. *Alfred, supra*, at 729.

22

*Shaw* is instructive. There, the two works at issue were a pilot script for a television series and a television series treatment. Although there were differences between the two works, and many of the similarities included unprotectable elements, the Ninth Circuit reversed a grant of summary judgment on the grounds that the pattern, rhythm, and sequence were substantially similar. The Court noted that "[e]ven if none of these [common] plot elements is remarkably unusual in and of itself, the fact that both [works] contain all of these similar events gives rise to a triable question of substantial similarity of protected expression." *Shaw*, *supra*, at 1363.

Similarly, in *Metcalf*, despite the fact that the similarities between the two works arose from scenes-a-faire, "the presence of so many generic similarities and the common patterns in which they arise […] help[ed] the [plaintiffs] satisfy the extrinsic test." *Metcalf*, *supra*, 294 F.3d at 1074. The Ninth Circuit explained that "[t]he particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element." *Id.* Notably, *Metcalf* also dealt with a screenplay that was copied and turned into a longer television series. *See id.*

### D. **Defendants Cite To Numerous Cases That Are Inapposite.**

Defendants cite various cases—decided on summary judgment, with the aid of discovery and expert analysis—that do not support their position. In *Althouse v. Warner Bros. Entm't, Inc.*, the holding was not that the plaintiff's work was too general to be protectable, but instead, that the two stories **only shared one plot similarity**, *i.e.*, "both stories portray a protagonist attempting to prevent a dominant group from oppressing and annihilating a subservient group." 2014 WL 2986939, at *3 (C.D. Cal. Apr. 28, 2014). Here, Plaintiff has alleged page after page of plot similarities. FAC, ¶¶ 72-92.

*Basile v. Warner Bros. Entm't, Inc.* is inapposite. There, the Court found that many of the alleged similarities identified by Plaintiff simply did not exist. Here, the similarities Plaintiff has alleged in the FAC are in fact present in both works, and Defendants have failed to establish otherwise. 2016 WL 5867432, (C.D. Cal. Jan. 4, 2016), *aff'd*, 678 Fed.Appx. 604 (9th Cir. 2017).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS

*Benay v. Warner Bros. Entm't, Inc.* —decided on summary judgment and after consideration of expert testimony—does not help Defendants. The Ninth Circuit ruled that because "both works are based on the same historical events" and the similarities flowed from these events, the premise they shared "contain[ed] unprotectable elements". 607 F.3d 620, 626 (9th Cir. 2010). Because historical events are not copyrightable, the *Benay* court had no trouble finding insufficient evidence of substantial similarity. Here, *Totem* is based on its author's own life experience, not historical events.

### E. Dismissal Of Plaintiff's Claims Regarding Its Copyrighted Artwork Is Not Appropriate At The Pleading Stage.

When applying the extrinsic test to artwork, "a court looks to the similarity of the objective details in appearance". *Cavalier v. Random House*, 297 F.3d 815, 825–26 (9th Cir. 2002). Among other things, courts consider "the subject matter, shapes, colors, materials, and arrangement of the representations" when determining objective similarity in appearance". *Id.* Here, a comparison of Plaintiff's copyrighted artwork and the artwork in *Stranger Things* reveals obvious objective similarities:

- The copyrighted artwork of the blue tunnels in the carbon copy plane in *Totem*, reveal dark, rocky tunnels. Page 8 of the FAC-E.9 shows how Defendants copied the same blue, dark, and rocky tunnels in the carbon copy of *Stranger Things*.

- Autumn Chance standing in her house with dark lighting looking at the backyard from where she will soon be abducted. Page 4 of FAC-E.9 reveals the copied image in *Stranger Things* when Will Byers is standing in his house looking out at the backyard.

- The copyrighted imagery of Azrael's sanctuary shows a large cavern with light coming through. The rocks have a dark orange-reddish hue where the light hits them. Similarly, Pages 11-12 of FAC-E.9 include shots from *Stranger Things*, revealing a similar rocky cavern where there is light coming through, with the rocks we can see having the same dark orange-reddish hue as Azrael's sanctuary in *Totem*.

24

- The copyrighted still photo of Azrael reveals him to be standing in the dark woods, tall, and lanky.  On Page 17 of the FAC-E.9, a Demogorgon is shown standing the woods also looking tall and lanky. A striking similarity between Azrael and the Demogorgon is the manner in which their mouths open revealing the inside of their mouths.  (FAC-E.9 at 19-20)

- An illustration of Azrael different from how the monster is depicted in the live-action demo shows a figure with lengthy appendages, towering over hills, lightning running through it, with reddish hues.  (FAC-E.10 at 11-12.)  The shot of the Shadow Monster/Mind Flayer also depicts a towering monster with lengthy appendages surrounded by lightning and reddish hues.

Analyzing the objective elements of Plaintiff's copyrighted artwork, it is evident that Defendants' conclusory arguments regarding substantial similarity must fail.

### F. <u>Leave To Amend Should Be Granted.</u>

Plaintiff has demonstrated that *Totem* and *Stranger Things* share numerous substantial similarities between protectable elements. At a bare minimum, the two works share so many elements, protectable and otherwise, that the court should conclude that Plaintiff has satisfied the "selection and arrangement" standard. That said, if the Court is inclined the grant the Motion, Plaintiff should have an opportunity to amend the First Amended Complaint based on the additional similarities identified in the exhibits attached to the concurrently-filed Declaration of Jeffrey Kennedy.

### V.   <u>CONCLUSION</u>

Plaintiff respectfully requests that the Court deny the instant Motion. However, if the Court is inclined to grant the instant Motion, Plaintiff requests an opportunity to amend the First Amended Complaint to address any deficiencies identified by the Court.

Dated: December 29, 2020              BOREN, OSHER & LUFTMAN LLP


                                      By: /s/ Jeremy J. Osher
                                      Jeremy J. Osher
                                      Attorneys for Plaintiff
                                      IRISH ROVER ENTERTAINMENT, LLC