1  DAVID GROSSMAN (SBN 211326)
   dgrossman@loeb.com
2  SAFIA GRAY HUSSAIN (SBN 251123)
   sghussain@loeb.com
3  LOEB & LOEB LLP
   10100 Santa Monica Blvd., Suite 2200
4  Los Angeles, CA  90067
   Telephone: 310.282.2000
5  Facsimile: 310.282.2200

6  Attorneys for Defendants
   AARON SIMS; MATT DUFFER; ROSS
7  DUFFER; NETFLIX, INC.; NETFLIX
   STREAMING SERVICES, INC.; and
8  21 LAPS, INC.

9

10                UNITED STATES DISTRICT COURT

11               CENTRAL DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| 13  IRISH ROVER ENTERTAINMENT, LLC, a California limited liability company,<br><br>15          Plaintiff,<br><br>16       v.<br><br>17  AARON SIMS, an individual; MATT DUFFER, an individual; ROSS DUFFER, an individual; NETFLIX, INC., a Delaware corporation; NETFLIX STREAMING SERVICES, INC., a Delaware corporation; 21 LAPS, INC., a California corporation; and DOES 1 through 50, inclusive,<br><br>21          Defendants. | Case No.: 2:20-cv-06293-CBM-PLA<br><br>**DISCOVERY MATTER**<br><br>**DECLARATION OF SAFIA GRAY HUSSAIN IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL FURTHER RESPONSE TO REQUESTS FOR PRODUCTION**<br><br>Date:      July 20, 2022<br>Time:      10:00 a.m.<br>Judge:    Hon. Paul L. Abrams<br>Courtroom:    780<br><br>First Amended Complaint Filed: October 12, 2020<br><br>Discovery Cutoff:  August 25, 2022<br>Pre-Trial Conference:  March 7, 2023<br>Jury Trial:  April 4, 2023 |

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

## DECLARATION OF SAFIA GRAY HUSSAIN

I, Safia Gray Hussain, do hereby declare and state:

1.      I am an attorney licensed to practice in the State of California, including before this Court. I am a Partner with Loeb & Loeb LLP, counsel of record for Defendants Netflix, Inc. ("Netflix"), Netflix Streaming Services, Inc., 21 Laps, Aaron Sims ("Sims"), Matt Duffer and Ross Duffer (collectively, "Defendants"). I make this declaration in support of Defendants' Opposition to Plaintiff Irish Rover Entertainment, LLC's ("Plaintiff") Motion to Compel Further Responses to (1) Request for Production No. 28 from Defendant Netflix, Inc.; and (2) Request for Production Nos. 5 and 7 from Aaron Sims (the "Motion"). I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2.      Attached hereto as **Exhibit "A"** is a true and correct copy of Plaintiff's First Amended Complaint (the "FAC"), filed in this case on October 12, 2020 [Dkt. No. 10]. To reduce the amount of paper filed with the Court, Defendants have omitted the exhibits to the FAC, but will provide them to the Court upon request.

3.      Attached hereto as **Exhibit "B"** is a true and correct copy of the Court's January 21, 2021 Order re: Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Fed. R. Civ. Proc. 12(b)(6) [Dkt. No. 40].

4.      Attached hereto as **Exhibit "C"** is a true and correct copy of the cover page of a *Totem* screenplay produced by Plaintiff in this matter, Bates-stamped IRISH 00527. Defendants have included only the cover page of the screenplay, which totals more than one hundred pages in length (Bates-stamped IRISH 00527 to IRISH 00637), in order to reduce the amount of paper filed with the Court, but will provide a complete copy of the document upon the Court's request.

5.      On April 19, 2022, I sent an email to Jeremy Osher, counsel for Plaintiff, regarding, among other things, Plaintiff's claim that a "virus" resulted in the deletion of its pre-2014 emails, requesting "additional details regarding the nature of the

claimed virus and plaintiff's (and [its principal, Jeffrey] Kennedy's) efforts to recover, maintain and collect emails for purposes of this litigation." Mr. Osher responded to that request by email dated May 11, 2022. True and correct copies of my April 19, 2022 email to Mr. Osher, and Mr. Osher's May 11, 2022 email response to me, are attached hereto as **Exhibit "D"**. To reduce the amount of paper filed with the Court, Defendants have not included the attachment to Mr. Osher's May 11, 2022 email but will provide it to the Court upon request.

6.     Attached hereto as **Exhibit "E"** is a true and correct copy of Plaintiff Irish Rover Entertainment, LLC's Responses to Defendant Netflix, Inc.'s Interrogatories (Set One), served in this case on July 30, 2021.

7.     On July 8, 2021, Plaintiff served on Netflix, *inter alia*, its Requests for Production, Set One. Also on July 8, 2021, Plaintiff served on Sims, *inter alia*, its Requests for Production, Set One.

8.     Attached hereto as **Exhibit "F"** is a true and correct copy of Plaintiff's Requests for Production (Set One) to Defendant Netflix Streaming Services, Inc., served in this case on July 8, 2021.

9.     Attached hereto as **Exhibit "G"** is a true and correct copy of Plaintiff's Requests for Production (Set One) to Defendant Ross Duffer, served in this case on July 8, 2021.

10.     Attached hereto as **Exhibit "H"** is a true and correct copy of Plaintiff's Requests for Production (Set One) to Defendant Matt Duffer, served in this case on July 8, 2021.

11.     On August 31, 2021, my partner, David Grossman, sent Jeremy Osher, counsel for Plaintiff, a draft protective order based on the Central District of California's model stipulated protective order. Counsel for the parties continued to negotiate and make revisions to that draft protective order until September 15, 2021, when it was filed with the Court by counsel for Defendants. The Court entered the parties' stipulated protective order on the same day.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

22366502.1
231804-10002

2

DECLARATION OF SAFIA GRAY HUSSAIN IN
OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

12.     Netflix and Sims timely served their respective Responses to Plaintiff's Requests for Production, Set One, on September 3, 2021.

13.     On September 30, 2021, pursuant to and under the auspices of the stipulated protective order entered by the Court, Defendants made their initial production of documents. That production consisted of 4,997 documents comprising approximately 53,778 pages.

14.     Based on and consistent with agreements reached between the parties during their meet and confer discussions regarding Defendants' responses to Plaintiff's discovery requests, Defendants made additional productions of documents on January 18, February 4, February 11, February 14, March 18, and April 29, 2022.

15.     On June 3, 2022, I advised counsel for Plaintiff that Defendants would produce all communications between Sims and Matt Duffer and Ross Duffer relating to Sims' creative contributions to Seasons 1 and 2 of *Stranger Things*, but that Sims was not involved in Seasons 3 or 4 of that Series. On June 17, 2022, I advised counsel for Plaintiff that additional documents relating to Sims' creative contributions to Seasons 1 and 2 of *Stranger Things* located following a reasonable search and diligent inquiry would be produced the following week. *See* Declaration of Jeremy J. Osher Exhibits EE, GG. On June 23, 2022, consistent with my representation, Defendants produced those documents.

16.     In total, Defendants have produced approximately 5,196 documents comprising approximately 62,939 pages.

17.     By contrast, Plaintiff made a single production of 151 documents on July 30, 2021. The substantial majority of that production, totaling 2,648 pages, consists of 2,137 pages of scripts and concept art. A large portion of the remainder of that production consists of confirmations of copyright and Writers Guild of America registrations.

18.     Plaintiff's principal, Jeffrey Kennedy, made a separate production of documents in response to a subpoena issued by Defendants. Mr. Kennedy's December

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

22366502.1
231804-10002

3

DECLARATION OF SAFIA GRAY HUSSAIN IN
OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

8, 2021 production consisted of 49 documents. Of the 796 pages in that production, 630 pages are scripts and concept art.

19.     In addition to the substantial document productions referenced above, Defendants collectively have responded to 46 Requests for Admission and 90 Interrogatories propounded by Plaintiff.

20.     On June 10, 2022, shortly before sending Defendants the draft Joint Stipulation Regarding Plaintiff's Motion to Compel Pursuant to Local Rule 37-2, Plaintiff propounded an additional 61 Requests for Production on Defendants.

## **Request for Monetary Sanctions**

21.     My billing rate on this matter is $550 per hour, which is reasonable for a Partner with my level of experience at a large, multi-national law firm based in Los Angeles, and the rates charged by other attorneys in Los Angeles county at firms of similar size and with nearly fifteen years of litigation experience.

22.     I received a Bachelor of Arts (Summa Cum Laude) and a Bachelor of Fine Arts (With Honors) from the University of Oklahoma in 2001, where I was a National Merit Scholar and was selected to the Golden Key International Honor Society. I received a Juris Doctor (Cum Laude) from the Fordham University School of Law in 2007, where I was named to the Dean's Honor Roll and served as Notes & Articles Editor for the Law Review. I have been a lawyer engaged in the practice of civil litigation and a member of the California State Bar since 2007. I also have been a member of the New York State Bar since 2008.

23.     From August 2007 through August 2016, I was a litigation associate at Quinn Emanuel Urquhart & Sullivan, LLP, in its Los Angeles, CA and New York, NY offices. From August 2017 to April 2018, I was a litigation associate at Blank Rome, LLP in its Los Angeles, CA office. I joined the litigation department at the law firm of Loeb & Loeb LLP in May 2018; my practice is focused on entertainment and intellectual property litigation.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

22366502.1
231804-10002

4

DECLARATION OF SAFIA GRAY HUSSAIN IN
OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

24.     I have extensive experience in all areas of general civil and business litigation, including arbitrations and appeals. I am currently admitted to practice before all courts in the State of California, including State and Federal courts, as well as the State of New York, United States District Court for the Southern District of New York, and the United States District Court for the Eastern District of New York.

25.     I personally have spent at least 15 hours of my time billed to this matter reviewing, researching and preparing Defendants' opposing portions to the Joint Stipulation and the accompanying declarations.

26.     In addition to my time personally spent on this matter, my partner David Grossman spent approximately five hours of his time billed to this matter to review and revise Defendants' opposing portions of the Joint Stipulation and the accompanying declarations. Defendants are not seeking to recover the time incurred by Mr. Grossman and are limiting their fee request to my time incurred in dealing with this matter. Defendants have reasonably incurred $8,250 in attorneys' fees opposing Plaintiff's motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of June, 2022, at Los Angeles, California.

_____
SAFIA GRAY HUSSAIN

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

22366502.1
231804-10002

5

DECLARATION OF SAFIA GRAY HUSSAIN IN
OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

# EXHIBIT A

1  BOREN, OSHER & LUFTMAN LLP
2  Jeremy J. Osher (SBN 192109)
   josher@bollaw.com
3  Saba Zafar (SBN 271963)
   szafar@bollaw.com
4  222 North Pacific Coast Highway, Suite 2222
5  El Segundo, CA 90245
   Telephone: (310) 322-2021
6  Facsimile: (310) 322-2228
7
8  Attorneys for Plaintiff
   IRISH ROVER ENTERTAINMENT, LLC
9
                **UNITED STATES DISTRICT COURT**
10
                **CENTRAL DISTRICT OF CALIFORNIA**
11
                     **WESTERN DIVISION**
12

| | |
|---|---|
| 13 IRISH ROVER ENTERTAINMENT, LLC, a California limited liability company, | Case No.: 2:20-cv-06293-CBM-PLA |
| 14 | |
| 15 | Judge: Hon. Consuelo B. Marshall Magistrate Judge: Hon. Paul L. Abrams |
| 16 Plaintiff, | |
| 17 | **FIRST AMENDED COMPLAINT FOR DAMAGES FOR:** |
| vs. | |
| 18 | |
| 19 AARON SIMS, an individual; MATT DUFFER, an individual; ROSS DUFFER, an individual; NETFLIX, INC., a Delaware corporation; NETFLIX STREAMING SERVICES, INC., a Delaware corporation; 21 LAPS, INC., a California corporation; and DOES 1 through 50, inclusive, | **1. COPYRIGHT INFRINGEMENT (SCREENPLAY);** |
| 20 | **2. COPYRIGHT INFRINGEMENT (CONCEPT ART AND LIVE ACTION DEMO);** |
| 21 | |
| 22 | **3. CONTRIBUTORY COPYRIGHT INFRINGEMENT;** |
| 23 | **4. VICARIOUS COPYRIGHT INFRINGEMENT; AND** |
| 24 | **5. DECLARATORY RELIEF.** |
| 25 Defendants. | |
| 26 | **DEMAND FOR JURY TRIAL** |
| 27 | |
| 28 | |

FIRST AMENDED COMPLAINT FOR DAMAGES

COMES NOW Plaintiff IRISH ROVER ENTERTAINMENT, LLC and hereby requests a trial by jury and complains and alleges as against Defendants AARON SIMS, MATT DUFFER, ROSS DUFFER, NETFLIX, INC., NETFLIX STREAMING SERVICES, INC., 21 LAPS, INC., and DOES 1 through 50, and each of them, as follows:

## NATURE OF THE ACTION

2.     This is an action for copyright infringement arising out of Defendants' unauthorized exploitation of the copyrighted screenplay *Totem*, written by Jeffrey Kennedy, in connection with Defendants' creation of the hit television series *Stranger Things*.

3.     Defendants brazenly have infringed upon and incorporated numerous protectible elements from *Totem* into *Stranger Things*, including characters, plot, sequence, themes, setting, mood/tone, pace, and dialogue, as well as copyrighted concept art developed by Defendant Aaron Sims for *Totem*, including key art work, promotional artwork, first class storyboards, creatures, visual effects, and design and creation of CGI characters.

4.     Throughout the period of 2009 to 2015, Sims repeatedly was provided access to numerous versions of the *Totem* screenplay by Kennedy and worked closely with Kennedy during his development of the script.

5.     To assist Sims with his creative process, Kennedy shared information regarding the backstory, involved Sims in discussions about story ideas and script revisions, and even proposed the formation of a new production company, through which Kennedy, in partnership with Sims and his producing partner John Norris, would bring *Totem* to the screen. Unfortunately, and unbeknownst to Kennedy, Sims decided to go in a different direction.

6.     Specifically, shortly after receiving another version of *Totem* from Kennedy in or around Spring 2013, Sims began work with Defendants Matt and Ross Duffer on an unrelated project. Within months of Sims meeting the Duffer Brothers, the Duffer

1

Brothers created a skeleton outline for what was to become *Stranger Things*, which incorporated various elements from *Totem*.

7.     Notably, the Duffer Brothers repeatedly have claimed to have independently come up with the idea for *Stranger Things* in 2010. However, in reality, it was not until late 2013—and only after teaming up with Sims—that the Duffer Brothers actually "created" their outline for what was to become *Stranger Things*. Shortly thereafter, the Duffer Brothers created the pilot for *Stranger Things*, and in March 2015, the show was sold to Netflix and distributed by the Netflix Entities. For his part, Sims was hired to create the concept art for *Stranger Things*, Seasons 1 and 2.

8.     It is no small coincidence that Sims, who was given direct access to the copyrighted *Totem* screenplays and was intimately involved in the development of the story and the creation of concept art, went to work with the Duffer Brothers in 2013 and that in that same year, the Duffer Brothers created *Stranger Things*, which incorporated numerous protected elements from the *Totem* screenplays as well as from the concept art.

9.     Plaintiff believes that Sims shared the copyrighted *Totem* screenplays and related concept art with the Duffer Brothers, who then infringed on Plaintiff's exclusive rights in and to these protected works.

10.    There are substantial similarities between the *Totem* copyrighted screenplays and related concept art, on the one hand, and the television series *Stranger Things*, on the other hand, in terms of characters, plot, sequence, themes, setting, mood/tone, pace, and dialogue.

11.    When Defendants realized they were producing a derivative work based on the *Totem* copyrighted work, or at least were incorporating protected elements from the screenplays and concept art, they were obligated to obtain a license from Plaintiff, the owner of the *Totem* copyrighted works, and to give credit to Kennedy as the author of the *Totem* screenplays and concept art.

FIRST AMENDED COMPLAINT FOR DAMAGES

12.    Instead, Defendants did nothing, necessitating the filing of this action to vindicate Plaintiff's rights and to prevent Defendants from exploiting those rights without just compensation and due creative credit.

## **THE PARTIES**

13.    Plaintiff IRISH ROVER ENTERTAINMENT, LLC (hereafter, "Plaintiff") is, and at all times mentioned herein was, a California limited liability company with its principal place of business in the County of Los Angeles, State of California. Plaintiff's Managing Member is Jeffrey Kennedy, the author of the *Totem* copyrighted screenplays.

14.    Upon information and belief, Defendant AARON SIMS (hereafter, "Sims") is, and at all times mentioned herein was, an individual residing in the County of Los Angeles, State of California

15.    Upon information and belief, Defendant MATT DUFFER (hereafter, "M. Duffer") is, and at all times mentioned herein was, an individual residing in the County of Los Angeles, State of California.

16.    Upon information and belief, Plaintiff ROSS DUFFER (hereafter, "R. Duffer") is, and at all times mentioned herein was, an individual residing in the County of Los Angeles, State of California.

17.    Defendants M. Duffer and R. Duffer are sometimes referred to collectively herein as the "Duffer Brothers".

18.    Upon information and belief, Defendant NETFLIX, INC. (hereafter, "Netflix") is, and at all times mentioned herein was, a corporation organized under the laws of the State of Delaware and authorized to transact business in the County of Los Angeles, State of California.

19.    Upon information and belief, Defendant NETFLIX STREAMING SERVICES, INC. (hereafter, "NSSI") is, and at all times mentioned herein was, a corporation organized under the laws of the State of Delaware and authorized to transact business in the State of California.

FIRST AMENDED COMPLAINT FOR DAMAGES

20.   Netflix and NSSI are sometimes referred to collectively as the "Netflix Entities".

21.   Upon information and belief, Defendant 21 LAPS, INC. ("21 Laps") is, and at all times mentioned herein was, a California corporation with its principal place of business in the County of Los Angeles, State of California.

22.   The true names, identities and capacities, whether individual, corporate, associate or otherwise, of defendants Does 1 through 50 are unknown to Plaintiff at this time, who therefore sues said defendants by such fictitious names pursuant to California Code of Civil Procedure Section 474. Upon ascertaining the true and correct names, titles, capacities and/or identities of the defendants designated herein as Does, Plaintiff will amend this Complaint accordingly. Does 1 through 50 are sometimes referred to collectively herein as "Defendants".

23.   Plaintiff is informed and believes, and thereon alleges, that each of the Defendants herein, however designated, whether by real or fictitious name, were and are in some manner responsible for the events, happenings, occurrences, and instrumentalities upon and about which complaint is hereinafter made.

24.   Plaintiff is further informed and believes, and thereon alleges, that each of the Defendants herein, whether designated by real or fictitious names, are, and at all times relevant hereto, were, the agent, servant, employee and hireling of each of the Defendants and in doing the things and acts herein alleged and complained of or in failing to do that which they should have done, were acting within the course and scope of such employment, agency and hiring with the full knowledge, consent, approval and ratification of each of the other Defendants.

## **JURISDICTION AND VENUE**

25.   This is a civil action seeking damages and declaratory and injunctive relief for copyright infringement arising under 17 U.S.C. section 101 *et seq.*

/ / /

/ / /

FIRST AMENDED COMPLAINT FOR DAMAGES

26.     This Court has original subject matter jurisdiction over this action under 28 U.S.C. §1331 and § 1338(a), as this action asserts copyright claims arising under the laws of the United States.

27.     This Court has personal jurisdiction over Defendants because some or all of them reside in this state, and because all Defendants conduct continuous, systematic, and routine business within this state and this District.

28.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400 in that Plaintiff's claims arose in this District and because Defendants reside or may be found in this District.

### **STANDING**

29.     Plaintiff has standing to bring this action as the current owner of the copyrighted works upon which the claims in this action are based. More specifically, Plaintiff is the assignee of the exclusive rights in and to the copyrighted works by virtue an assignment of all rights from Jeffrey Kennedy, the author of the works.

### **GENERAL ALLEGATIONS**

30.     Plaintiff Irish Rover Entertainment, LLC ("Plaintiff") is the exclusive owner of all copyright rights in and to the following original screenplays:

- *Lightning Shower in Jackson Hole*, Copyright Reg. No. Pau3-133-215 (6/19/07). A true and correct copy of this Copyright Registration Certificate is attached as Exhibit "1".

- *Chain of Being*, Copyright Reg. No. Pau3-454-906 (5/1/08). A true and correct copy of this Copyright Registration Certificate is attached as Exhibit "2".

- *Totem: The Story of a Wounded Warrior*, Copyright Reg. No. Pau3-771-261 (3/19/2015). A true and correct copy of this Copyright Registration Certificate is attached as Exhibit "3".

- *Totem*, Copyright Reg. No. TXu2-193-423 (5/6/20). A true and correct copy of this Copyright Registration Certificate is attached as Exhibit "4".

5

31.  These screenplays collectively are referred to herein as the "*Totem* Screenplays". Each of these screenplays constitute original works of authorship by Jeffrey Kennedy (hereafter, "Kennedy"). These artistic works represent a years-long progression and evolution of the same basic story, with each successive screenplay building upon the prior version. Kennedy also registered many of these screenplays with the Writers Guild of America.

32.  In addition to the *Totem* Screenplays, Plaintiff also is the owner of the copyright in and to certain concept art that was created by Defendant Aaron Sims for the *Totem* project. This concept art includes, without limitation, key art work, promotional artwork, first class storyboards, creatures, visual effects, design and creation of CGI characters, and at least one 3D test shoot (collectively, the "*Totem* Concept Art"), for which Sims created the concept art and storyboard. Sims also worked on the 3D test shoot, the effects, and the CGI character for the shoot.

33.  The *Totem* Concept Art is registered as Copyright Reg. No. PA1-762-543 (12/27/10). A true and correct copy of the Copyright Registration Certificate is attached hereto as Exhibit "5".

34.  For ease of reference, the *Totem* Screenplays and the *Totem* Concept Art are sometimes collectively referred to herein as the "*Totem* Copyrighted Works".

35.  Plaintiff is the owner of all rights in the *Totem* Copyrighted Works, in all of their original, unique, and protected permutations and derivations, and neither Plaintiff nor Kennedy has ever assigned, licensed, or otherwise transferred the rights in the *Totem* Copyrighted Works to any of the Defendants or, with the exception of Kennedy's assignments of rights to Plaintiff, to any other third party.

36.  Kennedy was inspired to write and develop the screenplay *Totem* (f/k/a *Lightning Shower in Jackson Hole* and *Chain of Being*) following the tragic death of his childhood friend Clint Osthimer (hereafter, "Osthimer").

37.  *Totem* was based on Kennedy's and Osthimer's friendship growing up in South Bend, Indiana during the 1980's. *Totem*'s story takes place in the same type of

everyday, middle class, rural town in which Kennedy and Osthimer grew up. As children, the two enjoyed spending time in nature, where, amongst many other adventures, Osthimer enjoyed jumping off cliffs into lakes. In this regard, *Totem* is an homage to Osthimer, to growing up in the 1980s' rural Indiana, and to Kennedy's and Osthimer's love of the outdoors.

38. Notably, from a very early age, Osthimer suffered from epilepsy. During their childhood together in rural Indiana, Osthimer and Kennedy dealt with the constant threat of Osthimer's "personal demon", epilepsy, which created "lightning showers" in his brain. Kennedy speculated that these lightning showers or seizures would send Osthimer to an alternate supernatural plane where the demon resided.

39. Osthimer died on September 8, 2005 in a tragic car accident. Kennedy has described in countless industry pitch meetings that the *Totem* story was born in the last moment of Osthimer's life—the moment he was hanging upside down in his vehicle and journeyed to the alternative supernatural plane one final time to conquer his personal demon.

40. A number of these ideas and elements were incorporated into the *Totem* Copyrighted Works and were shared by Kennedy with Defendant Aaron Sims. Attached hereto as Exhibit "6" is a document entitled "Totem: Indiana Backstory", which provides a few visual examples of how the Indiana backstory both strongly influenced and was heavily incorporated into the *Totem* Copyrighted Works and *Stranger Things*.

41. On or about March 23, 2007, Kennedy created a treatment for what later was to become *Totem*. At that time, the working title for the project was "*Lightning Shower in Jackson Hole*". On or about June 19, 2007, Kennedy obtained a copyright for the screenplay by this same name.

42. After further development of the screenplay on or about May 1, 2008, Kennedy copyrighted the updated version with new working title *Chain of Being*.

FIRST AMENDED COMPLAINT FOR DAMAGES

43.   On November 18, 2008, Kennedy, together with his partners Machiel Kennedy (also his father) and Charles Brink formed Irish Rover Entertainment, LLC, the plaintiff in this action.

44.   On or about February 4, 2009, Plaintiff entered into an agreement with Evergreen Films, Inc. ("Evergreen") whereby Evergreen was to provide development services in relation to the project. Thereafter, in or around May 2009, Evergreen subcontracted concept artist Aaron Sims and The Aaron Sims Company to create key art work, promotional artwork, first class storyboards, creatures, visual effects, design and creation of CGI characters, and work on at least one 3D test shoot for which Aaron Sims did ultimately create the concept art, storyboard, CGI character, and visual effects.

45.   Sims was provided with a copy of the copyrighted *Chain of Being* screenplay and contributed to the project throughout the period 2009 and 2010. During the period, Sims was privy to Kennedy's marketing pitch, participated in producer note sessions, was privy to Kennedy's casting choices, was provided with Kennedy's designs and physical drawings of set pieces, and was provided with photographs showcasing the project's visual imagery.

46.   In or around June 2009, Kennedy provided Sims with a folder containing photos to showcase imagery as well as a drawing of the layout of the backyard for Jackson and Autumn Chance's home, which was based on Osthimer's house in the 1980's.  Based on this, Sims provided the first round of the *Totem* Concept Art to Plaintiff and Evergreen in July 2009 and continued to provide weekly updates for, and revisions to, the *Totem* Concept Art.

47.   In or around August 2009, Kennedy met with Sims and John Norris (hereafter, "Norris"), Sims' producing partner and employee, during which they discussed script notes and Kennedy disclosed detailed information regarding the background for his screenplay, Kennedy's and Osthimer's full backstory, including the backdrop he wanted to showcase for the project (*i.e.*, similar to South Bend, Indiana but set in a grander outdoor setting).

FIRST AMENDED COMPLAINT FOR DAMAGES

48.     In January 2010, Kennedy completed further revisions to the screenplay, now titled *Totem*, based on development notes he received from his meetings with Sims and others. Between January and July of 2010, Sims finalized the concept art, storyboards, and live action demo while Kennedy, Sims, and Norris continued to discuss story ideas, Kennedy's backstory, and the script. Kennedy subsequently copyrighted the live action demo and concept art created by Sims on or about December 27, 2010. (See Exhibit "5".)

49.     Importantly, throughout *Totem*'s script development, including multiple revisions of the screenplay, Kennedy developed and worked with a significant number of story ideas and concepts, all of which he shared with Sims and all of which are included in the various copyrighted versions of the *Totem* Screenplays.

50.     In or around August 2010, Plaintiff ended its business relationship with Evergreen. Following Plaintiff's termination of Evergreen, Kennedy continued to meet with and correspond with Sims and Norris regarding the *Totem* project and continued to provide Sims with updated versions of the screenplay. Impressed with Sims' talent and vision, Kennedy also offered Sims the opportunity to direct *Totem* and to co-produce it with Kennedy and Norris.

51.     During the Summer of 2011, Kennedy met with Sims to discuss the most recent version of the screenplay. In November 2011, Kennedy further revised the *Totem* screenplay while continuing to raise funding and partnerships for the project.  He also continued to revise the screenplay in 2012 and 2013.

52.     In the Spring of 2013, Kennedy provided the latest version of the *Totem* screenplay to Sims. This version incorporated the various concepts, ideas, and elements that Kennedy had developed over the preceding several years, including the concepts, ideas, and elements created during the years that he had worked closely with Sims. A true and correct copy of the 2013 version of the *Totem* screenplay is attached as Exhibit "7" and is the version that was registered with the copyright office as Copyright Reg. No. TXu2-193-423, *i.e.*, Exhibit "4".

9

53.     Plaintiff is informed and believes, and thereon alleges, that in the Fall of 2013, Warner Brothers Studios hired Sims to assist the Duffer Brothers with the motion picture *Hidden*, which they had written and were directing. This was the first time Sims met the Duffer Brothers. In an interview entitled, "Making the Monster with Aaron Sims", Sims confirmed that he first met the Duffer Brothers when he worked with them on *Hidden*.

54.     Plaintiff is informed and believes, and thereon alleges, that after *Hidden* wrapped in 2013, the Duffer Brothers began development of a skeleton outline for the precursor to *Stranger Things*, which at that time was titled *The Montauk Experiment*. A version of the outline was completed in October 2013, and a close review of the outline reveals that the Duffer Brothers had incorporated numerous elements from *Totem*.

55.     Plaintiff is informed and believes, and thereon alleges that before teaming up with Sims in 2013, and before drafting the skeleton outline in October 2013, the Duffer Brothers had not created any original content for what later would become *Stranger Things*. This is consistent with sworn declarations the Duffer Brothers submitted in connection with prior litigation involving *Stranger Things, i.e., Kessler v. Duffer et al.*, LASC Case No. BC700197. In these declarations, the Duffer Brothers contend that in November 2010, they exchanged emails about several film projects, including one they called "The Montauk Experiments", which "reflected elements of the Montauk Urban Legends". A true and accurate copy of these declarations are attached here to as Exhibit "8".

56.     However, a review of the Duffer Brothers' emails reveals that they do not contain any original ideas; instead, these emails simply summarize information regarding Preston Nichols' book "The Montauk Project: Experiments in Time". The ideas that the Duffer Brothers claim are their own original ideas, and which they claim they developed in November 2010, actually come directly from the Nichols book. Moreover, Matt Duffer's November 23, 2010 email suggests that their idea was to create a "gritty and intensely realistic found footage presentation of the lost film, following

10

FIRST AMENDED COMPLAINT FOR DAMAGES

the experiments from their inception to blood-soaked finale." See Exhibit "8" (and attached 11/19/10 and 11/23/10 emails attached thereto). This has absolutely nothing in common with—and shares no elements with—*Stranger Things*.

57.    Even more telling is that the sworn Declarations do not include evidence of, or reference to, any efforts by the Duffer Brothers to develop their "Montauk Experiments" concept throughout the period November 2010 through October 2013. Notably, at a May 2019 Closing Convocation Speech at Chapman University, Ross Duffer recounted how he and his brother were "crushed" when Warner Brothers "dumped" *Hidden*, which went "straight to video" in 2013. He said they decided in 2013 to "pretend we knew how to write television" and then decided to "create our own show", *i.e.*, *Stranger Things*.

58.    This is consistent with the timing of the skeleton outline from October 2013, which is attached to the Duffer Brothers' sworn Declarations in the *Kessler* case—and it suggests that they came up with *Stranger Things* in 2013, **not November 2010**, and only after they met Sims, who by that time had been working on *Totem* with Kennedy for years, had received numerous versions of the *Totem* screenplay, and was intimately familiar with the *Totem* story, having worked with Kennedy on the script and concept art.

59.    After *Hidden*, Sims and the Duffer Brothers teamed up again on the show *Wayward Pines*, with Sims serving as a concept artist.

60.    In or around March 2015, the Duffer Brothers met with the Netflix Entities and sold *Stranger Things* with a look book, pilot script, teaser trailer, and endorsement from Shawn Levy of Defendant 21 Laps Entertainment.

61.    *Stranger Things* went straight-to-series, and Aaron Sims Creative, Sims's company, was hired to develop the *Stranger Things* creatures and world. Within approximately one years' time, the Duffer Brothers wrote, directed, produced, edited, cast, and distributed 8 single camera episodes of *Stranger Things*, when in the three years between the time they claim to have developed their idea for *Stranger Things* until

11

they met Sims in the fall of 2013, they had not taken any steps to develop *Stranger Things*.

62.     The first season of *Stranger Things* was released by the Netflix Entities on July 15, 2016. Sims was credited as one of the concept artists for the show.

63.     The second season of *Stranger Things* was released by the Netflix Entities on October 27, 2017. Again, Sims was credited as one of the concept artists for the show.

64.     The third season of *Stranger Things* was released by the Netflix Entities on July 4, 2019. A fourth season was announced in September 2019 and is expected to be released in 2021.

## ALLEGATIONS OF SUBSTANTIAL SIMILARITY BETWEEN *TOTEM* SCREENPLAYS AND *STRANGER THINGS*

65.     There are substantial and articulable similarities between the protectable elements in the *Totem* Screenplays and *Stranger Things* in terms of characters, plot, sequence, themes, setting, mood/tone, pace, and dialogue. Moreover, there are substantial similarities between the protectable elements in the *Totem* Concept Art developed by Sims for *Totem* and the concept art that he went on to develop in connection with Seasons 1 and 2 of *Stranger Things*.

66.     The similarities between the television series *Stranger Things* and the *Totem* Copyrighted Works are so substantial, and Defendants' access to the *Totem* Copyrighted Works so significant, that it seems unlikely that the former could possibly have been created independently from the latter.

### Characters

67.     Both *Totem* and *Stranger Things* utilize characters with remarkably similar character traits and extremely similar relationships to each other.

68.     Every dynamic element within a story stems from character: action, conflict, plot, escalating story structure, reversals, climax, and theme.

FIRST AMENDED COMPLAINT FOR DAMAGES

69. Specifically, a character nurses a primary wound and builds an emotional armor around it. That creates a personality with emotional limitations and unconscious needs. Unconscious needs manifest as conscious desire. Conscious desire to be, do, or have something creates an emotionally challenging decision which, when made, leads to an action that creates a reaction from an antagonist. Protagonist action and antagonist reaction escalating back and forth creates a conflict which becomes plot. Escalating emotionally challenging decisions of the protagonist (or it could be characters that the protagonist influences) creates story structure. Ultimately, the character has to cognize, accept, and dissolve the limitation of emotional armor in order to achieve the goal. That dissolution of limitation results in the story's theme.

70. In comparing characters between *Totem* and *Stranger Things*, it is necessary to look at character qualities and behaviors. Archetypes are story functions and can change from character to character. Just so, character tendencies and behaviors can be represented by different archetypal functions (protagonist, antagonist, ally, mentor, conscience character, tempter character, skeptic, shapeshifter, love interest, child archetype, *etc.*) in a remodeling of the same story.

