DAVID GROSSMAN (SBN 211326)
dgrossman@loeb.com
SAFIA GRAY HUSSAIN (SBN 251123)
sghussain@loeb.com
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Telephone: 310.282.2000
Facsimile: 310.282.2200

Attorneys for Defendants
AARON SIMS, MATT DUFFER, ROSS
DUFFER, NETFLIX, INC., NETFLIX
STREAMING SERVICES, INC., and
21 LAPS INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IRISH ROVER ENTERTAINMENT, LLC, a California limited liability company,<br><br>             Plaintiffs,<br><br>        v.<br><br>AARON SIMS, an individual; MATT DUFFER, an individual; ROSS DUFFER, an individual; NETFLIX, INC., a Delaware corporation; NETFLIX STREAMING SERVICES, INC., a Delaware corporation; 21 LAPS, INC., a California corporation; and DOES 1 through 50, inclusive,<br><br>           Defendants. | Case No.: 2:20-cv-06293-CBM-PLA<br><br>Assigned to Hon. Consuelo B. Marshall<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S FIRST, SECOND, THIRD, FOURTH AND FIFTH CAUSES OF ACTION PURSUANT TO FED. R. CIV. P. 56**<br><br>[*Filed concurrently: Notice of Motion and Motion; Separate Statement of Uncontroverted Facts and Conclusions of Law; Declarations of Matt Duffer, Ross Duffer, Aaron Sims, Lester A. Standiford, and Safia Gray Hussain; [Proposed] Judgment*]<br><br>Date: February 7, 2023<br>Time: 10:00 a.m.<br>Courtroom: 8D<br><br>First Amended Complaint Filed: October 12, 2020<br>Trial Date: May 2, 2023 |

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

1

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

**I.**   INTRODUCTION ...................................................................... 1

**II.**  FACTS ...................................................................................... 3

    A.   The Duffers Create *Stranger Things*. ...................................... 3

    B.   *Stranger Things* ..................................................................... 4

    C.   Plaintiff's *Totem*. .................................................................... 9

**III.** DISCUSSION ........................................................................ 11

    A.   Legal Standard. ..................................................................... 11

    B.   There Is No Genuine Issue of Fact With Respect to Access. ... 13

    C.   The Duffers Independently Created the Series. ...................... 14

    D.   There Is No Substantial Similarity Between the Works at Issue ...................................................................................... 17

        1.   Plot and Sequence of Events. ......................................... 17

        2.   Characters. ..................................................................... 20

        3.   Theme. ........................................................................... 22

        4.   Dialogue. ....................................................................... 23

        5.   Mood. ............................................................................ 23

        6.   Settings. ......................................................................... 23

        7.   Pace. .............................................................................. 24

    E.   Plaintiff's Separate "Concept Art" Claim Fails. .................... 24

**IV.**  CONCLUSION ...................................................................... 25

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Records v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) ............................................................. 25

*Althouse v. Warner Bros. Entertainment*,
  No. CV 13-00696-RGK, 2014 U.S. Dist. LEXIS 92071 (C.D. Cal.
  Apr. 28, 2014) .................................................................................... 19

*Basile v. Warner Bros. Entertainment, Inc.*,
  No. CV 15-5243-DMG, 2016 U.S. Dist. LEXIS 194791 (C.D. Cal.
  Jan. 4, 2016) ...................................................................................... 19

*Benay v. Warner Bros. Entertainment, Inc.*,
  607 F.3d 620, 625 (9th Cir. 2010) ............................................. 19, 20, 21

*Bernal v. Paradigm Talent & Literary Agency*,
  788 F. Supp. 2d 1043 (C.D. Cal. 2010) ................................... 12, 13, 14

*Carlini v. Paramount Pictures Corp.*,
  No. 21-55213, 2022 U.S. App. LEXIS 5480 (9th Cir. Mar. 2, 2022) ........... 18

*Cavalier v. Random House, Inc.*,
  297 F.3d 815 (9th Cir. 2002) ................................................... 12, 25

*Christian v. Mattel, Inc.*,
  286 F.3d 1118 (9th Cir. 2002) ............................................................. 14

*Dumond v. Reilly*,
  No. CV 19-8922-GW-AGRx, 2021 U.S. Dist. LEXIS 199398 (C.D.
  Cal. Jan. 8, 2021) .............................................................................. 24

*Esplanade Prods. v. Walt Disney Co.*,
  No. CV 17-02185-MWF, 2017 U.S. Dist. LEXIS 217700 (C.D. Cal.
  Nov. 8, 2017) ..................................................................................... 22

*Funky Films, Inc. v. Time Warner Ent. Co., L.P.*,
  462 F.3d 1072 (9th Cir. 2006) ............................................... 12, 20, 21

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

ii

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

*Gable v. NBC*,
   727 F. Supp. 2d 815 (C.D. Cal. 2010) ................................................... 18

*Gadh v. Spiegel*,
   No. CV 14-855-JFW, 2014 U.S. Dist. LEXIS 648081 (C.D. Cal.
   Apr. 2, 2014) ......................................................................................... 22

*Grubb v. KMS Patriots, L.P.*,
   88 F.3d 1 (1st Cir. 1996) .............................................................. 14, 16

*Hardwell v. Parker*,
   No. CV 21-9100-DMG, 2022 U.S. Dist. LEXIS 206346 (C.D. Cal.
   Aug. 25, 2022) ...................................................................................... 21

*Kouf v. Walt Disney Pictures & TV*,
   16 F.3d 1042 (9th Cir. 1994) ............................................................... 19

*Litchfield v. Spielberg*,
   736 F.2d 1352 (9th Cir. 1984) ............................................................. 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .............................................................................. 12

*MGM Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005) .............................................................................. 25

*Morawski v. Lightstorm Ent., Inc.*,
   No. CV 11-10294 MMM, 2013 U.S. Dist. LEXIS 189155 (C.D. Cal.
   Jan. 31, 2013) ....................................................................................... 16

*Morrill v. Smashing Pumpkins*,
   157 F. Supp. 2d 1120 (C.D. Cal. 2001) ............................................... 25

*Narell v. Freeman*,
   872 F.2d 907 (9th Cir. 1989) ............................................................... 23

*Olson v. NBC*,
   855 F.2d 1446 (9th Cir. 1988) ....................................................... 17, 23

*Payne v. Anvil Knitwear, Inc.*,
   No. CV 06-8100 SVW, 2007 U.S. Dist. LEXIS 51352 (C.D. Cal.
   June 22, 2007) ....................................................................................... 12

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

iii

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

*Rentmeester v. Nike, Inc.*,
   883 F.3d 1111 (9th Cir. 2018) ........................................................................ 11, 16

*Rice v. Fox Broad. Co.*,
   330 F.3d 1170 (9th Cir. 2003) ........................................................................ 23, 24

*Romex Textiles, Inc. v. HK Worldwide, LLC*,
   No. CV 18-6543-RSWL-AGR, 2020 U.S. Dist. LEXIS 23633 (C.D.
   Cal. Feb. 10, 2020) .............................................................................................. 13

*Seals-McClellan v. Dreamworks, Inc.*,
   120 Fed. App'x 3 (9th Cir. 2004) ........................................................................ 13

*Shame on You Prods. v. Banks*,
   120 F. Supp. 3d 1123 (C.D. Cal. 2015) ................................................................ 23

*Skidmore v. Led Zeppelin*,
   952 F.3d 1051 (9th Cir. 2020) ................................................................. 11, 12, 24

*Tiscareno v. Netflix, Inc.*,
   No. CV 13-01560 SJO (AGR), 2014 U.S. Dist. LEXIS 190361
   (C.D. Cal. Mar. 6, 2014) ...................................................................................... 23