71. As a result of the combination of extremely similar characters and extremely similar character archetypes, *Totem* and *Stranger Things* manifest extremely similar plots and themes (as detailed below). More specifically, there are nine (9) character comparisons in the primary story line of both projects that parallel each other, which are discussed more fully below. Note, this is not an exhaustive comparison of the similarities between the characters in the two stories:

| *Totem* | *Stranger Things* |
|---|---|
| **Jackson Chance** | **Joyce Byers** |
| Jackson Chance (hereafter, "Jackson") is the strong-willed protagonist, or story driver, of the screenplay *Totem*. Jackson believes his wife Autumn Chance was | Joyce Byers (hereafter, "Joyce") is the strong-willed protagonist, or story driver, of *Stranger Things*. She initiates and sustains an obsessive search for her son |

FIRST AMENDED COMPLAINT FOR DAMAGES

| | |
|---|---|
| alive and taken by Azrael when no one else believed him. He is considered borderline psychotic and is treated as such by medical professionals, authorities, and friends. Jackson also experiences resistance from FBI Agent Sam Miller who has something to hide about his relationship with Autumn. Jackson's quest to find Autumn is fueled by his unconditional spousal love for her. | Will Byers (hereafter, "Will"), in the face of great resistance from everyone around her. She is considered borderline psychotic and is treated as such by friends, family, and acquaintances. Joyce also experiences resistance from Dr. Martin Brenner and his subordinates who would rather keep the existence of the Upside Down a secret. Joyce's quest to find Will is fueled by her unconditional motherly love for him. |
| His belief leads him on a desperate search for Autumn and ultimately into the alternate plane. In the process, he scatters sketches all over his family room to find answers. | Her belief leads her on a desperate search for Will and ultimately into the alternate plane. In the process, she uses Will's drawings to find answers. |
| **Dr. William Nerowe**<br><br>Dr. William Nerowe (hereafter, "Nerowe") is a long-time friend of Jackson's and is also his doctor. He has great affection for Jackson and that affection involves concern for him. Jackson has seizures as a result of his time spent in the Navy, which results in PTSD. When Jackson approaches Nerowe to convince him that Autumn is still alive, Nerowe grows concerned for Jackson's mental stability. Over time, he becomes convinced that, although there has been a funeral for Autumn, she needs to be rescued from wherever she is. He joins Jackson in his quest even though they experience resistance from FBI Agent Sam Miller who has something to hide. In the process of assisting Jackson on his improbable quest, Nerowe saves himself from his own cancer and other | **Jim Hopper**<br><br>Jim Hopper (hereafter, "Hopper") is a long-time friend of Joyce's and also the Chief of Police of Hawkins. He has great affection for Joyce, yet he knows that she can be neurotic at times. When Joyce approaches him with the concern that her son Will is missing, he blows her off. Once he becomes convinced that Will is still alive despite Will's funeral and is in great danger, he joins Joyce in her quest. He experiences resistance from his co-workers and others who believe that Will is dead. He and Joyce also experience resistance from Federal Authorities who have something to hide. In the process of assisting Joyce on her improbable quest, Hopper resolves his depression and addictive behavior. |

FIRST AMENDED COMPLAINT FOR DAMAGES

| | |
|---|---|
| afflictions. | |
| **Autumn Chance** | **Will Byers** |
| Autumn Chance can see the alternate plane during her spells. She uses drawings as a way of communicating what she sees in the alternate supernatural plane to the inhabitants of the earthly plane. Azrael abducts her from the shed and makes her a Grim. Autumn Chance is artistic and draws her visions and dreams. She was physically and emotionally abused as a child by the caretakers at Evergreen Orphanage. When she is considered dead, a funeral is held for her. Autumn is the motive for Jackson's quest to reunite with her at all cost. | Will can see the earthly plane. However, during his "spells/seizures", he can also see the alternate supernatural plane. He uses drawings as a way of communicating what he sees in the alternate supernatural plane to the inhabitants of the earthly plane. In Season 1, Will was abducted by the Demogorgon from the shed and in Season 2 the Shadow Monster takes hold of Will. He was emotionally abused by his father in early childhood. He disappears and is considered dead. A funeral is held for him. He is the motive for Joyce's quest to reunite with him at all cost. |
| **Kimimela** | **Eleven** |
| Kimimela (hereafter, "Kimi") is a ten-year-old girl, yet she is an old soul who functions well beyond her age. She has great spiritual powers. She is revered by those around her. She is the heart of the Lynx tribe. She is responsible for the creation of a gateway that allows Azrael, a demon entity, to enter this world. Her death would result in allowing Azrael to destroy humankind. She is wounded during the climax but convinces Nerowe that only he can destroy Azrael, which he does. | Eleven is a twelve-year-old girl, yet she is an old soul who functions (perceives) well beyond her age. She has great psionic powers (psychokinetic, telepathic, and remote viewing). She is responsible for opening the 'Gate' that allows the Demogorgon/Shadow Monster/Mind Flayer to enter this world. Her death would result in allowing the Shadow Monster/Mind Flayer to destroy humankind. In Season 1, she obliterates a Demogorgon. In Season 2, with the help of Hopper, she banishes the Shadow Monster/Mind Flayer by closing the gate. In Season 3, she is wounded near the climax, but convinces Billy Hargrove to stand against the Shadow Monster/Mind Flayer, which gives Joyce and Hopper time to close the gate and again defeat the |

15

|  | Shadow Monster/Mind Flayer. |
|---|---|
| **Thunderbear** | **Mike Wheeler** |
| In *Totem*, Thunderbear is the Shaman and unofficial chief of the Lynx tribe. He is also Kimi's protector and father figure. He is willing to sacrifice his life to save Kimi from harm. | In *Stranger Things*, Mike Wheeler is the unofficial leader of the group of boys that Will belongs to, the group of boys that finds Eleven in the woods. Mike is Eleven's protector and future heartthrob. He puts himself in harm's way to save Eleven from danger. |
| **FBI Agent Sam Miller** | **Billy Hargrove** |
| In *Totem*, FBI Agent Sam Miller is a secondary antagonist to the cohesion between Jackson and Nerowe in their quest to save Autumn. Sam, having been bullied as a child, feels that the world is against him and he must protect himself by playing the bully including threatening a child. A part of his bullying persona is that he is prejudiced against Native Americans. For instance, Sam says to the totem pole: "Stupid Injun stick! I hate you! Retarded Injuns! I will find you!" (Exhibit "7" at page 41.) | In *Stranger Things*, Billy Hargrove is a secondary antagonist to the cohesion of the group fighting the Shadow Monster/Mind Flayer. Billy, having been bullied as a child, feels that the world is against him and he must protect himself by playing the bully including threatening his young sister and her friends. A part of that bullying persona is that he is prejudiced against Blacks. Several times in Season 2, he threatens Max for befriending Lucas Sinclair, who is Black. In Episode 4, Billy, referring to Lucas, verbally and physically threatens Max: "There's a certain type of people in this world that you stay away from, and that kid, Max, that kid is one of them." In Episode 5, he confronts her again for hanging out with Lucas. |
| Sam has a car accident in an industrial area and is captured by the monster Azrael, who forces Sam to do his bidding in his quest to destroy Kimi. Sam kills humans whose souls are imprisoned by Azrael. He wounds Kimi and incapacitates her, but ultimately meets his demise as a result. | Billy has a car accident in an industrial area and is captured by the Mind Flayer. The Mind Flayer forces Billy to do his bidding in its quest to destroy Eleven. Billy kills humans whose souls are absorbed by the Mind Flayer. He abducts the wounded Eleven, but ultimately meets his demise as a result of Eleven's persuasion. |

16

| | |
|---|---|
| Sam helps Azrael capture and take possession of human souls in the earthly plane which are then called Grims/Watchers. Sam and Azrael pursue Kimi and her friends to a cave, where a final battle ensues. | Billy helps the Shadow Monster/Mind Flayer capture and take possession of human souls in the earthly plane, which are then called "The Flayed". Billy and the Shadow Monster pursue Eleven and her friends to a mall, where a final battle ensues. |
| **Agent Cho** | **Flo** |
| Agent Cho is FBI Agent Sam Miller's superior. She radios directives to him while he is out in the field on duty. She chastises him when he steps out of line. | Flo is Jim Hopper's office manager at the police station. She radios directives to him while he is out in the field on duty. She chastises him for his eating and smoking habits. |
| **Azrael** | **Shadow Monster/Mind Flayer** |
| In *Totem*, Azrael is the evil figure that is released from the carbon-copy alternate supernatural dimension as a result of a totem gift shared by Kimi. Azrael's goal is to enslave and rule humanity. He does that by directing his Blackwolf Indian minions to kill humans and he imprisons their souls in a cloak of purple feathers thereby trapping them in a limbo and turning them into Grims/Watchers. He must kill Kimi, the External Light of creation and the only one that can defeat him, in order to fulfill this quest. | In *Stranger Things*, the Shadow Monster/Mind Flayer is a figure of pure evil that is released from the alternate supernatural dimension as a result of a burst of energy from Eleven that ruptures the "veil" between two dimensions. The Shadow Monster's goal is to enslave humanity. It does that by directing its Demogorgon minions (a/k/a Demo-Dogs) to abduct or consume humans and take them to the Upside Down (alternate dimension). It must kill Eleven, the only one with power greater than its power, in order to fulfill its quest. |
| Azrael has multiple appendages and often appears surrounded by lightning, as his powers are connected to electricity, and lightning storms are used as a symbolic device to announce Azrael. Azrael enters the earthly plane through a portal in a cave. | The Shadow Monster has multiple appendages and often appears surrounded by lightning, as its powers are connected to electricity, and lightning storms are used as a symbolic device to announce the Shadow Monster. The Shadow Monster enters the earthly plane through a portal under the Hawkins Laboratory. |

17

FIRST AMENDED COMPLAINT FOR DAMAGES

| Azrael takes possession of human souls. These captured human souls under Azrael's control are called Grims/Watchers. | The Shadow Monster/Mind Flayer takes possession of human souls. These captured human souls under the Shadow Monster/Mind Flayer's control are called "The Flayed". |
|---|---|
| **Blackwolf Indians/Black Wolves**<br><br>In *Totem*, Azrael uses a hive-mind army of supernatural creatures called Blackwolf Indians to do his bidding. The Blackwolf come from an alternate supernatural plane. The Blackwolf Indians/Black Wolves shape-shift back and forth from two-legged, upright beings to four-legged Black Wolves. | **Demogorgons/Demo-Dogs**<br><br>In *Stranger Things*, the Shadow Monster/Mind Flayer uses a hive-mind army of supernatural creatures called Demogorgon to do his bidding. The Demogorgon come from an alternate supernatural plane. They shape-shift back and forth from two-legged, upright humanoid monsters to four-legged Demo-Dogs. |

### Plot

72.    *Totem* and *Stranger Things* share an overwhelming number of concrete plot elements that render the two works substantially similar. Stripping away secondary characters and plot lines necessary to expand the *Stranger Things* series into multiple episodes and seasons, the core plots of both stories parallel each other.

73.    Both *Totem* and *Stranger Things* revolve around the respective protagonists' quests—Jackson in *Totem* and Joyce in *Stranger Things*—to rescue a loved one from having been abducted by a monster and carried to an alternate dimension that is a dark copy of their current reality. The respective monsters and shapeshifting minions oppose that quest.

74.    In both projects, a pubescent girl—ten-year-old Kimi in *Totem* and twelve-year-old Eleven in *Stranger Things*—is responsible for the rupture in the "veil" between the human dimension and a dark, carbon-copy alternate dimension through which a monster is able to invade the current human reality.

75.    In both projects, the hook of the respective plots relies on the conceit that

18

there is an independent agency of evil that wishes to destroy humanity, and to defeat this evil all humanity must rely on the power of this single pubescent girl to close the rupture, one acting directly and the other acting through the agency of another character.

76.     In *Totem*, Kimi, imbued with great spiritual powers, allows a totem to be removed from its watery tomb and planted (grounded) in such a way that it opens a gateway between this dimension and an alternate dark dimension. This creates a gateway between the two dimensions through which a powerful monster (Azrael) and its minions (Blackwolf Indians/Black Wolves) enter into the dimension to prey upon humans.

77.     In *Stranger Things*, Season 1, Eleven, imbued with great psionic powers, ruptures the veil between this dimension and an alternate dark dimension. This creates a gateway between the two dimensions through which a powerful monster (Shadow Monster/Mind Flayer) and its minions (Demogorgons/Demo-Dogs) are released into the human dimension to prey upon humans.

78.     In *Totem*, Azrael abducts Autumn from the tool shed in the Chance's back yard and imprisons her in the dark, alternate dimension, a reflected copy of the human dimension. Her disappearance motivates Jackson, her husband, to go on an obsessive quest to bring his wife back.

79.     In *Stranger Things*, the Demogorgon/Shadow Monster abducts Will, a 12-year-old boy, from the tool shed in the Byers' back yard and imprisons him in the dark, alternate dimension, a reflected copy of the human dimension. Will's disappearance motivates Joyce, his mother, to go on an obsessive quest to bring her son back.

80.     In *Totem*, acquaintances consider Jackson to be mentally unbalanced, including Nerowe, Jackson's doctor and his long-time friend. Similarly, in *Stranger Things*, acquaintances consider Joyce to be mentally unbalanced, including Hopper, the Chief of Police and Joyce's long-time friend. In *Totem*, Nerowe ultimately resolves his skepticism and becomes convinced that something strange regarding Autumn's seeming death is happening. Despite the funeral held for Autumn, Nerowe feels he must

19

FIRST AMENDED COMPLAINT FOR DAMAGES

assist Jackson in his quest to find her. Similarly, in *Stranger Things*, Hopper ultimately resolves his skepticism and becomes convinced that something strange regarding Will's seeming death is happening. Despite the funeral held for Will, Hopper feels he must assist Joyce in her quest to find him.

81. In *Totem*, Jackson and Nerowe enlist Kimi and her protector, Thunderbear, to help them. Kimi is able to guide Jackson and Nerowe to Autumn in the carbon copy alternate dimension. Similarly, in *Stranger Things*, Joyce and Hopper enlist Eleven and her protector, Mike Wheeler, to help them. Eleven is able to guide Joyce and Hopper to Will in the carbon copy alternate dimension (Season 1, Episode 7).

82. As noted above with respect to the similarities between characters, character traits and actions can be attributed to any archetype that serves the story. In *Totem*, Jackson, the protagonist archetype, or story-driver, is afflicted with seizures that give him visions of the alternate dimension, carbon-copy world. In *Stranger Things*, Season 2, this character trait of seizures and visions of evil is attributed to Will, the child archetype, as a motive for the protagonist archetype, Joyce, to continue her quest to save her son.

83. In both projects, the device of seizures is used to reveal the other-worldly danger that threatens the human race. Because of the monster's relationship to Will in Season 1, a twist is created in the final sequence of Season 1 to allow the Shadow Monster to obtain control over Will and make him its "spy". As it gains more influence over him, Will, like Jackson in *Totem*, has seizures that give him visions of the alternate-dimensional world.

84. Joyce becomes aware of Will's possession and seeks to resolve Will's seizures and vows to protect him, just as Autumn seeks to protect Jackson in *Totem*. The respective vows to protect taken by Autumn in *Totem* and Joyce in *Stranger Things* are a mirror of each other in that while the vows are exactly the same between the two codependent relationships, the archetypes are reversed.

FIRST AMENDED COMPLAINT FOR DAMAGES

85.   In *Totem*, Jackson and Nerowe use Autumn's drawings from a dream to locate "a dark, bluish toned cavern" in the alternate dimension that leads to Azrael's "vast, cavernous, brimstone sanctuary". (Exhibit "7" at page 110.) Similarly, in *Stranger Things*, Season 2, Joyce and friends use Will's drawings of his visions to locate a maze of dark bluish tunnels in the alternate dimension that lead to the Shadow Monster's central mind from which it controls its Demogorgon/Demo-Dog minions.

86.   In *Totem*, by using a sweat lodge, a cancer (physical manifestation of disbelief, alluding to theme) is sweat out of from Nerowe's body which allows him to fully embrace Jackson's quest to free Autumn from Azrael's clutches. They elude the attacking army of Blackwolf Indians/Black Wolves and uproot the grounded totem thereby closing the gateway to Azrael's alternate dimension. Similarly, in *Stranger Things*, Season 2, Episode 9, by using a makeshift sweat lodge (in a cabin), Joyce and friends are able to free Will from the Shadow Monster's possession (a result of disbelief in self, alluding to theme) by sweating it out of his body. They elude the attacking army of Demogorgons/Demo-Dogs. Eleven closes the gate to the Upside Down, which ends the Shadow Monster's threat to humanity.

87.   In *Stranger Things*, Season 3, the monster finds its way back into the human dimension once again because that's the core of the entire series if it is to sustain its status as supernatural horror. Eleven closes the gate to the monster's dimension at the end of Season 2, so the series must reopen it and unleash the monster yet once again in order to have a third season.

88.   The core of the entire *Stranger Things* series is the monster's need to kill the only thing that can destroy it, which is Eleven. To accomplish this, *Stranger Things* introduces psychopathic Russians in Season 3 to replace the psychopathic scientists in Seasons 1 and 2. They reopen the gate to the dark, alternate dimension, and release the Shadow Monster/Mind Flayer. They dress the season up and disguise it with new characters and new settings, but the dance between monster (Shadow Monster/Mind Flayer) and monster slayer (Eleven) is the same dance that happens between Azrael, the

21

monster, and Kimi, the monster slayer.

89.     In *Totem*, FBI Agent Sam Miller, a bully character, crashes his car in an industrial area. Azrael then overwhelms Sam and forces him to do its bidding, the primary objective being to kill Kimi and her friends. Sam helps Azrael capture and take possession of human souls in the earthly plane which are then called Grims/Watchers. (Exhibit "7" at page 48.) Similarly, in *Stranger Things,* Billy Hargrove, a bully character introduced in Season 2, crashes his car in an industrial area in Season 3, Episode 1. The Shadow Monster/Mind Flayer then overwhelms Billy and forces him to do its bidding, the primary objective being to kill Eleven and her friends. This becomes a driving plot point for Season 3. Billy helps the Shadow Monster/Mind Flayer capture and take possession of human souls in the earthly plane which are then called "The Flayed".

90.     In *Totem,* Thunderbear and Sam face off with each other. Thunderbear tries to stop Sam and fails. Sam shoots and kills Thunderbear. Similarly, in *Stranger Things,* Mike and Billy face off with each other. Mike tries to stop Billy and fails. Billy knocks him out.

91.     In *Totem,* Sam, Azrael, and minions pursue Jackson, Nerowe, and Kimi, ultimately arriving at a cave in the Valley of Death (synonymous with the tool shed in the human dimension), where the final battle ensues. Wounded, Kimi encourages Nerowe to rise up against Azrael. Nerowe destroys Azrael's totem as a result of Kimi's influence. Sam is killed in the final battle. Similarly, in *Stranger Things,* Billy and the Mind Flayer pursue Eleven and her friends to a mall where a final battle ensues. Wounded, Eleven encourages Billy to rise up against the Mind Flayer. Billy turns against the Mind Flayer as a result of Eleven's influence. Eleven's friends distract the Mind Flayer long enough to give Joyce and Hopper time to close the gate which defeats the Shadow Monster/Mind Flayer. Billy is killed in the final battle.

92.     When comparing the core elements regarding the human-versus-monster battle of the series *Stranger Things* with the *Totem* Screenplays, the central through-line of both stories is substantially similar.

FIRST AMENDED COMPLAINT FOR DAMAGES

**Sequence**

93.     At their respective cores, both *Totem* and *Stranger Things*, share a significantly similar sequence of events. A multi-season series such as *Stranger Things* has to add secondary and tertiary plots and characters in order to extend the broadcast time, but once these secondary and tertiary elements are peeled away, the through-line is significantly similar to *Totem*.

a.   In both projects, a young girl, Kimi in *Totem* and Eleven in *Stranger Things*, helps to create a gateway to an alternate universe/dimension.

b.   In both projects, a powerful monster—Azrael in *Totem* and Shadow Monster/Mind Flayer in *Stranger Things*—and its minions, Blackwolf Indians/Black Wolves and Demogorgons/Demo-Dogs, respectively, are released into this dimension to prey upon humans;

c.   In both projects, the monster abducts someone from a shed in the back yard—Autumn in *Totem* and Will in *Stranger Things*—and carries them into the alternate carbon-copy dimension, which motivates the protagonist (and close family members of the abducted characters) of the respective stories, Jackson in *Totem* and Joyce Byers in *Stranger Things*, to go on an obsessive quest to bring their loved one back;

d.   In both projects, after overcoming the stigma of alleged mental disorder, the protagonist—Jackson in *Totem* and Joyce Byers in *Stranger Things*—enlists an ally, William Nerowe in *Totem* and Jim Hopper in *Stranger Things*, who is initially skeptical and does not believe that Autumn / Will is alive, but start to believe them and then joins their quest to find and save their loved one;

e.   In both projects, the monster conspires to destroy the young girl—Kimi in *Totem* and Eleven in *Stranger Things*—in order to keep the gateway between the two dimensions open;

f.   In both projects, the monster is assisted by a human they enslave after a car accident at an industrial site—Agent Sam Miller in *Totem* and Billy Hargrove

23

FIRST AMENDED COMPLAINT FOR DAMAGES

in *Stranger Things*—and the enslaved human is ultimately destroyed;

g. In both projects, the gateway is closed with the ally's assistance. In *Totem*, this is accomplished by Nerowe and Kimi. In *Stranger Things*, Season 2, this is accomplished by Hopper and Eleven and in *Stranger Things*, Season 3, this is accomplished by Hopper and Joyce; and

h. In both projects, as a result of the closed gateway, the monster ceases its activities in the human world.

## **Themes**

94.     There are two aspects to the subject of theme. First, there are universal thematic topics that conceptualize the nature of the story itself. Second, there is the moral, ethical thematic arc that is implied by the emotional journey the main character (often the protagonist) takes leading to the resolution of some flaw or value out of balance in that character.

95.     In both *Totem* and *Stranger Things*, various universal thematic subjects are present, subjects such as unconditional love, death of a close family member, mental illness, dreams and visions, family, power and corruption, courage and heroism, facing darkness, epilepsy and seizures, female roles with supernatural powers, reuniting with loved ones, man versus supernatural, etc. These themes exist in both projects in the following substantially similar ways:

| *Totem* | *Stranger Things* |
|---|---|
| **Unconditional Love:** | |
| In *Totem*, Jackson's love for his wife Autumn drives him to undertake a perilous quest into the alternate supernatural plane to uncover the mystery behind her disappearance and to rescue her. | In *Stranger Things*, Joyce Byers' love for her son Will Byers takes her on a perilous quest into the alternate supernatural plane to uncover the mystery behind his disappearance and to rescue him. |

FIRST AMENDED COMPLAINT FOR DAMAGES

| **Death of a Close Family Member** | |
|---|---|
| In *Totem*, Autumn appears to have died as a result of what appears to be a Black Wolf attack. A funeral is performed, and the body is buried. Each character mourns Autumn's death in their own manner and disbelieves Jackson when he refuses to accept her death as real. | In *Stranger Things*, a body assumed to be Will's is found. A funeral is performed, and the body is buried. Each character mourns Will's death in their own manner and disbelieves Joyce when she refuses to embrace what seems to be the reality of his death. |
| In *Totem*, Nerowe appears to have died in the alternate supernatural plane, but is miraculously brought back to life using mouth-to-mouth resuscitation. | In *Stranger Things*, Will appears to have died in the alternate supernatural plane, but is miraculously brought back to life using mouth-to-mouth resuscitation. |
| **Mental Illness:** | |
| In *Totem*, Autumn Chance can see an alternate reflective dimension where a powerful evil being (Azrael) exists with designs on destroying humanity. She is evaluated by members of the medical profession and diagnosed as having a mental illness. Because Jackson believes that what Autumn sees is real, he also is perceived as having a mental illness. | In *Stranger Things*, Will Byers can see an alternate supernatural plane where a powerful evil entity exists with designs on destroying humanity. He is evaluated by medical professions and diagnosed as having a mental illness. His mother Joyce believes that what Will sees is real, and refuses to believe he has died, so she is also perceived as having a mental illness. |
| **Dreams and Visions:** | |
| In *Totem*, dreams and visions reveal an alternate dimension of evil to both Autumn and Jackson which is a carbon copy of their reality. Autumn has dreams in which a pure light being guides her with clairaudient messages about how to proceed to keep Jackson safe. | In *Stranger Things*, Will receives visions of an Upside Down, alternate supernatural dimension world that appears to threaten him and his family and friends. |
| Dreams and visions are used in *Totem* to see into the alternate supernatural plane by those on the earthly plane who have "Mystic Visions". | Dreams and visions are used in *Stranger Things* to see into the alternate supernatural plane by those on the earthly plane who can "Shadow Walk". |

FIRST AMENDED COMPLAINT FOR DAMAGES

| | |
|---|---|
| **Family:**<br><br>In *Totem*, Autumn and Jackson Chance, because of their respective afflictions, are brought closer together feeling like they are two against the world. They support each other unconditionally. On the other hand, the Nerowe family feel like they are being ripped apart because of Nerowe's stage-4 cancer. They (Nerowe, wife Anna, and daughter Stella) seem to operate with an agenda different than the Chances until fate intervenes via the abduction of a friend bringing the two families together and creating healing and cohesion. | In *Stranger Things*, the Byers family has experienced divorce and hard times financially, which has driven Joyce and her two sons closer together. Their love for each other compels each member to assume respective responsibilities to maintain their unity. On the other hand, the Wheeler family's parents are still together physically, but there is a disconnect between them and between the two older children until fate intervenes via the abduction of a friend bringing the two families together and creating a healing and cohesion. |
| **Power and Corruption:**<br><br>In *Totem*, corrupt government agents abuse their power and even commit murder in order to capture Kimi. | In *Stranger Things*, corrupt government agents abuse their power and even commit murder in order to capture Eleven. |
| **Courage and Heroism:**<br><br>In *Totem*, Jackson Chance's courage born of his unconditional love for his wife Autumn, drives him to take up a fatal and perilous journey into the alternate supernatural plane to rescue her. | In *Stranger Things*, Joyce Byers' courage born of her unconditional love for her son Will, drives her to take up a dangerous quest into an alternate dimension to rescue him. |
| **Facing Darkness:**<br><br>In *Totem*, Autumn Chance enters her shed and faces a supernatural creature because she knows it is the only way to save her husband Jackson. | In *Stranger Things*, Joyce Byers enters her house and faces a supernatural creature because she knows it is the only way to save her son Will. |

FIRST AMENDED COMPLAINT FOR DAMAGES

| | |
|---|---|
| **Epilepsy and Seizures** | |
| In *Totem*, Jackson Chance experience violent seizures that bring about visions of the alternate dimensions, a dark carbon copy of his present reality, wherein exists the ultimate evil that is Azrael. | In *Stranger Things*, Will Byers experiences seizures that bring about visions of the Upside Down (an alternate dimension), a dark carbon copy of his present reality, wherein exists the ultimate evil that is the Shadow Monster/Mind Flayer. |
| In *Totem*, Jackson Chance violently seizures in the grass. Seizures are used to show Jackson's connection to the dark spirit Azrael. | In *Stranger Things*, Will violently seizures in the grass. Seizures are used to show Will's connection to the Shadow Monster. |
| **Female Roles with Supernatural Powers:** | |
| In *Totem*, one of the characters is a pubescent girl named Kimi, who has supernatural powers. Kimi helps her friends find the portal gate to an alternate supernatural plane and helps them battle the plane's inhabitants; a dark spirit named Azrael and his army of Blackwolf. | In *Stranger Things*, one of the characters is a little girl named Eleven, who has supernatural powers. Eleven helps her friends find the portal gate to an alternate supernatural plane and helps them battle the plane's inhabitants; a Shadow Monster and his army of Demogorgon. |
| **Reuniting with Loved Ones:** | |
| In *Totem*, Jackson Chance loses his wife Autumn in the earthly plane but finds her again in the alternate supernatural plane. | In *Stranger Things*, Joyce Byers loses her son Will in the earthly plane but finds him again in the alternate supernatural plane. |
| **Man v. Supernatural:** | |
| In *Totem*, Jackson and Nerowe must go on a perilous journey into the alternate supernatural plane to uncover the mystery behind Autumn's disappearance. | In *Stranger Things*, Joyce and Hopper must go on a perilous journey into the alternate supernatural plane to uncover the mystery behind Will Byer's disappearance. |

FIRST AMENDED COMPLAINT FOR DAMAGES

96.    Both *Totem* and *Stranger Things* also utilize a substantially similar personal thematic arc with the inclusion of the less popular model of the steadfast protagonist:

97.    A more specific, personal theme in a story is implied as the result of the emotional (inner) journey that one (or more) character takes. A story's moral or ethic is implied as a result of the inner emotional transformational journey that the point-of-view character takes. It concludes with the resolution of the respective main character's flaw that has formed as the result of some past experience, or ghost, that throws a value out of balance in their psyche.

98.    Usually, the protagonist, or character that drives the story, is the character that has this change in consciousness. Usually, there is a steadfast character who provokes the change by continuing to challenge the protagonist to make the more emotionally challenging choice, the emotionally risky choice that moves the character closer to the goal. This is the model that is taught to beginning writers and often accepted as the Hollywood story model.

99.    However, while not as common, there are cases where the protagonist is the steadfast character and, by maintaining a strong emotional position or mindset, changes those around them. This much less common story model is used in the construction of both of these projects' core through-lines.

100.    In the case of *Totem*, Jackson, as protagonist, is steadfast in his belief and his ability to rescue Autumn. As a result of his steadfast nature, he convinces the doubting Nerowe to believe in the validity of his quest.

101.    Likewise, in *Stranger Things*, Joyce Byers, as protagonist, is steadfast in her belief and her ability to rescue Will. As a result of her steadfast nature, she convinces the doubting Hopper to believe in the validity of her quest.

102.    Both projects being compared here are extremely similar in their application of this lesser-used story model of thematic revelation.

103.    Because of the need for the *Stranger Things* series to extend its stories, the same is true of Joyce's eldest son, Jonathan Byers, who, after doubting Joyce, is

convinced to believe in her quest. Lucas Sinclair, after being skeptical of Eleven's presence as an asset, comes to believe that she is a valued friend. Max, after refusing to believe Lucas's story about monsters, disappearing friends, and a magical girl called Eleven, comes to believe that it is all true.

104. Therefore, the thematic journey in both projects is as follows: From skepticism couched in status quo to belief born of faith in others.

105. In *Totem*, Nerowe has been trained in the scientific method. Seeing is believing. Reality comes from what has been discovered. Of course, this limits his experience of what is possible. Nerowe suffers from stage-4 cancer and he is depressed knowing that he will not see his young daughter grow up. Jackson's steadfastness dissolves his skepticism and brings him to believe in the prospect of alternate possibilities. As a result, he helps Jackson achieve his quest of rescuing Autumn and his cancer is healed.

106. In *Stranger Things*, Hopper has been trained in police investigation. He believes only in hard evidence. Reality comes from what has been discovered, similar to Nerowe in *Totem*. This limits his experience of what is possible. Hopper suffers from deep depression because of the death of his young daughter knowing that he will not see her grow up (revealed in Season 1, Episode 7 flashbacks). Joyce's steadfastness dissolves his skepticism and brings him to believe in the prospect of alternate possibilities (Season 1, Episode 5). As a result, he helps Joyce to achieve her quest of rescuing Will and his depression is healed as he becomes Eleven's surrogate father (Season 2, Episode 3).

107. In *Totem*, the idea of the need to believe in unknown possibilities is driven home to Jackson and one of his tasks is to convince Nerowe to believe in things unseen. *Stranger Things* creates this theme of people promising others and stating that one can trust a promise because people don't lie. In fact, this thematic motif is a request for people to believe the person making the promise. Therefore, the primary theme of believing is extended through this presentation of a promise.

108.   On page 113 of the 2013 *Totem* screenplay (Exhibit "7"), Nerowe, the change character, says to Jackson: "I believe." He has spent the entire story ensconced in his science-based skepticism, which is a subtle form of fear of the unknown. Jackson, the steadfast character, who needs Nerowe to believe in order for Jackson to complete his quest to save Autumn, finally convinces him to believe in unknown possibilities.

109.   Near the end of Season 1, Episode 5 (40:55) of *Stranger Things*, Hopper, the change character, says to Joyce: "You were right. This whole time, you were right." Joyce, the steadfast character, who needs Hopper to believe in her in order for her to complete her quest to save Will, finds comfort in her new ally. She finally convinces him to believe in the unbelievable.

110.   Because of the nature of the long form of story, this theme is extended to other characters in *Stranger Things*. Jonathan Byers is skeptical of Joyce, but he comes around. Lucas Sinclair is skeptical of Eleven, but he comes around. Max, in Season 2, is skeptical of Lucas' story regarding the Shadow Monster, disappearing friends, and Eleven's powers, but she comes around. Joyce, the character steadfast in her belief that Will is alive, brings those around her to believe as does Jackson do the same in *Totem*.

## **Setting**

111.   The events in *Totem* and *Stranger Things* take place in substantially similar settings. Both works are set in a small, middle-class town in rural America surrounded by a sprawling landscape of woods and nature. The citizens in each of the small towns are folksy and friendly with each other, and know each other's personal business. The inhabitants of both towns feel safe and secure in the knowledge that help is just a phone call away.

112.   Crucial events in both works take place at the protagonists' homes, which are depicted in a similar fashion. The protagonists both live in humble houses, have large yards like one would find in a rural town, and both have a tool shed in the back yard in the midst of overgrown vegetation that can be seen from the kitchen window.

FIRST AMENDED COMPLAINT FOR DAMAGES

113. The tool sheds in both stories become the nexus for abduction into the alternative dimension. Specifically, in *Totem*, the tool shed in the Chances' back yard becomes the setting where Autumn is abducted by Azrael. In *Stranger Things*, the tool shed in the Byers' back yard becomes the setting where Will is abducted by the Demogorgon.

114. Even though both works take place in a small town, they both include a large institutional building (a psychiatric hospital in *Totem* and a government building in *Stranger Things*), which are juxtaposed against the small towns, and buildings are used for psychiatric evaluations, interrogations, and holding individuals against their will.

115. In *Totem*, Jackson and Nerowe discover that the Chance home resides in an area known as the "Valley of Death" in Azrael's alternative dimension. It is there that they find Autumn Chance. In *Stranger Things*, the "Vale of Shadows" is a term used by Will Byers' friends to describe the Upside Down (alternative dimension). Joyce and Hopper enter the Upside Down to search for Will, traverse the Vale of Shadows, and discover the Byers home—it is there they find Will.

116. In *Totem*, there is a dark, blue-tinted cave that leads to caverns and tunnels that are an opening to the alternate dimension and to Azrael and his minions. Dangers for the good guys emanate from this darkness. Similarly, in *Stranger Things*, there exists a vast maze of dark, blue-tinted tunnels that are an opening to the Upside Down and to the Shadow Monster/Mind Flayer and its minion. The maze of tunnels leads to clues, settings, and dangers for the good guys.

117. Both stories utilize railroad tracks as a symbolic device used to illustrate the journey between the earthly plane and the alternate supernatural plane. In *Totem*, Jackson follows train tracks during his journey to find Autumn in the alternate supernatural plane. In *Stranger Things*, Eleven and her friends follow train tracks on their journey to find Will in the alternate supernatural plane. The railroad tracks are a symbolic device used to illustrate the journey between the earthly plane and the alternate

1  supernatural plane.