*Washington v. ViacomCBS, Inc.*,
   No. CV 20-435-CBM, 2021 U.S. Dist. LEXIS 104820 (C.D. Cal.
   May 21, 2021) ................................................................................................. 13, 14

*Weygand v. CBS, Inc.*,
   No. CV 96-4540-WMB, 1997 U.S. Dist. LEXIS 10613 (C.D. Cal.
   May 20, 1997) ...................................................................................................... 24

**Other Authorities**

Fed. R. Civ. P. 56(a) ................................................................................................ 12

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

iv

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

## I.    INTRODUCTION

In July 2016, *Stranger Things* premiered on Netflix.  In the wake of the series' acclaim, the principal of Plaintiff Irish Rover Entertainment, LLC ("Plaintiff"), Jeffrey Kennedy, began sending monthly unsolicited emails to Netflix attempting to secure distribution for his unpublished screenplay, entitled *Totem*.  When Kennedy failed to receive a response to his approximately seven different pitches to Netflix (in which he described *Totem* as "a great compliment/follow up to Stranger Things"), he filed this baseless lawsuit.[1]  Plaintiff's FAC is a classic conspiracy theory: Plaintiff contends that not only did Defendants Matt and Ross Duffer base their pilot script for *Stranger Things* on *Totem*, but that they have repeatedly returned to Kennedy's work over the last eight years to create all seasons of *Stranger Things*.  Kennedy also believes that the Duffers somehow acquired and used photos and information from his "childhood" to create their popular television series.  Finally, Kennedy testified under oath that, not content to simply steal from *Totem*, the Duffers dropped "Easter eggs" throughout *Stranger Things* to "mock" Kennedy.  This is nonsense.  Discovery is complete and Plaintiff's infringement claims are entirely without legal or factual merit.  Summary judgment should be granted for the following reasons:

*First, there is no evidence that the Duffers ever had access to Plaintiff's work.* Plaintiff alleges that the 2013 version of its *Totem* script (attached to the FAC) was sent to an artist named Aaron Sims, who later worked with the Duffers on *Stranger Things*. However, there is no evidence that Plaintiff ever sent this 2013 screenplay to Sims (much less any evidence that Sims, in turn, provided the script to the Duffers).  The only – and uncontroverted – evidence is that Sims states he never provided any *Totem* materials to the Duffers, and the Duffers state that they never received any such materials.  Kennedy's theory of "access" to his screenplay is entirely speculative. Well-established authority holds that speculation and conjecture cannot form the basis

---

[1] Plaintiff attached its 2013 *Totem* screenplay to the First Amended Complaint ("FAC") and alleges that certain related concept art was infringed.  Defendants collectively refer to these works as *Totem*.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

1

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

for a claim of "access" in a copyright infringement case.

*Second, the evidence establishes that the Duffers independently created Stranger Things (then called Montauk) prior to Plaintiff's alleged date of access.* As of November 2010, years before the events of Kennedy's theory, the Duffers had already outlined their *Montauk* idea, which included many of the key elements in what became *Stranger Things*. For example, *Montauk* included a secret research facility (what became "Hawkins Lab"); evil scientists (what became "Dr. Martin Brenner"); a "gritty eighties" setting (what became the setting and mood in *Stranger Things*); unethical mind control experiments (a major plot point in *Stranger Things*); and the opening of an interdimensional portal (what became the gate to the "Upside Down").

*Third, there is no substantial similarity between these – incredibly different – works.* *Stranger Things* is a sentimental series, set in a small Indiana town in the mid-1980s, featuring four preteen boys and a young girl named Eleven who is gifted with psionic powers. In the first season, one of the boys, Will Byers, is abducted by a monster called the "Demogorgon." The other children (along with Will's mother) work together to find and rescue Will. In the second and third seasons, the same core group of children, along with some of their older siblings and classmates, continue to fight different monsters, evil scientists, and Soviet military operatives in their small town.

Plaintiff's *Totem*, on the other hand, is the story of Jackson Chance, an epileptic military veteran who dies after freeing his dead wife's spirit from the grasp of a giant English-speaking fallen angel/demon named Azrael. *Totem* is steeped in Native American imagery and mythology, is imbued with Christian ideology, and involves magical totem poles, dream catchers with supernatural powers, "Blackwolf Indians" from another realm, "Lynx Indians" that help the protagonist on his journey, and a local doctor who is eventually revealed to be a powerful "medicine man."

There is no genuine issue of fact to be tried concerning substantial similarity of protected expression in the two works. A comparison of the copyrightable expression reveals that the works are incredibly dissimilar in plot, theme, characters, settings,

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

2

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

dialogue, tone, and mood.  The only even arguable similarities arise from general, unprotectable ideas (e.g., a "hero's journey" and a monster from an alternate dimension).  The Ninth Circuit has repeatedly affirmed summary judgment of infringement claims that are based on nothing more than abstract, unprotectable ideas. A straightforward application of this Circuit's governing extrinsic test unequivocally establishes that there are no similarities of protectable expression between these works.

There is no evidence of access to the *Totem* work that Plaintiff alleges was infringed, *Stranger Things* was independently created based on documented story ideas that pre-date Plaintiff's alleged date of "access," and there is no substantial similarity between the works at issue as a matter of law.  Defendants' motion should be granted.

## II.    FACTS

### A.    The Duffers Create *Stranger Things*.

In 2010, the Duffers began to develop the concept for a film inspired by the "Montauk Urban Legend," according to which government scientists at the Camp Hero military base in Montauk, New York conducted research into mind control and other supernatural activities.  SUF 1.  In November 2010 emails, the Duffers sketched out their *Montauk Experiment* project as a story set in the 1980s that would include science-fiction elements such as: a secret research facility, evil scientists, mind control, paranormal activity, unethical experiments, a monster that comes through a portal to another dimension and kills people in the facility before escaping, and a main character with psionic abilities who is a subject of mind control experiments at the facility (the "2010 *Montauk* Project").  SUF 2.  As discussed further below, these concepts, ideas, and elements were the foundation for *Stranger Things* (the "Series").

In 2013, inspired in part by the film *Prisoners* (which featured kidnappings), the Duffers decided to incorporate a child abduction into their 2010 *Montauk* Project, and to make it a television series instead of a film.  SUF 4.  In October 2013, the Duffers created an outline for the pilot episode (the "2013 Pilot Outline").  SUF 5.  The 2013 Pilot Outline explains that the Series would follow a group of nerdy children who spend

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

3

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

their nights playing Dungeons & Dragons ("D&D") and eating pizza, but who are drawn into a world of supernatural terror. The 2013 Pilot Outline elaborates that, while biking home one night, one of the children "goes into a strange world, taken by some evil force." A local sheriff investigates, but the child has "simply vanished." The sheriff and the missing child's family and friends all try to find him. There is also an "escapee" from a research facility, who is tattooed with a number, has psionic powers, and is the key to figuring out what has happened. SUF 6.

In the summer of 2014, the Duffers completed their script for the Series' pilot episode (then titled *Montauk*) (the "2014 Pilot Script"). SUF 7. The 2014 Pilot Script includes key elements from the 2010 *Montauk* Project (e.g., a 1980s setting, a secret research facility, evil scientists conducting unethical experiments, mind control, paranormal activity, a monster that comes through a portal to another dimension and kills people in the facility before escaping, and a main character with psionic abilities who is the subject of mind control experiments at the facility), and from the 2013 Pilot Outline (e.g., a child abducted by a monster while biking home from playing D&D with friends, and the child's cross-dimensional communications with friends and family searching for him). SUF 2, 6, 8. To support their attempted sale of the 2014 Pilot Script to a studio, the Duffers created a "Look Book" showcasing the 1980s-era inspirations for the Series (such as *E.T.* and *Poltergeist*). SUF 9.