2      118.  Both stories include scenes in a sweat lodge. In *Totem*, Nerowe is brought

3  to a Lynx Sweat Lodge in the "Village at the End of the World" and forced to sweat out

4  his illness (cancer) to avoid certain death. In *Stranger Things*, Will is brought to a

5  makeshift sweat lodge (in a cabin) and forced to sweat out the Shadow Monster to avoid

6  certain death.

7                      **Mood, Tone, and Pace**

8      119.  Mood, Tone, and Pace are qualities of genre. Genre is a set of categories in

9  which one can easily catalog a particular movie or story. Both projects, *Totem* and

10  *Stranger Things*, would be categorized in the genre of supernatural horror. Supernatural

11  horror has as its basis an aberration of acceptable reality created or utilized by the

12  paranormal agency of a mysterious entity.

13      120.  In both *Totem* and *Stranger Things*, there is an alternate dimension where

14  an evil monster exists. This alternate dimension is a dark foreboding carbon copy of the

15  reality where the protagonist exists. In both stories, a "gate" is opened into the alternate

16  carbon-copy dimension and the monster takes advantage of it to enter the human realm

17  and create chaos and havoc. The monsters in both stories escape from the dark,

18  reflective alternate dimension.

19      121.  Both projects open with this fissure into the alternate dimension being

20  apparent and the monster entity being revealed in the first scene. Then, the stories move

21  to the ordinary world of the respective protagonists that drive the two stories.

22      122.  In both stories the beginning scenes are violent and bloody. The two stories

23  then shift to reveal a pleasant ordinary world that is interrupted by the abduction of a

24  character significant to the respective protagonists.

25      123.  In *Totem*, after establishing the protagonist's ordinary world, Jackson's

26  wife, Autumn, is abducted by Azrael, the monster from the dark, but reflective alternate

27  dimension. Similarly, in *Stranger Things*, Joyce's son, Will, is abducted by a

28  Demogorgon who has escaped from the dark, reflective alternate dimension.

32

FIRST AMENDED COMPLAINT FOR DAMAGES

124. Each project reflects an air of family cohesion that devolves into anxiety, desperation, and tension as a result of the abduction. The pace of each story accelerates when the abductions take place and the distress increases in both when the relative protagonists are not believed. Each narrative plots the same escalation of growing skepticism in the characters associated with the protagonists.

125. Panic is a primary human reaction in supernatural horror. The two protagonists, Jackson and Joyce, both pump up their adrenaline in an effort to find their loved ones. Their panic is interpreted by others as frantic mental chaos and neither is taken seriously. Their respective hysterical urgency and need to convince an ally, Nerowe in *Totem*, and Hopper in *Stranger Things*, of the abduction is met with skepticism in both cases.

126. In *Totem*, there are a number of examples where the description of darkness is a prelude of things to come: Lilly gives Jackson a necklace to "protect ya from de darkness…" (Exhibit "7" at page 5.) Autumn makes Jackson promise that he won't tear down the shed. "That shed holds captive evil things. Things that belong in the darkness." (Exhibit "7" at page 16.) Autumn dreams that she "…moves through a dark, bluish toned cavern." (Exhibit "7" at page 16.) Autumn speaks of her fear for Jackson: "His spirit will be swallowed in darkness if I do not act swiftly." (Exhibit "7" at page 23.)

127. The story moves from the apprehension of darkness to the darkness itself. And as the danger intensifies, so does the tone fade deeper into darkness.

128. Similarly, in *Stranger Things*, the growing darkness is manufactured technically and with a growing number of scenes shot at night. It begins with the night that Will is abducted. He bicycles home at night, hears something in the woods, and races home. He notices someone or something outside the front door and runs out to the tool shed in the back yard to arm himself with a shotgun. He loads the gun, turns around, and the light surges as the monster looms. The monster abducts Will. The light dims and the scene fades to black.

FIRST AMENDED COMPLAINT FOR DAMAGES

1   129.   The monster (Demogorgon) appears mostly when it is dark outside,
2   whether at Steve's party where Barb disappears, or later when Nancy investigates in the
3   darkened woods (although it is the afternoon), or when the sky has darkened. When the
4   Demogorgon makes its presence known to Joyce by pressing itself through the walls of
5   her house, the light is very dim. The atmosphere in general grows dimmer and dimmer
6   as the episodes progress.

7   130.   The alternative dimensions of *Totem* and *Stranger Things* are a dark, bluish-
8   tinted carbon copy of the respective human dimensions. This is described in the *Totem*
9   screenplay. In *Stranger Things*, it is filmed as a dark, bluish-tinted carbon copy of
10  human reality. The action in these alternate dimension sequences is surreal and slower
11  paced.

12  131.   In both stories, when the monster appears, it is announced by lightning
13  flashes or blinking lights. Electricity is affected by its presence in both *Totem* and
14  *Stranger Things*. The fact that both stories use lightning and power surges to
15  complement the presence of the respective monsters seems more than coincidental. In
16  fact, the presentational tone of the respective monsters is remarkably similar in both
17  projects.

18  132.   In *Stranger Things,* Season 3, there is a decided shift in the mood and tone
19  from Seasons 1 and 2. A well-lit mall, in which many scenes and sequences take place,
20  lightens the tone. More levity is introduced as a result of the introduction of new
21  comedic characters, Robin and Erica, which shifts the mood. Comedic beats
22  countermand the basic genre of supernatural horror. However, when the monster
23  appears, the mood and tone return to the original supernatural dark and foreboding
24  nature found in *Totem*.

25  133.   Throughout both stories, the horror, the action, and the violence escalate in
26  parallel fashion as the respective protagonists pursue their loved ones. This escalation
27  of tension, trepidation, and violence is complemented by the suggested growing
28  physical darkness of scenes and sequences.

34
FIRST AMENDED COMPLAINT FOR DAMAGES

134.   The Mood and Tone of both projects are equally dark and foreboding with a supernatural sense of horror. Following the core plot of the supernatural horror aspect of both properties, the Pace is also significantly similar.

### Dialogue

135.   Due to similarities in characters, plot, theme, and sequence, the dialogue or communications between the characters are substantially similar.

136.   Dialogue is a result of a character's impulse to communicate. That impulse is translated into language. The symbols of language, *i.e.*, words, are connotative at best. Thus, in addition to analyzing the similarities in dialogue, it is also important to look at the similarities of character impulses and interpret the similar intents.

137.   A few examples of similarities in dialogue between *Totem* and *Stranger Things* are listed below:

| *Totem* | *Stranger Things* |
|---|---|
| In *Totem*, Nerowe explains to FBI Agent Sam Miller that Jackson has Post Traumatic Stress Disorder (PTSD). Specifically, Nerowe says to Sam Miller: "He's mentally ill. He needs professional care." (Exhibit "7" at page 65.) Nerowe implies that Jackson's erratic behavior is a result of Autumn's death, which provoked PTSD. | In *Stranger Things*, Dr. Sam Owens explains to Joyce that Will has Post Traumatic Stress Disorder (PTSD). Dr. Owens states that Will's seizures and strangeness are symptoms of PTSD as a result of his experience of having been abducted by the Demogorgon/Shadow Monster. (Season 2, Episode 1.) |
| In *Totem*, Autumn says to Jackson: "Your seizures are getting worse." (Exhibit "7" at page 33.) | In *Stranger Things*, after Will has a massive seizure, Lucas Sinclair says: "Two episodes in two days." Mike follows with: "It's getting worse." (Season 2, Episode 4.) |
| In *Totem*, Nerowe tells Jackson "You need anything, you find me" while in the | In *Stranger Things*, Jim Hopper tells Joyce Byers, "Things get worse, you call me |

FIRST AMENDED COMPLAINT FOR DAMAGES

| | |
|---|---|
| parking lot of the Psychiatric Hospital with Autumn. (Exhibit "7" at page 12.) | first" while in the parking lot of the Hawkins Laboratory with Joyce and Will. (Season 2, Episode 1.) |
| In *Totem*, after Autumn's funeral, Jackson screams to Nerowe: "Azrael is real. He has Autumn. She's in pain. I must save her from him. It is my quest!" (Exhibit "7" at page 46.) | In *Stranger Things*, after Will's body is reported found and identified, Joyce cries to Hopper: "Whoever you found, it's not my boy. It's not Will. It's after him." She goes on to say: "He was hiding from that, that thing. It's after him. He's in danger. We have to find him." (Season 1, Episode 4.) |
| In *Totem*, Nerowe offers a deal to Agent Sam Miller to help him find Thunderbear and the Lynx, and in exchange, Agent Miller will agree to leave Jackson alone. Nerowe to Agent Sam Miller: "I give you their location and you let Jackson go." Agent Miller: "An interesting notion." Nerowe: "I'm serious, Sam. I give you what you want and you leave him alone. Forever. That's the deal. Agreed?" (Exhibit "7" at page 74.) | In *Stranger Things*, Hopper makes a similar deal with the Government Agents interrogating him. In exchange for releasing he and Joyce, they will maintain their silence about the ongoings at the Hawkins Laboratory. Hopper to Agents: "Here's what's gonna happen. You're gonna let me and Joyce Byers go. You're gonna give us anything we need. And we're going to find her son. And then we're going to forget that any of this ever happened. Agent: Oh. is that right? Hopper: Yep, that's right. (Season 1, Episode 8.) |
| In *Totem*, after saving Nerowe's life, Jackson tells Nerowe that he is sorry for hurting him, as Jackson lies bloodied and dying in Azrael's sanctuary. Jackson to Nerowe: "I'm sorry if I hurt you, Willy." Nerowe: "No Brother, you saved me." (Exhibit "7" at page 114). | In *Stranger Things*, after saving Mike Wheeler's life, Eleven tells Mike that she is sorry for opening the gate, as she lies bloodied on the gravel. Eleven to Mike: "Mike, I'm sorry." Mike: "Sorry? What are you sorry for? Eleven: "The gate. I opened it. I'm the monster." Mike: "No. No El, you're not the monster. You saved me. Don't you understand? You saved me." (Season 1, Episode 6.) |

FIRST AMENDED COMPLAINT FOR DAMAGES

| | |
|---|---|
| In *Totem*, FBI Agent Sam Miller jokes that at least the totem that Autumn brought home was not a garden gnome: "… (sarcastically) at least it's not a Garden Gnome". (Exhibit "7" at page 23.) | In *Stranger Things*, Season 1, Episode 1, Hopper makes a joke about a police report that comes in about a stolen garden gnome: "Oh, the Garden Gnomes again. (sarcastically) I'm gonna get right on that". Then, in Season 1, Episode 4, a scene opens with a garden gnome in the forefront of the camera shot for no apparent reason. |

138.   There are numerous additional examples of similarities in dialogue between the *Totem* Screenplays and *Stranger Things*, which will be the subject of discovery in this action, including comparing the dialogue in the *Totem* Screenplays with the *Stranger Things* television series scripts.

139.   Because the stories are also fundamentally similar at their foundation, there are similarities found in the dialogues of both projects that affect the core of the stories themselves. By way of example only, a primary theme of both *Totem* and *Stranger Things* is the idea of the protagonists' allies—Nerowe in *Totem* and Hopper in *Stranger Things*—evolving from skepticism to believing a surreal event has happened. When a character promises something, it is a request to believe in something.

140.   The word "promise"—and its complementary alternatives such as pinkie swears and the phrases "trust me" and "friends don't lie" are used as a driver of the plot and character relationships in both stories. Promises in both stories lead to the escalation of the plot.

141.   Multiple characters in both *Totem* and *Stranger Things* use the word "promise" to either verbally ask or verbally commit to an agreement.  This dialogue tag is used countless times in the stories and often marks the end of a scene and creates a transition. There are numerous examples:

142.   *Totem*:

- **Exhibit "7" at page 11**: Autumn promises Nerowe that she will take care

37

of Jackson. Nerowe says: "You make sure to take care of him." Autumn replies: "I will. I promise."

- **Exhibit "7" at page 16**: Autumn's promise to take care of Jackson is unknowingly compromised by her request that Jackson promise not to tear down their back yard shed: "That shed holds captive evil things. Things that belong in the darkness. Jackson Michael Chance, you promise me you won't (tear it down). Swear it to me." Autumn and Jackson seal this promise with a pinkie swear.
- **Exhibit "7" at page 34**: Autumn to Jackson: "Promise me you know this. That I would never do anything to hurt you. Promise." Jackson promises, but then Autumn's acquisition of Azrael's totem from Kimi creates dire consequences for Jackson.
- **Exhibit "7" at page 98:** Jackson to Kimi: "No one is going to hurt you. I won't let them. I promise!"

143. In *Stranger Things*:

- **Season 1, Episode 2**: Mike Wheeler promises Eleven that he will not tell his mom about her. He explains to her that a promise is "something you can't break. Ever." This definition implies the pinkie swear found in *Totem*. Eleven takes this definition literally and it leads to misunderstanding and dissention that feeds the plot by creating conflict amongst the kids.
- **Season 1, Episode 2:** Lucas Sinclair and Dustin Henderson promise Eleven they will not tell anyone about her. "A friend is someone you'll do anything for… and they never break a promise."
- **Season 1, Episode 2:** Like Autumn and Jackson's pinkie swear in *Totem*, Lucas explains to Eleven that "spit swear is never breaking your word, it's a bond" when he spits in his hand and shakes Dustin's hand.
- **Season 1, Episode 2**: Barbara Holland promises Nancy Wheeler that she would go to a party and Nancy holds her to that promise: "You promised

38

1   that you'd go. You're coming."

2   **Additional Similarities**

3       144.   There are numerous other similarities between *Totem* and *Stranger Things*,

4   including similarities between protected elements as well as instances where both the

5   *Totem* Screenplays and *Stranger Things* contain a significant number of similar plot

6   devices, settings, and other elements that together belie any claim of literary accident:

7   ***Plot Devices***

8       145.   Upside Down Imagery/Alternate Dimension:  In *Totem*, being upside down

9   signifies the moment that one enters into the alternate supernatural plane controlled by

10  Azrael. Notably, the 2010 *Totem* storyboards include art with Azrael reaching out to a

11  boy named Iron Lightning, who hangs upside down on a totem. Defendant Sims was

12  well aware that Kennedy had created the concept of a "carbon copy" universe, for which

13  the Duffer Brothers attempt to take credit by naming it the "upside down". This "upside

14  down" imagery however, appears repeatedly in the *Totem* Copyrighted Works and, of

15  course, Sims was aware of the connection that Kennedy had drawn between being

16  upside down and the final moments of Osthimer's life, when he was hanging upside

17  down in his car after a tragic accident. In *Stranger Things*, the alternate plane is referred

18  to as the Upside Down, and signified by an upside-down copy of the earthly plane. This

19  is similar to Kennedy's concept of being upside down as signifying the moment a

20  character enters the carbon-copy plane as well as in his concept of a "carbon copy"

21  universe.

22      146.   Lightning and Electrical Aberrations that Announce the Presence of the

23  Monster:  In *Totem*, the screenplay opens with lightning and the reader learns that evil

24  is present. This evil takes the form of Azrael's minions first—Blackwolf Indians.

25  Lightning announces the Blackwolf Indians and Azrael on numerous pages. (*See*

26  Exhibit "7" at pp. 15, 32, 34, 35, 37, 49, 87, 88, 98, 99, 104, 105, 107, and 108.) Also,

27  the electrical surges in Jackson Chance's brain during his seizures give him visions of

28  the monster Azrael. Similarly, in *Stranger Things*, throughout Season 1, electrical

aberrations, such as lights blinking, electrical outages, phones going dead, announce the presence of the monster. In Episode 8, Jonathan says, "My mom, she said the lights speak when it comes. Blink. Think of them as alarms." Then, the lights begin to blink. The first time the lights blink to announce the Demogorgon happens early in Season 1, Episode 1. Initially, the Wheeler's exterior house lights blink, after which Will's bicycle light blinks. That motif continues throughout Season 1. For instance, when Eleven enters the sensory deprivation bath in Episode 7, a tremendous electrical activity surge happens. However, in Season 2, the blinking lights are replaced with lightning. It is all about electricity and power surges in both stories.

147. <u>Seizures</u>: In *Totem*, seizures are associated with surges in neural electricity and electrical surges are associated with the monster's presence. Jackson has electrical surges in his brain that result in grand mal seizures on the following pages of the 2013 draft of *Totem*. (*See* Exhibit "7" at pp. 3, 6, 9, 14, 16, 33, 36, 46, 50, 73, 85, 102, 103, 107.) In almost every seizure that he has, Jackson either has a vision of a dramatic future event or he has an experience of Azrael and the alternate dimension. In *Stranger Things*, Season 2, Episodes 3-4, when the Shadow Monster/Mind Flayer enters Will's body, he has a seizure. But he has shivering reactions before that event that flips him briefly into the Upside-Down, alternate dimension. This happens in Season 2, Episodes 1, 2, and 3 before the Shadow Monster/Mind Flayer enters him and gives him grand mal seizures. Will's massive seizures happen in Season 2, Episodes 4, 6, 8, and 9.

148. <u>Drawings</u>: In *Totem*, Autumn draws her visions and dreams. Stella, Nerowe's young daughter also draws her visions. These drawings from both reveal clues to Azrael's identity and his alternate dimension as well as to Autumn's location and her predicament. Jackson and Nerowe use the drawings created by Autumn to locate a series of bluish toned tunnels in the alternate supernatural plane that lead to Azrael. They evade the attacking army of Blackwolf and defeat Azrael by breaking Azrael's grip on Jackson with heat lighting. Similarly, in *Stranger Things*, Will draws his visions which reveal the shape, size, and dimension of the Shadow Monster. His drawings also

40

reveal the whereabouts of Hopper when Hopper gets trapped in the Shadow Monsters' tentacle-laced dark bluish tunnels. Joyce, Hopper, and friends use drawings created by Will to locate a series of bluish toned tunnels in the alternate supernatural plane that lead to the Shadow Monster. They evade the attacking army of Demogorgon and defeat the Shadow Monster by breaking its grip on Will with heat.

149. <u>Communicating with Alternate Dimension</u>: In *Totem*, Autumn hangs dream catchers all over her house and uses them as communication conduits to talk to Kimi in the alternate dimension. In *Stranger Things*, Joyce Byers hangs Christmas lights throughout her house and communicates through them with Will while he is in the Upside Down.

### *Settings*

150. <u>Backyard Sheds</u> - Both projects use a shed in the respective protagonist's back yard as the setting for the monster to abduct the loved one. In *Stranger Things*, Will is abducted from the shed because he went there to retrieve a shotgun. The shotgun could have been in a garage, basement, attic, pickup truck, etc., but it was a backyard shed, the same as in *Totem*.

151. <u>Sweat Lodge</u> - Both projects use a sweat lodge to sweat out evil from significant characters.

152. <u>Dark Bluish Tunnels</u> - Both projects use dark, bluish tunnels as ways to enter the alternate dimension. In *Totem*, Azrael uses purple feathers to entrap souls. In *Stranger Things*, white feathery spores float in the atmosphere and slow the action.

153. <u>Woods and Forests in Rural America</u> - Both projects use surrounding woods and forests for significant scenes and sequences. In fact, both projects are set in what appears to be the exact same setting.

### *Integral Elements*

154. <u>Butterfly</u>: In *Totem*, the butterfly is frequently used as a motif to imply transformation. In fact, the butterfly motif shows up on numerous pages in the 2013 Draft. (*See* Exhibit "7" at pp. 13, 20, 43, 44, 47, 57, 70, 71, 72, 73, 83, 85, 93, 112, 115,

41

119.) In *Stranger Things*, the butterfly motif is used casually but repeatedly. In Season 1, Episode 4, Nancy has butterfly stickers on the inside of her locker. In Season 2, Episode 7, Kali manifests a blue butterfly to prove to Eleven what her powers are. In Season 2, Episode 9, a butterfly design is crocheted into a pillow on the Byers' sofa.

155. <u>Tattoos</u>: In *Totem*, the butterfly tattoo on the wrist is used as a form of identification between Autumn and Kimi stating that they belong to the spiritual tribe of the Lynx Native Americans. In *Stranger Things*, the numbers imprinted on their wrist identifies Eleven and Kali as "sisters" from the Hawkins National Laboratory.

156. <u>Totem</u>: In *Totem*, a totem is the McGuffin that opens the gateway to Azrael's alternate dimension and frees him to enter the human dimension. In *Stranger Things*, a totem sits in Will Byer's bedroom on a shelf. There is no reason to have a totem on his shelf as it has no relevance to his interests or personality or to anything else in his room.

157. <u>Dream Catchers/Lights</u> – Lights also equate in *Stranger Things* with the glowing dream catchers in *Totem*. In *Totem*, Autumn hangs dream catchers all over her house and uses them as communication conduits to talk to Kimi in that realm.

158. <u>Hockey Stick</u>: In *Totem*, Jackson uses a hockey stick to attack the shed in his back yard. In *Stranger Things*, Dustin protects himself from Dart (the baby Demo-Dog now half grown) with a hockey stick; he could have used many different items to protect himself other than a hockey stick.

159. <u>Lynx</u> – In *Totem*, Lynx is the name of the spiritual tribe of Native Americans who guard the gateway to the alternate dimension. In *Stranger Things*, Season 3, the Lynx Corporation is a transport company assisting with secret deliveries to an undercover Russian operation.

160. <u>Monster Enslaves Humans</u> - In *Totem*, the bodies taken over by Azrael act as a hive-mind group controlled by the monster Azrael. They are called Grims/Watchers. In *Stranger Things*, bodies taken over by the Shadow Monster/Mind Flayer act as a hive-mind group controlled by the monster. They are called "the Flayed".

FIRST AMENDED COMPLAINT FOR DAMAGES

In both cases, they act in unison as extensions of the monster.

161.  Garden Gnome: In *Totem*, Agent Sam Miller jokes that at least the totem that Autumn brought home was not a garden gnome: "… (sarcastically) at least it's not a Garden Gnome". In *Stranger Things*, Season 1, Episode 1, Hopper makes a joke about a police report that comes in about a stolen garden gnome: "Oh, the Garden Gnomes again. (sarcastically) I'm gonna get right on that". Then, in Season 1, Episode 4, a scene opens with a garden gnome in the forefront of the camera shot for no apparent reason.

162.  *Stranger Things* Title: As if all of these similarities were not egregious enough, *Stranger Things* appears to derive its very title from a line of Jackson's in *Totem*. Specifically, there is a scene in which Jackson is speaking with Nerowe regarding Autumn and whether she is a mystic. Nerowe asks whether Autumn has taken her medicine because without it "she can't distinguish between what's real and what isn't". In response, Jackson says: "But how can we really know what is real? I mean, sometimes I see things. **Strange things**."

163.  Dungeons & Dragons: On page 35 of the 2008 script entitled *Chain of Being* (copyright registration at Exhibit "2"), a previous draft of *Totem*, Nerowe, skeptical of Jackson's story about Azrael and Autumn's predicament, says to him, "Azrael Seraphim, High Archangel of Death? Leader of the fallen Grigori Angel Choir, known to many as The Watchers?... This is hocus-pocus. It's dungeons and dragons, voodoo bullshit." The same quote exists on page 44 of the 2010 draft retitled as *Totem*. In *Stranger Things*, Will's friends, Mike Wheeler, Dustin Henderson, and Lucas Sinclair frequently use the game and mythology of *Dungeons & Dragons* to build their case for their belief and understanding of Will's predicament in the Upside-Down, alternate dimension.

## ALLEGATIONS OF SUBSTANTIAL SIMILARITY BETWEEN *TOTEM* CONCEPT ART AND *STRANGER THINGS*

164.  In addition to these substantial similarities between the *Totem* Screenplays and the television series *Stranger Things*, there are substantial similarities between

43

protectable elements of the *Totem* Concept Art, which were created by Defendant Aaron Sims for the *Totem* project, and the art for *Stranger Things*.

165. Exhibit "9" to this First Amended Complaint is a compilation of copyrighted illustrations and still photos from *Totem* juxtaposed with scenes from *Stranger Things*, which evidence infringement by Defendants.

166. Exhibit "10" to this First Amended Complaint is a compilation of 2010 development materials created for *Totem* (including storyboards, illustrations, posters, excerpts from the screenplay) juxtaposed with photos and stills from *Stranger Things*, which further evidence infringement by Defendants.

## **CONCLUSION**

167. *Stranger Things* is clearly derivative of the *Totem* Screenplays and incorporates numerous protected elements that appear in both the screenplays and the related *Totem* Concept Art created by Sims. There is no dispute that Sims had access to the screenplays; indeed, he was working with Kennedy as the *Totem* story was being developed and was himself involved in the creative process.

168. Again, it is no small coincidence that after Sims started work with the Duffer Brothers in 2013, they suddenly were "inspired" to create the October 2013 skeleton outline that would become *Stranger Things* and which incorporates numerous elements from the *Totem* Copyrighted Works. The level of access that Sims had to the *Totem* Copyrighted Works and the proximity between his commencing work with the Duffer Brothers and their "creation" of *Stranger Things* certainly gives rise to the presumption that the Duffer Brothers infringed on Plaintiff's valid copyrights.

169. It is more than just a mere possibility that Sims, who created the *Totem* Concept Art and was involved in the development of the screenplays, disclosed the *Totem* Copyrighted Works to the Duffer Brothers, who then incorporated elements from those works without permission or authorization from Kennedy or Plaintiff.

/ / /

/ / /

FIRST AMENDED COMPLAINT FOR DAMAGES

1
2
3

# **FIRST CAUSE OF ACTION**

## **(Copyright Infringement—*Totem* Screenplays)**

### **(As Against all Defendants)**

4   170.   Plaintiff hereby repeats, realleges, and incorporates by this reference each
5  and every allegation from each and every paragraph before and after this paragraph, as
6  though said paragraphs were set forth in full herein.

7   171.   The *Totem* Screenplays constitute copyrightable subject matter under the
8  Copyright Act, 17 U.S.C. sections 101 *et seq.*

9   172.   Plaintiff is the owner of valid copyrights in and to the *Totem* Screenplays
10  and has the exclusive right to develop, create, and/or produce televisions shows based
11  on the *Totem* Screenplays, including but not limited, but not limited to, the characters,
12  plot, sequence, themes, setting, mood/tone, pace, and dialogue, and other events and
13  incidents therein.

14   173.   Plaintiff is entitled to all of the protections and remedies for the *Totem*
15  Screenplays accorded to a copyright owner.

16   174.   At no time did Plaintiff license the *Totem* Screenplays to Defendants.

17   175.   Upon information and belief, in direct violation of Plaintiff's exclusive
18  rights, Defendants have directly infringed, and unless enjoined by this Court, will
19  continue to infringe the copyrights in the *Totem* Screenplays by, among other things:

20   • Preparing unauthorized derivative works of the *Totem* Screenplays in the
21     form of the television series *Stranger Things*;

22   • Reproducing copyrighted elements of the *Totem* Screenplays in the
23     television series *Stranger Things*;

24   • Publicly performing the television series *Stranger Things*, which contain
25     copyright elements of the *Totem* Screenplays.

26   176.   Defendants' acts of infringement were willful, in disregard of and with
27  indifference to the rights of Plaintiff.

28   177.   Each infringement by Defendants on Plaintiff's copyrights in and to the

45

*Totem* Screenplays constitutes a separate and distinct act of infringement.

178.   As a direct, legal, and proximate result of the infringements by Defendants, Plaintiff is entitled to damages and Defendants' profits in amounts to be proven at trial which are not currently ascertainable. If necessary, Plaintiff will seek leave to amend this First Amended Complaint to state the full amount of such damages and profits when such amounts have been ascertained.

179.   Alternatively, Plaintiff is entitled to the maximum statutory damages in the amount of $150,000 with respect to each work infringed or for such other amounts as may be proper under 17 U.S.C. § 504(c).

180.   Plaintiff is further entitled to attorney's fees and full costs pursuant to 17 U.S.C. § 505.

181.   As a direct, legal, and proximate result of foregoing acts and conduct, Plaintiff has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. Plaintiff is informed and believes, and on that basis alleges, that unless enjoined and restrained by this Court, Defendants will continue to infringe Plaintiff's rights in the *Totem* Screenplays. Plaintiff is entitled to preliminary and permanent injunctive relief.

## **SECOND CAUSE OF ACTION**

### **(Copyright Infringement—*Totem* Concept Art)**

### **(As Against all Defendants)**

182.   Plaintiff hereby repeats, realleges, and incorporates by this reference each and every allegation from each and every paragraph before and after this paragraph, as though said paragraphs were set forth in full herein.

183.   The Concept Art constitutes copyrightable subject matter under the Copyright Act, 17 U.S.C. sections 101 *et seq.*

184.   Plaintiff is the owner of valid copyrights in and to the Concept Art and has the exclusive right to develop, create, and/or produce televisions shows based on the *Totem* screenplays, including but not limited to the characters, plot, sequence, themes,

setting, mood/tone, pace, and dialogue, and other events and incidents therein.

185.   Plaintiff is entitled to all of the protections and remedies for the *Totem* screenplays accorded to a copyright owner.

186.   At no time did Plaintiff license the *Totem* Concept Art to Defendants.

187.   Upon information and belief, in direct violation of Plaintiff's exclusive rights in the *Totem* Concept Art, Defendants have directly infringed, and unless enjoined by this Court, will continue to infringe the copyrights in the *Totem* Concept Art by, among other things:

- Preparing unauthorized derivative works of the *Totem* Concept Art that have been incorporated into the television series *Stranger Things*.
- Reproducing copyrighted elements of the *Totem* screenplays in the television series *Stranger Things*;
- Publicly performing the television series *Stranger Things*, which contain copyright elements of the *Totem* screenplays.

188.   Defendants' acts of infringement were willful, in disregard of and with indifference to the rights of Plaintiff.

189.   Each infringement by Defendants on Plaintiff's copyrights in and to the *Totem* Screenplays constitutes a separate and distinct act of infringement.

190.   As a direct, legal, and proximate result of the infringements by Defendants, Plaintiff is entitled to damages and Defendants' profits in amounts to be proven at trial which are not currently ascertainable. If necessary, Plaintiff will seek leave to amend this First Amended Complaint to state the full amount of such damages and profits when such amounts have been ascertained.

191.   Alternatively, Plaintiff is entitled to the maximum statutory damages in the amount of $150,000 with respect to each work infringed or for such other amounts as may be proper under 17 U.S.C. § 504(c).

192.   Plaintiff is further entitled to attorney's fees and full costs pursuant to 17 U.S.C. § 505.

FIRST AMENDED COMPLAINT FOR DAMAGES

193.   As a direct, legal, and proximate result of foregoing acts and conduct, Plaintiff has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. Plaintiff is informed and believes, and on that basis alleges, that unless enjoined and restrained by this Court, Defendants will continue to infringe Plaintiff's rights in the *Totem* Screenplays. Plaintiff is entitled to preliminary and permanent injunctive relief.

## **THIRD CAUSE OF ACTION**

### **(Contributory Copyright Infringement)**

### **(As Against All Defendants)**

194.   Plaintiff hereby repeats, realleges, and incorporates by this reference each and every allegation from each and every paragraph before and after this paragraph, as though said paragraphs were set forth in full herein.

195.   On information and belief, Defendants knew or had reason to know that *Stranger Things* is an unauthorized derivative work based on the *Totem* Copyrighted Works, including the *Totem* Screenplays and *Totem* Concept Art, that are, at least in part, substantially similar to the copyright elements in copyrighted *Totem* screenplays.

196.   On information and belief, Defendants induced, caused, and materially contributed to the unauthorized preparation, duplication, distribution, and public performance of the infringing *Stranger Things* television series, and are continuing to do so.

197.   In violation of Plaintiff's exclusive rights, Defendants have contributed to the infringement and, unless enjoined by this Court, will continue to contribute to the infringement of the copyrights in the copyrighted *Totem* copyrighted works.

198.   Defendants' acts of infringement were willful, in disregard of and with indifference to the rights of Plaintiff.

199.   Each infringement by Defendants on Plaintiff's copyrights in and to the *Totem* Screenplays constitutes a separate and distinct act of infringement.

200.   As a direct, legal, and proximate result of the infringements by Defendants,

48

Plaintiff is entitled to damages and Defendants' profits in amounts to be proven at trial which are not currently ascertainable. If necessary, Plaintiff will seek leave to amend this First Amended Complaint to state the full amount of such damages and profits when such amounts have been ascertained.

201.   Alternatively, Plaintiff is entitled to the maximum statutory damages in the amount of $150,000 with respect to each work infringed or for such other amounts as may be proper under 17 U.S.C. § 504(c).

202.   Plaintiff is further entitled to attorney's fees and full costs pursuant to 17 U.S.C. § 505.

203.   As a direct, legal, and proximate result of foregoing acts and conduct, Plaintiff has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. Plaintiff is informed and believes, and on that basis alleges, that unless enjoined and restrained by this Court, Defendants will continue to infringe Plaintiff's rights in the *Totem* Screenplays. Plaintiff is entitled to preliminary and permanent injunctive relief.

## **FOURTH CAUSE OF ACTION**

### **(Vicarious Copyright Infringement)**

### **(As Against All Defendants)**

204.   Plaintiff hereby repeats, realleges, and incorporates by this reference each and every allegation from each and every paragraph before and after this paragraph, as though said paragraphs were set forth in full herein.

205.   On information and belief, Defendants have the right and ability to supervise the other Defendants, and on information and belief, did supervise them in their unlawful preparation, duplication, and distribution of the *Stranger Things* television series.

206.   On information and belief, Defendants enjoy a direct financial benefit from the preparation, duplication, and distribution of the infringing *Stranger Things* television series.

FIRST AMENDED COMPLAINT FOR DAMAGES

207.   In direction violation of Plaintiff's exclusive rights and as a consequence of the foregoing, Defendants have vicariously infringed the copyrights in the *Totem* Copyrighted Works.

208.   Defendants' acts of infringement were willful, in disregard of and with indifference to the rights of Plaintiff.

209.   Each infringement by Defendants on Plaintiff's copyrights in and to the *Totem* Screenplays constitutes a separate and distinct act of infringement.

210.   As a direct, legal, and proximate result of the infringements by Defendants, Plaintiff is entitled to damages and Defendants' profits in amounts to be proven at trial which are not currently ascertainable. If necessary, Plaintiff will seek leave to amend this First Amended Complaint to state the full amount of such damages and profits when such amounts have been ascertained.

211.   Alternatively, Plaintiff is entitled to the maximum statutory damages in the amount of $150,000 with respect to each work infringed or for such other amounts as may be proper under 17 U.S.C. § 504(c).

212.   Plaintiff is further entitled to attorney's fees and full costs pursuant to 17 U.S.C. § 505.

213.   As a direct, legal, and proximate result of foregoing acts and conduct, Plaintiff has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. Plaintiff is informed and believes, and on that basis alleges, that unless enjoined and restrained by this Court, Defendants will continue to infringe Plaintiff's rights in the *Totem* Screenplays. Plaintiff is entitled to preliminary and permanent injunctive relief.