In March of 2015, using the 2014 Pilot Script and Look Book, they closed a series deal with Netflix. SUF 10. Over the next several months, working with a group of writers, the Duffers changed the Series' title from *Montauk* to *Stranger Things* and the Series' setting from Long Island to the fictional town of Hawkins, Indiana. SUF 11. Aside from changing the title and the location, what became *Stranger Things* remained largely unchanged from the elements set forth in the Duffers' 2010 *Montauk* Project, the 2013 Pilot Outline, and the 2014 Pilot Script.

**B.   *Stranger Things*.**

Season 1 is set in Hawkins, Indiana, in 1983. SUF 12. It begins with twelve-

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

4

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

year-old Will Byers being abducted by a monster while biking home one night after playing D&D with friends. SUF 13. Will's twelve-year-old friends, Mike, Dustin, and Lucas, begin investigating his disappearance. SUF 14. While looking for Will in the forest, the boys find a young girl with a shaved head wearing a hospital gown. They learn that her name is Eleven, and that she has psionic abilities. SUF 15.

While the boys and Eleven search for Will, the monster threatens other Hawkins residents. SUF 16. Mike's teenage sister Nancy attends a party where her best friend, Barb, is abducted by the monster. SUF 17. While searching for Barb, Nancy glimpses the monster running through the woods. SUF 18. Will's teenage brother, Jonathan, also captures a photo of Barb and the monster. Nancy and Jonathan team up to search for the monster in the hopes they can save Will and Barb. SUF 19.

What is initially thought to be Will's body is discovered in a quarry. SUF 20. However, Eleven proves that Will is still alive by manipulating radios to project the sound of Will's voice. SUF 21. Dustin, Lucas, and Mike learn that Will is trapped in an alternate dimension, which they name "The Upside Down." They decide to call the monster a "Demogorgon" (after a D&D character). SUF 22. After pulling together all their knowledge of the supernatural events occurring in Hawkins, Dustin, Lucas, Mike, and Eleven decide to search for a hypothetical gate to the Upside Down. SUF 23.

Meanwhile, Hawkins' police chief, Jim Hopper, who is being pressed by Will's mother, Joyce, has grown suspicious of the nearby research laboratory after findings a torn piece of Eleven's hospital gown outside the lab grounds. SUF 24. After discovering that the body found in the quarry was not Will's, Hopper breaks into the laboratory and finds Eleven's bedroom and a massive gate to an alternate dimension. SUF 25. Throughout the first season, Eleven experiences a series of painful flashbacks – culminating in a flashback to an experiment in which Eleven was placed in a sensory deprivation tank. While in an altered psychic state, Eleven accidentally opened a gate to the Upside Down after making contact with the Demogorgon. SUF 26.

The children and adults join forces and formulate a plan to make a sensory

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

5

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

deprivation tank to enhance Eleven's powers, so that she can psychically view Will in, but without entering, the Upside Down.  SUF 27.  They break into Hawkins Middle School to set it up.  SUF 28.  Using the tank, Eleven discovers that Barb is dead, but that Will is alive and is hiding in a play fort near his house.  SUF 29.  Hopper and Joyce break into the laboratory and enter the Upside Down, discovering the monster's nest, where an unconscious Will has been strung up with a tendril extending down his throat. Hopper and Joyce detach and revive Will, and return through the gate.  SUF 30.

Agents from the lab arrive at Hawkins Middle School to capture Eleven.  SUF 31.  After sharing a romantic moment with Mike, Eleven kills some of the agents, crushing their brains with her psionic abilities.  SUF 32.  The Demogorgon is attracted to the bloodshed at the school and attacks just as Eleven is about to be captured by the agents.  Mike, Dustin, and Lucas escape with Eleven and hide in a classroom, but the monster finds them.  Before it can harm the boys, Eleven says goodbye to Mike and telekinetically explodes the monster.  Mike is left in tears as Eleven vanishes.  Will is hospitalized and reunited with his family and friends.  SUF 33, 34.[2]

Season 2 begins in Hawkins in 1984, one year after Will's disappearance.  SUF 35.  Dustin, Lucas, and Mike are intrigued by a new girl at school named Max, and Will is struggling to return to normal life.  SUF 36.  Will has started having episodes in which he freezes and sees a long-limbed shadowy monster looming over Hawkins. This new monster is called the "Mind Flayer" (another D&D reference), and is depicted as a massive, spider-like, shadow creature.  SUF 37.

While Mike mourns the loss of Eleven, she is actually alive and secretly living with Hopper (who has assumed a father-figure role with her) in his cabin.  SUF 38.

---

[2] Nearly all of the alleged similarities identified in the FAC relate to *Stranger Things*, Season 1. Plaintiff has not alleged that the plot or sequence of events contained in Seasons 2 and 3 of *Stranger Things* are substantially similar to *Totem*.  In fact, Seasons 2 and 3 of *Stranger Things* are even more different from *Totem* than the first season.  Nevertheless, as Plaintiff has included sporadic elements from Seasons 2 and 3 in the FAC, and in Plaintiff's expert reports, Defendants address those seasons in this motion. *Stranger Things*, Season 4, is not identified in the FAC, is not part of this lawsuit, and there are no conceivable similarities between *Totem* and that season of *Stranger Things* – which was released years after this lawsuit was filed.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

6

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

Eleven struggles with being cut off from Mike, and rebels against Hopper over his strict rules, which require that she stay hidden. SUF 39. Dustin finds a strange-looking slug and adopts it as a pet. SUF 40. It grows large, eats Dustin's cat, and escapes; the boys learn that this "pet" is one of four juvenile demogorgons (which Dustin nicknames "demodogs") psychically linked to the Mind Flayer's hive mind. As they grow, the demodogs terrorize Hawkins as a pack, killing and eating people and pets. SUF 41, 42.

Will's episodes become more frequent and, during one of them, the monster sticks a tentacle down Will's throat and infects him like a parasite. SUF 43. After passing out, Will awakens at home acting strangely. SUF 44. He scribbles and demands that the house be kept cold. SUF 45. Joyce, Mike, and Joyce's boyfriend, Bob, piece together the scribbles to discover a map to the demodogs' underground tunnels. SUF 46. Joyce, Bob, Will, and Mike rescue Hopper, who had also found the tunnels but became trapped inside. SUF 47. Scientists from the laboratory set fire to the tunnels, causing Will to collapse in pain due to his connection to the Mind Flayer. Will is rushed to the laboratory, but the demodogs soon arrive and start attacking. SUF 48. Mike deduces that the Mind Flayer can spy on them through Will, and he convinces Joyce to sedate Will to prevent the monster from tracking them. Joyce, Hopper, and Mike escape the laboratory and take Will home. SUF 49, 50.

Meanwhile, Eleven tracks down her biological mother and discovers another young girl named Kali, who also has supernatural power, and was also experimented on at Hawkins lab. Eleven travels to Chicago to find Kali, who helps Eleven hone her abilities. Kali is part of a vengeful street gang, and Eleven decides not to join Kali and returns home to reunite with the boys. SUF 51, 52. The Mind Flayer finds the group at the Byers' house and sends the demodogs to attack, but Eleven destroys them. Joyce, Jonathan, and Nancy take Will to Hopper's cabin to try and force the monster out of him by overheating it. Nancy finally releases Will from the monster's grasp by jabbing him with a hot fire poker. SUF 53, 54. Hopper drives Eleven to the lab, where she closes the gate to the Upside Down. SUF 55.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

7

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

Season 3 begins in 1984, in the Soviet Union.  SUF 56.  A Soviet scientist has come close, but failed to build a gate to the Upside Down, and is murdered by a Soviet general, who gives the remaining scientists one year to build the gate.  SUF 57.  The story moves to Hawkins, in 1985.  The new Starcourt Mall has become the town focal point, and Mike and Eleven, Lucas and Max, and Jonathan and Nancy are dating. Will still wants to play D&D, but the other boys are now more interested in girls.  SUF 58.