214.   As a direct, legal, and proximate result of Defendants' contributory infringement on Plaintiff's copyrights in and to the *Totem* Copyrighted Works, Plaintiff has been damaged in an amount according to proof at trial.

/ / /

/ / /

FIRST AMENDED COMPLAINT FOR DAMAGES

## **FIFTH CAUSE OF ACTION**

### **(Declaratory Relief)**

### **(As Against All Defendants)**

215.   Plaintiff hereby repeats, realleges, and incorporates by this reference each and every allegation from each and every paragraph before and after this paragraph, as though said paragraphs were set forth in full herein.

216.   An actual controversy has arisen and now exists relating to the rights and duties of Plaintiff and Defendants under the United States copyright laws.

217.   Plaintiff contends that it is the sole owner of the *Totem* Copyrighted Works, including the *Totem* Screenplays and related *Totem* Concept Art, and that *Stranger Things* infringes on Plaintiff's rights in and to the *Totem* Copyrighted Works.

218.   Plaintiff further contends that it is entitled to compensation based on Defendants' infringement on Plaintiff's rights in and to the *Totem* Copyrighted Works and that Kennedy is entitled to credit as a writer of *Stranger Things*.

219.   Plaintiff is informed and believes and thereon alleges that Defendants dispute Plaintiff's contentions.

220.   Plaintiff therefore desires a judicial determination and declaration of the respective rights and obligations of the parties.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff IRISH ROVER ENTERTAINMENT, LLC prays for the following relief against Defendants AARON SIMS, MATT DUFFER, ROSS DUFFER, NETFLIX, INC., NETFLIX STREAMING SERVICES, LLC, 21 LAPS, INC., and DOES 1 through 50, as follows:

1.      For a preliminary and permanent injunction enjoining Defendants from infringing the copyrights of Plaintiff in any manner.

2.      For an award of all gains, profits, and advantages derived by Defendants by their infringement of Plaintiff's copyrights or such damages as the Court shall deem

51

proper within the provisions of the copyright statute, in an amount determined at trial, together with interest thereon as provided by law. Alternatively, for maximum statutory damages in the amount of $150,000 with respect to each copyrighted work infringed either directly or indirectly, and with respect to each act of inducing another to infringe one of the copyrighted works, or for such other amounts as may be proper pursuant to 17 U.S.C. § 504(c).

3. For an order requiring that Defendants provide a complete accounting and for the restitution to Plaintiff of all monies, gains, profits and advantages Defendants have derived from their production, distribution and exploitation of the infringing television series *Stranger Things*, and ancillary products based thereon, and from their copyright infringement the *Totem* Copyrighted Works.

4. For an order imposing a constructive trust over all monies, gains, and profits Defendants derive from their production, distribution and exploitation of the infringing television series, and ancillary products based thereon, and from their copyright infringement of the Totem Copyright Works.

5. For statutory damages, costs, and attorney's fees with respect to television series *Stranger Things* and any derivative works.

6. For such other and further relief and remedies available under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, which the Court may deem just and proper.

7. For a judicial declaration that: (a) *Stranger Things* infringes on Plaintiff's rights in and to the *Totem* Copyrighted Works, including the *Totem* Screenplays and *Totem* Concept Art; (b) Plaintiff is entitled to compensation based on Defendants' infringement on Plaintiff's rights in and to the *Totem* Copyrighted Works; and (c) Kennedy is entitled to credit as a writer of *Stranger Things*.

/ / /

/ / /

/ / /

/ / /

FIRST AMENDED COMPLAINT FOR DAMAGES

8.     For such other and further relief as the Court deems just and proper.

Dated: October 12, 2020                BOREN, OSHER & LUFTMAN LLP


                                       By: /s/ Jeremy J. Osher
                                           Jeremy J. Osher
                                           Saba Zafar
                                           Attorneys for Plaintiff
                                           IRISH ROVER ENTERTAINMENT, LLC

FIRST AMENDED COMPLAINT FOR DAMAGES

# **DEMAND FOR JURY TRIAL**

Plaintiff IRISH ROVER ENTERTAINMENT, LLC hereby demands a trial by jury in this action on all issues so triable.


Dated: October 12, 2020          BOREN, OSHER & LUFTMAN LLP


By: /s/ Jeremy J. Osher
      Jeremy J. Osher
      Saba Zafar
      Attorneys for Plaintiff
      IRISH ROVER ENTERTAINMENT, LLC

FIRST AMENDED COMPLAINT FOR DAMAGES

# EXHIBIT B

1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| IRISH ROVER ENTERTAINMENT, LLC, | Case No.: CV 20-6293-CBM-PLA(x) |
| Plaintiff, | **ORDER RE: MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. PROC. 12(b)(6) [30]** |
| v. | |
| AARON SIMS *et al.*, | |
| Defendants. | |

11
12
13
14
15

16       The matter before the Court is Defendants Aaron Sims, Matt Duffer, Ross
17   Duffer, Netflix, Inc., Netflix Streaming Services, Inc. and 21 Laps Inc.'s
18   (collectively, "Defendants'") Motion to Dismiss Plaintiff's First Amended
19   Complaint Pursuant to Fed. R. Civ. Proc. 12(b)(6) (the "Motion"), noticed for
20   hearing on January 26, 2021. (Dkt. No. 30.) The matter is fully briefed.

21       The Court finds the matter is appropriate for decision without oral
22   argument. Therefore, the hearing is **<u>VACATED</u>** and no appearances are
23   necessary on January 26, 2021.

24                     **I.      BACKGROUND**

25       This is a copyright infringement action arising from Defendants' alleged
26   unauthorized use of the *Totem* copyrighted screenplays written by Jeffrey
27   Kennedy in connection with the television series *Stranger Things*. The First
28   Amended Complaint ("FAC") asserts five causes of action: (1) copyright

infringement (screenplay); (2) copyright infringement (concept art and live action demo); (3) contributory copyright infringement; (4) vicarious copyright infringement; and (5) declaratory relief in the form of a judicial declaration that a) *Stranger Things* infringes on Plaintiff's rights in the copyrighted works; (b) Plaintiff is entitled to compensation based on Defendants' infringement on Plaintiff's rights in the copyrighted works; and c) Kennedy is entitled to credit as a writer of *Stranger Things*.

## II.     STATEMENT OF THE LAW

### A.     Fed. R. Civ. Proc. 12(b)(6)

Defendants move to dismiss all of Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  Rule 12(b)(6) allows a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. Proc. 12(b)(6).  Dismissal of a complaint can be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 663, (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A formulaic recitation of the elements of a cause of action will not suffice.  *Twombly*, 550 U.S. at 555. Labels and conclusions are insufficient to meet the plaintiff's obligation to provide the grounds of his or her entitlement to relief.  *Id.*  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Id.*  On a motion to dismiss for failure to state a claim, courts accept as true all well-pleaded allegations of material fact and construes them in a light most favorable to the non-moving party.  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031–32 (9th Cir. 2008).  The court may only consider the allegations contained in the pleadings, exhibits attached to or referenced in the complaint, and matters

properly subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).[1]

**B.    Copyright Infringement, Contributory and Vicarious Copyright Infringement, and Declaratory Relief**

To state a claim for direct copyright infringement, Plaintiff must show (1) he owns a valid copyright in the screenplays, and (2) Defendants copied protected aspects of Plaintiff's works. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  As to the second element regarding copying, Plaintiff must demonstrate "substantial similarities" between the works. *Skidmore v. Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020).  At the pleading stage, this Court applies the "extrinsic test" for similarity, which asks whether Defendants' work "shares objective similarities of specific expressive elements" with the allegedly infringed work. *Alfred v. Walt Disney Co.*, 821 F. App'x 727, 728 (9th Cir. 2020) (citing *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018), *overruled on other grounds by Skidmore*, 952 F.3d 1051).

As to contributory and vicarious infringement, "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930  (2005) (internal citations omitted).  Therefore, direct infringement is an element of Plaintiff's contributory and vicarious copyright infringement claims. *Id.; see also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007) ("Secondary liability for copyright infringement  does not exist in the absence of direct infringement by a third

---

[1] Defendants request for judicial notice of the first, second and third seasons of *Stranger Things,* and Plaintiff's copyrighted screenplays and concept art for his screenplays, which are the basis of Plaintiff's claims, is **GRANTED**.  (Dkt. No. 32.)  *See* Fed. R. Evid. 201.

party.”); *Contessa Food Prod. Inc. v. Lockpur Fish Processing Co.,* 123 F. App’x 747, 749–50 (9th Cir. 2005) (“The three elements required to establish contributory copyright liability are: (1) direct infringement by a primary infringer, (2) knowledge of the infringement, and (3) material contribution to the infringement.”).

Moreover, Plaintiff’s declaratory relief claim seeks a judicial declaration *Stranger Things* infringes on Plaintiff’s rights in the copyrighted *Totem* screenplays.  Thus, each of Plaintiff’s claims requires that Plaintiff demonstrate “substantial similarities” between the works.

### III.   DISCUSSION

Defendants move to dismiss all of Plaintiff’s claims on the ground “there is no substantial similarity between Plaintiff’s works and Defendants’ television series, *Stranger Things*.”  Plaintiff argues comparison of the works “at this early stage of the proceedings” is not warranted and that additional evidence, including a more developed factual record and expert opinions, would aid in the objective literary analysis needed to determine the extent and qualitative important of the similarities” alleged in the FAC.  (Opposition at 9; *see also id*. at 13 (Plaintiff contends “it is critical the court has the benefit of expert analysis of the works’ extrinsic elements” when evaluating substantial similarity between the works.).)

In *Alfred v. Walt Disney Co.*, the Ninth Circuit held this court erred in finding the parties’ works were not substantially similar as a matter of law under the extrinsic test in granting the defendant’s motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), finding “[a]dditional evidence would help inform the question of substantial similarity” and “expert testimony would aid in determining whether the similarities Plaintiffs identify are qualitatively significant.” 821 F. App’x at 729.   Therefore, consistent with the Ninth Circuit’s opinion in *Alfred v. Walt Disney Co*., this Court finds additional evidence such as expert testimony may help inform the question of substantial similarity in this

1   case. *Id.*

2         Defendants also argue various elements of Plaintiff's works are

3   unprotectible. "When evaluating the . . . works, courts must generally distinguish

4   between protectible and unprotectible elements, and ask only whether the

5   protectible elements in two works are substantially similar." *Id.* at 728 (internal

6   quotations and citation omitted). However, "at this stage of the litigation, it is

7   difficult to know whether such elements are indeed unprotectible material." *Id*. at

8   729.

9                     **IV.**   **CONCLUSION**

10        Accordingly, the Court **<u>DENIES</u>** the Motion to Dismiss Plaintiff's First

11   Amended Complaint.

12

13        **IT IS SO ORDERED.**

14

15   DATED:  January 21, 2021.        _____

16                            CONSUELO B. MARSHALL
                                 UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT C

**Totem**

By

Jeffrey Scott Kennedy

*"A Native American Ghost Story"*

Production Draft #01
January 22, 2010
Irish Rover Entertainment, LLC 2008
Copyright 2007 by Jeffrey Scott Kennedy
Registered, WGAw

**IRISH 00527**

# EXHIBIT D

**Valent Manssourian**

| | |
|---|---|
| **From:** | Jeremy J. Osher <josher@bollaw.com> |
| **Sent:** | Wednesday, May 11, 2022 6:28 PM |
| **To:** | Safia Gray Hussain |
| **Cc:** | Aaron M. Gladstein; Jeremy J. Osher; Matthew Tom; David Grossman |
| **Subject:** | FW: Irish Rover Entertainment, LLC v. Aaron Sims, et al. |
| **Attachments:** | 2022-03-01 Declaration of No Records (AEG - Third Subpoena).pdf |

**This email originated from outside of Loeb's Network.**

Hello Safia-

This will address the questions you raised in your April 22nd and May 3rd emails concerning Irish Rover's document production. Thank you for your patience.

Respectfully, we do not agree with your repeated characterization of Irish Rover's production as "deficient". We understand you have concerns about the production, particularly with respect our prior representation that Jeffrey Kennedy no longer has access potentially responsive documents, including email communications, from his computer due to a virus. In this regard, you have asked a series of questions regarding Mr. Kennedy's efforts to retrieve responsive documents from his computer. Our responses to your questions are set forth below.

As an initial matter, with regard to the virus, our client does not know exactly when it occurred or the "nature" of the same. That said, in an effort to retrieve documents from his computer, in February 2021 we did in fact retain a third-party vendor to perform a forensic analysis of Mr. Kennedy's computer in an effort retrieve documents and communications that were lost as a result of the virus. Mr. Kennedy sent his computer to the vendor for analysis and retrieval and unfortunately the vendor could not retrieve any documents from Mr. Kennedy's computer. As you know, in a further effort to retrieve responsive emails, our office issued subpoenas to AEG and Yahoo. In response to the AEG subpoena, we received a declaration of no records (attached).  In response to the Yahoo subpoena, we received an email advising, in pertinent part:

"Please be advised that in the normal course of business Yahoo does not maintain AOL email on its servers that is not directly accessible to an active user of an email address. **If a current active user cannot access any given email message, then it doesn't exist on Yahoo's  AOL email servers. Yahoo does not archive or keep records of deleted AOL email.**" (Emphasis original.)

Our client clearly has made every reasonable effort to procure the emails. The reason he undertook these extensive and costly efforts is because he believes that the communications will only help his case, not hurt it. He has no reason to withhold responsive documents, particularly the communications that he had with Evergreen, Aaron Sims and other ASC employees, etc. Moreover, given the lack of emails produced by Aaron Sims—including emails he exchanged with Mr. Kennedy—we were hopeful that the subpoenas would help fill in the significant gaps.

You previously have made much of the fact that our client was able to identify a number of individuals to whom he may have sent emails regarding Totem. Many of those individuals are friends and family. Mr. Kennedy was able to identify many others simply by going through his address book. And then there are some he identified from memory, *i.e.*, he at one point thought to involve Ben Affleck/Matt Damon and so he emailed Pear Street.

I am happy to further discuss this with you.

1

We will address the other issues in your May 3rd email separately.

Regards,

Jeremy J. Osher, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
Telephone: (310) 322-2021 ext. 225
email: josher@bollaw.com
web: www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*

---

**From:** Safia Gray Hussain <sghussain@loeb.com>
**Sent:** Tuesday, May 3, 2022 5:50 PM
**To:** Jeremy J. Osher <josher@bollaw.com>
**Cc:** David Grossman <dgrossman@loeb.com>; Aaron M. Gladstein <agladstein@bollaw.com>; Matthew Tom <mtom@bollaw.com>
**Subject:** RE: Irish Rover Entertainment, LLC v. Aaron Sims, et al.

Jeremy,

Though Plaintiff continues to express urgency for additional information from Netflix—which I already represented we were working with our client to obtain and would provide this week—Plaintiff still has not responded to the basic questions we raised on April 22 regarding its own deficient document production. Namely: Do Plaintiff and/or Kennedy have hard copy documents responsive to Defendants' discovery requests and/or subpoena? When did the virus that purportedly targeted Kennedy's AOL account occur? What was the nature of that virus? Did Plaintiff engage a third-party vendor to conduct a forensic analysis of the emails and computer(s)? Did Plaintiff engage a third-party vendor to collect emails and documents or rely on self-collection? The foregoing information is clearly within the possession of Plaintiff/Kennedy, if not its counsel; please let us know when we can expect responses to these questions.

We were also disappointed to learn, in a document production from Plaintiff's former counsel, Jeffrey D. Easley, that Plaintiff instructed this third party not to produce certain documents in response to Defendants' subpoena that are relevant to the parties' claims and defenses and proportional to the needs of the case—especially in light of Plaintiff's scant production to date. Although Mr. Gladstein instructed Mr. Easley not to produce documents related to Kennedy's complaint filed against him with the California State Bar ostensibly on the basis of privileged client "confidences," this appears to be a misunderstanding or misstatement of the law. The "privilege" referenced in Cal. Bus. & Prof. Code § 6094 is the litigation privilege, not the attorney-client privilege. *E.g., Stanwyk v. Horne*, 146 Cal. App. 3d 450, 459-463 (1983). Such "privilege" does not preclude production of responsive and relevant documents. Nor is there any basis for withholding documents related to the fee arbitration between your client and Easley. Courts routinely compel arbitration-related documents where, as here, there is a protective order in place to ensure their continuing confidentiality. *E.g., DNA Genotek Inc. v. Spectrum*, No. 21cv516-DMS-LL, 2021 U.S. Dist. LEXIS 23954, at *9-14 (S.D. Cal. Dec. 14, 2021). But even setting aside Plaintiff's instruction to Easley to not produce responsive documents, the foregoing documents appear to be responsive to numerous requests to Plaintiff and Kennedy, including but not limited to Nos. 2, 27, 28, 29, 30 and 32 to Plaintiff and No. 8 to Kennedy. Please immediately advise us if Plaintiff will produce these documents, and if not, the objections supporting and the bases for its refusal. Defendants reserve all rights.

David will respond to your email regarding the impact value for seasons 2 and 3 later this week.

2

Regards,
Safia

---

**From:** Jeremy J. Osher <josher@bollaw.com>
**Sent:** Tuesday, May 3, 2022 10:05 AM
**To:** Safia Gray Hussain <sghussain@loeb.com>
**Cc:** David Grossman <dgrossman@loeb.com>; Jeremy J. Osher <josher@bollaw.com>; Aaron M. Gladstein <agladstein@bollaw.com>; Matthew Tom <mtom@bollaw.com>
**Subject:** RE: Irish Rover Entertainment, LLC v. Aaron Sims, et al.

Hello Safia-

What is the ETA for the amended responses regarding impact value?

Thanks,

Jeremy J. Osher, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
Telephone: (310) 322-2021 ext. 225
email: josher@bollaw.com
web: www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*

---

**From:** Safia Gray Hussain <sghussain@loeb.com>
**Sent:** Thursday, April 28, 2022 1:35 PM
**To:** Jeremy J. Osher <josher@bollaw.com>
**Cc:** David Grossman <dgrossman@loeb.com>
**Subject:** RE: Irish Rover Entertainment, LLC v. Aaron Sims, et al.

We are still working with our client on that information and will provide it as soon as possible; hopefully next week.

---

**From:** Jeremy J. Osher <josher@bollaw.com>
**Sent:** Thursday, April 28, 2022 8:50 AM
**To:** Safia Gray Hussain <sghussain@loeb.com>
**Cc:** Jeremy J. Osher <josher@bollaw.com>
**Subject:** RE: Irish Rover Entertainment, LLC v. Aaron Sims, et al.

Thanks Safia.

I assume you also will be serving amended responses to SROGS concerning impact value?

Regards,

Jeremy J. Osher, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
Telephone: (310) 322-2021 ext. 225
email: josher@bollaw.com
web:  www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged.  If you are not the intended recipient, you may not read, copy, distribute, or use this information.  If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*

---

**From:** Safia Gray Hussain <sghussain@loeb.com>
**Sent:** Thursday, April 28, 2022 8:15 AM
**To:** Jeremy J. Osher <josher@bollaw.com>
**Cc:** Matthew Tom <mtom@bollaw.com>; David Grossman <dgrossman@loeb.com>; Aaron M. Gladstein <agladstein@bollaw.com>
**Subject:** Re: Irish Rover Entertainment, LLC v. Aaron Sims, et al.

Hi Jeremy,

We expect to make a production this week.

Best,
Safia

> On Apr 27, 2022, at 5:40 PM, Jeremy J. Osher <josher@bollaw.com> wrote:
>
>
>
> Hello Safia-
>
> Following up on this.
>
> Thanks
>
> Jeremy J. Osher, Esq.
> Boren, Osher & Luftman, LLP
> 222 N. Pacific Coast Highway, Suite 2222
> El Segundo, California 90245
> Telephone: (310) 322-2021 ext. 225
> email:josher@bollaw.com
> web: www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*

---

**From:** Jeremy J. Osher
**Sent:** Friday, April 22, 2022 12:32 PM
**To:** 'Safia Gray Hussain' <sghussain@loeb.com>
**Cc:** Matthew Tom <mtom@bollaw.com>; David Grossman <dgrossman@loeb.com>; Aaron M. Gladstein <agladstein@bollaw.com>; Jeremy J. Osher <josher@bollaw.com>
**Subject:** RE: Irish Rover Entertainment, LLC v. Aaron Sims, et al.

Hello Safia-

Thank you for your response.

Please let me know when you will be providing the impact value information and the streaming information.

I will again confer with my client regarding his production of documents and let you know whether there are any additional materials to produce.

Regards,

Jeremy J. Osher, Esq.
Boren, Osher & Luftman, LLP
222 N. Pacific Coast Highway, Suite 2222
El Segundo, California 90245
Telephone: (310) 322-2021 ext. 225
email:josher@bollaw.com
web: www.bollaw.com

*This message and any attached documents contain information from the law firm of Boren, Osher & Luftman, LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply email and then delete this message.*

---

**From:** Safia Gray Hussain <sghussain@loeb.com>
**Sent:** Tuesday, April 19, 2022 4:51 PM
**To:** Jeremy J. Osher <josher@bollaw.com>
**Cc:** Matthew Tom <mtom@bollaw.com>; David Grossman <dgrossman@loeb.com>; Aaron M. Gladstein <agladstein@bollaw.com>
**Subject:** RE: Irish Rover Entertainment, LLC v. Aaron Sims, et al.

Jeremy,

We write in response to your email of April 13, 2022, regarding the remaining damages discovery issues.

We are disappointed by plaintiff's unwillingness to consider reasonable compromises to fully resolve the outstanding disputes regarding damages discovery, including with respect to the impact value for seasons 2 and 3 of *Stranger Things*—and especially in light of plaintiff's failure and refusal to identify any infringing elements in seasons 2 & 3 of the Series that did not appear in or were not derived from season 1.  While we do not consider the statement that the information sought is "relevant to the damages analysis" to be a good-faith attempt to meet and confer, regardless, in hopes of finally moving forward from this round of discovery, and to avoid burdening the Court with wasteful motion practice, Netflix will agree to provide the impact value for seasons 2 and 3.

Again, the streaming information requested is well outside the scope of thediscoverable damages period and Netflix does not agree that the requested data will somehow "indicate the increase in streaming that Netflix experienced prior to the release to *Stranger Things*, which will serve as a benchmark to compare the increase in streaming after the release of*Stranger Things*."  Nonetheless, in an effort to put this issue to rest, Netflix will agree to provide this information.

Netflix cannot agree, however, to produce all of the underlying consumer products licensing agreements for the Series. Netflix does not agree that Plaintiff has explained how that information is relevant to copyright infringement damages.  The de minimis relevance (if any) of this information is far outweighed by the burden on Netflix of collecting and producing the underlying agreements, which contain confidential information of third parties to this lawsuit.  Further, Plaintiff's unpublished screenplay,*Totem*, is not substantially similar to *Stranger Things*, no character in*Stranger Things* is even arguably similar to any of the characters in *Totem*, and there is no basis for the assertion that individual consumer products licensing agreements will be relevant to this case.  These agreements relate to toys, clothes and merchandise that have no bearing on anything in plaintiff's screenplay, and are far beyond the scope of permissible discovery.

Finally, we again note that plaintiff continues to press for damages discovery notwithstanding its (and its principal, Jeffrey Kennedy's) failure and claimed inability to produce communications relating and relevant to its claim, as well as to Defendants' defenses—including, but not limited to, Kennedy's submissions of his work to dozens of companies and writing competitions—on the purported basis of a virus that somehow deleted his emails.  As we are not aware of a PC-based virus that could delete emails stored on a web-based platform, and Kennedy continued to use the AOL account at least until 2020 (i.e., IRISH 100082), we would appreciate additional details regarding the nature of the claimed virus and plaintiff's (and Kennedy's) efforts to recover, maintain and collect emails for purposes of this litigation.  For example, when did this virus occur?  Did plaintiff engage a third-party vendor to conduct a forensic analysis of the computer and email account, and/or to collect emails?  Kennedy's document production also includes at least one email forwarded to mkenn1058@aol.com; please confirm that plaintiff and Kennedy searched this email address for additional responsive documents.  Additionally, given that (1) plaintiff was able to identify dozens of email addresses relating to such submissions in a written discovery response, and (2) plaintiff's document production includes photographs/scans of hard copy documents dating back over a decade (i.e., IRISH 01352, IRISH 01672), Defendants have reason to believe that plaintiff and Kennedy maintained hard copies of*Totem*-related materials that have not been produced in this litigation.  Please confirm that plaintiff and Kennedy have searched for, and produced, all hard copy documents responsive to Defendants' document requests and subpoena.  In short, plaintiff's and Kennedy's meager document productions—and explanations therefor—remain woefully deficient; Defendants reserve the right to seek all appropriate remedies against plaintiff in connection with its failure to produce relevant documents.

Thank you,
Safia

# EXHIBIT E

1  BOREN, OSHER & LUFTMAN, LLP
2  Jeremy J. Osher (SBN 192109)
   josher@bollaw.com
3  Brittanee A. Marksbury (SBN 315579)
4  bmarksbury@bollaw.com
   222 N. Pacific Coast Highway, Suite 2222
5  El Segundo, CA 90245
6  Telephone: (310) 322-2021
   Facsimile: (310) 322-2228
7
8  Attorneys for Plaintiff,
   IRISH ROVER ENTERTAINMENT,
9  LLC

10              **UNITED STATES DISTRICT COURT**

11         **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

12

| | |
|---|---|
| 13 IRISH ROVER ENTERTAINMENT, LLC, a California limited liability company, | Case No.: 2:20-cv-06293-CBM-PLA |
| 14 | **PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S RESPONSES TO DEFENDANT NETFLIX, INC.'S INTERROGATORIES (SET ONE)** |
| 15 | |
| 16                    Plaintiff, | |
| 17         vs. | |
| 18 AARON SIMS, an individual; MATT DUFFER, an individual; ROSS DUFFER, an individual; NETFLIX INC., a Delaware corporation; NETFLIX STREAMING SERVICES, INC., a Delaware corporation; 21 LAPS INC., a California corporation; and DOES 1 through 50, inclusive, | First Amended Complaint Filed: October 12, 2020 |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24                    Defendants. | |
| 25 | |

26  PROPOUNDING PARTY:      DEFENDANT NETFLIX, INC.

27  RESPONDING PARTY:      PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC

28  SET NUMBER:      ONE (1)

---

PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S RESPONSES TO DEFENDANT NETFLIX, INC.'S
INTERROGATORIES (SET ONE)

Pursuant to Rule 33 of the *Federal Rules of Civil Procedure*, Plaintiff IRISH ROVER ENTERTAINMENT, LLC (hereafter, "Responding Party"), hereby objects and responds to Defendant NETFLIX, INC's (hereafter "Propounding Party") Interrogatories, Set One, as follows:

## PRELIMINARY STATEMENT

Responding Party has not fully completed its investigation of the facts relating to this case, discovery in this action or preparation for trial. All of the responses contained herein are based only upon such information and documents that are presently available to, and specifically known to the Responding Party. It is anticipated that further discovery, independent investigation, legal research and analysis will supply additional facts, which may, in turn, clarify and add meaning to known facts as well as establish entirely new factual matters, all of which will lead to substantial additions to, changes in, and variations from the contentions and responses herein set forth.

The following responses are given without prejudice to Responding Party's right to produce evidence of any subsequently discovered fact or facts, witnesses or information which this Responding Party may later recall or to produce any subsequently obtained documents or other tangible things. Responding Party accordingly reserves the right to change any and all responses herein as additional facts are ascertained, analyses are made, legal research is completed and contentions are formulated. The responses contained herein are made in a good faith effort to supply as much factual information and as much specification of legal contentions as is presently known but should in no way be to the prejudice of this Responding Party in relation to further discovery, research, or analysis. This preliminary statement is incorporated into each and every response set forth below.

## GENERAL OBJECTIONS

Responding Party generally objects to the Interrogatories on the following grounds, each of which is incorporated in the responses to the individual Interrogatories below. All responses set forth herein are subject to and without waiver of any of these General Objections.

1.    Responding Party objects to the Interrogatories to the extent they would impose an obligation on Responding Party outside the Local Civil Rules of the United States District Court for the Central District of California and other statutes, rules, guidelines or common law.

2.    Responding Party objects to the Interrogatories to the extent they seek or require the disclosure of information that is protected from discovery by the attorney-client privilege, the attorney work product doctrine, the joint prosecution or common interest privilege, the right to privacy, proprietary rights or any other applicable privilege or immunity.  Such production as may hereafter occur pursuant to the Interrogatories shall not include any information protected by such privileges or doctrines.  Inadvertent production of any information protected by an applicable privilege or doctrine is not intended to constitute, and shall not constitute, a waiver in whole or in part of any applicable privilege, protection, immunity, doctrine or objection.

3.    Responding Party objects to the Interrogatories to the extent they seek information that is beyond the scope of permissible discovery.

4.    Responding Party objects to the Interrogatories to the extent that they seek information which is not within Responding Party's possession, custody or control.

5.    Responding Party objects to the Interrogatories to the extent they are overly broad as to time and/or scope.

6.    Responding Party objects to the Interrogatories to the extent they seek information that can be found in the pleadings in this or any other action.

7.    Responding Party objects to the Interrogatories to the extent they require Responding Party to make legal conclusions.

8.    Responding Party objects to the Interrogatories insofar as they are vague, ambiguous, harassing overly broad or burdensome, and to the extent that the discovery sought is unreasonable cumulative, duplicative or disproportionate.

///

///

9.    Responding Party objects to the Interrogatories insofar as they seek information that is irrelevant to any claim, defense or subject matter of the litigation or is not reasonably calculated to lead to the discovery of admissible evidence.

10.    Responding Party objects to the Interrogatories to the extent they fail to state with particularity the information to be provided.

11.    Responding Party objects to the Interrogatories to the extent they constitute contention discovery that is premature at this stage of the litigation and is invasive of the attorney work product doctrine.

12.    Responding Party objects to the Interrogatories to the extent they prematurely seek information related to experts, expert testimony or opinion at a time when no experts have been designated and when the Court has not yet determined a date for expert discovery.

13.    In providing information in response to the Interrogatories, Responding Party does not in any way waive, or intend to waive, but rather intends to preserve and is preserving:

(a)    all objections as to competency, relevancy, materiality, and/or admissibility of any Interrogatory, the responses and their subject matter;

(b)    all objections as to vagueness, ambiguity or other infirmity in the form of the Interrogatories, any objections based on undue burden imposed by the Interrogatories and each individual interrogatory contained therein;

(c)    all rights to object on any ground to the use of any of the information in any subsequent proceedings, including the trial of this or any other action;

(d)    the right to supplement responses to the Interrogatories; and

(e)    any and all privileges and rights under the applicable Local Civil Rules of the United States District Court for the Central District of California and other statutes, rules, guidelines or common law;

(f)    Responding Party reserves the right to amend, modify and supplement these responses should additional discovery warrant such amendment, modification

or supplementation.

14.   The following specific responses are subject to and limited by these General Objections.  By setting forth specific objections, Responding Party does not intend to limit or restrict these General Objections.   Responding Party incorporates these General Objections into its responses to each of the Interrogatories.  To the extent that Responding Party objects to the Interrogatories, any stated objections are not waived by providing responses.   In addition, the inadvertent disclosure of privileged information shall not constitute a waiver of any applicable privilege.  Responding Party also expressly preserves the right to object to further discovery, to the subject matter of the Interrogatories and to the introduction of any of these responses or any portion thereof into evidence in this action.

## **OBJECTIONS & RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1:**

IDENTIFY all owners, members, officers and employees of PLAINTIFF.

**RESPONSE TO INTERROGATORY NO. 1:**

Objection.  Responding Party incorporates by reference as set forth in full, its general objections one through twelve above.  As phrased, this request is vague, ambiguous and overbroad as to time.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

- Jeffrey Kennedy (Owner, Member & Managing Partner):  Contact through Jeremy J. Osher, Boren, Osher & Luftman, LLP, 222 N. Pacific Coast Highway, Ste. 2222, El Segundo, CA 90245.

- Charles Brink (Owner, Member):  Contact through Jeremy J. Osher, Boren, Osher & Luftman, LLP, 222 N. Pacific Coast Highway, Ste. 2222, El Segundo, CA 90245.

- Machiel Kennedy 2007 Revocable Trust (Owner, Member):  The trust beneficiaries are as follows:
  - Jeffrey Kennedy
  - Laurie Costello

4

o   Kelly Kennedy.

Contact trust beneficiaries through Jeremy J. Osher, Boren, Osher & Luftman, LLP, 222 N. Pacific Coast Highway, Ste. 2222, El Segundo, CA 90245.

**INTERROGATORY NO. 2:**

IDENTIFY all PERSONS, including without limitation, employees, representatives or agents of PLAINTIFF, as well as non-parties to this action, involved in the creation, development, registration, use, marketing and/or advertising of the *TOTEM* WORKS and the *TOTEM* FILM PROJECT.

**RESPONSE TO INTERROGATORY NO. 2:**

Objection.  Responding Party incorporates by reference as set forth in full, its general objections one through twelve above.  As phrased, this interrogatory is vague, ambiguous and overbroad.  Responding Party additionally objects to the extent that this interrogatory seeks private third-party information on the grounds that the disclosure of such information would constitute an invasion of privacy of those individuals as guaranteed by the Federal and California constitutions and applicable statutes.

Subject to and without waiving the foregoing objections, Responding Party responds as follows: Jeffrey Kennedy (Irish Rover Ent.); Machiel Kennedy (Irish Rover Ent.); Charles Brink (Irish Rover Ent.); Pierre de Lespinois (Evergreen Films); Frances LoCascio (Evergreen Films); Jean Pierre de Lespinois (Evergreen Films); Mike Devlin (Evergreen Films); John Copeland (Evergreen Films; pigdog13@mac.com); Tom Marnell (Evergreen Films); Pat Devlin (Evergreen Films); Pete Von Sholly (Evergreen Films); John Sullivan (Evergreen Films); Mick Pacifici (Evergreen Films); Christina Newhall (Evergreen Films); Chad Gesson (Evergreen Films); Aaron Sims (Aaron Sims Creative); John Norris (Aaron Sims Creative); Steffen Reichstadt (Aaron Sims Creative); Jerad Merantz (Aaron Sims Creative); Alexander Mandradjiev (Aaron Sims Creative); Various employees of Aaron Sims Creative; Fred Bernstein (Astute Films); Terry McFadden (Storybuilders; terrintoit@att.net).  Discovery is continuing and Responding Party reserves the right to supplement this response upon completion of further discovery.

5

**INTERROGATORY NO. 3:**

IDENTIFY all PERSONS with knowledge or information CONCERNING the creation, development, registration, use, marketing and/or advertising of the *TOTEM* WORKS and the *TOTEM* FILM PROJECT.

**RESPONSE TO INTERROGATORY NO. 3:**

Objection. Responding Party incorporates by reference as set forth in full, its general objections one through twelve above. As phrased, this interrogatory is vague, ambiguous, overbroad and unduly burdensome. Responding Party additionally objects to the extent that this interrogatory seeks private third-party information on the grounds that the disclosure of such information would constitute an invasion of privacy of those individuals as guaranteed by the Federal and California constitutions and applicable statutes.