Billy, Max's eighteen-year-old brother, gets hit by a shadowy creature while driving by the town mill and becomes possessed by the Mind Flayer.  SUF 59.  Billy abducts other Hawkins residents, who also become possessed.  SUF 60.  Dustin enlists Steve, who now works with a friend named Robin at an ice cream shop, to help translate a message Dustin intercepted from the Soviets.  Dustin, Steve, and Robin translate the message and learn that Starcourt Mall is a front for the Soviets.  SUF 61, 62.

Billy rallies the other possessed townspeople to attack Will, Mike, Lucas, Eleven, Max, Jonathan, and Nancy.  SUF 63.  Eleven saves them, injuring the Mind Flayer in the process.  SUF 64.  Meanwhile, Dustin, Steve, and Robin recruit Lucas' younger sister Erica to crawl through an air duct to break into the Soviets' loading dock at the mall. SUF 65.  They discover an underground testing area where Soviet scientists are trying to force open the gate to the Upside Down.  SUF 66.  Eleven uses her powers to find Dustin at the mall, and she, Will, Mike, Lucas, Max, Jonathan, and Nancy head there.  The Mind Flayer – depicted as a massive, scaly, spider-like creature comprised of human remains, and with long tentacles – finds and attacks the group.  SUF 67.

Eleven tries to protect them, but in an earlier confrontation, the Mind Flayer managed to "bite" her, infecting her with a piece of itself.  Eleven uses her powers to fling the piece out of her body but, in doing so, exerts all her energy and loses her powers.  SUF 68.  Billy captures Eleven and offers her to the Mind Flayer, but Eleven accesses Billy's memories and manages to release him from the Mind Flayer's control. Billy sacrifices himself for Eleven as the others use fireworks to distract the Mind Flayer.  SUF 69.  Joyce and Hopper find the gate to the Upside Down and Hopper

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations
23344574
231804-10002
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

appears to die when Joyce closes the gate to stop the Mind Flayer.  SUF 70.

### C.     Plaintiff's *Totem*.

*Totem* tells the story of Jackson Chance, a military veteran in his thirties. Jackson lives near a "Lynx Indian" reservation, and struggles with epilepsy.  SUF 71. Jackson's wife Autumn is a diagnosed schizophrenic in her twenties who believes she is a "mystic," connected to the Native American spirit world.  SUF 72.  In the opening scene, Jackson has a vision during an epileptic seizure in which he defeats a group of "Blackwolf Indians" outside of a cave, then announces his intention to confront an evil fallen angel named Azrael who resides there.  SUF 73.

The story then shifts to nine days earlier, the morning Jackson brings his wife home from a psychiatric ward.  SUF 74.  After she returns home, Autumn tells Jackson that epileptics were once revered as mystics who could talk to the "Great Spirit."  She explains that this 'spirit' told her that it has an important plan for Jackson.  SUF 75.  In the next scene, Autumn sees three wolves in the backyard, which a lightning flicker reveals to be three "Blackwolf Indians."  SUF 76.  That night, Autumn has a dream in which she sees Jackson's life and soul threatened by Azrael.  SUF 77.

The following morning, Autumn travels to a "Lynx Indian" village.  SUF 78. In the Lynx village, Autumn meets Kimi, a 10-year-old Lynx girl, and Thunderbear, a Lynx Shaman in his sixties, whom Kimi calls "Grandfather."  SUF 79.  When Autumn selects a charred totem pole tied down in a murky pond, Kimi and Thunderbear attempt to dissuade her from taking it home.  SUF 80.  Autumn, nevertheless, takes the totem pole home, where Jackson, his friend Dr. William Nerowe, and Autumn's childhood friend, FBI Agent Sam Miller (also in his thirties), are having a backyard barbecue. SUF 81.  That afternoon, Miller reveals to Autumn that he is in love with her, a feeling she informs him is not reciprocated.  Devastated and angry, Miller rejoins the group in the backyard, and the men plant the totem.  SUF 82.

Once planted, the totem allows Azrael to invade the earthly realm.  SUF 83. Azrael is a giant "fallen angel" with six purple wings, large horns, and a skinless bison

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

skull.  He speaks English, and his stated intent is to stamp out good in the real world and to use his powers to slaughter everyone and turn their souls into "Grims."  SUF 84.

Soon after the totem is planted, Autumn leaves the bedroom and confronts Azrael.  SUF 85.  Autumn is killed by the Blackwolf, and Azrael scatters purple feathers over her body.  SUF 86.  Just before "[t]he light leaves Autumn's eyes," Jackson finds her.  She tells him that Azrael is responsible, and to find Thunderbear and begin his "quest."  SUF 87.  At Autumn's funeral, an enraged Miller, who blames Jackson for Autumn's death, hits Jackson and knocks him out.  SUF 88.  Later, at Jackson's house, Nerowe dismisses Jackson's claims of mystical forces and the two fight before Jackson storms out.  SUF 89.  Jackson is then followed by Miller to a "train port," where Miller rams his car into Jackson's pickup.  SUF 90.  Thunderbear arrives and pulls Jackson from the flaming wreckage; Miller frees himself.  SUF 91.  Protected by magical dreamcatchers, which render them invisible to Azrael, Thunderbear and Jackson jump into the boxcar of a freight train.  SUF 92.

Thunderbear tells Jackson that only a "Medicine Man" who "believes," and not a warrior, can defeat Azrael.  SUF 93.  Azrael then appears to Miller and promises him that, "[w]hen the Eternal Light is extinguished, [Autumn] will be yours."  SUF 94.  Miller follows and confronts Jackson on the train, and Jackson and Miller fight before Jackson jumps from the train and is arrested, at Miller's direction.  SUF 95.  Jackson is then transferred to Nerowe's hospital for psychiatric evaluation.  SUF 96.

Nerowe is revealed to have terminal cancer, and he arrives at the hospital, where he tells Jackson that he will follow him in his quest.  Nerowe then helps Jackson escape from the hospital.  SUF 97.  Protected by mystical dreamcatchers, the men evade the Blackwolf and travel to the Lynx reservation.  SUF 98.  There, members of the Lynx tribe conduct a sweat lodge ceremony, ostensibly to cure Nerowe's cancer.  SUF 99.

Thunderbear, Kimi, Nerowe, and Jackson (the latter two men now dressed in Native American "regalia") venture to the "Valley of Death," where Azrael's cave lair is located, pursued by Miller and the Blackwolf.  SUF 100.  During the chase, Miller

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

10

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

kills Thunderbear and shoots Kimi.  SUF 101.  Jackson hurls an electrified spear known as a "Silverstick" at a fiery totem outside the cave.  Nerowe also hurls his Silverstick at the totem, causing the totem to shatter into flaming pieces.  SUF 102.  Nerowe and Jackson, carrying the injured Kimi, enter Azrael's cave sanctuary, where a river of blood flows around a peninsula of rock.  SUF 103.  Outside the cave, Miller is stomped to death by an elk.  SUF 104.  Inside the cave, "[t]he light leaves Kimi's eyes" before Nerowe and Jackson confront Azrael.  SUF 105.  Azrael stabs Jackson in the abdomen with a fiery sword, mortally wounding him. SUF 106. Jackson and Nerowe nonetheless manage to overcome Azrael when Nerowe finally proclaims, "I believe."  SUF 107.

Upon Azrael's death, the Grims (trapped souls) in the cave – including Autumn – become celestial auras.  SUF 108.  Kimi, now clothed in a white robe, reveals to Jackson and Nerowe that she is the Eternal Light. She informs Nerowe that he will live a long life, and a dying Jackson that his quest is complete and that he "may dwell with me in the house of the Lord forever."  Jackson's soul joins Autumn's.  SUF 109, 110.