Subject to and without waiving the foregoing objections, Responding Party responds as follows: Jeffrey Kennedy (Irish Rover Ent.); Machiel Kennedy (Irish Rover Ent.); Charles Brink (Irish Rover Ent.); Pierre de Lespinois (Evergreen Films); Frances LoCascio (Evergreen Films); Jean Pierre de Lespinois (Evergreen Films); Mike Devlin (Evergreen Films); John Copeland (Evergreen Films; pigdog13@mac.com); Tom Marnell (Evergreen Films); Pat Devlin (Evergreen Films); Pete Von Sholly (Evergreen Films); John Sullivan (Evergreen Films); Mick Pacifici (Evergreen Films); Christina Newhall (Evergreen Films); Chad Gesson (Evergreen Films); Aaron Sims (Aaron Sims Creative); John Norris (Aaron Sims Creative); Steffen Reichstadt (Aaron Sims Creative); Jerad Merantz (Aaron Sims Creative); Alexander Mandradjiev (Aaron Sims Creative); Various employees of Aaron Sims Creative; Matt Duffer (Monkey Massacre); Ross Duffer (Monkey Massacre); Shawn Levy (21 Laps Ent.); Dan Cohen (21 Laps, Ent.); Various employees at 21 Laps Entertainment; Cindy Holland (Netflix; chollandnyc@hotmail.com); Kate Chilton (Netflix; kchilton@netflix.com); Elizabeth Bradley (Netflix; ebradley@netflix.com); Bryan Crocker (Multicom Ent. Group; bryan.crocker@gmail.com); Fred Bernstein (Astute Films). Discovery is continuing and Responding Party reserves the right to supplement this response upon completion of further discovery.

6

**INTERROGATORY NO. 4:**

IDENTIFY all PERSONS to whom YOU provided any of the *TOTEM* WORKS, including any producers, directors, actors, film festivals, investors or artists.

**RESPONSE TO INTERROGATORY NO. 4:**

Objection.  Responding Party incorporates by reference as set forth in full, its general objections one through twelve above.  Responding Party objects on the grounds that this interrogatory is overbroad and unduly burdensome.  Responding Party additionally objects to the extent that this interrogatory seeks private third-party information on the grounds that the disclosure of such information would constitute an invasion of privacy of those individuals as guaranteed by the Federal and California constitutions and applicable statutes.  This interrogatory also seeks information that is equally available to Propounding Party; Responding Party does not have a duty to make reasonable efforts to obtain requested information that is equally available to the propounding party.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:  Jeffrey Kennedy (Irish Rover Ent.); Machiel Kennedy (Irish Rover Ent.); Charles Brink (Irish Rover Ent.); Pierre de Lespinois (Evergreen Films); Frances LoCascio (Evergreen Films); Mike Devlin (Evergreen Films); John Copeland (Evergreen Films; pigdog13@mac.com); Tom Marnell (Evergreen Films); Pat Devlin (Evergreen Films); Pete Von Sholly (Evergreen Films); John Sullivan (Evergreen Films); Aaron Sims (Aaron Sims Creative); John Norris (Aaron Sims Creative); Steffen Reichstadt (Aaron Sims Creative); Ari Emanuel (William Morris Endeavor Agency; Boomer Malkin (William Morris Endeavor Agency); Patrick Whitesell (William Morris Endeavor Agency); Christopher Nolan (William Morris Endeavor Agency); Various employees of William Morris Endeavor Agency; Richard Lovett (Creative Artists Agency); Maha Dakhil (Creative Artists Agency); Brian Kend (Creative Artists Agency); Todd Feldman (Creative Artists Agency); Dan Rabinow (Creative Artists Agency); Rowena Arguelles (Creative Artists Agency); Praveen Pandian (Creative Artists Agency); Various employees of Creative Artists Agency; Rick Yorn (Appian Way); Winona Ryder (via The Gersh Agency

and Anonymous Content); Manoj Nelliyattu "M. Night" Shyamalan (Blinding Edge Pictures); Guymon Cassady (Management 360); Chantal Nong (Warner Bros. Studios); Courtenay Valenti (Warner Bros. Studios); Lee Baker (Advent FX); Cindy Holland (Netflix; chollandnyc@hotmail.com); Kate Chilton (Netflix; kchilton@netflix.com); Bryan Crocker (Multicom Ent. Group; bryan.crocker@gmail.com); Cristina Oh (Plan B); Alan Bergman (Disney); Gary Ungar (Exile Ent.); Ben Affleck (Pearl Street Ent.); Drew Vinton (Pearl Street Ent.); Jennifer Todd (Pearl Street Ent.); Drew Barrymore (Flower Films); Emmanuelle Chriqui (via Paradim Talent Agency & Management 360); Dawn Saltzman (Mosaic); Paul Nelson (Mosaic); Terry McFadden (Storybuilders; terrintoit@att.net); Bonni Lee (Village Roadshow Pictures); Brian Philipson (STX Ent.); Adam Fogelson (STX Ent.); Michael Brown (Investor; michaeljbrown@kingchanceinvestments.com); Bridget Johnson (Bridget Johnson Films; bj@bjfilms.com); Fred Bernstein (Astute Films); Josh Berman (bermanjosh@aol.com); Mike Zanuck (Michael Zanuck Agency); Olivia May (Michael Zanuck Agency); Ashley Bretz (ashley.bretz@gmail.com); Aaron Revoir (arevoir@sbcglobal.net); Amanda Lamb (amanda@benarrochproductions.com); Vicki Higgins (vhiggins@lainc.us); Colby Huffman (colbyhuffman@hotmail.com); Tom Moretto (tom_moretto@ahni.com); Powers Kane (gpowers41@gmail.com); Gerrit Ritt (g_madness@yahoo.com); Narmar Hannah (narmar777@yahoo.com); Billy Omer (willomer11@yahoo.com); Jared Jacobs (jazzues@aol.com; jazzues@mac.com); Mike Zent (mikezent@gmail.com); Jan Elkins (kathrnhiks@aol.com); Norm Elkins (nelkins@benton.k12.in.us); Laurie Costello (bugracer99@aim.com); Ken Costello (nekisken11@yahoo.com); Kelly Kennedy (kelmarken@aol.com); Terry Flynn (terry.flyn@fahertygroup.com); Bradley Berger (bradleyberger@hotmail.com); Mark Avey (bossfanmarka@gamil.com); Zand Broumand (zandbroumand@gmail.com); George Garritano (georgegarritano1@gmail.com); Jon Jones (directorjon@gmail.com); Becky Georgi (becky.georgi@gmail.com); Jon Doyle (jondice77@gmail.com); Jill Tomback; Bluecat Screenplay Competition; Scriptapalooza International Screenplay Competition; Nicoll Fellowship Screenwriting Competition;

Table Read My Screenplay; 5th Annual Sci-Fi/Fantasy Screenwriting Contest; PAGE International Screenwriting Awards; Live Read/LA; Filmmakers International Screenwriting Awards; Los Angeles Screenwriting Contest; Filmfreeway.com; Blcklst.com; Kickstarter.com. Discovery is continuing and Responding Party reserves the right to supplement this response upon completion of further discovery.

**INTERROGATORY NO. 5:**

IDENTIFY all PERSONS with whom YOU discussed any prospectus, pitch or request for financing RELATING TO the *TOTEM* WORKS.

**RESPONSE TO INTERROGATORY NO. 5:**

Objection. Responding Party incorporates by reference as set forth in full, its general objections one through twelve above. As phrased, this interrogatory is vague, ambiguous, overbroad and unduly burdensome. Responding Party is unable, without speculating, to determine what the terms "prospectus" and "pitch" are intended to mean. Responding Party additionally objects to the extent the interrogatory seeks private third-party information on the grounds that the disclosure of such information would constitute an invasion of privacy of those individuals as guaranteed by the Federal and California constitutions and applicable law. This interrogatory also seeks information that is equally available to Propounding Party; Responding Party does not have a duty to make reasonable efforts to obtain requested information that is equally available to the propounding party.

Subject to and without waiving the foregoing objections, Responding Party responds as follows: Jeffrey Kennedy (Irish Rover Ent.); Machiel Kennedy (Irish Rover Ent.); Charles Brink (Irish Rover Ent.); Pierre de Lespinois (Evergreen Films); Frances LoCascio (Evergreen Films); Mike Devlin (Evergreen Films); John Copeland (Evergreen Films; pigdog13@mac.com); Tom Marnell (Evergreen Films); Pat Devlin (Evergreen Films); Pete Von Sholly (Evergreen Films); John Sullivan (Evergreen Films); Aaron Sims (Aaron Sims Creative); John Norris (Aaron Sims Creative); Steffen Reichstadt (Aaron Sims Creative); Ari Emanuel (William Morris Endeavor Agency; Boomer Malkin (William Morris Endeavor Agency); Patrick Whitesell (William Morris Endeavor Agency);

Christopher Nolan (William Morris Endeavor Agency); Various employees of William Morris Endeavor Agency; Richard Lovett (Creative Artists Agency); Maha Dakhil (Creative Artists Agency); Brian Kend (Creative Artists Agency); Todd Feldman (Creative Artists Agency); Dan Rabinow (Creative Artists Agency); Rowena Arguelles (Creative Artists Agency); Praveen Pandian (Creative Artists Agency);Various employees of Creative Artists Agency; Rick Yorn (Appian Way); Winona Ryder (via The Gersh Agency and Anonymous Content); Manoj Nelliyattu "M. Night" Shyamalan (Blinding Edge Pictures); Guymon Cassady (Management 360); Chantal Nong (Warner Bros. Studios); Courtenay Valenti (Warner Bros. Studios); Lee Baker (Advent FX); Cindy Holland (Netflix; chollandnyc@hotmail.com); Kate Chilton (Netflix; kchilton@netflix.com); Bryan Crocker (Multicom Ent. Group; bryan.crocker@gmail.com); Cristina Oh (Plan B); Alan Bergman (Disney); Gary Ungar (Exile Ent.); Ben Affleck (Pearl Street Ent.); Drew Vinton (Pearl Street Ent.); Jennifer Todd (Pearl Street Ent.); Drew Barrymore (Flower Films); Emmanuelle Chriqui (via Paradim Talent Agency & Management 360); Dawn Saltzman (Mosaic); Paul Nelson (Mosaic); Terry McFadden (Storybuilders; terrintoit@att.net); Bonni Lee (Village Roadshow Pictures); Brian Philipson (STX Ent.); Adam Fogelson (STX Ent.); Michael Brown (Investor); Fred Bernstein (Astute Films); Bluecat Screenplay Competition; Scriptapalooza International Screenplay Competition; Nicoll Fellowship Screenwriting Competition; Table Read My Screenplay; 5th Annual Sci-Fi/Fantasy Screenwriting Contest; PAGE International Screenwriting Awards; Live Read/LA; Filmmakers International Screenwriting Awards; Los Angeles Screenwriting Contest; Filmfreeway.com; Blcklst.com; Kickstarter.com.  Discovery is continuing and Responding Party reserves the right to supplement this response upon completion of further discovery.

## INTERROGATORY NO. 6:

IDENTIFY the date on which YOU first became aware of *STRANGER THINGS*.

///

///

**RESPONSE TO INTERROGATORY NO. 6:**

Objection. Responding Party incorporates by reference as set forth in full, its general objections one through twelve above.  As phrased, this interrogatory is vague and ambiguous.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:  Responding Party does not recall the date on which he first became aware of Stranger Things.

**INTERROGATORY NO. 7:**

IDENTIFY the date on which YOU first watched the first season of *STRANGER THINGS*.

**RESPONSE TO INTERROGATORY NO. 7:**

Objection. Responding Party incorporates by reference as set forth in full, its general objections one through twelve above. As phrased, this interrogatory is vague and ambiguous.

Subject to and without waiving the foregoing objections, Responding Party responds as follows: Responding Party does not recall the date on which he first watched the first season of Stranger Things.

**INTERROGATORY NO. 8:**

IDENTIFY all PERSONS with knowledge or information CONCERNING DEFENDANTS' alleged infringement of the *TOTEM* WORKS.

**RESPONSE TO INTERROGATORY NO. 8:**

Objection. Responding Party incorporates by reference as set forth in full, its general objections one through twelve above.  As phrased, this interrogatory is vague, ambiguous and overbroad.  Responding Party additionally objects to the extent the interrogatory seeks private third-party information on the grounds that the disclosure of such information would constitute an invasion of privacy of those individuals as guaranteed by the Federal and California constitutions and applicable law.  This interrogatory also seeks information that is equally available to Propounding Party; Responding Party does not have a duty to

make reasonable efforts to obtain requested information that is equally available to the propounding party.

Subject to and without waiving the foregoing objections, Responding Party responds as follows: Jeffrey Kennedy (Irish Rover Ent.); Charles Brink (Irish Rover Ent.); Matt Duffer (Monkey Massacre); Ross Duffer (Monkey Massacre); Shawn Levy (21 Laps Ent.); Dan Cohen (21 Laps, Ent.); Aaron Sims (Aaron Sims Creative); John Norris (Aaron Sims Creative); Steffen Reichstadt (Aaron Sims Creative); Jerad Merantz (Aaron Sims Creative); Alexander Mandradjiev (Aaron Sims Creative); Cindy Holland (Netflix; chollandnyc@hotmail.com); Kate Chilton (Netflix; kchilton@netflix.com); Reed Hastings (Netflix); Ted Serandos (Netflix); Greg Peters (Netflix); Spencer Neumann (Netflix); Spencer Wang (Netflix); Brian Wright (Netflix); Matt Thunell (Netflix); Karl Gajdusek (Netflix); Iain Paterson (Netflix); Pierre de Lespinois (Evergreen Films); Frances LoCascio (Evergreen Films); Mike Devlin (Evergreen Films); John Copeland (Evergreen Films); Tom Marnell (Evergreen Films); Pat Devlin (Evergreen Films); Pete Von Sholly (Evergreen Films); John Sullivan (Evergreen Films); Bryan Crocker (Multicom Ent. Group; bryan.crocker@gmail.com).   Discovery is continuing and Responding Party reserves the right to supplement this response upon completion of further discovery.

**INTERROGATORY NO. 9:**

IDENTIFY which individual DEFENDANTS "have directly infringed" the *TOTEM* WORKS, as alleged in paragraphs 175-178 and 187-190 of the FAC, and describe with reasonable specificity each such allegedly infringing act.

**RESPONSE TO INTERROGATORY NO. 9:**

Objection.  Responding Party incorporates by reference as set forth in full, its general objections one through twelve above.  This interrogatory calls for a legal conclusion and/or opinion.  Responding Party additionally objects to this interrogatory on the grounds that it is premature and purports to impose burdens on Plaintiff that are inconsistent with, or not otherwise authorized by, the Federal Rules of Civil Procedure and/or the Local Rules. Responding Party further objects to this request on the grounds that it calls for premature

12

expert discovery, in violation of Rule 26 of the Federal Rules of Civil.  Responding Party objects to the extent that this interrogatory seeks information protected under the attorney-client privilege and/or attorney work product doctrine.  This interrogatory also seeks information that is equally available to Propounding Party; Responding Party does not have a duty to make reasonable efforts to obtain requested information that is equally available to the propounding party.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:  Defendants Aaron Sims, Matt Duffer, Ross Duffer, Netflix, Inc., Netflix Streaming Services, Inc. and 21 Laps, Inc. (collectively, "Defendants") have directly infringed the copyrights in the Totem Works (as used herein, the term "Totem Works" means the screenplays and concept art at issue in this action - USDC, C.D. Cal., Case No. 2:20-cv-06293-CBM-PLA).  Specifically, Defendants have: (1) prepared unauthorized derivative works of the Totem Works that have been incorporated into the television series *Stranger Things*; (2) reproduced copyrighted elements of the Totem Works in the television series *Stranger Things*; and (3) publicly performed the television series *Stranger Things* on the Netflix streaming platform, which contains copyright elements of the Totem Works. The specifics of the infringing actions and the events leading up to said actions are as follows:

In or around May 2009, Aaron Sims was contracted to create key art work, promotional artwork, first class storyboards, creatures, visual effects, design and creation of CGI characters for the Totem Screenplays.  As a result, from that day forward, Sims was given direct access to the copyrighted Totem Screenplays and was intimately involved in the development and creation of the accompanying concept art.  Between 2009 and 2010, Sims was privy to Plaintiff's marketing pitch, participated in producer note sessions, was privy to Plaintiff's casting choices, was provided with Plaintiff's designs and physical drawings of set pieces, and was provided with photographs showcasing the project's visual imagery.  In or around June 2009, Plaintiff also provided Sims with a folder containing photos to showcase imagery as well as a drawing of the layout of the backyard for Jackson

and Autumn Chance's home.  Based on this, Sims provided the first round of the *Totem* Concept Art to Plaintiff in July 2009 and continued to provide weekly updates for, and revisions to, the *Totem* Concept Art.  Between August 2009 and the Spring of 2013, Plaintiff: (1) provided Sims with various versions of the Totem Screenplays; and (2) received the finalized concept art, storyboards, and live action demo created for said screenplays, all of which was copyrighted by Plaintiff.

In or around Spring 2013, Sims began working with Matt and Ross Duffer (collectively, the "Duffer Brothers").  Within months of Sims meeting the Duffer Brothers, the Duffer Brothers created a skeleton outline for what was to become the Netflix television series, *Stranger Things*.  Notably, *Stranger Things* incorporated elements from the Totem screenplays as well as from the concept art.  Shortly thereafter, the Duffer Brothers created the pilot for *Stranger Things* and teamed up with production company 21 Laps Entertainment.  In March 2015, the show was sold to Netflix and distributed by Netflix, Inc. and Netflix Streaming Services, Inc. (collectively, the "Netflix Entities").  Sims was additionally hired to create the concept art for seasons 1 and 2 of *Stranger Things*.

Plaintiff contends that Sims shared the copyrighted *Totem* screenplays and related concept art with the Duffer Brothers, who then infringed on Plaintiff's exclusive rights in and to these protected works.  At the point when Defendants realized they were producing a derivative work based on the Totem copyrighted work, or at least were incorporating protected elements from the screenplays and concept art, they were obligated to: (1) obtain a license from Plaintiff as the exclusive owner of all copyright rights in the Totem Works; and (2) give credit to Kennedy as the author of the *Totem* screenplays and concept art. They failed to do this and instead unlawfully infringed on the copyrighted works as detailed below.

## Characters

There are nine (9) character comparisons in the primary story line of *Totem* Screenplays and *Stranger Things* that parallel each other. This is not an exhaustive comparison of the similarities between the characters in the two stories:

| *Totem* | *Stranger Things* |
|---|---|
| **Jackson Chance**<br><br>Jackson Chance (hereafter, "Jackson") is the strong-willed protagonist, or story driver, of the screenplay *Totem*. Jackson believes his wife Autumn Chance was alive and taken by Azrael when no one else believed him. He is considered borderline psychotic and is treated as such by medical professionals, authorities, and friends. Jackson also experiences resistance from FBI Agent Sam Miller who has something to hide about his relationship with Autumn. Jackson's quest to find Autumn is fueled by his unconditional spousal love for her. His belief leads him on a desperate search for Autumn and ultimately into the alternate plane. In the process, he scatters sketches all over his family room to find answers. | **Joyce Byers**<br><br>Joyce Byers (hereafter, "Joyce") is the strong-willed protagonist, or story driver, of *Stranger Things*. She initiates and sustains an obsessive search for her son Will Byers (hereafter, "Will"), in the face of great resistance from everyone around her. She is considered borderline psychotic and is treated as such by friends, family, and acquaintances. Joyce also experiences resistance from Dr. Martin Brenner and his subordinates who would rather keep the existence of the Upside Down a secret. Joyce's quest to find Will is fueled by her unconditional motherly love for him.<br>Her belief leads her on a desperate search for Will and ultimately into the alternate plane. In the process, she uses Will's drawings to find answers. |
| **Dr. William Nerowe**<br><br>Dr. William Nerowe (hereafter, "Nerowe") is a long-time friend of Jackson's and is also his doctor. He has great affection for Jackson and that affection involves concern for him. Jackson has seizures as a result of his time spent in the Navy, which results in PTSD. When Jackson approaches Nerowe to convince him that Autumn is still alive, Nerowe grows concerned for Jackson's mental stability. Over time, he becomes convinced that, although there has been a funeral for Autumn, she needs to be rescued from wherever she is. He | **Jim Hopper**<br><br>Jim Hopper (hereafter, "Hopper") is a long-time friend of Joyce's and also the Chief of Police of Hawkins. He has great affection for Joyce, yet he knows that she can be neurotic at times. When Joyce approaches him with the concern that her son Will is missing, he blows her off. Once he becomes convinced that Will is still alive despite Will's funeral and is in great danger, he joins Joyce in her quest. He experiences resistance from his co-workers and others who believe that Will is dead. He and Joyce also experience resistance from Federal Authorities who |

| | |
|---|---|
| joins Jackson in his quest even though they experience resistance from FBI Agent Sam Miller who has something to hide. In the process of assisting Jackson on his improbable quest, Nerowe saves himself from his own cancer and other afflictions. | have something to hide. In the process of assisting Joyce on her improbable quest, Hopper resolves his depression and addictive behavior. |
| **Autumn Chance**<br><br>Autumn Chance can see the alternate plane during her spells. She uses drawings as a way of communicating what she sees in the alternate supernatural plane to the inhabitants of the earthly plane. Azrael abducts her from the shed and makes her a Grim. Autumn Chance is artistic and draws her visions and dreams.  She was physically and emotionally abused as a child by the caretakers at Evergreen Orphanage. When she is considered dead, a funeral is held for her. Autumn is the motive for Jackson's quest to reunite with her at all cost. | **Will Byers**<br><br>Will can see the earthly plane.  However, during his "spells/seizures", he can also see the alternate supernatural plane.  He uses drawings as a way of communicating what he sees in the alternate supernatural plane to the inhabitants of the earthly plane.  In Season 1, Will was abducted by the Demogorgon from the shed and in Season 2 the Shadow Monster takes hold of Will. He was emotionally abused by his father in early childhood.  He disappears and is considered dead. A funeral is held for him. He is the motive for Joyce's quest to reunite with him at all cost. |
| **Kimimela**<br><br>Kimimela (hereafter, "Kimi") is a ten-year-old girl, yet she is an old soul who functions well beyond her age. She has great spiritual powers. She is revered by those around her. She is the heart of the Lynx tribe. She is responsible for the creation of a gateway that allows Azrael, a demon entity, to enter this world. Her death would result in allowing Azrael to destroy humankind. She is wounded during the climax but convinces Nerowe that only he can destroy Azrael, which he does. | **Eleven**<br><br>Eleven is a twelve-year-old girl, yet she is an old soul who functions (perceives) well beyond her age. She has great psionic powers (psychokinetic, telepathic, and remote viewing). She is responsible for opening the 'Gate' that allows the Demogorgon/Shadow Monster/Mind Flayer to enter this world. Her death would result in allowing the Shadow Monster/Mind Flayer to destroy humankind. In Season 1, she obliterates a Demogorgon. In Season 2, with the help of Hopper, she banishes the Shadow |

|  | Monster/Mind Flayer by closing the gate. In Season 3, she is wounded near the climax, but convinces Billy Hargrove to stand against the Shadow Monster/Mind Flayer, which gives Joyce and Hopper time to close the gate and again defeat the Shadow Monster/Mind Flayer. |
|---|---|
| **Thunderbear**<br><br>In *Totem*, Thunderbear is the Shaman and unofficial chief of the Lynx tribe. He is also Kimi's protector and father figure. He is willing to sacrifice his life to save Kimi from harm. | **Mike Wheeler**<br><br>In *Stranger Things*, Mike Wheeler is the unofficial leader of the group of boys that Will belongs to, the group of boys that finds Eleven in the woods. Mike is Eleven's protector and future heartthrob. He puts himself in harm's way to save Eleven from danger. |
| **FBI Agent Sam Miller**<br><br>In *Totem*, FBI Agent Sam Miller is a secondary antagonist to the cohesion between Jackson and Nerowe in their quest to save Autumn. Sam, having been bullied as a child, feels that the world is against him and he must protect himself by playing the bully including threatening a child. A part of his bullying persona is that he is prejudiced against Native Americans. For instance, Sam says to the totem pole: "Stupid Injun stick! I hate you! Retarded Injuns! I will find you!"<br><br>Sam has a car accident in an industrial area and is captured by the monster Azrael, who forces Sam to do his bidding in his quest to destroy Kimi. Sam kills humans whose souls are imprisoned by | **Billy Hargrove**<br><br>In *Stranger Things*, Billy Hargrove is a secondary antagonist to the cohesion of the group fighting the Shadow Monster/Mind Flayer. Billy, having been bullied as a child, feels that the world is against him and he must protect himself by playing the bully including threatening his young sister and her friends. A part of that bullying persona is that he is prejudiced against Blacks. Several times in Season 2, he threatens Max for befriending Lucas Sinclair, who is Black. In Episode 4, Billy, referring to Lucas, verbally and physically threatens Max: "There's a certain type of people in this world that you stay away from, and that kid, Max, that kid is one of them." In Episode 5, he confronts her again for hanging out with Lucas. |

17

| | |
|---|---|
| Azrael. He wounds Kimi and incapacitates her, but ultimately meets his demise as a result.<br><br>Sam helps Azrael capture and take possession of human souls in the earthly plane which are then called Grims/Watchers. Sam and Azrael pursue Kimi and her friends to a cave, where a final battle ensues. | Billy has a car accident in an industrial area and is captured by the Mind Flayer. The Mind Flayer forces Billy to do his bidding in its quest to destroy Eleven. Billy kills humans whose souls are absorbed by the Mind Flayer. He abducts the wounded Eleven, but ultimately meets his demise as a result of Eleven's persuasion.<br><br>Billy helps the Shadow Monster/Mind Flayer capture and take possession of human souls in the earthly plane, which are then called "The Flayed". Billy and the Shadow Monster pursue Eleven and her friends to a mall, where a final battle ensues. |
| **Agent Cho**<br><br>Agent Cho is FBI Agent Sam Miller's superior. She radios directives to him while he is out in the field on duty. She chastises him when he steps out of line. | **Flo**<br><br>Flo is Jim Hopper's office manager at the police station. She radios directives to him while he is out in the field on duty. She chastises him for his eating and smoking habits. |
| **Azrael**<br><br>In *Totem*, Azrael is the evil figure that is released from the carbon-copy alternate supernatural dimension as a result of a totem gift shared by Kimi. Azrael's goal is to enslave and rule humanity. He does that by directing his Blackwolf Indian minions to kill humans and he imprisons their souls in a cloak of purple feathers thereby trapping them in a limbo and turning them into Grims/Watchers. He must kill Kimi, the External Light of | **Shadow Monster/Mind Flayer**<br><br>In *Stranger Things*, the Shadow Monster/Mind Flayer is a figure of pure evil that is released from the alternate supernatural dimension as a result of a burst of energy from Eleven that ruptures the "veil" between two dimensions. The Shadow Monster's goal is to enslave humanity. It does that by directing its Demogorgon minions (a/k/a Demo-Dogs) to abduct or consume humans and take them to the Upside Down (alternate |

| | |
|---|---|
| creation and the only one that can defeat him, in order to fulfill this quest.<br><br>Azrael has multiple appendages and often appears surrounded by lightning, as his powers are connected to electricity, and lightning storms are used as a symbolic device to announce Azrael. Azrael enters the earthly plane through a portal in a cave.<br><br>Azrael takes possession of human souls. These captured human souls under Azrael's control are called Grims/Watchers. | dimension). It must kill Eleven, the only one with power greater than its power, in order to fulfill its quest.<br><br>The Shadow Monster has multiple appendages and often appears surrounded by lightning, as its powers are connected to electricity, and lightning storms are used as a symbolic device to announce the Shadow Monster. The Shadow Monster enters the earthly plane through a portal under the Hawkins Laboratory.<br><br>The Shadow Monster/Mind Flayer takes possession of human souls. These captured human souls under the Shadow Monster/Mind Flayer's control are called "The Flayed". |
| **Blackwolf Indians/Black Wolves**<br><br>In *Totem*, Azrael uses a hive-mind army of supernatural creatures called Blackwolf Indians to do his bidding. The Blackwolf come from an alternate supernatural plane. The Blackwolf Indians/Black Wolves shape-shift back and forth from two-legged, upright beings to four-legged Black Wolves. | **Demogorgons/Demo-Dogs**<br>In *Stranger Things*, the Shadow Monster/Mind Flayer uses a hive-mind army of supernatural creatures called Demogorgon to do his bidding. The Demogorgon come from an alternate supernatural plane. They shape-shift back and forth from two-legged, upright humanoid monsters to four-legged Demo-Dogs. |

## Plot

*Totem* and *Stranger Things* share an overwhelming number of concrete plot elements that render the two works substantially similar. Stripping away secondary characters and plot lines necessary to expand the *Stranger Things* series into multiple episodes and seasons, the core plots of both stories parallel each other. The following plot elements appear in both works:

a.  Both *Totem* and *Stranger Things* revolve around the respective protagonists'
quests—Jackson in *Totem* and Joyce in *Stranger Things*—to rescue a loved one from
having been abducted by a monster and carried to an alternate dimension that is a
dark copy of their current reality. The respective monsters and shapeshifting minions
oppose that quest.

b.  In both projects, a pubescent girl—ten-year-old Kimi in *Totem* and twelve-year-old
Eleven in *Stranger Things*—is responsible for the rupture in the "veil" between the
human dimension and a dark, carbon-copy alternate dimension through which a
monster is able to invade the current human reality.

c.  In both projects, the hook of the respective plots relies on the conceit that there is an
independent agency of evil that wishes to destroy humanity, and to defeat this evil
all humanity must rely on the power of this single pubescent girl to close the rupture,
one acting directly and the other acting through the agency of another character.

d.  In *Totem*, Kimi, imbued with great spiritual powers, allows a totem to be removed
from its watery tomb and planted (grounded) in such a way that it opens a gateway
between this dimension and an alternate dark dimension. This creates a gateway
between the two dimensions through which a powerful monster (Azrael) and its
minions (Blackwolf Indians/Black Wolves) enter into the dimension to prey upon
humans.  In *Stranger Things*, Season 1, Eleven, imbued with great psionic powers,
ruptures the veil between this dimension and an alternate dark dimension. This
creates a gateway between the two dimensions through which a powerful monster
(Shadow Monster/Mind Flayer) and its minions (Demogorgons/Demo-Dogs) are
released into the human dimension to prey upon humans.

e.  In *Totem*, Azrael abducts Autumn from the tool shed in the Chance's back yard and
imprisons her in the dark, alternate dimension, a reflected copy of the human
dimension. Her disappearance motivates Jackson, her husband, to go on an obsessive
quest to bring his wife back.  In *Stranger Things*, the Demogorgon/Shadow Monster
abducts Will, a 12-year-old boy, from the tool shed in the Byers' back yard and

20

imprisons him in the dark, alternate dimension, a reflected copy of the human dimension. Will's disappearance motivates Joyce, his mother, to go on an obsessive quest to bring her son back.

f.  In *Totem*, acquaintances consider Jackson to be mentally unbalanced, including Nerowe, Jackson's doctor and his long-time friend. Similarly, in *Stranger Things*, acquaintances consider Joyce to be mentally unbalanced, including Hopper, the Chief of Police and Joyce's long-time friend. In *Totem*, Nerowe ultimately resolves his skepticism and becomes convinced that something strange regarding Autumn's seeming death is happening. Despite the funeral held for Autumn, Nerowe feels he must assist Jackson in his quest to find her. Similarly, in *Stranger Things*, Hopper ultimately resolves his skepticism and becomes convinced that something strange regarding Will's seeming death is happening. Despite the funeral held for Will, Hopper feels he must assist Joyce in her quest to find him.

g.  In *Totem*, Jackson and Nerowe enlist Kimi and her protector, Thunderbear, to help them. Kimi is able to guide Jackson and Nerowe to Autumn in the carbon copy alternate dimension. Similarly, in *Stranger Things*, Joyce and Hopper enlist Eleven and her protector, Mike Wheeler, to help them. Eleven is able to guide Joyce and Hopper to Will in the carbon copy alternate dimension (Season 1, Episode 7).

h.  In *Totem*, Jackson, the protagonist archetype, or story-driver, is afflicted with seizures that give him visions of the alternate dimension, carbon-copy world. In *Stranger Things*, Season 2, this character trait of seizures and visions of evil is attributed to Will, the child archetype, as a motive for the protagonist archetype, Joyce, to continue her quest to save her son.  In both projects, the device of seizures is used to reveal the other-worldly danger that threatens the human race. Because of the monster's relationship to Will in Season 1, a twist is created in the final sequence of Season 1 to allow the Shadow Monster to obtain control over Will and make him its "spy". As it gains more influence over him, Will, like Jackson in *Totem*, has seizures that give him visions of the alternate-dimensional world.  Joyce becomes

aware of Will's possession and seeks to resolve Will's seizures and vows to protect him, just as Autumn seeks to protect Jackson in *Totem*. The respective vows to protect taken by Autumn in *Totem* and Joyce in *Stranger Things* are a mirror of each other in that while the vows are exactly the same between the two codependent relationships, the archetypes are reversed.

i.  In *Totem*, Jackson and Nerowe use Autumn's drawings from a dream to locate "a dark, bluish toned cavern" in the alternate dimension that leads to Azrael's "vast, cavernous, brimstone sanctuary."  Similarly, in *Stranger Things*, Season 2, Joyce and friends use Will's drawings of his visions to locate a maze of dark bluish tunnels in the alternate dimension that lead to the Shadow Monster's central mind from which it controls its Demogorgon/Demo-Dog minions.

j.  In *Totem*, by using a sweat lodge, a cancer (physical manifestation of disbelief, alluding to theme) is sweat out of from Nerowe's body which allows him to fully embrace Jackson's quest to free Autumn from Azrael's clutches. They elude the attacking army of Blackwolf Indians/Black Wolves and uproot the grounded totem thereby closing the gateway to Azrael's alternate dimension. Similarly, in *Stranger Things*, Season 2, Episode 9, by using a makeshift sweat lodge (in a cabin), Joyce and friends are able to free Will from the Shadow Monster's possession (a result of disbelief in self, alluding to theme) by sweating it out of his body. They elude the attacking army of Demogorgons/Demo-Dogs. Eleven closes the gate to the Upside Down, which ends the Shadow Monster's threat to humanity.  In *Stranger Things*, Season 3, the monster finds its way back into the human dimension once again because that's the core of the entire series if it is to sustain its status as supernatural horror. Eleven closes the gate to the monster's dimension at the end of Season 2, so the series must reopen it and unleash the monster yet once again in order to have a third season.  The core of the entire *Stranger Things* series is the monster's need to kill the only thing that can destroy it, which is Eleven. To accomplish this, *Stranger Things* introduces psychopathic Russians in Season 3 to replace the psychopathic

scientists in Seasons 1 and 2. They reopen the gate to the dark, alternate dimension, and release the Shadow Monster/Mind Flayer. They dress the season up and disguise it with new characters and new settings, but the dance between monster (Shadow Monster/Mind Flayer) and monster slayer (Eleven) is the same dance that happens between Azrael, the monster, and Kimi, the monster slayer.

k. In *Totem*, FBI Agent Sam Miller, a bully character, crashes his car in an industrial area. Azrael then overwhelms Sam and forces him to do its bidding, the primary objective being to kill Kimi and her friends. Sam helps Azrael capture and take possession of human souls in the earthly plane which are then called Grims/Watchers.  Similarly, in *Stranger Things,* Billy Hargrove, a bully character introduced in Season 2, crashes his car in an industrial area in Season 3, Episode 1. The Shadow Monster/Mind Flayer then overwhelms Billy and forces him to do its bidding, the primary objective being to kill Eleven and her friends. This becomes a driving plot point for Season 3. Billy helps the Shadow Monster/Mind Flayer capture and take possession of human souls in the earthly plane which are then called "The Flayed".

l. In *Totem,* Thunderbear and Sam face off with each other. Thunderbear tries to stop Sam and fails. Sam shoots and kills Thunderbear. Similarly, in *Stranger Things,* Mike and Billy face off with each other. Mike tries to stop Billy and fails. Billy knocks him out.

m. In *Totem,* Sam, Azrael, and minions pursue Jackson, Nerowe, and Kimi, ultimately arriving at a cave in the Valley of Death (synonymous with the tool shed in the human dimension), where the final battle ensues. Wounded, Kimi encourages Nerowe to rise up against Azrael. Nerowe destroys Azrael's totem as a result of Kimi's influence. Sam is killed in the final battle. Similarly, in *Stranger Things,* Billy and the Mind Flayer pursue Eleven and her friends to a mall where a final battle ensues. Wounded, Eleven encourages Billy to rise up against the Mind Flayer. Billy turns against the Mind Flayer as a result of Eleven's influence. Eleven's friends

distract the Mind Flayer long enough to give Joyce and Hopper time to close the gate which defeats the Shadow Monster/Mind Flayer. Billy is killed in the final battle. When comparing the core elements regarding the human-versus-monster battle of the series *Stranger Things* with the *Totem* Screenplays, the central through-line of both stories is substantially similar.