## III.    DISCUSSION

### A.    Legal Standard.

Proof of copyright infringement requires the plaintiff to show that: (1) it owns a valid copyright, and (2) the defendant copied protected aspects of the work.  *See Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020).  The second element has two distinct components: "copying" and "unlawful appropriation."  *Id.*  "Although these requirements are too often referred to in shorthand lingo as the need to prove 'substantial similarity,' they are distinct concepts."  *Id*.  "Proof of copying by the defendant is necessary because independent creation is a complete defense to copyright infringement."  *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018).

"In the absence of direct evidence of copying ... the plaintiff 'can attempt to prove it circumstantially by showing that the defendant had access to the plaintiff's work and that the two works share similarities probative of copying.'"  *Skidmore*, 952 F.3d at 1064 (quoting *Rentmeester*, 883 F.3d at 1117).  The "hallmark" of "unlawful

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

11

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

appropriation" is that the two works share substantial similarities involving protected elements of the plaintiff's work. *Id.* Determining substantial similarity involves a two-part analysis consisting of the extrinsic test and the intrinsic test; the plaintiff must satisfy both for the works to be deemed substantially similar. *See id.*

The extrinsic test compares the works' objective expressive elements, namely:

'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events' in the two works. In applying the extrinsic test, this court 'compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters.

*Funky Films, Inc. v. Time Warner Ent. Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006) (citation omitted). "Familiar stock scenes and themes that are staples of literature are not protected." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 823 (9th Cir. 2002). "[W]hen applying the extrinsic test, a court must filter out and disregard the non-protectable elements in making its substantial similarity determination." *Id.* at 822-23.

Courts may resolve the extrinsic test on summary judgment, and a plaintiff who cannot satisfy the extrinsic test "'necessarily loses on summary judgment.'"[3]   *Funky Films*, 462 F.3d at 1077 (citation omitted). A plaintiff that fails to adduce evidence of access likewise loses a motion for summary judgment. *See Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1054 (C.D. Cal. 2010). Summary judgment is also warranted where the defendant presents unrebutted evidence of independent creation of the allegedly infringing work. *See Payne v. Anvil Knitwear, Inc.*, No. CV 06-8100 SVW (SSx), 2007 U.S. Dist. LEXIS 51352, at *7 (C.D. Cal. June 22, 2007).

Here, the Duffers' lack of access to *Totem*, the Duffers' independent creation of *Stranger Things*, and the lack of substantial similarity between the two works, each provide an independent ground for granting summary judgment.

---

[3] Summary judgment is proper where "the movant shows that there is no genuine dispute to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the movant satisfies its initial burden, the nonmoving party must make a showing sufficient to establish the existence of each element of the case on which it will bear the burden of proof at trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

12

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

## B.    There Is No Genuine Issue of Fact With Respect to Access.

Plaintiff bears the burden of proving that the Duffers, the creators of *Stranger Things*, had access to *Totem*.  *See Romex Textiles, Inc. v. HK Worldwide, LLC*, No. CV 18-6543-RSWL-AGR, 2020 U.S. Dist. LEXIS 23633, at *11 (C.D. Cal. Feb. 10, 2020). Plaintiff must demonstrate more than a "bare possibility" of access, and access may not be inferred through mere speculation or conjecture.  *Seals-McClellan v. Dreamworks, Inc.*, 120 Fed. App'x 3, 4 (9th Cir. 2004); *Washington v. ViacomCBS, Inc.*, No. CV 20-435-CBM (PJWx), 2021 U.S. Dist. LEXIS 104820, at *4-5 (C.D. Cal. May 21, 2021). Rather, "to support a claim of access, a plaintiff must offer 'significant, affirmative and probative evidence.'"  *Bernal*, 788 F. Supp. 2d at 1054 (citation omitted).

Plaintiff's theory is that, after receiving a 2013 *Totem* screenplay from Plaintiff, Sims (on an undisclosed date) shared that screenplay and *Totem* concept art with the Duffers while working with them as a concept artist on a separate project entitled *Hidden*.  SUF 111; FAC ¶¶ 6-9, 52-54 (alleging access on "information and belief"). But after months of invasive discovery, Plaintiff has no evidence supporting this theory.  Instead, the evidence establishes the obvious: that Sims met with a group of people, including the Duffers, in connection with some limited art/effects work to be performed on *Hidden*, and did not discuss any other project with the Duffers while doing so.  SUF 112, 120, 129.  Plaintiff's theory of access fails for multiple reasons.

*First*, Plaintiff's two principals **both admitted in deposition that there is no evidence to support Plaintiff's access theory**.  SUF 114, 115.  While Plaintiff alleges that the 2013 version of *Totem* (FAC Ex. 7) was sent to Sims, Plaintiff does not have any such transmittal email.  SUF 116.  And Plaintiff can only speculate that Sims ***may*** have later provided that script to the Duffers.  There is simply no evidence supporting this speculative theory of access.  *Seals-McClellan*, 120 Fed. App'x at 4.

*Second*, even if Plaintiff could prove Kennedy sent the 2013 script to Sims, Defendants' testimony conclusively defeats Plaintiff's uncorroborated speculation that Sims might have sent *Totem* to the Duffers.  Sims testified under oath that he never

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

13

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

shared *Totem* with the Duffers, and the Duffers testified that they had never read or even heard of *Totem* before this lawsuit. SUF 118-125. Because there is no admissible evidence to the contrary, summary judgment is warranted. *See Grubb v. KMS Patriots, L.P.*, 88 F.3d 1, 4 (1st Cir. 1996) ("[O]n summary judgment, absent specific facts discrediting testimony from a witness associated with the movant, and absent a direct conflict in the testimony, the opponent (although entitled to have his or her evidence taken as true) is not entitled to have the defendant's evidence positively disbelieved.").

Plaintiff's access theory here is even more implausible than those rejected in *Bernal*, 788 F. Supp.2d at 1056 (rejecting speculative theory of access), and by this Court in *Washington*, 2021 U.S. Dist. LEXIS 104820, at *4 (dismissing case as plaintiff's access claims relating to alleged intermediaries did not rise "above the level of speculation"). The law mandates that Plaintiff's specious claim be dismissed.

## C.    The Duffers Independently Created the Series.

The undisputed evidence shows that, in 2010, the Duffers had already created the foundational concepts and elements for the Series, and that, before they ever communicated with Sims (Plaintiff's sole "access" point) about the Series, they had completed the 2014 Pilot Script containing all the relevant characters and story lines at issue in this suit. *See Christian v. Mattel, Inc.*, 286 F.3d 1118, 1128 (9th Cir. 2002) ("prior creation renders any conclusion of access or inference of copying illogical").

Beginning in 2010, the Duffers independently created the project that ultimately became *Stranger Things*. As of November 2010, three years before the Duffers met Sims, the Duffers had already outlined the *Montauk* idea, including:

- a secret research facility (this ultimately becomes the "Hawkins Lab" in *Stranger Things*);

- evil scientists (this ultimately becomes several characters, most notably "Dr. Martin Brenner," in *Stranger Things*);

- a "gritty eighties" setting (this becomes the Series' mood/setting);

- mind control, paranormal activity, and unethical/mind control experiments (all major plot points in *Stranger Things*);

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

14

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

- the opening of an interdimensional portal (this ultimately becomes the "Upside Down" in *Stranger Things*);

- a monster coming through the opened portal (this ultimately becomes the "Demogorgon" monster in *Stranger Things*);

- the main character being forced to use psychic powers to end the experiments and save the facility, as visualized in a "blood-soaked finale" (this becomes the character, "Eleven"). SUF 1, 2, 3.