## Sequence

*Totem* and *Stranger Things*, share a significantly similar sequence of events. While a multi-season series such as *Stranger Things* has to add secondary and tertiary plots and characters in order to extend the broadcast time, once these secondary and tertiary elements are peeled away, the through-line is significantly similar to *Totem*. The following sequence of events appear in both works:

a. A young girl, Kimi in *Totem* and Eleven in *Stranger Things*, helps to create a gateway to an alternate universe/dimension.

b. A powerful monster—Azrael in *Totem* and Shadow Monster/Mind Flayer in *Stranger Things*—and its minions, Blackwolf Indians/Black Wolves and Demogorgons/Demo-Dogs, respectively, are released into this dimension to prey upon humans. In both projects, the monster abducts someone from a shed in the back yard—Autumn in *Totem* and Will in *Stranger Things*—and carries them into the alternate carbon-copy dimension, which motivates the protagonist (and close family members of the abducted characters) of the respective stories, Jackson in *Totem* and Joyce Byers in *Stranger Things*, to go on an obsessive quest to bring their loved one back.

c. After overcoming the stigma of alleged mental disorder, the protagonist—Jackson in *Totem* and Joyce Byers in *Stranger Things*—enlists an ally, William Nerowe in *Totem* and Jim Hopper in *Stranger Things*, who is initially skeptical and does not believe that Autumn/Will is alive, but start to believe them and then joins their quest to find and save their loved one.

///

d. The monster conspires to destroy the young girl—Kimi in *Totem* and Eleven in *Stranger Things*—in order to keep the gateway between the two dimensions open.

e. The monster is assisted by a human they enslave after a car accident at an industrial site—Agent Sam Miller in *Totem* and Billy Hargrove in *Stranger Things*—and the enslaved human is ultimately destroyed.

f. The gateway is closed with the ally's assistance. In *Totem*, this is accomplished by Nerowe and Kimi. In *Stranger Things*, Season 2, this is accomplished by Hopper and Eleven and in *Stranger Things*, Season 3, this is accomplished by Hopper and Joyce.  As a result of the closed gateway, the monster ceases its activities in the human world in both projects.

## **Themes**

In both *Totem* and *Stranger Things*, various universal thematic subjects are present, subjects such as unconditional love, death of a close family member, mental illness, dreams and visions, family, power and corruption, courage and heroism, facing darkness, epilepsy and seizures, female roles with supernatural powers, reuniting with loved ones, man versus supernatural, etc. These themes exist in both projects in the following substantially similar ways:

| *Totem* | *Stranger Things* |
|---|---|
| **Unconditional Love:**<br><br>In *Totem*, Jackson's love for his wife Autumn drives him to undertake a perilous quest into the alternate supernatural plane to uncover the mystery behind her disappearance and to rescue her. | In *Stranger Things*, Joyce Byers' love for her son Will Byers takes her on a perilous quest into the alternate supernatural plane to uncover the mystery behind his disappearance and to rescue him. |
| **Death of a Close Family Member**<br><br>In *Totem*, Autumn appears to have died as a result of what appears to be a Black | In *Stranger Things*, a body assumed to be Will's is found. A funeral is performed, |

| | |
|---|---|
| Wolf attack. A funeral is performed, and the body is buried. Each character mourns Autumn's death in their own manner and disbelieves Jackson when he refuses to accept her death as real.<br><br>In *Totem*, Nerowe appears to have died in the alternate supernatural plane, but is miraculously brought back to life using mouth-to-mouth resuscitation. | and the body is buried. Each character mourns Will's death in their own manner and disbelieves Joyce when she refuses to embrace what seems to be the reality of his death.<br><br>In *Stranger Things*, Will appears to have died in the alternate supernatural plane, but is miraculously brought back to life using mouth-to-mouth resuscitation. |
| **Mental Illness:**<br><br>In *Totem*, Autumn Chance can see an alternate reflective dimension where a powerful evil being (Azrael) exists with designs on destroying humanity. She is evaluated by members of the medical profession and diagnosed as having a mental illness. Because Jackson believes that what Autumn sees is real, he also is perceived as having a mental illness. | In *Stranger Things*, Will Byers can see an alternate supernatural plane where a powerful evil entity exists with designs on destroying humanity. He is evaluated by medical professions and diagnosed as having a mental illness. His mother Joyce believes that what Will sees is real, and refuses to believe he has died, so she is also perceived as having a mental illness. |
| **Dreams and Visions:**<br><br>In *Totem*, dreams and visions reveal an alternate dimension of evil to both Autumn and Jackson which is a carbon copy of their reality. Autumn has dreams in which a pure light being guides her with clairaudient messages about how to proceed to keep Jackson safe.<br><br>Dreams and visions are used in *Totem* to see into the alternate supernatural plane by those on the earthly plane who have "Mystic Visions". | In *Stranger Things*, Will receives visions of an Upside Down, alternate supernatural dimension world that appears to threaten him and his family and friends.<br><br>Dreams and visions are used in *Stranger Things* to see into the alternate supernatural plane by those on the earthly plane who can "Shadow Walk". |

| | |
|---|---|
| **Family:**<br><br>In *Totem*, Autumn and Jackson Chance, because of their respective afflictions, are brought closer together feeling like they are two against the world. They support each other unconditionally. On the other hand, the Nerowe family feel like they are being ripped apart because of Nerowe's stage-4 cancer. They (Nerowe, wife Anna, and daughter Stella) seem to operate with an agenda different than the Chances until fate intervenes via the abduction of a friend bringing the two families together and creating healing and cohesion. | In *Stranger Things*, the Byers family has experienced divorce and hard times financially, which has driven Joyce and her two sons closer together. Their love for each other compels each member to assume respective responsibilities to maintain their unity. On the other hand, the Wheeler family's parents are still together physically, but there is a disconnect between them and between the two older children until fate intervenes via the abduction of a friend bringing the two families together and creating a healing and cohesion. |
| **Power and Corruption:**<br><br>In *Totem*, corrupt government agents abuse their power and even commit murder in order to capture Kimi. | In *Stranger Things*, corrupt government agents abuse their power and even commit murder in order to capture Eleven. |
| **Courage and Heroism:**<br><br>In *Totem*, Jackson Chance's courage born of his unconditional love for his wife Autumn, drives him to take up a fatal and perilous journey into the alternate supernatural plane to rescue her. | In *Stranger Things*, Joyce Byers' courage born of her unconditional love for her son Will, drives her to take up a dangerous quest into an alternate dimension to rescue him. |
| **Facing Darkness:**<br><br>In *Totem*, Autumn Chance enters her shed and faces a supernatural creature because she knows it is the only way to save her husband Jackson. | In *Stranger Things*, Joyce Byers enters her house and faces a supernatural creature because she knows it is the only way to save her son Will. |

| | |
|---|---|
| **Epilepsy and Seizures** | |
| In *Totem*, Jackson Chance experience violent seizures that bring about visions of the alternate dimensions, a dark carbon copy of his present reality, wherein exists the ultimate evil that is Azrael. | In *Stranger Things*, Will Byers experiences seizures that bring about visions of the Upside Down (an alternate dimension), a dark carbon copy of his present reality, wherein exists the ultimate evil that is the Shadow Monster/Mind Flayer. |
| In *Totem*, Jackson Chance violently seizures in the grass. Seizures are used to show Jackson's connection to the dark spirit Azrael. | In *Stranger Things*, Will violently seizures in the grass. Seizures are used to show Will's connection to the Shadow Monster. |
| **Female Roles with Supernatural Powers:** | |
| In *Totem*, one of the characters is a pubescent girl named Kimi, who has supernatural powers.  Kimi helps her friends find the portal gate to an alternate supernatural plane and helps them battle the plane's inhabitants; a dark spirit named Azrael and his army of Blackwolf. | In *Stranger Things*, one of the characters is a little girl named Eleven, who has supernatural powers.  Eleven helps her friends find the portal gate to an alternate supernatural plane and helps them battle the plane's inhabitants; a Shadow Monster and his army of Demogorgon. |
| **Reuniting with Loved Ones:** | |
| In *Totem*, Jackson Chance loses his wife Autumn in the earthly plane but finds her again in the alternate supernatural plane. | In *Stranger Things*, Joyce Byers loses her son Will in the earthly plane but finds him again in the alternate supernatural plane. |
| **Man v. Supernatural:** | |
| In *Totem*, Jackson and Nerowe must go on a perilous journey into the alternate supernatural plane to uncover the mystery behind Autumn's disappearance. | In *Stranger Things*, Joyce and Hopper must go on a perilous journey into the alternate supernatural plane to uncover the mystery behind Will Byer's disappearance. |

28

Both *Totem* and *Stranger Things* also utilize a substantially similar personal thematic arc with the inclusion of the less popular model of the steadfast protagonist.  While not as common, there are cases where the protagonist is the steadfast character and, by maintaining a strong emotional position or mindset, changes those around them. This much less common story model is used in the construction of both of these projects' core through-lines.

In the case of *Totem*, Jackson, as protagonist, is steadfast in his belief and his ability to rescue Autumn. As a result of his steadfast nature, he convinces the doubting Nerowe to believe in the validity of his quest.  Likewise, in *Stranger Things*, Joyce Byers, as protagonist, is steadfast in her belief and her ability to rescue Will. As a result of her steadfast nature, she convinces the doubting Hopper to believe in the validity of her quest. Because of the need for the *Stranger Things* series to extend its stories, the same is true of Joyce's eldest son, Jonathan Byers, who, after doubting Joyce, is convinced to believe in her quest. Lucas Sinclair, after being skeptical of Eleven's presence as an asset, comes to believe that she is a valued friend. Max, after refusing to believe Lucas's story about monsters, disappearing friends, and a magical girl called Eleven, comes to believe that it is all true.

The thematic journey in both projects is as follows: From skepticism couched in status quo to belief born of faith in others.

a. In *Totem*, Nerowe has been trained in the scientific method. Seeing is believing. Reality comes from what has been discovered. Of course, this limits his experience of what is possible. Nerowe suffers from stage-4 cancer and he is depressed knowing that he will not see his young daughter grow up. Jackson's steadfastness dissolves his skepticism and brings him to believe in the prospect of alternate possibilities. As a result, he helps Jackson achieve his quest of rescuing Autumn and his cancer is healed.  In *Stranger Things*, Hopper has been trained in police investigation. He believes only in hard evidence. Reality comes from what has been discovered, similar to Nerowe in *Totem*. This limits his experience of what is possible. Hopper

suffers from deep depression because of the death of his young daughter knowing that he will not see her grow up (revealed in Season 1, Episode 7 flashbacks). Joyce's steadfastness dissolves his skepticism and brings him to believe in the prospect of alternate possibilities (Season 1, Episode 5). As a result, he helps Joyce to achieve her quest of rescuing Will and his depression is healed as he becomes Eleven's surrogate father (Season 2, Episode 3).

b. In *Totem*, the idea of the need to believe in unknown possibilities is driven home to Jackson and one of his tasks is to convince Nerowe to believe in things unseen. *Stranger Things* creates this theme of people promising others and stating that one can trust a promise because people don't lie. In fact, this thematic motif is a request for people to believe the person making the promise. Therefore, the primary theme of believing is extended through this presentation of a promise.

c. On page 113 of the 2013 *Totem* screenplay, Nerowe, the change character, says to Jackson: "I believe." He has spent the entire story ensconced in his science-based skepticism, which is a subtle form of fear of the unknown. Jackson, the steadfast character, who needs Nerowe to believe in order for Jackson to complete his quest to save Autumn, finally convinces him to believe in unknown possibilities.

d. Near the end of Season 1, Episode 5 (40:55) of *Stranger Things*, Hopper, the change character, says to Joyce: "You were right. This whole time, you were right." Joyce, the steadfast character, who needs Hopper to believe in her in order for her to complete her quest to save Will, finds comfort in her new ally. She finally convinces him to believe in the unbelievable.  Because of the nature of the long form of story, this theme is extended to other characters in *Stranger Things*. Jonathan Byers is skeptical of Joyce, but he comes around. Lucas Sinclair is skeptical of Eleven, but he comes around. Max, in Season 2, is skeptical of Lucas' story regarding the Shadow Monster, disappearing friends, and Eleven's powers, but she comes around. Joyce, the character steadfast in her belief that Will is alive, brings those around her to believe as does Jackson do the same in *Totem*.

## Setting

The events in *Totem* and *Stranger Things* take place in substantially similar settings. Both works are set in a small, middle-class town in rural America surrounded by a sprawling landscape of woods and nature. The citizens in each of the small towns are folksy and friendly with each other, and know each other's personal business. The inhabitants of both towns feel safe and secure in the knowledge that help is just a phone call away.

Crucial events in both works take place at the protagonists' homes, which are depicted in a similar fashion. The protagonists both live in humble houses, have large yards like one would find in a rural town, and both have a tool shed in the back yard in the midst of overgrown vegetation that can be seen from the kitchen window.

The tool sheds in both stories become the nexus for abduction into the alternative dimension. Specifically, in *Totem*, the tool shed in the Chances' back yard becomes the setting where Autumn is abducted by Azrael. In *Stranger Things*, the tool shed in the Byers' back yard becomes the setting where Will is abducted by the Demogorgon.

Even though both works take place in a small town, they both include a large institutional building (a psychiatric hospital in *Totem* and a government building in *Stranger Things*), which are juxtaposed against the small towns, and buildings are used for psychiatric evaluations, interrogations, and holding individuals against their will.

In *Totem*, Jackson and Nerowe discover that the Chance home resides in an area known as the "Valley of Death" in Azrael's alternative dimension. It is there that they find Autumn Chance. In *Stranger Things*, the "Vale of Shadows" is a term used by Will Byers' friends to describe the Upside Down (alternative dimension). Joyce and Hopper enter the Upside Down to search for Will, traverse the Vale of Shadows, and discover the Byers home—it is there they find Will.

In *Totem*, there is a dark, blue-tinted cave that leads to caverns and tunnels that are an opening to the alternate dimension and to Azrael and his minions. Dangers for the good guys emanate from this darkness. Similarly, in *Stranger Things*, there exists a vast maze of dark, blue-tinted tunnels that are an opening to the Upside Down and to the Shadow

Monster/Mind Flayer and its minion. The maze of tunnels leads to clues, settings, and dangers for the good guys.

Both stories utilize railroad tracks as a symbolic device used to illustrate the journey between the earthly plane and the alternate supernatural plane. In *Totem*, Jackson follows train tracks during his journey to find Autumn in the alternate supernatural plane. In *Stranger Things*, Eleven and her friends follow train tracks on their journey to find Will in the alternate supernatural plane. The railroad tracks are a symbolic device used to illustrate the journey between the earthly plane and the alternate supernatural plane.

Both stories include scenes in a sweat lodge. In *Totem*, Nerowe is brought to a Lynx Sweat Lodge in the "Village at the End of the World" and forced to sweat out his illness (cancer) to avoid certain death. In *Stranger Things*, Will is brought to a makeshift sweat lodge (in a cabin) and forced to sweat out the Shadow Monster to avoid certain death.

### **Mood, Tone and Pace**

Mood, tone and pace are qualities of genre. *Totem* and *Stranger Things* would both be categorized in the genre of supernatural horror, which has as its basis an aberration of acceptable reality created or utilized by the paranormal agency of a mysterious entity.  The following elements of the supernatural horror genre appear in both projects:

a.  In both stories, there is an alternate dimension where an evil monster exists. This alternate dimension is a dark foreboding carbon copy of the reality where the protagonist exists.  A "gate" is opened into the alternate carbon-copy dimension and the monster takes advantage of it to enter the human realm and create chaos and havoc. The monsters in both stories escape from the dark, reflective alternate dimension.  Both projects open with this fissure into the alternate dimension being apparent and the monster entity being revealed in the first scene. Then, the stories move to the ordinary world of the respective protagonists that drive the two stories.

///

///

PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S RESPONSES TO DEFENDANT NETFLIX, INC.'S
INTERROGATORIES (SET ONE)

b. In both stories, the beginning scenes are violent and bloody. The two stories then shift to reveal a pleasant ordinary world that is interrupted by the abduction of a character significant to the respective protagonists.

c. In *Totem*, after establishing the protagonist's ordinary world, Jackson's wife, Autumn, is abducted by Azrael, the monster from the dark, but reflective alternate dimension. Similarly, in *Stranger Things*, Joyce's son, Will, is abducted by a Demogorgon who has escaped from the dark, reflective alternate dimension.

d. Each project reflects an air of family cohesion that devolves into anxiety, desperation, and tension as a result of the abduction. The pace of each story accelerates when the abductions take place and the distress increases in both when the relative protagonists are not believed. Each narrative plots the same escalation of growing skepticism in the characters associated with the protagonists.

e. Panic is a primary human reaction in supernatural horror. The two protagonists, Jackson and Joyce, both pump up their adrenaline in an effort to find their loved ones. Their panic is interpreted by others as frantic mental chaos and neither is taken seriously. Their respective hysterical urgency and need to convince an ally, Nerowe in *Totem*, and Hopper in *Stranger Things*, of the abduction is met with skepticism in both cases.

f. In *Totem*, there are a number of examples where the description of darkness is a prelude of things to come: Lilly gives Jackson a necklace to "protect ya from de darkness…"  Autumn makes Jackson promise that he won't tear down the shed. "That shed holds captive evil things. Things that belong in the darkness."  Autumn dreams that she "…moves through a dark, bluish toned cavern."  Autumn speaks of her fear for Jackson: "His spirit will be swallowed in darkness if I do not act swiftly." The story moves from the apprehension of darkness to the darkness itself. And as the danger intensifies, so does the tone fade deeper into darkness.  Similarly, in *Stranger Things*, the growing darkness is manufactured technically and with a growing number of scenes shot at night. It begins with the night that Will is abducted.

33

He bicycles home at night, hears something in the woods, and races home. He notices someone or something outside the front door and runs out to the tool shed in the back yard to arm himself with a shotgun. He loads the gun, turns around, and the light surges as the monster looms. The monster abducts Will. The light dims and the scene fades to black.  The monster (Demogorgon) appears mostly when it is dark outside, whether at Steve's party where Barb disappears, or later when Nancy investigates in the darkened woods (although it is the afternoon), or when the sky has darkened. When the Demogorgon makes its presence known to Joyce by pressing itself through the walls of her house, the light is very dim. The atmosphere in general grows dimmer and dimmer as the episodes progress.

g.  The alternative dimensions of *Totem* and *Stranger Things* are a dark, bluish-tinted carbon copy of the respective human dimensions. This is described in the *Totem* screenplay. In *Stranger Things*, it is filmed as a dark, bluish-tinted carbon copy of human reality. The action in these alternate dimension sequences is surreal and slower paced.

h.  In both stories, when the monster appears, it is announced by lightning flashes or blinking lights. Electricity is affected by its presence in both *Totem* and *Stranger Things*. The fact that both stories use lightning and power surges to complement the presence of the respective monsters seems more than coincidental. In fact, the presentational tone of the respective monsters is remarkably similar in both projects.

i.  In *Stranger Things,* Season 3, there is a decided shift in the mood and tone from Seasons 1 and 2. A well-lit mall, in which many scenes and sequences take place, lightens the tone. More levity is introduced as a result of the introduction of new comedic characters, Robin and Erica, which shifts the mood. Comedic beats countermand the basic genre of supernatural horror. However, when the monster appears, the mood and tone return to the original supernatural dark and foreboding nature found in *Totem*.

///

PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S RESPONSES TO DEFENDANT NETFLIX, INC.'S
INTERROGATORIES (SET ONE)

j. Throughout both stories, the horror, the action, and the violence escalate in parallel fashion as the respective protagonists pursue their loved ones. This escalation of tension, trepidation, and violence is complemented by the suggested growing physical darkness of scenes and sequences.

k. The mood and tone of both projects are equally dark and foreboding with a supernatural sense of horror. Following the core plot of the supernatural horror aspect of both properties, the pace is also significantly similar.

## **Dialogue**

Due to similarities in characters, plot, theme, and sequence, the dialogue between the characters is substantially similar.  Dialogue is a result of a character's impulse to communicate; that impulse is translated into language. The symbols of language (*i.e.*, words) are connotative at best. Thus, in addition to analyzing the similarities in dialogue, it is also important to look at the similarities of character impulses and interpret the similar intents.  A few examples of similarities in dialogue between *Totem* and *Stranger Things* are listed below:

| *Totem* | *Stranger Things* |
|---|---|
| In *Totem*, Nerowe explains to FBI Agent Sam Miller that Jackson has Post Traumatic Stress Disorder (PTSD). Specifically, Nerowe says to Sam Miller: "He's mentally ill. He needs professional care."  Nerowe implies that Jackson's erratic behavior is a result of Autumn's death, which provoked PTSD. | In *Stranger Things*, Dr. Sam Owens explains to Joyce that Will has Post Traumatic Stress Disorder (PTSD). Dr. Owens states that Will's seizures and strangeness are symptoms of PTSD as a result of his experience of having been abducted by the Demogorgon/Shadow Monster. (Season 2, Episode 1.) |
| In *Totem*, Autumn says to Jackson: "Your seizures are getting worse." | In *Stranger Things*, after Will has a massive seizure, Lucas Sinclair says: "Two episodes in two days." Mike follows with: "It's getting worse." (Season 2, Episode 4.) |

| | |
|---|---|
| In *Totem*, Nerowe tells Jackson "You need anything, you find me" while in the parking lot of the Psychiatric Hospital with Autumn. | In *Stranger Things*, Jim Hopper tells Joyce Byers, "Things get worse, you call me first" while in the parking lot of the Hawkins Laboratory with Joyce and Will. (Season 2, Episode 1.) |
| In *Totem*, after Autumn's funeral, Jackson screams to Nerowe: "Azrael is real. He has Autumn. She's in pain. I must save her from him. It is my quest!" | In *Stranger Things*, after Will's body is reported found and identified, Joyce cries to Hopper: "Whoever you found, it's not my boy. It's not Will. It's after him." She goes on to say: "He was hiding from that, that thing. It's after him. He's in danger. We have to find him." (Season 1, Episode 4.) |
| In *Totem*, Nerowe offers a deal to Agent Sam Miller to help him find Thunderbear and the Lynx, and in exchange, Agent Miller will agree to leave Jackson alone. Nerowe to Agent Sam Miller: "I give you their location and you let Jackson go." Agent Miller: "An interesting notion." Nerowe: "I'm serious, Sam. I give you what you want and you leave him alone. Forever. That's the deal. Agreed?" | In *Stranger Things*, Hopper makes a similar deal with the Government Agents interrogating him. In exchange for releasing he and Joyce, they will maintain their silence about the ongoings at the Hawkins Laboratory. Hopper to Agents: "Here's what's gonna happen. You're gonna let me and Joyce Byers go. You're gonna give us anything we need. And we're going to find her son. And then we're going to forget that any of this ever happened. Agent: Oh. is that right? Hopper: Yep, that's right. (Season 1, Episode 8.) |
| In *Totem*, after saving Nerowe's life, Jackson tells Nerowe that he is sorry for hurting him, as Jackson lies bloodied and dying in Azrael's sanctuary. Jackson to Nerowe: "I'm sorry if I hurt you, Willy." Nerowe: "No Brother, you saved me." | In *Stranger Things*, after saving Mike Wheeler's life, Eleven tells Mike that she is sorry for opening the gate, as she lies bloodied on the gravel. Eleven to Mike: "Mike, I'm sorry." Mike: "Sorry? What are you sorry for? Eleven: "The gate. I opened it. I'm the monster." Mike: "No. No El, you're not the monster. You saved me. Don't you understand? You saved me." (Season 1, Episode 6.) |

PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S RESPONSES TO DEFENDANT NETFLIX, INC.'S INTERROGATORIES (SET ONE)

| In *Totem*, FBI Agent Sam Miller jokes that at least the totem that Autumn brought home was not a garden gnome: "… (sarcastically) at least it's not a Garden Gnome". | In *Stranger Things*, Season 1, Episode 1, Hopper makes a joke about a police report that comes in about a stolen garden gnome: "Oh, the Garden Gnomes again. (sarcastically) I'm gonna get right on that". Then, in Season 1, Episode 4, a scene opens with a garden gnome in the forefront of the camera shot for no apparent reason. |
|---|---|

Because the stories are also fundamentally similar at their foundation, there are similarities found in the dialogues of both projects that affect the core of the stories themselves. By way of example only, a primary theme of both *Totem* and *Stranger Things* is the idea of the protagonists' allies—Nerowe in *Totem* and Hopper in *Stranger Things*—evolving from skepticism to believing a surreal event has happened. When a character promises something, it is a request to believe in something.

The word "promise"—and its complementary alternatives such as pinkie swears and the phrases "trust me" and "friends don't lie" are used as a driver of the plot and character relationships in both stories. Promises in both stories lead to the escalation of the plot. Multiple characters in both *Totem* and *Stranger Things* use the word "promise" to either verbally ask or verbally commit to an agreement.  This dialogue tag is used countless times in the stories and often marks the end of a scene and creates a transition.

### Additional Similarities

There are numerous other similarities between *Totem* and *Stranger Things*, including similarities between protected elements as well as instances where both the *Totem* Screenplays and *Stranger Things* contain a significant number of similar plot devices, settings, and other elements that together belie any claim of literary accident:

///

///

*Plot Devices*

a. <u>Upside Down Imagery/Alternate Dimension</u>:  In *Totem*, being upside down signifies the moment that one enters into the alternate supernatural plane controlled by Azrael. Notably, the 2010 *Totem* storyboards include art with Azrael reaching out to a boy named Iron Lightning, who hangs upside down on a totem. Defendant Sims was well aware that Kennedy had created the concept of a "carbon copy" universe, for which the Duffer Brothers attempt to take credit by naming it the "upside down". This "upside down" imagery however, appears repeatedly in the *Totem* Copyrighted Works and, of course, Sims was aware of the connection that Kennedy had drawn between being upside down and the final moments of Osthimer's life, when he was hanging upside down in his car after a tragic accident. In *Stranger Things*, the alternate plane is referred to as the Upside Down, and signified by an upside-down copy of the earthly plane. This is similar to Kennedy's concept of being upside down as signifying the moment a character enters the carbon-copy plane as well as in his concept of a "carbon copy" universe.

b. <u>Lightning and Electrical Aberrations that Announce the Presence of the Monster</u>:  In *Totem*, the screenplay opens with lightning and the reader learns that evil is present. This evil takes the form of Azrael's minions first—Blackwolf Indians. Lightning announces the Blackwolf Indians and Azrael on numerous pages.  Also, the electrical surges in Jackson Chance's brain during his seizures give him visions of the monster Azrael. Similarly, in *Stranger Things*, throughout Season 1, electrical aberrations, such as lights blinking, electrical outages, phones going dead, announce the presence of the monster. In Episode 8, Jonathan says, "My mom, she said the lights speak when it comes. Blink. Think of them as alarms." Then, the lights begin to blink. The first time the lights blink to announce the Demogorgon happens early in Season 1, Episode 1. Initially, the Wheeler's exterior house lights blink, after which Will's bicycle light blinks. That motif continues throughout Season 1. For instance, when Eleven enters the sensory deprivation bath in Episode 7, a tremendous electrical

activity surge happens. However, in Season 2, the blinking lights are replaced with lightning. It is all about electricity and power surges in both stories.

c.  <u>Seizures</u>: In *Totem*, seizures are associated with surges in neural electricity and electrical surges are associated with the monster's presence. Jackson has electrical surges in his brain that result in grand mal seizures on the following pages of the 2013 draft of *Totem*.  In almost every seizure that he has, Jackson either has a vision of a dramatic future event or he has an experience of Azrael and the alternate dimension. In *Stranger Things*, Season 2, Episodes 3-4, when the Shadow Monster/Mind Flayer enters Will's body, he has a seizure. But he has shivering reactions before that event that flips him briefly into the Upside-Down, alternate dimension. This happens in Season 2, Episodes 1, 2, and 3 before the Shadow Monster/Mind Flayer enters him and gives him grand mal seizures. Will's massive seizures happen in Season 2, Episodes 4, 6, 8, and 9.

d.  <u>Drawings</u>: In *Totem*, Autumn draws her visions and dreams. Stella, Nerowe's young daughter also draws her visions. These drawings from both reveal clues to Azrael's identity and his alternate dimension as well as to Autumn's location and her predicament. Jackson and Nerowe use the drawings created by Autumn to locate a series of bluish toned tunnels in the alternate supernatural plane that lead to Azrael. They evade the attacking army of Blackwolf and defeat Azrael by breaking Azrael's grip on Jackson with heat lighting. Similarly, in *Stranger Things*, Will draws his visions which reveal the shape, size, and dimension of the Shadow Monster. His drawings also reveal the whereabouts of Hopper when Hopper gets trapped in the Shadow Monsters' tentacle-laced dark bluish tunnels. Joyce, Hopper, and friends use drawings created by Will to locate a series of bluish toned tunnels in the alternate supernatural plane that lead to the Shadow Monster.  They evade the attacking army of Demogorgon and defeat the Shadow Monster by breaking its grip on Will with heat.

///

e. <u>Communicating with Alternate Dimension</u>: In *Totem*, Autumn hangs dream catchers all over her house and uses them as communication conduits to talk to Kimi in the alternate dimension. In *Stranger Things*, Joyce Byers hangs Christmas lights throughout her house and communicates through them with Will while he is in the Upside Down.

*Settings*

a. <u>Backyard Sheds</u> - Both projects use a shed in the respective protagonist's back yard as the setting for the monster to abduct the loved one. In *Stranger Things*, Will is abducted from the shed because he went there to retrieve a shotgun. The shotgun could have been in a garage, basement, attic, pickup truck, etc., but it was a backyard shed, the same as in *Totem*.

b. <u>Sweat Lodge</u> - Both projects use a sweat lodge to sweat out evil from significant characters.

c. <u>Dark Bluish Tunnels</u> - Both projects use dark, bluish tunnels as ways to enter the alternate dimension. In *Totem*, Azrael uses purple feathers to entrap souls. In *Stranger Things*, white feathery spores float in the atmosphere and slow the action.

d. <u>Woods and Forests in Rural America</u> - Both projects use surrounding woods and forests for significant scenes and sequences. In fact, both projects are set in what appears to be the exact same setting.

*Integral Elements*

a. <u>Butterfly</u>: In *Totem*, the butterfly is frequently used as a motif to imply transformation. In fact, the butterfly motif shows up on numerous pages in the 2013 Draft. In *Stranger Things*, the butterfly motif is used casually but repeatedly. In Season 1, Episode 4, Nancy has butterfly stickers on the inside of her locker. In Season 2, Episode 7, Kali manifests a blue butterfly to prove to Eleven what her powers are. In Season 2, Episode 9, a butterfly design is crocheted into a pillow on the Byers' sofa.

///

PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S RESPONSES TO DEFENDANT NETFLIX, INC.'S INTERROGATORIES (SET ONE)

b. <u>Tattoos</u>: In *Totem*, the butterfly tattoo on the wrist is used as a form of identification between Autumn and Kimi stating that they belong to the spiritual tribe of the Lynx Native Americans. In *Stranger Things*, the numbers imprinted on their wrist identifies Eleven and Kali as "sisters" from the Hawkins National Laboratory.

c. <u>Totem</u>: In *Totem*, a totem is the McGuffin that opens the gateway to Azrael's alternate dimension and frees him to enter the human dimension. In *Stranger Things*, a totem sits in Will Byer's bedroom on a shelf. There is no reason to have a totem on his shelf as it has no relevance to his interests or personality or to anything else in his room.

d. <u>Dream Catchers/Lights</u>: Lights also equate in *Stranger Things* with the glowing dream catchers in *Totem*. In *Totem*, Autumn hangs dream catchers all over her house and uses them as communication conduits to talk to Kimi in that realm.

e. <u>Hockey Stick</u>: In *Totem*, Jackson uses a hockey stick to attack the shed in his back yard. In *Stranger Things*, Dustin protects himself from Dart (the baby Demo-Dog now half grown) with a hockey stick; he could have used many different items to protect himself other than a hockey stick.

f. <u>Lynx</u>: In *Totem*, Lynx is the name of the spiritual tribe of Native Americans who guard the gateway to the alternate dimension. In *Stranger Things*, Season 3, the Lynx Corporation is a transport company assisting with secret deliveries to an undercover Russian operation.

g. <u>Monster Enslaves Humans</u>: In *Totem*, the bodies taken over by Azrael act as a hive-mind group controlled by the monster Azrael. They are called Grims/Watchers. In *Stranger Things*, bodies taken over by the Shadow Monster/Mind Flayer act as a hive-mind group controlled by the monster. They are called "the Flayed".  In both cases, they act in unison as extensions of the monster.

h. <u>Garden Gnome</u>: In *Totem*, Agent Sam Miller jokes that at least the totem that Autumn brought home was not a garden gnome: "… (sarcastically) at least it's not a Garden Gnome". In *Stranger Things*, Season 1, Episode 1, Hopper makes a joke

about a police report that comes in about a stolen garden gnome: "Oh, the Garden Gnomes again. (sarcastically) I'm gonna get right on that". Then, in Season 1, Episode 4, a scene opens with a garden gnome in the forefront of the camera shot for no apparent reason.

i.  *Stranger Things* Title: As if all of these similarities were not egregious enough, *Stranger Things* appears to derive its very title from a line of Jackson's in *Totem.* Specifically, there is a scene in which Jackson is speaking with Nerowe regarding Autumn and whether she is a mystic. Nerowe asks whether Autumn has taken her medicine because without it "she can't distinguish between what's real and what isn't". In response, Jackson says: "But how can we really know what is real? I mean, sometimes I see things. **Strange things**."

j.  Dungeons & Dragons: On page 35 of the 2008 script entitled *Chain of Being*, a previous draft of *Totem*, Nerowe, skeptical of Jackson's story about Azrael and Autumn's predicament, says to him, "Azrael Seraphim, High Archangel of Death? Leader of the fallen Grigori Angel Choir, known to many as The Watchers?... This is hocus-pocus. It's dungeons and dragons, voodoo bullshit." The same quote exists on page 44 of the 2010 draft retitled as *Totem*. In *Stranger Things*, Will's friends, Mike Wheeler, Dustin Henderson, and Lucas Sinclair frequently use the game and mythology of *Dungeons & Dragons* to build their case for their belief and understanding of Will's predicament in the Upside-Down, alternate dimension.