These concepts, ideas, and elements were the foundation for *Stranger Things*.

Plaintiff's claim is that the Duffers "took" Kennedy's ideas by creating a story involving characters that have to fight against a villainous creature from another dimension/plane of existence. *E.g.*, FAC ¶ 73. Setting aside that such a concept is not unique to Kennedy nor protected by the Copyright Act, it is undisputed that all of the ideas which led to the creation of the Demogorgon (i.e., the "villainous creature"), the "Upside Down" (i.e., the other "dimension/plane of existence"), and the inclusion of a character who has special powers that help to defeat the monster, all ***originated in 2010***, years before the Duffers even met Aaron Sims. Sims cannot act as a "point of access" for elements the Duffers created before they shared their work with him.

The Duffers next created the 2013 Pilot Outline for *Montauk*, which explains that the Series would follow a group of nerdy children who spend their nights hanging out and playing D&D before being drawn into a world of supernatural terror. The 2013 Pilot Outline expands on the 2010 *Montauk* Project by adding to the story that, while biking home one night, one of the children "goes into a strange world, taken by some evil force." A local sheriff investigates, but the child has "simply vanished." The sheriff and the missing child's family and friends all try to find him. There is also an "escapee" from a research facility, who is tattooed with a number, has psionic powers, and is the key to figuring out what has happened. SUF 5, 6.

The next year, the Duffers completed the 2014 Pilot Script (then titled *Montauk*) and the Look Book. The 2014 Pilot Script includes key elements that the Duffers created in their 2010 *Montauk* Project and their 2013 Pilot Outline. SUF 7, 8. After closing a series deal with Netflix, and working with a group of writers, the Duffers

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

15

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

changed the Series' title from *Montauk* to *Stranger Things* and the Series' setting from Long Island to the fictional town of Hawkins, Indiana.  SUF 10, 11.  However, *Stranger Things* remains largely unchanged from the elements set forth in the Duffers' 2010 *Montauk* Project, the 2013 Pilot Outline, and the 2014 Pilot Script.

The connection between the 2010 *Montauk* Project, the October 2013 Pilot Outline, the 2014 Pilot Script, and *Stranger Things **shows clear independent creation by the Duffers***, and no legitimate claim can be asserted based on supposed "infringement" of those pre-existing elements and ideas.  *See Grubb*, 88 F.3d at 4 (affirming summary judgment where allegedly infringing work "bears unmistakable resemblance" to work created prior to alleged access); *cf. Morawski v. Lightstorm Ent., Inc.*, No. CV 11-10294 MMM (JCGx), 2013 U.S. Dist. LEXIS 189155, at *22 (C.D. Cal. Jan. 31, 2013) ("[T]he court concludes that Cameron has rebutted any inference that would otherwise arise that he used Morawski's ideas by demonstrating that he independently created the ideas he purportedly misappropriated.").

Plaintiff may argue that there is an issue of fact because, while the foundation of the Series was created in 2010, certain elements were created after 2013, when Plaintiff alleges that the Duffers first met Sims.  However, it is undisputed that, in 2014, the Duffers emailed Sims their ***completed*** 2014 Pilot Script, when they asked him to help create some concept art ("We're developing a look book for a new sci-fi horror limited series…and we were thinking it might be nice to have some accompanying concept art.").  SUF 128, 129, 130.  Plaintiff is arguing, therefore, that the Duffers worked with Sims to create the story and characters for *Montauk*, and then they sent an email in 2014 ***pretending*** as if Sims was not previously involved with the creation of that project.  This is not a rational theory, and this type of speculation and conjecture, in the face of clear contrary evidence, is entirely insufficient to defeat summary judgment.[4]

---

[4] To the extent that Plaintiff claims it has demonstrated an "inference of copying" (it has not), independent creation, as is established here, rebuts any such inference. *Rentmeester*, 883 F.3d at 1117.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### D.    There Is No Substantial Similarity Between the Works at Issue.

As plaintiffs in infringement cases often do, Plaintiff has strung together lists of claimed "similarities" in the works.  Courts routinely disregard such lists, as they are inherently subjective and subject to manipulation.  *See Olson v. NBC*, 855 F.2d 1446, 1450 (9th Cir. 1988); *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984).  Random elements, cherry-picked from the works, and disassociated from the extrinsic analysis, are of no assistance in carrying out the requisite legal analysis.

Here, Plaintiff's 2013 script (which was never sent to any of the Defendants), is not remotely similar, in any literary or protectable sense, to *Stranger Things*.  The most Plaintiff can do is improperly take random elements ***from three separate seasons*** of the Series and compare those "random similarities" to entirely different scenes, elements, and characters in *Totem*.[5]  This approach has been repeatedly rejected by the Ninth Circuit and cannot form the basis of a credible claim for copyright infringement.

### 1.    Plot and Sequence of Events.

An objective analysis of the works shows they tell completely different stories.

### a.    The Works' Plots Are Entirely Dissimilar.

*Totem* is centered around Jackson Chance, an epileptic veteran, his schizophrenic wife Autumn, and her "mystic" connection to the Native American spiritual world.  When Autumn dies, Jackson embarks on a vision quest to release her spirit from the six-winged, fallen angel Azrael and his band of "Blackwolf Indians." Battling Azrael in the spirit world, and Autumn's childhood friend, Agent Miller, who is in love with Autumn, in the real world, Jackson embraces Native American folklore, teaming up with a Shaman, Thunderbear, and his granddaughter, Kimi.  Jackson and his friend Dr. Nerowe fight Azrael in a climactic scene, aided by fiery swords and

---

[5] For example, Plaintiff alleges substantial similarity in sequence because in both projects, a powerful being – Azrael in *Totem* and the Mind Flayer in *Stranger Things* – and its minions, the Blackwolf and the Demogorgon/demodogs, respectively, are released into this dimension to prey on humans.  FAC ¶ 93.  This, however, ignores *Stranger Things*' sequence of events: while the Demogorgon is introduced in Season 1, the Mind Flayer is not introduced until Season 2.  SUF 12-34, 35-55.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

17

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

magical dreamcatchers.  Jackson is killed, sacrificing himself to save Nerowe, and is reunited with Autumn when her spirit is released.  As Jackson dies, Kimi tells him: "be not afraid, Warrior.  Your quest is complete … I am the Great Spirit.  And you may dwell with me in the house of the Lord forever."  SUF 71-110.

*Stranger Things* does not concern Native American folklore or overt Christian imagery and, in large part, does not even revolve around adults.  The first season is about Will's abduction, his friends' (and family's) search to save him, Mike's budding romantic relationship with Eleven, and the group's quest to find and destroy the gate to the Upside Down.  SUF 12-34.  The plot of the second season revolves around freeing Will from his possession by the Mind Flayer, avoiding being eaten by "demodogs," Eleven learning about her past and honing her psionic abilities, and closing the gate to the Upside Down.  SUF 35-55.  The third season involves the teenage leads working together to prevent Soviet scientists from reopening the gate to the Upside Down, avoiding being killed by possessed townspeople, the core group of friends becoming interested in girls, and two of the teen girls (Eleven and Max) becoming friends.  SUF 56-70.  *Stranger Things*' plot – solving mysteries involving top-secret government experiments that released supernatural forces – is vastly different from *Totem*'s Native American mythological vision quest.

Courts routinely find no substantial similarity – and dismiss claims – where, as here, the plots and sequences of events expressing plot concepts are highly dissimilar. *See, e.g.*, *Gable v. NBC*, 727 F. Supp. 2d 815, 844 (C.D. Cal. 2010) (finding no substantial similarity in plot where elements were not similar when viewed in context, and those that did "bear some commonality … [did] not occur in the same sequence"); *see also Carlini v. Paramount Pictures Corp.*, No. 21-55213, 2022 U.S. App. LEXIS 5480, at *4 (9th Cir. Mar. 2, 2022) (affirming dismissal of copyright claim where there were only "superficial similarities in how the main characters gain their mind-reading powers" and "the events play out in materially different ways in each work").