In addition to these substantial similarities between the *Totem* Screenplays and the television series *Stranger Things*, there are substantial similarities between protectable elements of the *Totem* Concept Art, which were created by Aaron Sims for the *Totem* project, and the art for *Stranger Things*.  Discovery is continuing and Responding Party reserves the right to supplement this response upon completion of further discovery.

## INTERROGATORY NO. 10:

IDENTIFY which individual DEFENDANTS "induced, caused, and materially contributed to the unauthorized preparation, duplication, distribution, and public

42

performance of the infringing [*STRANGER THINGS*]," as alleged in paragraph 196 of the FAC, and describe with reasonable specificity each activity YOU allege each DEFENDANT took part in.

## RESPONSE TO INTERROGATORY NO. 10:

Objection. Responding Party incorporates by reference as set forth in full, its general objections one through twelve above. This interrogatory calls for a legal conclusion and/or opinion. Responding Party additionally objects to this interrogatory on the grounds that it is premature and purports to impose burdens on Plaintiff that are inconsistent with, or not otherwise authorized by, the Federal Rules of Civil Procedure and/or the Local Rules. Responding Party further objects to this request on the grounds that it calls for premature expert discovery, in violation of Rule 26 of the Federal Rules of Civil. Responding Party objects to the extent that this interrogatory seeks information protected under the attorney-client privilege and/or attorney work product doctrine. This interrogatory also seeks information that is equally available to Propounding Party; Responding Party does not have a duty to make reasonable efforts to obtain requested information that is equally available to the propounding party.

Subject to and without waiving the foregoing objections, Responding Party responds as follows: Defendants Netflix, Inc., Netflix Streaming Services, Inc. and 21 Laps, Inc. (collectively, "Defendants") have contributed to the unauthorized preparation, duplication, distribution, and public performance of the television series *Stranger Things* in their roles as the exclusive distributors and producers of the series.

The Netflix Entities have intentionally induced and materially contributed to said direct infringement by: (1) contracting with Matt Duffer, Ross Duffer, Monkey Massacre, and/or 21 Laps Entertainment to write and produce all three (3) seasons of *Stranger Things*; and (2) providing a streaming platform that allows for the exclusive distribution of the infringing series to millions of subscribers with the intent that the series be viewed. Notably, this has occurred despite the Netflix Entities being able to prevent further damage

to the copyrighted Totem Works by simply taking *Stranger Things* off of their streaming platform.

As the production company for *Stranger Things*, 21 Laps Entertainment was and continues to be intimately involved in the creation, development and production process of the series.  21 Laps Entertainment has intentionally induced and materially contributed to the direct infringement by contracting with Matt Duffer, Ross Duffer, and the Netflix Entities to write and distribute three (3) seasons of *Stranger Things*.

Discovery is continuing and Responding Party reserves the right to supplement this response upon completion of further discovery.

## INTERROGATORY NO. 11:

IDENTIFY which individual DEFENDANTS "have contributed to the infringement" of the *TOTEM* WORKS, as alleged in paragraph 197 of the FAC, and describe with reasonable specificity each such allegedly infringing act.

## RESPONSE TO INTERROGATORY NO. 11:

Objection.  Responding Party incorporates by reference as set forth in full, its general objections one through twelve above.  This interrogatory calls for a legal conclusion and/or opinion.  Responding Party additionally objects to this interrogatory on the grounds that it is premature and purports to impose burdens on Plaintiff that are inconsistent with, or not otherwise authorized by, the Federal Rules of Civil Procedure and/or the Local Rules. Responding Party further objects to this request on the grounds that it calls for premature expert discovery, in violation of Rule 26 of the Federal Rules of Civil.  Responding Party objects to the extent that this interrogatory seeks information protected under the attorney-client privilege and/or attorney work product doctrine.  This interrogatory also seeks information that is equally available to Propounding Party; Responding Party does not have a duty to make reasonable efforts to obtain requested information that is equally available to the propounding party.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:  Defendants Netflix, Inc., Netflix Streaming Services, Inc. and 21 Laps, Inc.

44

(collectively, "Defendants") have contributed to the infringement of the Totem Works (as used herein, the term "Totem Works" means the screenplays and concept art at issue in this action - USDC, C.D. Cal., Case No. 2:20-cv-06293-CBM-PLA).

Netflix, Inc. and Netflix Streaming Services, Inc. (collectively, the "Netflix Entities") knew or had reason to know of the infringing activity prior to Plaintiff filing the present copyright infringement action. On November 1, 2016, Elizabeth Bradley (Netflix Vice President, Content) was provided with the Totem script and prospectus by former Netflix Director of Content Acquisition, Bryan Crocker. At that point, based on the substantial similarities between *Stranger Things* and the Totem Works, the Netflix Entities had reason to know of the infringing activity of Aaron Sims, Matt Duffer, and Ross Duffer. Moreover, between May 1, 2019 and June 13, 2019, Plaintiff's Managing Partner, Jeffrey Kennedy, contacted various individuals at Netflix and advised them of *Stranger Things'* infringement upon the Totem Works copyrights:

- May 1, 2019: Jeffrey Kennedy advised Netflix's then Vice President of Original Content, Cindy Holland, that he believed *Stranger Things* infringed on the Totem Works.

- May 20, 2019: Jeffrey Kennedy advised Netflix's Vice President of Business and Legal Affairs, Elizabeth Polk, that he believed *Stranger Things* infringed on the Totem Works.

- May 29, 2019 to June 13, 2019: Jeffrey Kennedy and Netflix's Director of Content Litigation, Kate Chilton, exchanged various communications regarding the infringing content.

Despite knowing that *Stranger Things* infringes on the Totem Works copyrights, the Netflix Entities have intentionally induced and materially contributed to the direct infringement by: (1) contracting with Matt Duffer, Ross Duffer, Monkey Massacre, and/or 21 Laps Entertainment to write and produce three (3) seasons of *Stranger Things*; and (2) providing a streaming platform that allows for the exclusive distribution of the infringing series to millions of subscribers with the intent that the series be viewed. Notably, this has

45

occurred despite the Netflix Entities being able to prevent further damage to the copyrighted Totem Works by simply taking *Stranger Things* off of their streaming platform.

21 Laps Entertainment additionally knew or had reason to know of the infringing activity prior to Plaintiff filing the present copyright infringement action.  As the production company for *Stranger Things*, 21 Laps Entertainment was and continues to be intimately involved in the creation and development process of the series.  Therefore, they knew or, at a minimum, had reason to know of the infringing activity of Aaron Sims, Matt Duffer, and Ross Duffer.  Despite this, the production company has intentionally induced and materially contributed to the direct infringement by contracting with Matt Duffer, Ross Duffer, and the Netflix Entities to write and distribute three (3) seasons of *Stranger Things*.

Discovery is continuing and Responding Party reserves the right to supplement this response upon completion of further discovery.

## INTERROGATORY NO. 12:

IDENTIFY which individual DEFENDANTS had "the right and ability to supervise the other [DEFENDANTS], ... did supervise them in their unlawful preparation, duplication, and distribution of the [*STRANGER THINGS*] television series," and "enjoy a direct financial benefit from the preparation, duplication, and distribution of the infringing [*STRANGER THINGS*] television series," as alleged in paragraphs 205-206 of the FAC.

## RESPONSE TO INTERROGATORY NO. 12:

Objection.  Responding Party incorporates by reference as set forth in full, its general objections one through twelve above.  As phrased, this interrogatory is vague, ambiguous and compound.  The interrogatory additionally calls for a legal conclusion and/or opinion. Responding Party also objects to the extent that this interrogatory seeks information protected under the attorney-client privilege and/or attorney work product doctrine.  This interrogatory also seeks information that is equally available to Propounding Party; Responding Party does not have a duty to make reasonable efforts to obtain requested information that is equally available to the propounding party.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:  Defendants Netflix, Inc., Netflix Streaming Services, Inc. and 21 Laps, Inc. (collectively, "Defendants") all supervised each other in their unlawful preparation, duplication, and distribution of the *Stranger Things* television series.   Moreover, Defendants all have enjoyed a direct financial benefit as a result of said preparation, duplication, and distribution of the *Stranger Things* television series.   Discovery is continuing and Responding Party reserves the right to supplement this response upon completion of further discovery.

**INTERROGATORY NO. 13:**

IDENTIFY which individual DEFENDANTS "have vicariously infringed the copyrights in the" *[sic] TOTEM* WORKS, as alleged in paragraph 207 of the FAC, and describe with reasonable specificity each such allegedly infringing act.

**RESPONSE TO INTERROGATORY NO. 13:**

Objection.  Responding Party incorporates by reference as set forth in full, its general objections one through twelve above.  This interrogatory calls for a legal conclusion and/or opinion.  Responding Party additionally objects to this interrogatory on the grounds that it is premature and purports to impose burdens on Plaintiff that are inconsistent with, or not otherwise authorized by, the Federal Rules of Civil Procedure and/or the Local Rules. Responding Party further objects to this request on the grounds that it calls for premature expert discovery, in violation of Rule 26 of the Federal Rules of Civil.  Responding Party objects to the extent that this interrogatory seeks information protected under the attorney-client privilege and/or attorney work product doctrine.   This interrogatory also seeks information that is equally available to Propounding Party; Responding Party does not have a duty to make reasonable efforts to obtain requested information that is equally available to the propounding party.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:  Defendants Netflix, Inc., Netflix Streaming Services, Inc. and 21 Laps, Inc. (collectively, "Defendants") have all vicariously infringed the copyrights in the Totem

PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S RESPONSES TO DEFENDANT NETFLIX, INC.'S
INTERROGATORIES (SET ONE)

Works (as used herein, the term "Totem Works" means the screenplays and concept art at issue in this action - USDC, C.D. Cal., Case No. 2:20-cv-06293-CBM-PLA).   More specifically, they have profited directly from the direct infringement on the Totem Works while declining to exercise their right to stop or limit said infringement.

Both Netflix Inc. and Netflix Streaming Services, Inc. (collectively, the "Netflix Entities) have financially benefitted from the creation and distribution of *Stranger Things* on the Netflix streaming platform.   More specially, the popular series has been a draw for new and returning customers who pay monthly subscription fees to access *Stranger Things* on the Netflix streaming platform.   These subscriptions produce direct revenue for the Netflix Entities.   As the production company for *Stranger Things*, 21 Laps, Inc. has also benefitted financially from the creation and distribution of the series through its licensing agreement(s) with Netflix.

As the exclusive distributors and producers of *Stranger Things*, Defendants had and continue to have a contractual ability and right to supervise and control the infringing activity of Aaron Sims, Matt Duffer and Ross Duffer. The Defendants' pervasive participation in the creation, production, distribution and promotion of *Stranger Things* shows their substantial level of control over the series.  Notably, despite having the direct ability to stop or limit the streaming of *Stranger Things*, the Netflix Entities have chosen not to do so and instead continue to encourage the creation and production of more episodes.

Based on these facts, Defendants have vicariously infringed the copyrights in the Totem Works.   Discovery is continuing and Responding Party reserves the right to supplement this response upon completion of further discovery.

## INTERROGATORY NO. 14:

IDENTIFY all PERSONS who have performed, or assisted with, any analysis of the similarity, or lack of similarity, between the *TOTEM* WORKS and *STRANGER THINGS*, including but not limited to the PERSON whose voice is audible in the video posted on YouTube on or about December 2, 2019 entitled "Stranger Similarities."

## RESPONSE TO INTERROGATORY NO. 14:

Objection.  Responding Party incorporates by reference as set forth in full, its general objections one through twelve above.  As phrased, this interrogatory is vague and ambiguous.  Responding Party additionally objects to this interrogatory on the grounds that it is premature and purports to impose burdens on Plaintiff that are inconsistent with, or not otherwise authorized by, the Federal Rules of Civil Procedure and/or the Local Rules. Responding Party further objects to this request on the grounds that it calls for premature expert discovery, in violation of Rule 26 of the Federal Rules of Civil.  Responding Party additionally objects to the extent that this interrogatory seeks information protected under the attorney-client privilege and/or attorney work product doctrine.  Lastly, the interrogatory seeks information that is protected by a third-party's right to privacy under the Federal and California constitutions and applicable law.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

- Jeffrey Kennedy (Contact through Jeremy J. Osher, Boren, Osher & Luftman, LLP, 222 N. Pacific Coast Highway, Ste. 2222, El Segundo, CA 90245);

- Thuy Tien Nguyen (210 Legal Solutions, Inc., 21010 Pacific City Cir., Unit 1101, Huntington Beach, CA 92648; (213) 787-4004).

## INTERROGATORY NO. 15:

IDENTIFY all PERSONS with knowledge or information relevant to the allegations in the FAC, summarize that knowledge or information, and describe the basis for such knowledge or information.

## RESPONSE TO INTERROGATORY NO. 15:

Objection.  Responding Party incorporates by reference as set forth in full, its general objections one through twelve above.  As phrased, this interrogatory is vague, ambiguous, compound, overbroad and unduly burdensome.  Responding Party additionally objects to this interrogatory on the grounds that it is premature and purports to impose burdens on Plaintiff that are inconsistent with, or not otherwise authorized by, the Federal Rules of

49

Civil Procedure and/or the Local Rules. Responding Party further objects to this request on the grounds that it calls for premature expert discovery, in violation of Rule 26 of the Federal Rules of Civil.  Responding Party additionally objects to the extent that this interrogatory seeks information protected under the attorney-client privilege and/or attorney work product doctrine.  Lastly, the interrogatory seeks information that is protected by a third-party's right to privacy under the Federal and California constitutions and applicable law.  This interrogatory also seeks information that is equally available to Propounding Party; Responding Party does not have a duty to make reasonable efforts to obtain requested information that is equally available to the propounding party.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:  Plaintiff believes the following individuals have knowledge or information regarding the development and/or creation of the Totem Works (as used herein, the term "Totem Works" means the screenplays and concept art at issue in this action - USDC, C.D. Cal., Case No. 2:20-cv-06293-CBM-PLA): Jeffrey Kennedy (Irish Rover Ent.; *Totem* writer); Charles Brink (Irish Rover Ent.; *Totem* producer); Aaron Sims (Aaron Sims Creative; *Totem* concept artist); John Norris (Aaron Sims Creative; *Totem* development); Steffen Reichstadt (Aaron Sims Creative; *Totem* development); Jerad Merantz (Aaron Sims Creative; *Totem* development); Alexander Mandradjiev (Aaron Sims Creative; *Totem* development); Various employees of Aaron Sims Creative (*Totem* development); Pierre de Lespinois (Evergreen Films; *Totem* development); Frances LoCascio (Evergreen Films; *Totem* development); Mike Devlin (Evergreen Films; *Totem* development); John Copeland (Evergreen Films; pigdog13@mac.com; *Totem* development); Tom Marnell (Evergreen Films; *Totem* development); Pat Devlin (Evergreen Films; *Totem* development); Pete Von Sholly (Evergreen Films; *Totem* development); John Sullivan (Evergreen Films; *Totem* development); Kate Chilton (Netflix; kchilton@netflix.com; reviewed *Totem*); Elizabeth Bradley (Netflix; received *Totem*); Bryan Crocker (Multicom Ent. Group; bryan.crocker@gmail.com; submitted *Totem* to Netflix).

///

PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S RESPONSES TO DEFENDANT NETFLIX, INC.'S
INTERROGATORIES (SET ONE)

Plaintiff believes the following individuals have knowledge or information regarding the development and/or creation of *Stranger Things*:  Matt Duffer (Monkey Massacre Prod.; *Stranger Things* creator); Ross Duffer (Monkey Massacre Prod.; *Stranger Things* creator); Shawn Levy (21 Laps Ent.; *Stranger Things* creator); Dan Cohen (21 Laps Ent.; *Stranger Things* creator); Various employees of 21 Laps Entertainment (*Stranger Things* development); Aaron Sims (Aaron Sims Creative; *Stranger Things* concept artist); Alexander Mandradjiev (Aaron Sims Creative; *Stranger Things* development); Steffen Reichstadt (Aaron Sims Creative; *Stranger Things* development); Various employees of Aaron Sims Creative (*Stranger Things* development); Cindy Holland (Netflix; chollandnyc@hotmail.com; *Stranger Things* development); Reed Hastings (Netflix; *Stranger Things* development); Ted Serandos (Netflix; *Stranger Things* development); Greg Peters (Netflix; *Stranger Things* development); Spencer Neumann (Netflix; *Stranger Things* development); Spencer Wang (Netflix; *Stranger Things* development); Brian Wright (Netflix; *Stranger Things* development); Matt Thunell (Netflix; *Stranger Things* development); Karl Gajdusek (Netflix; *Stranger Things* development); Iain Paterson (Netflix; *Stranger Things* development).

Discovery is continuing and Responding Party reserves the right to supplement this response upon completion of further discovery.

Dated: July 30, 2021

BOREN, OSHER & LUFTMAN, LLP

_____
Jeremy J. Osher
Brittanee A. Marksbury
Attorneys for Plaintiff,
IRISH ROVER ENTERTAINMENT, LLC

DocuSign Envelope ID: 388DE625-838C-414F-ACDF-2A60D13EA83F

1

## **<u>VERIFICATION</u>**

2

3

I, Jeffrey Kennedy, have read the foregoing PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S RESPONSES TO DEFENDANT NETFLIX, INC.'S INTERROGATORIES (SET ONE) and know its contents.

4

5

[ ]       I am a party to this action.  The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

6

7

8

[X]       I am the authorized agent for Irish Rover Entertainment, LLC, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.  The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true

9

10

11

[ ]       I am one of the attorneys for _____, a party to this action. Such party is absent from the county of aforesaid State where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

12

13

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

14

Executed this _7/29/21_ day of July, 2021 at Los Angeles, California.

15

16

_____

Jeffrey Kennedy

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE

STATE OF CALIFORNIA )
                    ) ss
COUNTY OF LOS ANGELES )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years of age and am not a party to this action. My business address is 222 North Pacific Coast Highway, Suite 2222, El Segundo, CA 90245.

On July 30, 2021, I served the document(s) as described below on interested parties in this action as follows:

**PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S RESPONSES TO DEFENDANT NETFLIX, INC.'S INTERROGATORIES (SET ONE)**

| ☒ | by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth below. | |
|---|---|---|
| | David Grossman, Esq.<br>Nathalie Russell, Esq.<br>10100 Santa Monica Blvd., Suite 2200<br>Los Angeles, CA 90067<br>Telephone:  (310) 282-2000<br>Facsimile:   (310) 282-2200<br>dgrossman@loeb.com<br>nrussell@loeb.com | *Attorney for Defendants AARON SIMS; MATT DUFFER; ROSS DUFFER; NETFLIX, INC.; NETFLIX STREAMING SERVICES, INC.; and 21 LAPS, INC.* |

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 30, 2021, at El Segundo, California.

_____
Kristina Hicks

# EXHIBIT F

1  BOREN, OSHER & LUFTMAN, LLP
2  Jeremy J. Osher (SBN 192109)
   josher@bollaw.com
3  Brittanee A. Marksbury (SBN 315579)
   bmarksbury@bollaw.com
4  222 N. Pacific Coast Highway, Suite 2222
5  El Segundo, CA 90245
   Telephone: (310) 322-2021
6  Facsimile: (310) 322-2228
7
8  Attorneys for Plaintiff,
   IRISH ROVER ENTERTAINMENT,
9  LLC

10

## UNITED STATES DISTRICT COURT
11
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
12
## WESTERN DIVISION
13

14

15  IRISH ROVER ENTERTAINMENT, LLC, a California limited liability company,

16

17                      Plaintiff,

18          vs.

19  AARON SIMS, an individual; MATT DUFFER, an individual; ROSS DUFFER, an individual; NETFLIX, INC., a Delaware corporation; NETFLIX STREAMING SERVICES, INC., a Delaware corporation; 21 LAPS, INC., a California corporation; and DOES 1 through 50, inclusive,

20

21

22

23

24

25

26                      Defendants.

27

28

Case No.: 2:20-cv-06293-CBM-PLA

Judge: Hon. Consuelo B. Marshall
Magistrate Judge: Hon. Paul L. Abrams

**PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S REQUESTS FOR PRODUCTION (SET ONE) TO DEFENDANT NETFLIX STREAMING SERVICES, INC.**

Complaint Filed:   July 15, 2020
Trial Date: None Set

PROPOUNDING PARTY:       Plaintiff IRISH ROVER ENTERTAINMENT, LLC

RESPONDING PARTY:        Defendant NETFLIX STREAMING SERVICES, INC.

SET NUMBER:              One (1)


**TO RESPONDING PARTY AND ALL COUNSEL OF RECORD HEREIN:**

     **NOTICE IS HEREBY GIVEN** that pursuant to Rule 34 of the *Federal Rules of Civil Procedure,* Plaintiff IRISH ROVER ENTERTAINMENT, LLC ("Plaintiff") hereby demands that Defendant NETFLIX STEAMING SERVICES, INC. ("Defendant" or "YOU") produce and permit Plaintiff to inspect and copy all documents, including all originals and copies thereof, as described in the attached requests for documents and which are in Defendant's possession, custody or control. The documents to be produced are to be made available at Boren, Osher & Luftman, LLP, 222 North Pacific Coast Highway, Suite 2222, El Segundo, CA 90245, thirty (30) days after service of these Requests.

     In the event that any documents are withheld by Defendant due to a claim of privilege, Plaintiff expressly requests that a privilege log of all such documents be provided to Plaintiff concurrent with the production of documents.

     Plaintiff further demands that Defendant serve a written response which shall be verified to this request in accordance with the provisions of Code of Civil Procedure section 2031.260.  Finally, Defendant need not physically produce a requested item at the time and place indicated if Defendant attaches a copy of said requested item to the response and serves same within the required time therefore.

## **INSTRUCTIONS**

     1.    In responding to this demand for production of documents, Defendant shall produce all documents in his possession, custody or control, or in the possession, custody or control of his attorneys, accountants, investigators, adjusters, representatives, agents or employees.

     2.    Defendant shall produce not only the originals (or exact copies of the originals of all documents demanded), but also any copies of such documents which bear any notes

or markings not found on the originals and all preliminary, intermediate, final or revised drafts of such documents.

3.      Defendant shall produce all documents and tangible things which are responsive in whole or in part to any of the following demands in full, without abridgement, abbreviation or redaction of any kind.  If any documents cannot be produced in full, Defendant shall produce those documents to the extent possible and indicate by way of written response what portions of those documents are not produced and why those portions are not produced.

4.      If any documents demanded below no longer exist or cannot be located, Defendant shall set forth in the written response a complete statement of all circumstances surrounding the destruction, loss, or disappearance of each such document, including, without limitation, the following information:

> (a)    a specific description of the document, including the general subject matter, the date the document was created and received, its author or signatory, its addressee and every other recipient, and its type or nature;
>
> (b)    the date of its disposal;
>
> (c)    the manner of its disposal;
>
> (d)    the reason for its disposal;
>
> (e)    the name(s), business and home address(es) and telephone number(s) of the person(s) authorizing the disposal; and
>
> (f)    the name(s), business and home address(es) and telephone number(s) of the person(s) who disposed of the document.

5.      If Defendant is withholding any document responsive to this demand on the basis of a claimed privilege, Defendant shall state the following information by way of written response;

> (a)    a specific description of the document, including its type or nature and general subject matter;
>
> (b)    the date the document was created, executed and received;

(c)  the author or authors of the document;

(d)  the address or addresses and the telephone number or telephone numbers of the author or authors of the document;

(e)  the addressee or addressees of the document;

(f)  the identity of all persons or entities copied on the document;

(g)  the title of the document;

(h)  the name, address and telephone number of the person having custody of the document;

(i)  the location of the document and the identity of its custodian; and

(j)  the type of privilege claimed as grounds for withholding the document.

6.  YOU are required to produce that portion of the document to which no claim of privilege has been made.

7.  These Requests for Production shall be deemed continuing in nature, and YOU are under a duty to supplement YOUR document production with any document requested herein that is unavailable upon the initial date for the production of documents.

8.  If YOU refer in your responses to any document already produced, and not supplied with YOUR response, please indicate by document number of the documents to which you refer.

## **DEFINITIONS**

1.  As used herein, the term "DOCUMENT" shall mean and refer to written, typed, printed and graphic materials of whatever kind or nature, including, but not limited to, COMMUNICATIONS, notes, memoranda, telexes, telecopies, publications, contracts, agreements, minutes, interoffice communications, offers, charts, logs, papers, records, reports, analyses, studies, books, calendars, diaries, statements, complaints, filings with any court, tribunal or governmental agency, internal investigations, plans, bylaws, corporate minutes, ledgers, transcripts, summaries, agendas, audits, work orders, repair orders, bills, invoices, receipts, estimates, financial records, financial statements, personnel files, instruction manuals, policy manuals, bulletins, accounting records, checks, check

stubs, check registers, cancelled checks, bank statements, money orders, negotiable instruments, photographs, transcriptions, any records of any statement, conversation, telephone call, meeting, event or activity, computer programs, data and data processing cards.  DOCUMENT shall also mean and refer to all writings, originals and duplicates as defined in Evidence Code sections 250, 255 and 266, whether in draft, or otherwise, including but not limited to copies and nonidentical copies (whether different from the originals because of notes or marks made on or attached to said copies, or otherwise).

2.     As used herein, the term "COMMUNICATIONS" shall mean and refer to any oral or written exchange or transmission of words or ideas to another person or persons, whether direct or through one or more intermediaries, including but not limited to, all discussions, conversations, negotiations, conferences, meetings, speeches, statements, questions and/or any other audible transmissions, e-mail, computer disks, computer back-up tapes, all printed, typed handwritten, and/or other readable or viewable DOCUMENTS.

3.     As used herein, the terms "YOU" or "YOUR" shall mean and refer to Defendant Netflix Streaming Services, Inc. and any person acting on YOUR behalf including, but not limited to, agents, partners, ex-partners, servants, employees, attorneys and others who are in possession of or may have obtained information for, or on, YOUR behalf.

4.     As used herein, the term "RELATE TO" or "RELATING TO" means, in whole or in part, evidencing, constituting, containing, concerning, embodying, reflecting, referring or relating to, describing, discussing, mentioning, analyzing, identifying, stating, referring to, dealing with, or in any way mentioning or pertaining to.

5.     As used herein, the term "STRANGER THINGS" shall mean and refer to the television series Stranger Things, that Plaintiff contends infringes on the TOTEM WORKS.

6.     As used herein, the term "TOTEM SCREENPLAYS" shall mean and refer to the screenplays at issue in this action (USDC, C.D. Cal., Case No. 2:20-cv-06293-CBM-PLA).

7.    As used herein, the term "TOTEM CONCEPT ART" shall mean and refer to the concept art at issue in this action (USDC, C.D. Cal., Case No. 2:20-cv-06293-CBM-PLA).

8.    As used herein, the term "TOTEM WORKS" shall mean and refer to the TOTEM SCREENPLAYS and TOTEM CONCEPT ART.

9.    As used herein, the term "KESSLER LAWSUIT" shall mean and refer to the lawsuit entitled *Charlie Kessler v. Matt Duffer et al.*, LASC Case No. BC700197.

10.  As used herein, the term "EVERGREEN" shall mean and refer to Evergreen Films, Inc., and any of its officers, directors, agents, managers, supervisors, employees, representatives, and/or employees.

11.  The term "NETFLIX" shall mean and refer to Defendant Netflix, Inc. and any of its officers, directors, agents, managers, supervisors, employees, representatives, and/or employees.

12.  As used herein, the term "21 LAPS, INC." shall mean and refer to Defendant 21 Laps, Inc. and any of its officers, directors, agents, managers, supervisors, employees, representatives, and/or employees.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

Any and all DOCUMENTS that RELATE TO YOUR involvement in the creation and development of STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 2:**

Any and all DOCUMENTS that RELATE TO the creation and development of STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 3:**

Any and all DOCUMENTS that RELATE TO the TOTEM WORKS, which YOU received before YOU produced, distributed, or streamed STRANGER THINGS.

///

///

**REQUEST FOR PRODUCTION NO. 4:**

Any and all DOCUMENTS that YOU received from any third party, including any Defendant in this action, that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 5:**

Any and all COMMUNICATIONS between YOU and Aaron Sims that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 6:**

Any and all COMMUNICATIONS between YOU and Aaron Sims that RELATE TO STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 7:**

Any and all DOCUMENTS that YOU received from Aaron Sims that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 8:**

Any and all COMMUNICATIONS between YOU and Ross Duffer and/or Matt Duffer that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 9:**

Any and all COMMUNICATIONS between YOU and Ross Duffer and/or Matt Duffer that RELATE TO STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 10:**

DOCUMENTS that RELATE TO the script for the pilot episode for STRANGER THINGS

**REQUEST FOR PRODUCTION NO. 11:**

Any and all DOCUMENTS that RELATE to YOUR purchase of STRANGER THINGS, including any agreements that YOU signed with Monkey Massacre Productions, Matt Duffer and/or Ross Duffer.

**REQUEST FOR PRODUCTION NO. 12:**

Any and all DOCUMENTS that RELATE to why Aaron Sims was not involved in Season 3 and/or Season 4 of STRANGER THINGS.

6

PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S REQUESTS FOR PRODUCTION (SET ONE) TO
DEFENDANT NETFLIX STREAMING SERVICES, INC.

**REQUEST FOR PRODUCTION NO. 13:**

Any and all DOCUMENTS that RELATE to any "look book" or "pitch book" that Matt Duffer and/or Ross Duffer created for STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 14:**

Any and all DOCUMENTS that RELATE to any sizzle reel that Matt Duffer and/or Ross Duffer created for STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 15:**

Any and all DOCUMENTS that RELATE TO STRANGER THINGS that Matt Duffer and/or Ross Duffer, or anyone affiliated with either of them (e.g., agents), gave YOU prior to YOUR decision to purchase STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 16:**

Copies of any DOCUMENTS that YOU produced in connection with the KESSLER LAWSUIT.

**REQUEST FOR PRODUCTION NO. 17:**

Copies of any transcript for any deposition given by YOU in the KESSLER LAWSUIT.

**REQUEST FOR PRODUCTION NO. 18:**

Any and all COMMUNICATIONS between YOU and 21 LAPS, INC. that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 19:**

Any and all COMMUNICATION between YOU and 21 LAPS, INC. that RELATE TO STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 20:**

Any and all COMMUNICATIONS between YOU and EVERGREEN that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 21:**

Any and all COMMUNICATIONS between YOU and EVERGREEN that RELATE TO STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 22:**

Any and all COMMUNICATIONS between YOU and NETFLIX that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 23:**

Any and all COMMUNICATIONS between YOU and NETFLIX that RELATE TO STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 24:**

Any and all COMMUNICATIONS between and among any of YOUR employees, agents, or contractors that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 25:**

Any and all COMMUNICATIONS between and among any of YOUR employees, agents, or contractors that RELATE TO STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 26:**

Any and all COMMUNICATIONS between YOU and Jeffrey Kennedy that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 27:**

Any and all DOCUMENTS that RELATE TO contracts or agreements that YOU entered into RELATING TO STRANGER THINGS, including contracts or agreements regarding compensation.

**REQUEST FOR PRODUCTION NO. 28:**

Any and all DOCUMENTS that RELATE TO any attempt to license, option, or otherwise exploit STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 29:**

Any and all DOCUMENTS that RELATE TO the production budgets for each season of STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 30:**

Any and all DOCUMENTS sufficient to show the number of monthly Netflix subscribers in the United States, by month, from 2015 through 2020.

**REQUEST FOR PRODUCTION NO. 31:**

Any and all DOCUMENTS sufficient to show the amount of revenue YOU made from Netflix subscriptions from the United States, by month, from 2015 through 2019.

**REQUEST FOR PRODUCTION NO. 32:**

Any and all DOCUMENTS that RELATE TO the costs YOU have incurred that are associated with the streaming of STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 33:**

Any and all DOCUMENTS sufficient to show the Netflix streaming traffic numbers in the United States, by month, from 2015 through 2019.

**REQUEST FOR PRODUCTION NO. 34:**

Any and all DOCUMENTS that RELATE TO internal and/or third-party quantifications of the Netflix streaming traffic that is attributable to STRANGER THINGS

Dated: July 8, 2021                    BOREN, OSHER & LUFTMAN, LLP

_____
Jeremy J. Osher
Brittanee A. Marksbury
Attorneys for Plaintiff,
IRISH ROVER ENTERTAINMENT, LLC

**PROOF OF SERVICE**

STATE OF CALIFORNIA          )
                             )   ss
COUNTY OF LOS ANGELES        )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years of age and am not a party to this action. My business address is 222 North Pacific Coast Highway, Suite 2222, El Segundo, CA 90245.