**b.**    **Plaintiff Cannot Monopolize General Story Concepts.**

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

18

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

Plaintiff alleges that the plots of both *Totem* and *Stranger Things* involve a quest by a protagonist to rescue a loved one from a monster residing in an alternate dimension that is a dark copy of their current reality.  FAC ¶ 73.  Plaintiff's abstract plot description is so generalized that it is nothing more than a legally unprotectable idea. *See, e.g.*, *Kouf v. Walt Disney Pictures & TV*, 16 F.3d 1042, 1045 (9th Cir. 1994).

Moreover, the broad concept of a protagonist on a quest to an alternate dimension to save a loved one is not protectable.  Thus, in *Althouse v. Warner Bros. Entertainment*, No. CV 13-00696-RGK (SSx), 2014 U.S. Dist. LEXIS 92071, at *9 (C.D. Cal. Apr. 28, 2014), the court held that, although the protagonists both attempted to free other characters, had nightmares about their significant other dying, and battle against an evil enemy, those general concepts were insufficient to establish similarity of protectable plot expression.  Similarly, in *Basile v. Warner Bros. Entertainment, Inc.*, No. CV 15-5243-DMG (MRWx), 2016 U.S. Dist. LEXIS 194791, at *20-21 (C.D. Cal. Jan. 4, 2016), the plaintiff alleged that "Jupiter Jones and the characters Earth and Mars are similar because they are part of the 'Supreme being bloodline and the only ones who can save their home planet.'"  The court held that this claimed plot similarity was insufficient to establish a legal claim as it was based on nothing more than the "shared premises of human origin mythology and a hero's quest." *Id.*

In fact, courts consistently reject infringement claims alleging far more concrete and specific similarities.  For example, in *Benay v. Warner Bros. Entertainment, Inc.*, the Ninth Circuit ruled that the works at issue were **not** substantially similar even though:

> [The works] have identical titles; both share the historically unfounded premise of an American war veteran going to Japan to help the Imperial Army by training it in the methods of modern Western warfare for its fight against a samurai uprising; both have protagonists who are authors of non-fiction studies on war and who have flashbacks to battles in America; both include meetings with the Emperor and numerous battle scenes; both are reverential toward Japanese culture; and both feature the leader of the samurai rebellion as an important foil to the protagonist....
>
> Stripped of these unprotected elements, the works are not sufficiently similar to satisfy the extrinsic test.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

19

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

607 F.3d 620, 625 (9th Cir. 2010); *see also Funky Films*, 462 F.3d at 1081 (while works had conceptual similarities, "general plot ideas are not protected by copyright law, they remain forever the common property of artistic mankind").

Further, Plaintiff's allegation that both plots involve a young girl who "is responsible for the rupture in the 'veil' between the human dimension and a dark, carbon-copy alternate dimension through which a monster is able to invade the current human reality" fails to establish protectable similarity. FAC ¶ 74. This is a general plot idea and is not protectable. Moreover, it is a false description of the works: in *Totem*, it is the planting of a totem pole, and not a 'young girl,' that unleashes Azrael from the spirit realm. SUF 83. In *Stranger Things*, Eleven's psionic abilities open the gate to the Upside Down when she accidentally makes contact with the Demogorgon while the unwilling subject of experiments aimed at amplifying her abilities. SUF 26.

Plaintiff's substantial similarity expert, John Rainey, has never acted in that role before, is not familiar with the extrinsic test, and was "fascinated" when Plaintiff asked him to provide expert testimony because of his lack of experience in this realm. SUF 132-134. Instead of performing an independent analysis, Rainey duplicates the alleged "similarities" contained in Plaintiff's FAC, and also fails to summarize the plot or sequence of events of the works at issue (because there are no similarities between the works when they are summarized and objectively compared). SUF 135, 136. Rainey's opinion fails to apply this Circuit's governing extrinsic test, and he should be excluded for the reasons stated in Defendants' separately-filed motion to exclude.

The parties' works are not substantially similar as to plot or sequence of events under the extrinsic test as a matter of law because Plaintiff's claimed similarities do not involve protectable expression and, putting those general concepts aside, "a closer inspection reveals that they tell very different stories." *Funky Films*, 462 F.3d at 1081.

### 2.    Characters.

*Totem*'s protagonist is Jackson, a thirty-year-old epileptic veteran who has a "mystic" connection to the Native American spiritual world. Jackson is ever present

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

20

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

in the *Totem* script, appearing in nearly every scene. All of *Totem*'s other characters are secondary to Jackson. Those supporting characters are: Jackson's schizophrenic wife Autumn who is also a mystic; Autumn's friend Agent Miller, who is in love with Autumn and teams up with Azrael to kill Jackson; Jackson's friend Dr. Nerowe, who takes on the image of a Native American "medicine man"; a Lynx Shaman named Thunderbear; his granddaughter Kimi, who is the "Eternal Light" for the Lynx tribe; and the evil six-winged angel Azrael and his "Blackwolf Indians."

By contrast, *Stranger Things* is not structured around one character, but instead is constructed with an ensemble cast. Moreover, most of the main characters in *Stranger Things* are pre-teens or children. Unlike in *Totem*, where an adult male named Jackson is the sole protagonist, *Stranger Things* features four nerdy twelve-year-old boys who like to play D&D (Will, Mike, Dustin, and Lucas), and a strange-but-gifted young girl with psionic abilities (Eleven). Other significant characters in *Stranger Things* include: Will's sixteen-year-old brother Jonathan; Mike's sixteen-year-old sister Nancy; Steve (Nancy's teenage boyfriend in Season 1); Steve's teenage friend Robin; and Max, a female schoolmate of the young boys. Plaintiff's designated expert on substantial similarity admits that none of these significant characters, among others have any counterpart in *Totem*. SUF 137. This alone defeats Plaintiff's claims. *See Funky Films*, 462 F.3d at 1078-79; *see also Benay*, 607 F.3d at 627.

Plaintiff claims that nearly every *Totem* character was copied to create a character (or characters) in *Stranger Things*. FAC ¶ 71. However, not only do these claimed similarities involve deliberate mischaracterizations of the works,[6] but they are admittedly based on "archetypes" (SUF 141, 142) rather than the characters' objective attributes and traits, as is required by the extrinsic test. *See Hardwell v. Parker*, No.

---

[6] SUF 138. For example, to make *Totem*'s adult character Autumn appear similar to *Stranger Things*' abducted twelve-year old, Will Byers, Plaintiff alleged that *Totem*'s protagonist Jackson Chance is searching for his wife (like Joyce is searching for her son in *Stranger Things*) because "Jackson believes his wife Autumn Chance was alive." FAC ¶ 71. This is a knowingly false characterization of Plaintiff's work. Jackson knows his wife is dead, and embarks on a quest to free her soul. SUF 139; *see also* SUF 140.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

21

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

CV 21-9100-DMG (PVCx), 2022 U.S. Dist. LEXIS 206346, at *18-20 (C.D. Cal. Aug. 25, 2022) ("In determining whether characters are similar, a court looks at the totality of the characters' attributes and traits as well as the extent to which the defendants' characters capture the total concept and feel of the figures in the plaintiff's works.").

Plaintiff's alleged character similarities based on general archetypes, such as the common existence of "strong-willed" characters on a "quest" to find a loved one, are legally unprotectable. *See, e.g.*, *Esplanade Prods. v. Walt Disney Co*., No. CV 17-02185-MWF (JCx), 2017 U.S. Dist. LEXIS 217700, at *34 (C.D. Cal. Nov. 8, 2017). As a matter of law, there are no substantial similarities between any character in *Totem*, and any character in *Stranger Things*.