On July 8, 2021, I served the document(s) as described below on interested parties in this action as follows:

**PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S REQUESTS FOR PRODUCTION (SET ONE) TO DEFENDANT NETFLIX STREAMING SERVICES, INC.**

| ☒ | electronically by using the Court's ECF/CM System. |
|---|---|
| ☒ | (Via U.S. Mail) by placing the above-named document(s) in a sealed envelope addressed as set forth below and then by placing such sealed envelope for collection and mailing with the United States Postal Service in accordance with Boren, Osher & Luftman, LLP's ordinary business practices. |

| | |
|---|---|
| Nathalie Russell, Esq.<br>Loeb and Loeb LLP<br>345 Park Avenue<br>New York, NY 10154<br>Email: nrussell@loeb.com | *Attorneys for Defendants Aaron Sims, Matt Duffer, Ross Duffer, Netflix, Inc., Netflix Streaming Services, Inc., and 21 Laps, Inc.* |
| David A. Grossman, Esq.<br>Loeb and Loeb LLP<br>10100 Santa Monica Boulevard<br>Suite 2200<br>Los Angeles, CA 90067-4120<br>Email: dgrossman@loeb.com | *Attorneys for Defendants Aaron Sims, Matt Duffer, Ross Duffer, Netflix, Inc., Netflix Streaming Services, Inc., and 21 Laps, Inc.* |

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 8, 2021, at El Segundo, California.

_____
Jon Austin Raymundo

# EXHIBIT G

BOREN, OSHER & LUFTMAN, LLP
Jeremy J. Osher (SBN 192109)
josher@bollaw.com
Brittanee A. Marksbury (SBN 315579)
bmarksbury@bollaw.com
222 N. Pacific Coast Highway, Suite 2222
El Segundo, CA 90245
Telephone: (310) 322-2021
Facsimile: (310) 322-2228

Attorneys for Plaintiff,
IRISH ROVER ENTERTAINMENT,
LLC

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| IRISH ROVER ENTERTAINMENT, LLC, a California limited liability company,<br><br>     Plaintiff,<br><br>  vs.<br><br>AARON SIMS, an individual; MATT DUFFER, an individual; ROSS DUFFER, an individual; NETFLIX, INC., a Delaware corporation; NETFLIX STREAMING SERVICES, INC., a Delaware corporation; 21 LAPS, INC., a California corporation; and DOES 1 through 50, inclusive,<br><br>     Defendants. | Case No.: 2:20-cv-06293-CBM-PLA<br><br>Judge: Hon. Consuelo B. Marshall<br>Magistrate Judge: Hon. Paul L. Abrams<br><br>**PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S REQUESTS FOR PRODUCTION (SET ONE) TO DEFENDANT ROSS DUFFER**<br><br>Complaint Filed:  July 15, 2020<br>Trial Date: None Set |

| | |
|---|---|
| PROPOUNDING PARTY: | Plaintiff IRISH ROVER ENTERTAINMENT, LLC |
| RESPONDING PARTY: | Defendant ROSS DUFFER |
| SET NUMBER: | One (1) |

**TO RESPONDING PARTY AND ALL COUNSEL OF RECORD HEREIN:**

**NOTICE IS HEREBY GIVEN** that pursuant to Rule 34 of the *Federal Rules of Civil Procedure,* Plaintiff IRISH ROVER ENTERTAINMENT, LLC ("Plaintiff") hereby demands that Defendant ROSS DUFFER ("Defendant" or "YOU") produce and permit Plaintiff to inspect and copy all documents, including all originals and copies thereof, as described in the attached requests for documents and which are in Defendant's possession, custody or control. The documents to be produced are to be made available at Boren, Osher & Luftman, LLP, 222 North Pacific Coast Highway, Suite 2222, El Segundo, CA 90245, thirty (30) days after service of these Requests.

In the event that any documents are withheld by Defendant due to a claim of privilege, Plaintiff expressly requests that a privilege log of all such documents be provided to Plaintiff concurrent with the production of documents.

Plaintiff further demands that Defendant serve a written response which shall be verified to this request in accordance with the provisions of Code of Civil Procedure section 2031.260. Finally, Defendant need not physically produce a requested item at the time and place indicated if Defendant attaches a copy of said requested item to the response and serves same within the required time therefore.

## INSTRUCTIONS

1.     In responding to this demand for production of documents, Defendant shall produce all documents in his possession, custody or control, or in the possession, custody or control of his attorneys, accountants, investigators, adjusters, representatives, agents or employees.

2.     Defendant shall produce not only the originals (or exact copies of the originals of all documents demanded), but also any copies of such documents which bear any notes

or markings not found on the originals and all preliminary, intermediate, final or revised drafts of such documents.

3.     Defendant shall produce all documents and tangible things which are responsive in whole or in part to any of the following demands in full, without abridgement, abbreviation or redaction of any kind.  If any documents cannot be produced in full, Defendant shall produce those documents to the extent possible and indicate by way of written response what portions of those documents are not produced and why those portions are not produced.

4.     If any documents demanded below no longer exist or cannot be located, Defendant shall set forth in the written response a complete statement of all circumstances surrounding the destruction, loss, or disappearance of each such document, including, without limitation, the following information:

       (a)    a specific description of the document, including the general subject matter, the date the document was created and received, its author or signatory, its addressee and every other recipient, and its type or nature;

       (b)    the date of its disposal;

       (c)    the manner of its disposal;

       (d)    the reason for its disposal;

       (e)    the name(s), business and home address(es) and telephone number(s) of the person(s) authorizing the disposal; and

       (f)    the name(s), business and home address(es) and telephone number(s) of the person(s) who disposed of the document.

5.     If Defendant is withholding any document responsive to this demand on the basis of a claimed privilege, Defendant shall state the following information by way of written response;

       (a)    a specific description of the document, including its type or nature and general subject matter;

       (b)    the date the document was created, executed and received;

2

(c)   the author or authors of the document;

(d)   the address or addresses and the telephone number or telephone numbers of the author or authors of the document;

(e)   the addressee or addressees of the document;

(f)   the identity of all persons or entities copied on the document;

(g)   the title of the document;

(h)   the name, address and telephone number of the person having custody of the document;

(i)   the location of the document and the identity of its custodian; and

(j)   the type of privilege claimed as grounds for withholding the document.

6.    YOU are required to produce that portion of the document to which no claim of privilege has been made.

7.    These Requests for Production shall be deemed continuing in nature, and YOU are under a duty to supplement YOUR document production with any document requested herein that is unavailable upon the initial date for the production of documents.

8.    If YOU refer in your responses to any document already produced, and not supplied with YOUR response, please indicate by document number of the documents to which you refer.

## **DEFINITIONS**

1.    As used herein, the term "DOCUMENT" shall mean and refer to written, typed, printed and graphic materials of whatever kind or nature, including, but not limited to, COMMUNICATIONS, notes, memoranda, telexes, telecopies, publications, contracts, agreements, minutes, interoffice communications, offers, charts, logs, papers, records, reports, analyses, studies, books, calendars, diaries, statements, complaints, filings with any court, tribunal or governmental agency, internal investigations, plans, bylaws, corporate minutes, ledgers, transcripts, summaries, agendas, audits, work orders, repair orders, bills, invoices, receipts, estimates, financial records, financial statements, personnel files, instruction manuals, policy manuals, bulletins, accounting records, checks, check

3

stubs, check registers, cancelled checks, bank statements, money orders, negotiable instruments, photographs, transcriptions, any records of any statement, conversation, telephone call, meeting, event or activity, computer programs, data and data processing cards.  DOCUMENT shall also mean and refer to all writings, originals and duplicates as defined in Evidence Code sections 250, 255 and 266, whether in draft, or otherwise, including but not limited to copies and nonidentical copies (whether different from the originals because of notes or marks made on or attached to said copies, or otherwise).

2.    As used herein, the term "COMMUNICATIONS" shall mean and refer to any oral or written exchange or transmission of words or ideas to another person or persons, whether direct or through one or more intermediaries, including but not limited to, all discussions, conversations, negotiations, conferences, meetings, speeches, statements, questions and/or any other audible transmissions, e-mail, computer disks, computer back-up tapes, all printed, typed handwritten, and/or other readable or viewable DOCUMENTS.

3.    As used herein, the terms "YOU" or "YOUR" shall mean and refer to Defendant Ross Duffer and any person acting on his behalf including, but not limited to, agents, partners, ex-partners, servants, employees, attorneys and others who are in possession of or may have obtained information for, or on, his behalf.

4.    As used herein, the term "RELATE TO" or "RELATING TO" means, in whole or in part, evidencing, constituting, containing, concerning, embodying, reflecting, referring or relating to, describing, discussing, mentioning, analyzing, identifying, stating, referring to, dealing with, or in any way mentioning or pertaining to.

5.    As used herein, the term "STRANGER THINGS" shall mean and refer to the television series Stranger Things, which Plaintiff contends infringes on the TOTEM WORKS.

6.    As used herein, the term "TOTEM SCREENPLAYS" shall mean and refer to the screenplays at issue in this action (USDC, C.D. Cal., Case No. 2:20-cv-06293-CBM-PLA).

///

7.      As used herein, the term "TOTEM CONCEPT ART" shall mean and refer to the concept art at issue in this action (USDC, C.D. Cal., Case No. 2:20-cv-06293-CBM-PLA).

8.      As used herein, the term "TOTEM WORKS" shall mean and refer to the TOTEM SCREENPLAYS and TOTEM CONCEPT ART.

9.      As used herein, the term "KESSLER LAWSUIT" shall mean and refer to the lawsuit entitled *Charlie Kessler v. Matt Duffer et al.*, LASC Case No. BC700197.

10.     As used herein, the term "DEFENDANTS" shall mean and refer to Defendants Aaron Sims, Matt Duffer, Netflix, Inc., Netflix Streaming Services, Inc. and 21 Laps Entertainment individually or jointly with any of their officers, directors, agents, managers, supervisors, employees, and/or representatives.

11.     As used herein, the term "EVERGREEN" shall mean and refer to Evergreen Films, Inc., and any of its officers, directors, agents, managers, supervisors, employees, representatives, and/or employees.

12.     The term "NETFLIX" shall mean Defendants Netflix, Inc., Netflix Streaming Services, Inc. and any of their officers, directors, agents, managers, supervisors, employees, representatives, and/or employees.

13.     As used herein, the term "21 LAPS, INC." shall mean and refer to Defendant 21 Laps, Inc. and any of its officers, directors, agents, managers, supervisors, employees, representatives, and/or employees.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

Any and all DOCUMENTS that RELATE TO the creation and development of STRANGER THINGS, including any and all materials referenced or relied on upon in such creation.

**REQUEST FOR PRODUCTION NO. 2:**

Any and all COMMUNICATIONS between YOU and Matt Duffer that RELATE TO the creation and development of STRANGER THINGS.

PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S REQUESTS FOR PRODUCTION (SET ONE) TO
DEFENDANT ROSS DUFFER

**REQUEST FOR PRODUCTION NO. 3:**

Any and all DOCUMENTS that demonstrate when YOU first came up with the initial idea for STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 4:**

Any and all DOCUMENTS that RELATE TO any story outline that YOU and/or Matt Duffer created in connection with YOUR development of STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 5:**

Any and all handwritten notes regarding the creation and development of STRANGER THINGS, including notes appearing in journals or notebooks and on drafts of any scripts.

**REQUEST FOR PRODUCTION NO. 6:**

Any and all DOCUMENTS that RELATE TO the script for the pilot episode for STRANGER THINGS, including any drafts of the script.

**REQUEST FOR PRODUCTION NO. 7:**

Any and all DOCUMENTS that RELATE TO any version of the script for the pilot episode for STRANGER THINGS, including DOCUMENTS sufficient to identify the date of creation of each version.

**REQUEST FOR PRODUCTION NO. 8:**

Any and all DOCUMENTS that RELATE TO the script for the pilot episode for STRANGER THINGS, including any drafts of the script.

**REQUEST FOR PRODUCTION NO. 9:**

Any and all DOCUMENTS that RELATE TO any trailer that YOU and/or Matt Duffer created for STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 10:**

Any and all DOCUMENTS that RELATE TO any "look book" or "pitch book" that YOU and/or Matt Duffer created for STRANGER THINGS.

///

///

**REQUEST FOR PRODUCTION NO. 11:**

Any and all DOCUMENTS that RELATE TO any sizzle reel that YOU and/or Matt Duffer created for STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 12:**

Any and all DOCUMENTS that RELATE TO any submission of STRANGER THINGS to any third party, including any of the DEFENDANTS, producers, directors, actors, film festivals, or investors.

**REQUEST FOR PRODUCTION NO. 13:**

Any and all DOCUMENTS that RELATE TO any scripts for any episode in season one of STRANGER THINGS, including all versions thereof, along with DOCUMENTS sufficient to identify the date of creation of each version.

**REQUEST FOR PRODUCTION NO. 14:**

Copies of any and all DOCUMENTS that YOU provided to NETFLIX prior to YOUR first meeting with NETFLIX to pitch STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 15:**

Copies of any transcript(s) of any interview(s) that YOU gave in connection with STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 16:**

Copies of any recorded interview (whether audio or visual) that YOU provided in connection with STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 17:**

Copies of any DOCUMENTS that YOU produced in connection with the KESSLER LAWSUIT.

**REQUEST FOR PRODUCTION NO. 18:**

Copies of any transcript for any deposition given by YOU in the KESSLER LAWSUIT.

///

///

PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S REQUESTS FOR PRODUCTION (SET ONE) TO DEFENDANT ROSS DUFFER

**REQUEST FOR PRODUCTION NO. 19:**

Copies of any Declaration (including exhibits) submitted by YOU in the KESSLER LAWSUIT.

**REQUEST FOR PRODUCTION NO. 20:**

Any and all DOCUMENTS RELATING TO the TOTEM WORKS that YOU received prior to creating the script for the pilot episode of STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 21:**

Any and all DOCUMENTS that RELATE TO any scouting by YOU of potential locations for STRANGER THINGS prior to 2015.

**REQUEST FOR PRODUCTION NO. 22:**

Any and all DOCUMENTS that RELATE TO NETFLIX's purchase of STRANGER THINGS, including any agreements that YOU and/or Monkey Massacre Productions signed with NETFLIX.

**REQUEST FOR PRODUCTION NO. 23:**

Any and all DOCUMENTS that RELATE TO why Aaron Sims was not involved in Season 3 and/or Season 4 of STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 24:**

Any and all COMMUNICATIONS between YOU and Aaron Sims that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 25:**

Any and all COMMUNICATIONS between YOU and Aaron Sims that RELATE TO STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 26:**

Any and all COMMUNICATIONS between YOU and Matt Duffer that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 27:**

Any and all COMMUNICATIONS between YOU and Matt Duffer that RELATE TO STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 28:**

Any and all COMMUNICATIONS between YOU and NETFLIX that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 29:**

Any and all COMMUNICATIONS between YOU and NETFLIX that RELATE TO STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 30:**

Any and all COMMUNICATIONS between YOU and 21 LAPS, INC. that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 31:**

Any and all COMMUNICATION between YOU and 21 LAPS, INC. that RELATE TO STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 32:**

Any and all COMMUNICATIONS between YOU and EVERGREEN that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 33:**

Any and all COMMUNICATIONS between YOU and EVERGREEN that RELATE TO STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 34:**

Any and all COMMUNICATIONS between YOU and YOUR employees, agents, or contractors that RELATE TO the TOTEM WORKS from 2009 to 2013.

**REQUEST FOR PRODUCTION NO. 35:**

Any and all COMMUNICATIONS between YOU and Jeffrey Kennedy that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 36:**

Any and all DOCUMENTS that RELATE TO contracts or agreements that YOU and/or Monkey Massacre Productions entered into RELATING TO STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 37:**

Any and all DOCUMENTS that RELATE TO any attempt to license, option, or otherwise exploit STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 38:**

Any and all DOCUMENTS that RELATE TO compensation that YOU and/or Monkey Massacre Productions received for STRANGER THINGS, including but not limited to compensation YOU and/or Monkey Massacre Productions received for licensing deals, producing or the streaming of STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 39:**

Any and all DOCUMENTS that RELATE TO funding that YOU and/or Monkey Massacre Productions provided in connection with STRANGER THINGS, including without limitation funding for the creation, development, marketing, and/or distribution STRANGER THINGS.

Dated: July 8, 2021                                    BOREN, OSHER & LUFTMAN, LLP


_____
Jeremy J. Osher
Brittanee A. Marksbury
Attorneys for Plaintiff,
IRISH ROVER ENTERTAINMENT, LLC

PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S REQUESTS FOR PRODUCTION (SET ONE) TO DEFENDANT ROSS DUFFER

# PROOF OF SERVICE

STATE OF CALIFORNIA          )
                             )  ss
COUNTY OF LOS ANGELES        )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years of age and am not a party to this action. My business address is 222 North Pacific Coast Highway, Suite 2222, El Segundo, CA 90245.

On July 8, 2021, I served the document(s) as described below on interested parties in this action as follows:

**PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S REQUESTS FOR PRODUCTION (SET ONE) TO DEFENDANT ROSS DUFFER**

| ☒ | (Via email) I caused the transmission of the above-referenced document(s) to the email address set forth below. |
|---|---|
| ☒ | (Via U.S. Mail) by placing the above-named document(s) in a sealed envelope addressed as set forth below and then by placing such sealed envelope for collection and mailing with the United States Postal Service in accordance with Boren, Osher & Luftman, LLP's ordinary business practices. |

| | |
|---|---|
| Nathalie Russell, Esq.<br>Loeb and Loeb LLP<br>345 Park Avenue<br>New York, NY 10154<br>Email: nrussell@loeb.com | *Attorneys for Defendants Aaron Sims, Matt Duffer, Ross Duffer, Netflix, Inc., Netflix Streaming Services, Inc., and 21 Laps, Inc.* |
| David A. Grossman, Esq.<br>Loeb and Loeb LLP<br>10100 Santa Monica Boulevard<br>Suite 2200<br>Los Angeles, CA 90067-4120<br>Email: dgrossman@loeb.com | *Attorneys for Defendants Aaron Sims, Matt Duffer, Ross Duffer, Netflix, Inc., Netflix Streaming Services, Inc., and 21 Laps, Inc.* |

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 8, 2021, at El Segundo, California.

_____
Jon Austin Raymundo

# EXHIBIT H

BOREN, OSHER & LUFTMAN, LLP
Jeremy J. Osher (SBN 192109)
josher@bollaw.com
Brittanee A. Marksbury (SBN 315579)
bmarksbury@bollaw.com
222 N. Pacific Coast Highway, Suite 2222
El Segundo, CA 90245
Telephone: (310) 322-2021
Facsimile: (310) 322-2228

Attorneys for Plaintiff,
IRISH ROVER ENTERTAINMENT, LLC

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| IRISH ROVER ENTERTAINMENT, LLC, a California limited liability company,<br><br>          Plaintiff,<br><br>    vs.<br><br>AARON SIMS, an individual; MATT DUFFER, an individual; ROSS DUFFER, an individual; NETFLIX, INC., a Delaware corporation; NETFLIX STREAMING SERVICES, INC., a Delaware corporation; 21 LAPS, INC., a California corporation; and DOES 1 through 50, inclusive,<br><br>          Defendants. | Case No.: 2:20-cv-06293-CBM-PLA<br><br>Judge: Hon. Consuelo B. Marshall<br>Magistrate Judge: Hon. Paul L. Abrams<br><br>**PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S REQUESTS FOR PRODUCTION (SET ONE) TO DEFENDANT MATT DUFFER**<br><br>Complaint Filed:   July 15, 2020<br>Trial Date: None Set |

PROPOUNDING PARTY:    Plaintiff IRISH ROVER ENTERTAINMENT, LLC

RESPONDING PARTY:    Defendant MATT DUFFER

SET NUMBER:    One (1)

**TO RESPONDING PARTY AND ALL COUNSEL OF RECORD HEREIN:**

**NOTICE IS HEREBY GIVEN** that pursuant to Rule 34 of the *Federal Rules of Civil Procedure,* Plaintiff IRISH ROVER ENTERTAINMENT, LLC ("Plaintiff") hereby demands that Defendant MATT DUFFER ("Defendant" or "YOU") produce and permit Plaintiff to inspect and copy all documents, including all originals and copies thereof, as described in the attached requests for documents and which are in Defendant's possession, custody or control. The documents to be produced are to be made available at Boren, Osher & Luftman, LLP, 222 North Pacific Coast Highway, Suite 2222, El Segundo, CA 90245, thirty (30) days after service of these Requests.

In the event that any documents are withheld by Defendant due to a claim of privilege, Plaintiff expressly requests that a privilege log of all such documents be provided to Plaintiff concurrent with the production of documents.

Plaintiff further demands that Defendant serve a written response which shall be verified to this request in accordance with the provisions of Code of Civil Procedure section 2031.260. Finally, Defendant need not physically produce a requested item at the time and place indicated if Defendant attaches a copy of said requested item to the response and serves same within the required time therefore.

## INSTRUCTIONS

1.    In responding to this demand for production of documents, Defendant shall produce all documents in his possession, custody or control, or in the possession, custody or control of his attorneys, accountants, investigators, adjusters, representatives, agents or employees.

2.    Defendant shall produce not only the originals (or exact copies of the originals of all documents demanded), but also any copies of such documents which bear any notes

or markings not found on the originals and all preliminary, intermediate, final or revised drafts of such documents.

3. Defendant shall produce all documents and tangible things which are responsive in whole or in part to any of the following demands in full, without abridgement, abbreviation or redaction of any kind.  If any documents cannot be produced in full, Defendant shall produce those documents to the extent possible and indicate by way of written response what portions of those documents are not produced and why those portions are not produced.

4. If any documents demanded below no longer exist or cannot be located, Defendant shall set forth in the written response a complete statement of all circumstances surrounding the destruction, loss, or disappearance of each such document, including, without limitation, the following information:

        (a)    a specific description of the document, including the general subject matter, the date the document was created and received, its author or signatory, its addressee and every other recipient, and its type or nature;

        (b)    the date of its disposal;

        (c)    the manner of its disposal;

        (d)    the reason for its disposal;

        (e)    the name(s), business and home address(es) and telephone number(s) of the person(s) authorizing the disposal; and

        (f)    the name(s), business and home address(es) and telephone number(s) of the person(s) who disposed of the document.

5. If Defendant is withholding any document responsive to this demand on the basis of a claimed privilege, Defendant shall state the following information by way of written response;

        (a)    a specific description of the document, including its type or nature and general subject matter;

        (b)    the date the document was created, executed and received;

PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S REQUESTS FOR PRODUCTION (SET ONE) TO DEFENDANT MATT DUFFER

(c)    the author or authors of the document;

(d)    the address or addresses and the telephone number or telephone numbers of the author or authors of the document;

(e)    the addressee or addressees of the document;

(f)    the identity of all persons or entities copied on the document;

(g)    the title of the document;

(h)    the name, address and telephone number of the person having custody of the document;

(i)    the location of the document and the identity of its custodian; and

(j)    the type of privilege claimed as grounds for withholding the document.

6.    YOU are required to produce that portion of the document to which no claim of privilege has been made.

7.    These Requests for Production shall be deemed continuing in nature, and YOU are under a duty to supplement YOUR document production with any document requested herein that is unavailable upon the initial date for the production of documents.

8.    If YOU refer in your responses to any document already produced, and not supplied with YOUR response, please indicate by document number of the documents to which you refer.

## **DEFINITIONS**

1.    As used herein, the term "DOCUMENT" shall mean and refer to written, typed, printed and graphic materials of whatever kind or nature, including, but not limited to, COMMUNICATIONS, notes, memoranda, telexes, telecopies, publications, contracts, agreements, minutes, interoffice communications, offers, charts, logs, papers, records, reports, analyses, studies, books, calendars, diaries, statements, complaints, filings with any court, tribunal or governmental agency, internal investigations, plans, bylaws, corporate minutes, ledgers, transcripts, summaries, agendas, audits, work orders, repair orders, bills, invoices, receipts, estimates, financial records, financial statements, personnel files, instruction manuals, policy manuals, bulletins, accounting records, checks, check

PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S REQUESTS FOR PRODUCTION (SET ONE) TO DEFENDANT MATT DUFFER

stubs, check registers, cancelled checks, bank statements, money orders, negotiable instruments, photographs, transcriptions, any records of any statement, conversation, telephone call, meeting, event or activity, computer programs, data and data processing cards. DOCUMENT shall also mean and refer to all writings, originals and duplicates as defined in Evidence Code sections 250, 255 and 266, whether in draft, or otherwise, including but not limited to copies and nonidentical copies (whether different from the originals because of notes or marks made on or attached to said copies, or otherwise).

2.      As used herein, the term "COMMUNICATIONS" shall mean and refer to any oral or written exchange or transmission of words or ideas to another person or persons, whether direct or through one or more intermediaries, including but not limited to, all discussions, conversations, negotiations, conferences, meetings, speeches, statements, questions and/or any other audible transmissions, e-mail, computer disks, computer back-up tapes, all printed, typed handwritten, and/or other readable or viewable DOCUMENTS.

3.      As used herein, the terms "YOU" or "YOUR" shall mean and refer to Defendant Matt Duffer and any person acting on his behalf including, but not limited to, agents, partners, ex-partners, servants, employees, attorneys and others who are in possession of or may have obtained information for, or on, his behalf.

4.      As used herein, the term "RELATE TO" or "RELATING TO" means, in whole or in part, evidencing, constituting, containing, concerning, embodying, reflecting, referring or relating to, describing, discussing, mentioning, analyzing, identifying, stating, referring to, dealing with, or in any way mentioning or pertaining to.

5.      As used herein, the term "STRANGER THINGS" shall mean and refer to the television series Stranger Things, which Plaintiff contends infringes on the TOTEM WORKS.

6.      As used herein, the term "TOTEM SCREENPLAYS" shall mean and refer to the screenplays at issue in this action (USDC, C.D. Cal., Case No. 2:20-cv-06293-CBM-PLA).

///

7.     As used herein, the term "TOTEM CONCEPT ART" shall mean and refer to the concept art at issue in this action (USDC, C.D. Cal., Case No. 2:20-cv-06293-CBM-PLA).

8.     As used herein, the term "TOTEM WORKS" shall mean and refer to the TOTEM SCREENPLAYS and TOTEM CONCEPT ART.

9.     As used herein, the term "KESSLER LAWSUIT" shall mean and refer to the lawsuit entitled *Charlie Kessler v. Matt Duffer et al.*, LASC Case No. BC700197.

10.    As used herein, the term "DEFENDANTS" shall mean and refer to Defendants Aaron Sims, Ross Duffer, Netflix, Inc., Netflix Streaming Services, Inc. and 21 Laps Entertainment individually or jointly with any of their officers, directors, agents, managers, supervisors, employees, and/or representatives.

11.    As used herein, the term "EVERGREEN" shall mean and refer to Evergreen Films, Inc., and any of its officers, directors, agents, managers, supervisors, employees, representatives, and/or employees.

12.    As used herein, the term "NETFLIX" shall mean and refer to Defendants Netflix, Inc., Netflix Streaming Services, Inc. and any of their officers, directors, agents, managers, supervisors, employees, representatives, and/or employees.

13.    As used herein, the term "21 LAPS, INC." shall mean and refer to Defendant 21 Laps, Inc. and any of its officers, directors, agents, managers, supervisors, employees, representatives, and/or employees.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

Any and all DOCUMENTS that RELATE TO the creation and development of STRANGER THINGS, including any and all materials referenced or relied on upon in such creation.

**REQUEST FOR PRODUCTION NO. 2:**

Any and all COMMUNICATIONS between YOU and Ross Duffer that RELATE TO the creation and development of STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 3:**

Any and all DOCUMENTS that demonstrate when YOU first came up with the initial idea for STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 4:**

Any and all DOCUMENTS that RELATE TO any story outline that YOU and/or Ross Duffer created in connection with YOUR development of STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 5:**

Any and all handwritten notes regarding the creation and development of STRANGER THINGS, including notes appearing in journals or notebooks and on drafts of any scripts.

**REQUEST FOR PRODUCTION NO. 6:**

Any and all DOCUMENTS that RELATE TO the script for the pilot episode for STRANGER THINGS, including any drafts of the script.

**REQUEST FOR PRODUCTION NO. 7:**

Any and all DOCUMENTS that RELATE TO any version of the script for the pilot episode for STRANGER THINGS, including DOCUMENTS sufficient to identify the date of creation of each version.

**REQUEST FOR PRODUCTION NO. 8:**

Any and all DOCUMENTS that RELATE TO the script for the pilot episode for STRANGER THINGS, including any drafts of the script.

**REQUEST FOR PRODUCTION NO. 9:**

Any and all DOCUMENTS that RELATE TO any trailer that YOU and/or Ross Duffer created for STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 10:**

Any and all DOCUMENTS that RELATE TO any "look book" or "pitch book" that YOU and/or Ross Duffer created for STRANGER THINGS.

///

///

**REQUEST FOR PRODUCTION NO. 11:**

Any and all DOCUMENTS that RELATE TO any sizzle reel that YOU and/or Ross Duffer created for STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 12:**

Any and all DOCUMENTS that RELATE TO any submission of STRANGER THINGS to any third party, including any of the DEFENDANTS, producers, directors, actors, film festivals, or investors.

**REQUEST FOR PRODUCTION NO. 13:**

Any and all DOCUMENTS that RELATE TO any scripts for any episode in season one of STRANGER THINGS, including all versions thereof, along with DOCUMENTS sufficient to identify the date of creation of each version.

**REQUEST FOR PRODUCTION NO. 14:**

Copies of any and all DOCUMENTS that YOU provided to NETFLIX prior to YOUR first meeting with NETFLIX to pitch STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 15:**

Copies of any transcript(s) of any interview(s) that YOU gave in connection with STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 16:**

Copies of any recorded interview (whether audio or visual) that YOU provided in connection with STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 17:**

Copies of any DOCUMENTS that YOU produced in connection with the KESSLER LAWSUIT.

**REQUEST FOR PRODUCTION NO. 18:**

Copies of any transcript for any deposition given by YOU in the KESSLER LAWSUIT.

///

///

**REQUEST FOR PRODUCTION NO. 19:**

Copies of any Declaration (including exhibits) submitted by YOU in the KESSLER LAWSUIT.

**REQUEST FOR PRODUCTION NO. 20:**

Any and all DOCUMENTS RELATING TO the TOTEM WORKS that YOU received prior to creating the script for the pilot episode of STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 21:**

Any and all DOCUMENTS that RELATE TO any scouting by YOU of potential locations for STRANGER THINGS prior to 2015.

**REQUEST FOR PRODUCTION NO. 22:**

Any and all DOCUMENTS that RELATE TO NETFLIX's purchase of STRANGER THINGS, including any agreements that YOU and/or Monkey Massacre Productions signed with NETFLIX.

**REQUEST FOR PRODUCTION NO. 23:**

Any and all DOCUMENTS that RELATE TO why Aaron Sims was not involved in Season 3 and/or Season 4 of STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 24:**

Any and all COMMUNICATIONS between YOU and Aaron Sims that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 25:**

Any and all COMMUNICATIONS between YOU and Aaron Sims that RELATE TO STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 26:**

Any and all COMMUNICATIONS between YOU and Ross Duffer that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 27:**

Any and all COMMUNICATIONS between YOU and Ross Duffer that RELATE TO STRANGER THINGS.

8

**REQUEST FOR PRODUCTION NO. 28:**

Any and all COMMUNICATIONS between YOU and NETFLIX that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 29:**

Any and all COMMUNICATIONS between YOU and NETFLIX that RELATE TO STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 30:**

Any and all COMMUNICATIONS between YOU and 21 LAPS, INC. that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 31:**

Any and all COMMUNICATION between YOU and 21 LAPS, INC. that RELATE TO STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 32:**

Any and all COMMUNICATIONS between YOU and EVERGREEN that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 33:**

Any and all COMMUNICATIONS between YOU and EVERGREEN that RELATE TO STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 34:**

Any and all COMMUNICATIONS between YOU and YOUR employees, agents, or contractors that RELATE TO the TOTEM WORKS from 2009 to 2013.

**REQUEST FOR PRODUCTION NO. 35:**

Any and all COMMUNICATIONS between YOU and Jeffrey Kennedy that RELATE TO the TOTEM WORKS.

**REQUEST FOR PRODUCTION NO. 36:**

Any and all DOCUMENTS that RELATE TO contracts or agreements that YOU and/or Monkey Massacre Productions entered into RELATING TO STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 37:**

Any and all DOCUMENTS that RELATE TO any attempt to license, option, or otherwise exploit STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 38:**

Any and all DOCUMENTS that RELATE TO compensation that YOU and/or Monkey Massacre Productions received for STRANGER THINGS, including but not limited to compensation YOU and/or Monkey Massacre Productions received for licensing deals, producing or the streaming of STRANGER THINGS.

**REQUEST FOR PRODUCTION NO. 39:**

Any and all DOCUMENTS that RELATE TO funding that YOU and/or Monkey Massacre Productions provided in connection with STRANGER THINGS, including without limitation funding for the creation, development, marketing, and/or distribution STRANGER THINGS.

Dated: July 8, 2021

BOREN, OSHER & LUFTMAN, LLP

Jeremy J. Osher
Brittanee A. Marksbury
Attorneys for Plaintiff,
IRISH ROVER ENTERTAINMENT, LLC

1

**PROOF OF SERVICE**

2  STATE OF CALIFORNIA            )
                                 )  ss
3  COUNTY OF LOS ANGELES         )

4       I am employed in the County of Los Angeles, State of California. I am over the age

5  of 18 years of age and am not a party to this action. My business address is 222 North

   Pacific Coast Highway, Suite 2222, El Segundo, CA 90245.

6
        On July 8, 2021, I served the document(s) as described below on interested parties

7  in this action as follows:

8
        **PLAINTIFF IRISH ROVER ENTERTAINMENT, LLC'S REQUESTS FOR**

9       **PRODUCTION (SET ONE) TO DEFENDANT MATT DUFFER**

10
   ☒ | (Via email) I caused the transmission of the above-referenced document(s) to the

11 |   email address set forth below.

12 ☒ | (Via U.S. Mail) by placing the above-named document(s) in a sealed envelope

13 |   addressed as set forth below and then by placing such sealed envelope for
   |   collection and mailing with the United States Postal Service in accordance with
14 |   Boren, Osher & Luftman, LLP's ordinary business practices.

15

| Nathalie Russell, Esq. | *Attorneys for Defendants Aaron Sims,* |
16 | Loeb and Loeb LLP | *Matt Duffer, Ross Duffer, Netflix, Inc.,* |
| 345 Park Avenue | *Netflix Streaming Services, Inc., and* |
17 | New York, NY 10154 | *21 Laps, Inc.* |
| Email: nrussell@loeb.com | |
18

19 | David A. Grossman, Esq. | *Attorneys for Defendants Aaron Sims,* |
| Loeb and Loeb LLP | *Matt Duffer, Ross Duffer, Netflix, Inc.,* |
20 | 10100 Santa Monica Boulevard | *Netflix Streaming Services, Inc., and* |
| Suite 2200 | *21 Laps, Inc.* |
21 | Los Angeles, CA 90067-4120 | |
| Email: dgrossman@loeb.com | |
22

23

24       I declare under penalty of perjury under the laws of the State of California that the

25 above is true and correct.

26       Executed on July 8, 2021, at El Segundo, California.

27

28                                          _____
                                                   Jon Austin Raymundo

                                   1