### 3. Theme.

The primary themes of *Totem* have philosophical and religious overtones: overcoming the grief of a loved one dying and the fight between good and evil in the Native American spirit world. Indeed, when pitching his work, Kennedy created a prospectus explaining that *Totem*'s storyline "revolves around the universal theme of faith." SUF 143, 144. By contrast, the primary themes of *Stranger Things* are childhood friendship and social and romantic development and dynamics between teenagers working together to defeat monsters. SUF 145.

Plaintiff's expert claims that the only similar "theme" between the works is that there is one "steadfast" protagonist who works with a "change ally." SUF 146. These are not terms of art; no case has ever applied such terminology. Regardless, the concept of one character convincing another character to help them is neither a "theme" nor a protectable element of copyrightable expression. *See, e.g.*, *Gadh v. Spiegel*, No. CV 14-855-JFW (PJWx), 2014 U.S. Dist. LEXIS 648081, at *18 (C.D. Cal. Apr. 2, 2014) (alleged shared focus between the two works regarding "'[t]he relationship between a human and a droid" is insufficient to establish similarity because such relationship "was not a new concept" and unprotectable). Moreover, these "themes" are not depicted in a substantially similar manner in *Totem* and *Stranger Things*.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

22

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

### 4.    Dialogue.

There is no "extended similarity in dialogue" in *Totem* and *Stranger Things*, as is required for the works to be substantially similar. *Olson*, 855 F.2d at 1450 (finding no "extended similarity of dialogue [as] needed to support a claim of substantial similarity"); *see also Shame on You Prods. v. Banks*, 120 F. Supp. 3d 1123, 1156 (C.D. Cal. 2015) (ordinary phrases and commonly-used expressions are not protected).

Plaintiff's expert asserts that the use of the phrase "I promise" and references to "garden gnomes" constitute similarity of protectable dialogue. SUF 147. These snippets of allegedly similar dialogue are lacking in similarity, appear in highly different contexts, are uttered by completely different characters, and/or are unoriginal and unprotectable. *See Narell v. Freeman*, 872 F.2d 907, 911-12 (9th Cir. 1989) (allegedly copied dialogue consisted of unprotected "commonly-used expressions").

### 5.    Mood.

*Totem* is a dark, spiritual, and serious morality play. SUF 148. By contrast, while *Stranger Things* does include tense scenes involving monsters, the overarching mood is far lighter. SUF 149. To the extent that both works include scenes involving evil creatures and alternate dimensions, the mood in these scenes is unprotectable as it flows "naturally from unprotectable basic plot premises" involving monsters and evil dimensions. *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1177 (9th Cir. 2003).

### 6.    Settings.

*Totem* is set in the present day (or as of the mid-2000s) in the Mountain West, close to rural, Native American lands. SUF 150. This setting ties in to the Native American village, folklore, and spirit world that is central to *Totem*'s plot. SUF 151. By contrast, *Stranger Things* is set in the fictional town of Hawkins, Indiana in the 1980s. SUF 12, 35, 58. This alone defeats any claim of substantial similarity. *See Tiscareno v. Netflix, Inc.*, No. CV 13-01560 SJO (AGR), 2014 U.S. Dist. LEXIS 190361, at *28-29 (C.D. Cal. Mar. 6, 2014) (no substantial similarity in setting where two works took place in different decades and geographic locations).

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

23

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

Plaintiff alleges that the works share "a small, middle-class town in rural America surrounded by a sprawling landscape of woods and nature." FAC ¶ 111. Not only is this inaccurate, as the *Totem* script makes no mention of any "town," SUF 152, but this broad concept is not protectable. *See Rice*, 330 F.3d at 1177; *see also Dumond v. Reilly*, No. CV 19-8922-GW-AGRx, 2021 U.S. Dist. LEXIS 199398, at *56 (C.D. Cal. Jan. 8, 2021) ("comparisons between settings should be undertaken at a much-more-granular level"). Plaintiff's other setting "similarities" – backyard tool sheds, large institutional buildings, alternate dimensions with a blue-tinted cave/tunnels, railroad tracks, and a sweat lodge (FAC ¶¶ 112-118) – likewise constitute generic unprotectable ideas and, moreover, appear in highly different contexts.

### 7. Pace.

Plaintiff's work is a screenplay for a feature-length film, focused on Jackson's quest to confront Azrael, and the entire story unfolds over ten days. SUF 71-110, 153. The first three seasons of *Stranger Things* extends its stories over twenty-five television episodes, with a total runtime of more than twenty hours. These three seasons are distinct, each with separate storylines, spanning the course of several years and portraying the adventures of numerous characters. SUF 12-70. The parties' works are not substantially similar in pace as a matter of law. *See Weygand v. CBS, Inc.*, No. CV 96-4540-WMB, 1997 U.S. Dist. LEXIS 10613, at *25-26 (C.D. Cal. May 20, 1997) (pace not substantially similar where one work took place within approximately one year whereas the other work spanned over approximately twenty years).

### E. Plaintiff's Separate "Concept Art" Claim Fails.

*First*, copyright infringement requires proof of ownership. *See Skidmore*, 952 F.3d at 1064. Here, the only evidence is that Sims created the "concept art" at issue. SUF 154. Plaintiff has not presented any evidence that Sims transferred ownership of that artwork to either Plaintiff or Kennedy.

*Second*, even if Plaintiff could establish ownership, there is no basis for Plaintiff's assertion that any elements of the Series are "substantially similar" to any of

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

24

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

*Totem*'s concept art.  *See Cavalier*, 297 F.3d at 825-26 (extrinsic test also applies to comparison of art work).  In fact, during his deposition, Plaintiff's expert, Jeffrey Sedlik, who was retained to "review for comparison and contrast" *Totem* concept art with *Stranger Things*, repeatedly stated that he had "not been retained to make an expert determination as to whether any two or more visuals are substantially similar." SUF 155, 156.  Rather, Sedlik purported only to opine as to whether the "selection and arrangement" of random literary and visual elements in *Totem* are "reflected" somewhere in multiple seasons of *Stranger Things*.  SUF 157.  Sedlik is a professional photographer, but his "report" simply summarizes the literary and visual elements from Plaintiff's FAC, without applying any visual expertise (or analysis) to support his conclusions.  Not only did Sedlik disclaim any opinions relating to visual "similarity" of the works, but he could not identify a single, supposedly "common," element in his report that had not already been alleged by Kennedy (including the assertion that the works are somehow similar because the term "garden gnomes" is found, albeit used in different ways, in both works).  SUF 158, 159, 160.

There is no similarity of protectable expression between *Totem*'s concept art and *Stranger Things*.  SUF 161.  It is undisputed that Plaintiff's concept art, like the *Totem* story, is based on Native American imagery and mythology.  SUF 162. Defendants' Series is not.  SUF 163.  Defendants' motion should be granted.[7]

## IV. CONCLUSION

Defendants respectfully request that their Motion be granted in its entirety.

Dated:  December 27, 2022          LOEB & LOEB LLP

By: _____
         David Grossman
         Attorneys for Defendants

---

[7] Summary disposition of Plaintiff's claims for copyright infringement necessarily results in summary judgment as to Plaintiff's declaratory relief claim, which is dependent on the same alleged wrongdoing described in the first and second causes of action.  *See Morrill v. Smashing Pumpkins*, 157 F. Supp. 2d 1120, 1127 n.3 (C.D. Cal. 2001).  It also results in summary judgment of Plaintiff's claims for vicarious and contributory infringement. *See MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005); *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001).

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

23344574
231804-10002

25

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT