BOREN, OSHER & LUFTMAN, LLP
Jeremy J. Osher (SBN 192109)
josher@bollaw.com
Aaron Gladstein (SBN 266287)
agladstein@bollaw.com
Matthew Tom (SBN 324298)
mtom@bollaw.com
222 North Pacific Coast Highway, Suite 2222
El Segundo, CA 90245
Telephone: (310) 322-2021
Facsimile: (310) 322-2228

Attorneys for Plaintiff
IRISH ROVER ENTERTAINMENT, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IRISH ROVER ENTERTAINMENT, LLC, a California limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> AARON SIMS, an individual; MATT DUFFER, an individual; ROSS DUFFER, an individual; NETFLIX, INC., a Delaware corporation; NETFLIX STREAMING SERVICES, INC., a Delaware corporation; 21 LAPS ENTERTAINMENT, a business entity, form unknown; and DOES 1 through 50, inclusive, <br><br> Defendants. | Case No.: 2:20-CV-06293-CBM-PLA (Assigned to Hon. Consuelo B. Marshall) <br><br> **DECLARATION OF JEREMY J. OSHER IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF PROFESSOR JEFFREY SEDLIK** <br><br> [Plaintiff's Opposition to Motion to Exclude and Declaration of Professor Jeffrey Sedlik filed concurrently herewith] <br><br> **<u>Hearing</u>** <br> Date:    February 14, 2023 <br> Time:    10:00 a.m. <br> Courtroom: 8B |

1

## DECLARATION OF JEREMY J. OSHER

2      I, Jeremy J. Osher, do hereby declare and state:

3      1.      I am an attorney licensed to practice before all of the State courts in

4   California, including this Court. I am a Partner with Boren, Osher & Luftman, LLP,

5   counsel of record for Plaintiff Irish Rover Entertainment, LLC, ("Plaintiff"). I have

6   personal knowledge of the facts set forth herein and, if called as a witness at the trial of

7   this matter, I could and would testify competently thereto.

8      2.      I make this Declaration in support of Plaintiff's Opposition to Defendants'

9   Motion to Exclude the Expert Testimony of Professor Jeffrey Sedlik ("Sedlik").

10      3.      On December 6, 2022, Defendants deposed Sedlik in a full-day deposition.

11   The deposition was somewhat contentious, including at one point during a break when

12   Defendants' counsel accused Sedlik of failing to provide truthful testimony. Attached

13   hereto as **Exhibit "A"** are true and correct copies of portions of the deposition transcript

14   of Sedlik pertinent to Plaintiff's instant Opposition. The portions of the deposition

15   transcript attached to this declaration accurately reflect the questions asked during the

16   deposition proceedings and the answers of Sedlik given in the deposition proceedings.

17      4.      After reviewing his deposition transcript, Sedlik made some minor

18   corrections that do not impact the substance of the language quoted in Plaintiff's instant

19   Opposition. Attached hereto as **Exhibit "B"** is a true and correct copy of the Errata

20   Sheet prepared and signed by Sedlik.

21      5.      On August 9, 2022, I defended the deposition of Plaintiff's principal,

22   Jeffrey Kennedy.  Attached hereto as **Exhibit "C"** are true and correct portions of the

23   deposition transcript of Jeffrey Kennedy pertinent to Plaintiff's instant Opposition.  The

24   portions of the deposition transcript attached to this declaration accurately reflect the

25   questions asked during the deposition proceedings and the answers of Jeffrey Kennedy

26   given in the deposition proceedings.

27      6.      Attached hereto as **Exhibit "D"** is a true and correct copy of the "Artwork

28

1

Comparison – Exhibit #1", which Sedlik reviewed in connection with his report as indicated in Materials Considered list of his report. My office provided a copy of the same to Defendants.

7.    On December 20, 2022, Defendants forwarded a meet and confer communication requesting that Plaintiff meet and confer regarding this Motion pursuant to Local Rule 7-3.  This was the last possible day on which the parties could meet and confer on the substance of Defendants' Motion in accordance with Local Rule 7-3.

8.    In the copyright matter of *Craig v. UMG Recordings, Inc.*, No. 16-CV-5439 (JPO), 380 F.Supp3d 324 (S.D.N.Y. 2019), defendants were represented by Loeb & Loeb (counsel for Defendants in this matter), which retained Sedlik as a damages expert. In support of defendants' opposition to plaintiff's motion to disqualify Sedlik, defendants' attorney, Barry Slotnick, argued the following:

> While there may well be many people purporting to be such an expert, Mr. Sedlik is only one of a few qualified experts in the photography copyright space. Contrary to Craig's assertions, Mr. Sedlik's expertise is indeed "rare" – he is the only photography copyright licensing expert who has taught CLE courses to attorneys on copyright law, trained employees at the U.S. Copyright Office, taught workshops on copyright at Stanford Law School, has served as the President of the Advertising Photographers of America, is the current CEO of the global standards body for the photography licensing industry, is a globally recognized photographer who has been recognized as "Photography Person of the Year," among other awards, and who has taught copyright law and copyright licensing at the college level for 21 years.

A true and correct copy of Defendants' Memorandum of Law submitted in *Craig v. UMG Recordings, Inc.*, is attached hereto as **Exhibit "E"**. *See* p. 23.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of January, 2023, at El Segundo, California.

By: /s/ Jeremy J. Osher
Jeremy J. Osher

2

# Exhibit A

1           UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
2
            Case No. 2:20-cv-06293-CBM-PLA
3
4    IRISH ROVER ENTERTAINMENT, LLC,
     a California limited liability
5    company,
6                    Plaintiff,
7     vs.
8    AARON SIMS, an individual; MATT
     DUFFER, an individual; ROSS
9    DUFFER, an individual; NETFLIX,
     INC., a Delaware corporation;
10   NETFLIX STREAMING SERVICES,
     INC., a Delaware corporation; 21
11   LAPS, INC., a California
     corporation; and DOES 1 through
12   50, inclusive,
13                   Defendants.
     _____/
14
15
16           REMOTE VIDEOTAPED DEPOSITION OF
17                  JEFFREY SEDLIK
18            Monday, December 6, 2022
              10:30 a.m. - 7:19 p.m. (PST)
19
20
21
22          Stenographically Reported By:
            Kimberly Fontalvo, RPR,CLR
23          Realtime Systems Administrator
24
25

                                      Page 1

```
 1     APPEARANCES:
 2
       On behalf of Plaintiff:
 3
             BOREN OSHER AND LUFTMAN, LLP
 4           222 North Pacific Coast Highway, Suite 2222
             El Segundo, CA  90245
 5           BY:  JEREMY J. OSHER, ESQ.
             josher@bollaw.com
 6
 7
 8     On behalf of Defendants:
 9           LOEB & LOEB, LLP
             10100 Santa Monica Boulevard, Suite 2200
10           Los Angeles, CA  90067
             BY:  DAVID GROSSMAN, ESQ.
11           dgrossman@loeb.com
             BY:  SAFIA GRAY HUSSAIN, ESQ.
12           shussain@loeb.com
13
14
       ALSO PRESENT:  Jennifer Williams, Videographer
15                     Carrisa Narisco, Tech Concierge
                       Jeffrey Kennedy
16                     Wade Gentz, Director of Litigation,
                       Netflix
17                     Charles Brink
18
19
20
21
22
23
24
25

                                              Page  2
```

```
 1                    I N D E X
 2      Examination                               Page
 3
        Direct              By Mr. Grossman          4
 4
 5
 6
 7                      EXHIBITS
 8      No.                                        Page
 9      Exhibit 003    Previously Marked            56
10      Exhibit 9      Previously Marked           165
11      Exhibit 52     Previously Marked           122
12      Exhibit 54     Previously Marked           126
13      Exhibit 145    Email dated September 1,     146
                       2014, from Duffer Bros.
14                     to Aaron Sims
15      Exhibit 146    Email dated September 2,     153
                       2014, from Duffer Bros.
16                     to Aaron Sims
17      Exhibit 147    Look book for "Montauk"      182
18      Exhibit 150    Expert Report of             26
                       Professor Jeffrey Sedlik
19
20
21
22
23
24
25

                                          Page  3
```

```
 1     common.

 2          Q.   And when you say "motion work," are you    10:45:52AM

 3     referring to live action video?

 4          A.   Right.  I should -- I can just briefly    10:46:01AM

 5     explain there.  So photographers as they existed in

 6     the -- throughout time, and perhaps through the

 7     '90s, that profession really no longer exists.  We

 8     all have to do a lot of different things to make a

 9     living.  And one of those things is video and motion

10     projects.  Almost every client will request that the

11     photographer shoot both motion, which refers to, you

12     know, moving pictures of various types, and that

13     could be digital video, that could be anything.  And

14     photography.

15          Q.   Aside from the directing work that you    10:46:58AM

16     just referenced, can you think of any other

17     directing jobs that you have been paid for?

18          A.   I can't think of them offhand, but if    10:47:14AM

19     we -- I'm sure later we'll get into my CV and I can

20     probably identify the clients for whom I have

21     provided directing services.  Or cinematography

22     services as well.  Sometimes I'll be a DP.

23          Q.   Have you received any credits in feature    10:47:37AM

24     films?

25          A.   No.                                      10:47:40AM
```

Page 13

```
 1          foundation.

 2          A.   It was among the documents that were        11:32:35AM

 3     provided to me, and I did review it.

 4      BY MR. GROSSMAN:                                      11:32:41AM

 5          Q.   Were there any comparisons made by           11:32:41AM

 6     Mr. Kennedy, either in the First Amended Complaint

 7     or in that exhibit to his declaration, that you just

 8     referred to, that you disagreed with?

 9          MR. OSHER:  Same objection.  Lacks                11:33:05AM

10          foundation.  Overbroad.

11          A.   I don't recall that.  You know, I            11:33:19AM

12     performed my review of the images and then expressed

13     my opinions in the report.  But I would not adopt a

14     client's assertions of similarity.

15          Heads up, Counsel, we've been going for an        11:33:41AM

16     hour.  You can finish your line of questioning, but

17     I do need to use the restroom and get a drink of

18     water.

19          MR. GROSSMAN:  No problem.  Sure.  Let's          11:33:50AM

20          take a break.  And -- so we can take down

21          that -- thank you.

22          VIDEOGRAPHER:  We're going off the record         11:33:54AM

23          at time is 11:34.

24      (Recess was held from 11:34 a.m. until 11:44 a.m.)    11:34:11AM

25          VIDEOGRAPHER:  Stand by.                          11:44:42AM
```

Page 40

```
 1      2013 version.

 2           Q.   Is that the version that he's attached to    12:10:17PM

 3      the First Amended Complaint in this case?

 4           A.   That's correct, sir.  I also received        12:10:22PM

 5      other versions.

 6           Q.   Did you read those other versions?           12:10:30PM

 7           A.   I did.  But my report primarily relies on    12:10:34PM

 8      the version attached to the Complaint.

 9           Q.   Are you familiar with Jackson Chance in      12:10:48PM

10      "Totem"?

11           A.   Yes.                                         12:10:57PM

12           Q.   Do you think that Jackson Chance is          12:10:58PM

13      substantial similarity to any character in

14      "Stranger Things"?

15           MR. OSHER:  Objection.  It's outside the          12:11:06PM

16           scope of this witness's opinion.

17           A.   You're calling upon me to opine on           12:11:18PM

18      substantial similarity, which is a legal opinion,

19      and which is not among the topics stated in my

20      report on which I've been retained to testify.

21      BY MR. GROSSMAN:                                       12:11:43PM

22           Q.   Okay.  So you are not testifying regarding   12:11:43PM

23      substantial similarity in this case; is that

24      correct?

25           A.   I'm just trying to be very careful --        12:12:06PM
```

Page 55

1    trying to be very careful in answering your question

2    based on the words that you used to compose it.

3           You said the word "regarding," which can      12:12:14PM

4    mean related to, and I'm sure that there's any

5    number of my opinions that would relate to

6    substantial similarity.  So I would -- trying to

7    answer your question, I would say that my opinions

8    may relate to substantial similarity.  I've not been

9    retained to make an expert determination as to

10   whether any two or more visuals are substantially

11   similar.

12       Q.   Okay.  Thank you.                           12:12:44PM

13       A.   I'm not trying to play games with you,      12:12:48PM

14   counsel I'm just trying to be very careful because I

15   want to make sure that I answer your questions

16   correctly.

17       Q.   And the section that I just read, it        12:12:55PM

18   refers to characters in the "Totem" concept art and

19   screens in "Stranger Things."  Is it also true that

20   you are not expressing any opinion regarding

21   similarity of characters as between "Totem" and

22   "Stranger Things"?

23           MR. OSHER:  Objection.  It's overbroad.      12:13:23PM

24       Misstates testimony.

25       A.   I think the opinions that I express in a    12:13:35PM

Page 56

```
 1      substantial similarity between those ages.

 2        BY MR. GROSSMAN:                              12:19:23PM

 3          Q.   And if you look at the next page, there  12:19:23PM

 4      are some trees and some streets, and some

 5      storefronts.  And it looks like Sheriff Hopper

 6      walking in the middle of street.

 7              Same question with respect to this page.  12:19:38PM

 8      Is it correct, Mr. Sedlik, that you are not offering

 9      any opinions regarding the substantial similarity of

10      these images in this case?

11            MR. OSHER:  Same objections.              12:19:50PM

12          A.   There's that word "regarding" again,    12:19:53PM

13      Counselor, so I'll just state my answer.  I'm not

14      rendering an opinion one way or the other that these

15      images are or are not substantially similar.

16        BY MR. GROSSMAN:                              12:20:16PM

17          Q.   Can you explain the distinction you're   12:20:16PM

18      making with respect to the word "regarding"?

19          A.   If by regarding you mean related to, then  12:20:26PM

20      I have the same explanation that I provided earlier,

21      which was that if my opinion is related to -- if I

22      express an opinion in my report about the scope of

23      similarity across various different visuals, that

24      might relate to a later finding by a jury or a trier

25      of fact as to substantial similarity, which is a
```

Page 60

```
 1       BY MR. GROSSMAN:                              12:41:03PM

 2           Q.   Mr. Sedlik, I would appreciate it if you   12:41:03PM

 3       would refrain from telling me what you are not doing

 4       in this case.  I would like you just to focus on the

 5       questions and have you answer the questions that are

 6       being posed.  It will help us all get out of here

 7       faster.

 8              In this case, what is the methodology that   12:41:16PM

 9       you applied in order to come to your conclusions?

10              MR. OSHER:  Objection to preamble and also   12:41:25PM

11          to the question, which has been asked and

12          answered.

13           A.   In this case, I did not perform an        12:41:45PM

14       image-to-image comparison.  I reviewed the evidence

15       and testimony, including photographs and

16       screenshots, and written testimony, and I reviewed

17       the "Totem" script, and based on that review of the

18       visual evidence, and my review of that aspects of

19       the "Totem" script, I expressed my opinions.

20       BY MR. GROSSMAN:                                  12:42:31PM

21           Q.   What is the expert methodology that you   12:42:31PM

22       brought to bear on this case in coming to your

23       conclusion?

24           A.   Well, Counselor, I've been reviewing and  12:42:54PM

25       critiquing and instructing students on the creation
```

Page 72

1    of still and moving images for -- well, since 1979.

2    And I brought that personal experience, and my

3    education as well, in film and photography, visual

4    art, at the ArtCenter College, to bear in arriving

5    at my opinion that there are aspects of the visuals

6    from "Totem," concept art, that are reflected in

7    "Stranger Things," and that there are aspects in the

8    visuals of "Stranger Things" that reflect

9    occurrences and elements and aspects of the "Totem"

10   script.

11        Q.   And when you say reflected, you don't mean   12:44:04PM

12   that you compared two images and determined that

13   they are visually substantially similar, right?

14        A.   That's correct, sir.  I will not be         12:44:20PM

15   testifying on substantial similarity, and I did not

16   compare -- do a direct comparison of one image to

17   the other, and so my earlier testimony in which you

18   asked me to opine on that topic is not, from my

19   perspective, relevant to the topics on which I've

20   been asked to testify and is not within the list of

21   topics that I will be testifying on as expressed in

22   my report.

23        Q.   This methodology that you just described,   12:44:50PM

24   have you ever applied that in any other case in

25   order to arrive at an opinion that one work is

                                              Page 73

```
 1              MR. OSHER:  Objection.  It's overbroad.        1:52:55PM

 2         It exceeds the scope of this witness's

 3         designation.  He is not here to provide

 4         opinions regarding substantial similarity.

 5         A.   Counselor, I don't perform substantial      1:53:12PM

 6    similarity analysis on the fly.  I'm not performing

 7    it in this case.  I'm not performing it here today.

 8      BY MR. GROSSMAN:                                    1:53:21PM

 9         Q.   Are you refusing to answer the question,    1:53:21PM

10    Mr. Sedlik?

11         A.   No, I don't perform similarity analysis in  1:53:25PM

12    real time.  I'm not refusing to answer the question.

13         Q.   So what is the answer to my question?       1:53:37PM

14              MR. OSHER:  It's been asked and answered.    1:53:40PM

15         Twice.

16         A.   My answer to the question is that I don't    1:53:51PM

17    perform similarity analysis in real time.  I have

18    not formed an opinion as to the similarity of these

19    images.  And I have not been retained to opine on

20    substantial similarity between those photographs or

21    between any other two photographs in this matter.

22    Nor do I intend to opine on that topic.

23      BY MR. GROSSMAN:                                    1:54:17PM

24         Q.   Are you capable of doing that based on       1:54:17PM

25    your experience and your expertise?
```

                                                            Page 77

```
1        A.   If we came to do so.                    1:54:22PM

2        Q.   Mr. Sedlik, please do not provide reasons   1:54:27PM

3    or qualifications why you're not answering the

4    question.  I'm asking you a question.  I would

5    appreciate if you would answer.

6             Are you capable of comparing two           1:54:34PM

7    photographs like the ones that we are looking at on

8    Exhibit 6 to the First Amended Complaint and coming

9    up with an opinion based on your experience as to

10   whether or not they are substantially similar?

11           MR. OSHER:  He's already answered the       1:54:49PM

12       question.  Three or four times now.

13       A.   I'm capable of performing a substantial    1:54:55PM

14   similarity analysis, to the extent that that's not a

15   legal opinion, and I have not done so in this case.

16   I will not do so in real time.

17   BY MR. GROSSMAN:                                    1:55:07PM

18       Q.   Okay.  So you are not willing to offer     1:55:07PM

19   your opinion based on your expertise today regarding

20   these images, right?

21           MR. OSHER:  Counsel, he's already provided  1:55:17PM

22       you with his response.  He's not willing to do

23       that analysis on the fly in real time, which is

24       outside of scope of his designation.

25       A.   My response is that I'm not willing or     1:55:33PM
```

Page 78

| | | |
|---|---|---|
| 1 | able to perform a similarity analysis in real time. | |
| 2 | I did not say that I could not or would not perform | |
| 3 | it.  You can ask me to do any number of things here | |
| 4 | today that can't and shouldn't be done in real time. | |
| 5 | I've not expressed an opinion that those two images | |
| 6 | are similar, nor do I intend to do so.  I have not | |
| 7 | been retained to do that. | |
| 8 | BY MR. GROSSMAN: | 1:56:04PM |
| 9 | Q.   Please focus on the question, Mr. Sedlik. | 1:56:04PM |
| 10 | Are there images that you could look at and | |
| 11 | conclude, based on your decades of experience, that | |
| 12 | are not substantially similar to one another? | |
| 13 | MR. OSHER:  Same objection.  He's already | 1:56:24PM |
| 14 | answered this question. | |
| 15 | A.   If retained to perform a substantial | 1:56:31PM |
| 16 | similarity analysis, and given sufficient time to | |
| 17 | perform that analysis and to form my opinions, I | |
| 18 | could do so.  I will not be doing so in this case. | |
| 19 | MR. GROSSMAN:  Move to strike. | 1:56:56PM |
| 20 | BY MR. GROSSMAN: | 1:56:58PM |
| 21 | Q.   Mr. Sedlik, is it possible for you to look | 1:56:58PM |
| 22 | at two images in the moment that you are looking at | |
| 23 | them and determine that they are not substantially | |
| 24 | similar to one another? | |
| 25 | MR. OSHER:  Same objections.  It's | 1:57:11PM |

Page 79

```
 1              overbroad.  It's outside the scope of this
 2              witness's designation.  He's already told you
 3              that he's not able to do it on the fly and
 4              won't do it on the fly.
 5         A.   I earlier opined for between five and ten     1:57:28PM
 6     minutes on the list of considerations and
 7     comparing --
 8       BY MR. GROSSMAN:                                     1:57:35PM
 9         Q.   Yeah, but my question is, is it               1:57:35PM
10     possible --
11         A.   I will not --                                 1:57:39PM
12              (Crosstalk.)                                  1:57:40PM
13              MR. OSHER:  Let him finish.                   1:57:41PM
14         A.   You will not interrupt me.  I will not        1:57:42PM
15     interrupt you.  That's my promise.
16       BY MR. GROSSMAN:                                     1:57:45PM
17         Q.   Mr. Sedlik, Mr. Sedlik, your promise is to    1:57:45PM
18     tell the truth today under oath, which means
19     answering the questions that are posed to you --
20              MR. OSHER:  He's trying to, Counsel.          1:57:51PM
21         You're not letting him finish.
22       BY MR. GROSSMAN:                                     1:57:53PM
23         Q.   -- you repeatedly to do that.  Please         1:57:53PM
24     answer the question that is posed to you.
25              Do you have the question in mind,             1:57:57PM
```

Page 80

```
 1          Mr. Osher.
 2       BY MR. GROSSMAN:                              1:58:36PM
 3          Q.   Mr. Sedlik, the question is yes or no, do  1:58:36PM
 4       you have the question in mind?
 5             MR. OSHER:  The one he was trying to      1:58:41PM
 6          answer before when you cut him off?
 7          A.   There's been a lot of discussion here   1:58:50PM
 8       after the question.  You can reask the question.
 9       I'll repeat my answer.  I would ask that you not
10       interrupt my answer.
11             MR. GROSSMAN:  I apologize, Ms. Court     1:59:02PM
12          Reporter, can we have the question read back,
13          which was the original question I was trying to
14          get a response to.
15             (Requested portion read back.)           1:59:37PM
16             MR. OSHER:  Same objections.              1:59:40PM
17          A.   My methodology for the comparison of    1:59:54PM
18       images for substantial similarity involves the steps
19       previously described in my testimony today, and it
20       is not -- I would not offer nor agree to an
21       instantaneous determination of similarity for any
22       image.  I would follow the methodology previously
23       described in which all of the different factors are
24       considered before arriving at an opinion.  So I
25       cannot do that on demand instantaneously.
```

Page 82

```
 1        BY MR. GROSSMAN:                               2:00:35PM

 2           Q.   Okay.  So without taking a substantial  2:00:35PM

 3        amount of time to analyze and dissect images, you

 4        are incapable of telling whether or not two images

 5        are substantially different from one another, right?

 6               MR. OSHER:  Objection.  Misstates        2:00:52PM

 7           testimony.  Assumes facts.Objection.  Misstates

 8           testimony.Assumes facts.

 9           A.   That's the inverse of the previous      2:01:03PM

10        question.  So I just need to think about that.

11               My answer was as to substantial          2:01:23PM

12        similarity, and now you are asking for substantial

13        differences?

14           Q.   Would you like the question read back?  2:01:39PM

15           A.   I understand the question.              2:01:40PM

16               I wouldn't perform that analysis in real 2:01:41PM

17        time either because it involves the same

18        considerations.

19           Q.   What analysis?                          2:02:11PM

20           A.   The analysis that I testified about     2:02:13PM

21        earlier that I would follow in comparing any two or

22        more images.  But I have not determined that any of

23        these images are or are not substantially similar,

24        nor do I intend to testify on that topic.

25           Q.   And you are incapable of looking at two 2:02:29PM
```

Page 83

```
 1        images in real time and determining that they are

 2        not substantially similar to one another, right?

 3              MR. OSHER:  Same objections.  Asked and        2:02:40PM

 4           answered.  It's argumentative.

 5           A.    I'm unwilling to perform the analysis in    2:02:52PM

 6        real time on request because of the reasons

 7        described earlier and the considerations that are

 8        required to make that determination.  So the answer

 9        is, I do not and will not and would not perform an

10        instantaneous determination, just as if I was

11        looking at anything else to determine what it was,

12        it wouldn't be proper.

13              MR. GROSSMAN:  Can I please have the           2:03:27PM

14           question read back.

15           (Requested portion read back.)                   2:03:43PM

16              MR. OSHER:  Asked and answered,                2:03:49PM

17           argumentative.

18           A.    My answer is that it would be improper to   2:03:55PM

19        perform that analysis in real time without careful

20        consideration of all the factors that I mentioned

21        before, which were a subset of the factors that

22        would be considered, as I testified before.  So I

23        would not perform that analysis in real time.

24        BY MR. GROSSMAN:

25           Q.    Mr. Sedlik, do you understand that my       2:04:13PM
                                                               2:04:13PM
```

Page 84

```
 1        question was not would you perform that analysis,

 2        but my question was are you capable?  Do you

 3        understand that was my question, Mr. Sedlik?

 4            A.   I do understand your question.          2:04:29PM

 5            Q.   Okay.                                    2:04:32PM

 6                 MR. GROSSMAN:  Can I please have the prior  2:04:32PM

 7            question read back.

 8                 (Requested portion read back.)           2:04:58PM

 9                 MR. OSHER:  Same objections.  Lacks      2:05:00PM

10            foundation.  Misstates testimony.  It's

11            argumentative.

12            A.   And my answer is the same.  I would not  2:05:16PM

13        perform such an analysis in real time because it

14        requires consideration of numerous factors, which

15        would be improper for me to do so, and any expert

16        that would do so would lack the knowledge, training,

17        and expertise to be an expert.

18         BY MR. GROSSMAN:                                 2:05:35PM

19            Q.   Okay.  In your view, as an expert, there  2:05:35PM

20        is no such thing as an obvious set of dissimilar

21        images; is that your testimony, Mr. Sedlik?

22                 MR. OSHER:  Objection.  Vague and        2:05:53PM

23            ambiguous.  Incomplete hypothetical.  Lacks

24            foundation.  Misstates his testimony.

25            A.   My answer is that I would not perform any  2:06:10PM
```

Page 85

```
 1    analysis in real time on these images, or others,

 2    without following methodology to consider what

 3    similarities are there.

 4      BY MR. GROSSMAN:                                  2:06:26PM

 5        Q.   I will accept your statement that you keep  2:06:26PM

 6    making on the record, Mr. Sedlik.  I'll accept that.

 7    It's on the record.

 8             I would like to you answer the question    2:06:33PM

 9    posed, however.  Can you please do that?

10             MR. OSHER:  Objection to the preamble.     2:06:39PM

11         This has been asked and answered multiple times

12         now.  Lacks foundation.  It's argumentative and

13         harassing at this point.

14        A.   My answer is that I would not perform the  2:07:09PM

15    analysis in real time for the reasons -- for the

16    reasons that I described earlier.

17      BY MR. GROSSMAN:                                  2:07:19PM

18        Q.   Mr. Sedlik, I'm not asking you to perform  2:07:19PM

19    any analysis right now in real time.  You understand

20    that, right?

21        A.   You're asking me whether it's possible,    2:07:26PM

22    whether I could --

23        Q.   Mr. Sedlik --                              2:07:30PM

24             MR. OSHER:  Did you finish your answer,     2:07:34PM

25         Mr. Sedlik?
```

Page 86

| | | |
|---|---|---|
| 1 | MR. GROSSMAN:  Mr. Sedlik's has not | 2:07:35PM |
| 2 | answered my question. | |
| 3 | BY MR. GROSSMAN: | 2:07:36PM |
| 4 | Q.   Mr. Sedlik, you understand that right | 2:07:36PM |
| 5 | now -- | |
| 6 | MR. OSHER:  He has multiple times. | 2:07:39PM |
| 7 | BY MR. GROSSMAN: | 2:07:40PM |
| 8 | Q.   -- you understand that right now I am not | 2:07:40PM |
| 9 | asking you to perform a comparison in real time. | |
| 10 | You understand that, right, Mr. Sedlik? | |
| 11 | MR. OSHER:  Object to the preamble.  It's | 2:07:48PM |
| 12 | argumentative and harassing.  Witness has | |
| 13 | answered this line of questioning multiple | |
| 14 | times now. | |
| 15 | A.   You are asking me whether I'm incapable of | 2:08:02PM |
| 16 | performing it, which is the same as asking me | |
| 17 | whether I could perform it.  It's just the opposite. | |
| 18 | So you would infer the inverse.  And my answer is my | |
| 19 | answer. | |
| 20 | BY MR. GROSSMAN: | 2:08:33PM |
| 21 | Q.   Mr. Sedlik, I'm not sure what you are | 2:08:34PM |
| 22 | referring to. | |
| 23 | My question that I just posed to you was, | 2:08:41PM |
| 24 | do you understand that I am not currently asking you | |
| 25 | to perform a visual comparison of those images? | |

Page 87

```
 1              MR. OSHER:  Same objections.              2:08:53PM

 2              You can answer again if you have a        2:08:54PM

 3         different answer.

 4         A.   I understood your question to be whether  2:09:07PM

 5    or not I was capable of performing that analysis.

 6     BY MR. GROSSMAN:                                   2:09:18PM

 7         Q.   Mr. Sedlik, I'm trying to get a           2:09:18PM

 8    foundational question out of the way.

 9              Do you understand that as of this moment, 2:09:24PM

10    I am not asking you to perform a visual analysis of

11    any two images whatsoever.  Do you understand that?

12              MR. OSHER:  Object to the preamble.  Asked 2:09:34PM

13         and answered.  Harassing.  Argumentative.

14         A.   With the qualifier of "as of this moment," 2:09:42PM

15    I understand that.

16     BY MR. GROSSMAN:                                   2:09:46PM

17         Q.   However, you are unwilling to perform any  2:09:46PM

18    visual analysis of any two images in order to

19    determine whether they are substantially similar,

20    correct?

21              MR. OSHER:  Objection.  Misstates his      2:10:06PM

22         testimony.  Lacks foundation.  It's

23         argumentative and harassing.

24         A.   As I testified earlier, I'm not willing to 2:10:19PM

25    perform such an analysis in real time without
```

Page 88

```
1        following the procedure and methodology that I

2        described earlier.  And my answer was that that

3        would be improper.  Similarity is on a continuum.

4        There are always degrees of similarity between

5        photographs.  And I will not perform an analysis in

6        real time when that would be improper.
```

7        BY MR. GROSSMAN:                              2:10:57PM

8            Q.   Okay.  You talked to Mr. Osher before this   2:10:57PM

9        deposition, right?

10           A.   Yes.                                  2:11:07PM

11           Q.   When?                                 2:11:11PM

12           A.   Last night.                           2:11:17PM

13           Q.   For how long?                         2:11:21PM

14           A.   Perhaps 15 minutes.                   2:11:27PM

15           Q.   What did you discuss?                 2:11:30PM

16           A.   Logistics for the deposition.         2:11:38PM

17           Q.   What else?                            2:11:40PM

18           A.   Conversation was limited to logistics for   2:11:44PM

19        the deposition.

20           Q.   What does that mean, "logistics"?     2:11:48PM

21           A.   Confirmation of the time and the fact that   2:11:54PM

22        I was just getting over COVID and that I'm on my

23        last day of isolation and --

24           Q.   Is there anything else, Mr. Sedlik, that   2:12:10PM

25        you can recall from this conversation that took

Page 89

```
 1          Q.    Do you see the image of Iron Lightning and      2:25:21PM

 2    River Shadow?

 3          A.    Yes.                                            2:25:27PM

 4          Q.    Do you recall that those were characters        2:25:28PM

 5    in Mr. Kennedy's "Totem" script?

 6          A.    Not in the script attached to the report       2:25:38PM

 7    as far as I know.  My recollection, since you're

 8    asking for it, is that these character had to be

 9    removed because of the length of the script or

10    screenplay.

11          Q.    Your recollection of what leads you to          2:25:57PM

12    that conclusion?

13          A.    Somewhere in the probably 10,000 pages of       2:26:02PM

14    documents, I just -- I just recall, after a couple

15    months, vaguely, that there was reason that these

16    characters were removed and that -- at least from

17    Mr. Kennedy's perspective, and that it was because

18    he had to -- this may or may not be correct, but

19    it's recollection that he took them out and moved

20    them into another -- another script that was for,

21    you know, a later film that related to "Totem."  And

22    I say that loosely because the titles have changed

23    over time.  But that's my recollection.

24          Q.    You didn't use this image in connection         2:26:54PM

25    with your opinion in this case, right?
```

Page 99

| | |
|---|---|
| 1 | observation. |
| 2 | It's one of the occurrences of the type of        2:29:51PM |
| 3 | thing that occurred in a "Totem" script, albeit an |
| 4 | earlier "Totem" script.  Although I do think it ends |
| 5 | up with different characters doing that same thing |
| 6 | in the 2013 script.  I'm not absolutely positive. |
| 7 | So I considered that part of the overall        2:30:10PM |
| 8 | quantum of similarities. |
| 9 | Q.   You are referring to something you saw in        2:30:29PM |
| 10 | the "Totem" script or one of the "Totem" scripts? |
| 11 | A.   So the visual at the top of Page 10 of 10        2:30:42PM |
| 12 | shows a character going to the aid of another and -- |
| 13 | to bring that person out of a trance.  And one of |
| 14 | those characters was -- both of these characters |
| 15 | were removed from the script.  But I believe, but |
| 16 | I'm not absolutely positive, that a similar |
| 17 | situation occurs in the 2013 version of the script |
| 18 | attached to the Complaint, where a character brings |
| 19 | another character out of a trance or vision period |
| 20 | by touching their shoulder or approaching them.  Not |
| 21 | 100 percent on that, because there are so many |
| 22 | versions of the script. |
| 23 | Q.   Did you read Mr. Kennedy's deposition        2:31:38PM |
| 24 | transcript in this case? |
| 25 | A.    I did.  There might have been more than        2:31:45PM |

Page 101

```
 1      one.

 2           Q.    And you know that he testified that he has    2:31:51PM

 3      written at least 50 versions of the "Totem" story,

 4      right?

 5                MR. OSHER:  Objection.  Misstates his          2:31:58PM

 6           testimony.

 7           A.    I don't recall that testimony.  I recall      2:32:02PM

 8      testimony that he shared 12 of them with Mr. Sims or

 9      something to that effect.  Or at least 12.

10       BY MR. GROSSMAN:                                        2:32:12PM

11           Q.    Are you basing your opinion in this case      2:32:12PM

12      on elements of the "Totem" script?

13           A.    Yes, to the extent that visuals refer back    2:32:42PM

14      to occurrences or themes or tone or other aspects of

15      the "Totem" script that are then reflected in whole

16      or in part in "Stranger Things," yes.

17           Q.    Just for the record, I want to note that      2:33:05PM

18      Mr. Sedlik is taking at least ten seconds, if not

19      more, in between every question and every answer in

20      this deposition today.

21                Mr. Sedlik, you're not a literary expert,      2:33:22PM

22           correct?

23                MR. OSHER:  Let me object to the preamble.     2:33:27PM

24           Whether the witness takes two seconds, five

25           seconds or 15 seconds --
```

Page 102

```
 1          MR. GROSSMAN:  Just state your objection.    2:33:32PM

 2          MR. OSHER:  He's taking the time -- he's     2:33:32PM

 3      taking the time he needs to provide you with a

 4      response --

 5          MR. GROSSMAN:  Just state your objection.    2:33:39PM

 6          MR. OSHER:  -- with a response to your       2:33:41PM

 7      question.  Inappropriate observation.

 8      A.   Can you ask the question again, Counselor?  2:33:49PM

 9   I'm sorry, I don't mean to trouble you.

10          (Requested portion read back.)              2:34:08PM

11          MR. OSHER:  Asked and answered.             2:34:09PM

12    BY MR. GROSSMAN:                                   2:34:32PM

13      Q.   Mr. Sedlik, you are not a literary expert, 2:34:32PM

14   correct?

15          MR. OSHER:  It's been asked and answered    2:34:35PM

16      also.

17      A.   I'm not.                                    2:34:42PM

18    BY MR. GROSSMAN:                                   2:34:45PM

19      Q.   In this case, are you purporting to offer   2:34:45PM

20   the court opinions regarding the similarity of

21   "Totem" to "Stranger Things" based on the content of

22   the "Totem" script?

23          MR. OSHER:  Overbroad.  Vague and           2:35:10PM

24      ambiguous.

25      A.   All of my opinions are in my report.  And  2:35:20PM
```

Page 103

```
 1     so as part of this, I reviewed the visual words, and
 2     to the extent that those visual words were
 3     representations of occurrences or characters or tone
 4     or plot or other aspects of the script, I then went
 5     back to the script and read the script so I could
 6     understand what those images were intended to
 7     represent and then opined on the similarities
 8     between -- similarities between the elements that
 9     are referenced in Plaintiff's-- the "Totem" concept
10     are elements in the scenes of "Stranger Things."
11          MR. GROSSMAN:  Could I have the question       2:36:17PM
12        read back, please.
13          (Requested portion read back.)                 2:36:40PM
14          MR. OSHER:  Do you want him to answer that      2:36:46PM
15        again?
16          A.   My answer was that I reviewed the visuals  2:36:53PM
17     that were provided to me, and those visuals
18     represented occurrences or characters or themes or
19     tone or mood, setting in that -- that were part of
20     the "Totem" script.  I then reviewed the "Totem"
21     script so I could understand what -- so I could
22     understand in full what those visuals referred to.
23     And then I opined on which aspects of the "Totem"
24     script were -- script and visuals were reflected in
25     the -- in "Stranger Things."
```

Page 104

```
 1        BY MR. GROSSMAN:                              2:37:43PM

 2           Q.   Is the answer yes, Mr. Sedlik?        2:37:43PM

 3           A.   You didn't identify the entire universe, 2:37:49PM

 4   so I'm not going to say yes to that question,

 5   because your question implies that the "Totem"

 6   script is the only thing that I considered.

 7           Q.   No, it does not.                      2:37:59PM

 8           A.   It does to me.                        2:38:00PM

 9           Q.   Well, you are incorrect.  Now you have 2:38:03PM

10   been clarified.

11           Is the answer to my question, did you rely 2:38:06PM

12   on the "Totem" script in order to conclude that

13   there is similarities between "Totem" and

14   "Stranger Things," yes?

15           MR. OSHER:  It's been answered twice now   2:38:20PM

16        and I would appreciate if you wouldn't argue

17        with the witness.

18           If you have something different to add,    2:38:28PM

19        you can, Mr. Sedlik.

20           A.   To inform my understanding of the visuals, 2:38:35PM

21   I reviewed the 2013 script, and other scripts, and

22   so in part based my opinion on all the information

23   available to me, and one of those things was the

24   scripts.

25
```

Page 105

```
 1      question directly and honestly.  Can you please do

 2      that?

 3          A.   I believe I've done so throughout this        2:51:44PM

 4      deposition.  And the selection and arrangement of

 5      sequences and the scenes within them and events

 6      within the plot, the arc of the protagonist -- or

 7      multiple protagonists here actually, but the

 8      antagonist and protagonist and all their

 9      interactions is part of the selection and

10      arrangement.  In addition to determinations of what

11      the characters are, where things take place

12      physically, where things -- when things take place

13      within the script.

14          I mean, this is what my training was at          2:52:47PM

15      the college level when I received my film education.

16          Q.   You say that you determined the similarity   2:52:58PM

17      of theme from artwork or was that from reviewing the

18      "Totem" screenplay?

19          A.   Well, I think that the artwork, or I know    2:53:21PM

20      that the artwork is a representation of the

21      events -- it's a visual representation of events and

22      occurrences that are in the script or screenplay.

23      And so I don't quite understand the question how to

24      delineate those.  But the theme is a -- is a general

25      concept of -- how do I put it?  It's something that
```

Page 114

```
1         A.   So I'm just relying on you reading from my      3:28:29PM

2    report because that's not the current exhibit that's

3    displayed to me.  I'm currently looking at

4    Exhibit 54, so I will just rely on your

5    representation that you are reading from that

6    document and -- or from my report, from the

7    materials considered list.
```

```
8              So I don't recall any particular document      3:28:50PM

9    with specificity.  The deposition transcripts I

10   believe that I would agree that I received all

11   those.  I just don't know when I received them.  In

12   these cases there's usually ongoing production after

13   the time that I initially receive document, and so,

14   for example, if a deposition is taken, I might not

15   have received it in the initial round, but when it's

16   taken, when transcript is provided to retaining

17   counsel, they'll provide it to me as they go.

18             Of course, I don't know what I didn't          3:29:19PM

19   receive, but counsel never refused to provide me

20   something that I requested.

21        Q.   Were there any specific documents that you     3:29:34PM

22   were advised to focus on aside from the 2013 version

23   of the "Totem" script?

24        A.   I don't believe so.  I don't recall being      3:29:57PM

25   directed to focus on any particular document.  But I
```

```
 1        But in the context at the selection and arrangement

 2        of the dozens of other similar aspects was worthy of

 3        mention.

 4            Q.   So are you combining, in your selection      3:49:22PM

 5        and arrangement conclusion, literary elements and

 6        visual elements?

 7              MR. OSHER:  Objection.  It's overbroad.        3:49:37PM

 8          And compound.

 9            A.   I'm just trying to recall.  I think I       3:49:54PM

10        reversed my -- my previous testimony.  So that

11        garden gnome appeared in -- or was in the "Totem"

12        script.  The mention -- I'm confused as to which one

13        it was.  I think there's an appearance of a garden

14        gnome in "Stranger Things."  There's no appearance,

15        I think, of a garden gnome in "Totem."  I think

16        that's corrected.  That's -- that's correct.

17              And then to answer your question now, I'm       3:50:36PM

18        sorry, I just had to correct that.

19              So, as I mentioned before, I was asked to       3:50:45PM

20        review the visual representations of the concepts in

21        "Totem," and in order to inform my understanding of

22        those visual representations, I had to go back to

23        what they represented, which is the script, and a

24        review of that script.

25
```

Page 142

```
 1            A.   It wasn't my complete testimony.        3:52:52PM

 2            Q.   Okay.  So you've got something to add to 3:52:54PM

 3       that.  What is that?  What are you adding to that?

 4            A.   No, I don't have --                      3:52:58PM

 5                 MR. OSHER:  Objection.  Argumentative.   3:52:59PM

 6            Harassing.

 7            A.   I don't have anything to add to that, but, 3:53:02PM

 8       again, you know, I've done a lot of talking here

 9       today, and it helped to my understanding of

10       characters, plot, theme, mood, tone, and

11       Mr. Kennedy's selection and arrangement of all the

12       elements of -- in his story, many of which are

13       reflected in "Stranger Things."  Not all of which,

14       but --

15         BY MR. GROSSMAN:                                 3:53:32PM

16            Q.   Again, you're not providing a literary   3:53:32PM

17       expert analysis in this case, right?

18                 MR. OSHER:  Were you finished with your  3:53:37PM

19            answer, Mr. Sedlik?

20            A.   I think I got the idea across.           3:53:48PM

21                 MR. OSHER:  Okay.                        3:53:55PM

22            A.   Counselor, can you ask that question     3:53:55PM

23       again.

24         BY MR. GROSSMAN:                                 3:53:57PM

25            Q.   Yes.  Again, you are not providing a     3:53:58PM
```

Page 144

```
 1        literary expert opinion in this case, right,

 2        Mr. Sedlik?

 3               MR. OSHER:  Asked and answered,          3:54:08PM

 4          repeatedly.

 5          A.   There's a literary aspect to the opinions.   3:54:12PM

 6        I start from the visual art.  To understand the

 7        visual art and what it represents, I go back to the

 8        story as it's represented in the visual art and

 9        around those representations, there's -- the visual

10        art is a snapshot of -- of an occurrence or a

11        character or a setting and -- and to inform my

12        understanding of that and how it fits into the

13        overall picture, I have to go back to the script.

14        And I went back to the script.  I'm not -- and the

15        script is a -- is a literary representation of a

16        story.

17          BY MR. GROSSMAN:                              3:55:07PM

18          Q.   Right.  So when you were looking at the   3:55:07PM

19        "Totem" concept art, you went back to the script to

20        see the place in that script that related to the

21        specific image that you were looking at, right?

22          A.   More than the place in the script.  That   3:55:30PM

23        would suggest that there's a pinpoint location in

24        the script.  Whereas if it's a concept art for

25        setting, I need to read around that setting.  You
```

Page 145

1       know, where is this location, what is this house,

2       what is this shed, what are the occurrences in the

3       shed and so on.  And that, as is mentioned in my

4       report, those opinions determine -- or those

5       opinions are on what aspects of "Totem," starting

6       with the visual, going back to the script and

7       circling back to "Stranger Things," then show up in

8       "Stranger Things."

9            Q.   Mr. Sedlik, do you know that even though        3:56:33PM

10      the Duffers originally titled their series

11      "Montauk," Mr. Kennedy believes that the Duffers

12      took the title "Stranger Things" from his screenplay

13      "Totem"?

14           A.   I did see somewhere in the script a            3:57:07PM

15      reference to "Stranger Things."  I didn't base my

16      opinion at all on that.

17           Q.   Are you aware that Mr. Kennedy is claiming     3:57:13PM

18      that?

19                MR. OSHER:  Objection.  Asked and             3:57:17PM

20           answered.

21           A.   As I mentioned, I saw in the script but        3:57:22PM

22      didn't base any of my opinions in this matter on it

23      and --

24        BY MR. GROSSMAN:                                       3:57:28PM

25           Q.   Mr. Sedlik, Mr. Sedlik, please focus on my    3:57:28PM

                                                         Page 146

| | | |
|---|---|---|
| 1 | A.    I do. | 4:00:30PM |
| 2 | Q.    And have you been promised any additional | 4:00:33PM |
| 3 | compensation in this case if there is a positive | |
| 4 | financial outcome for the Plaintiff? | |
| 5 | A.    Not in this case or any other case.  That | 4:00:43PM |
| 6 | would be -- | |
| 7 | Q.    Okay. | 4:00:46PM |
| 8 | A.    Improper and -- | 4:00:46PM |
| 9 | Q.    Okay.  Please answer the question and -- | 4:00:46PM |
| 10 | MR. OSHER:  Let him finish his answer. | 4:00:52PM |
| 11 | MR. GROSSMAN:  No, Mr. Osher.  He's not | 4:00:54PM |
| 12 | answering -- | |
| 13 | MR. OSHER:  Finish your answer, | 4:00:56PM |
| 14 | Mr. Sedlik.  He interrupted you again. | |
| 15 | MR. GROSSMAN:  No. | 4:01:00PM |
| 16 | BY MR. GROSSMAN: | 4:01:00PM |
| 17 | Q.    Mr. Sedlik, have you issued bills to the | 4:01:00PM |
| 18 | Plaintiff or its counsel in this case? | |
| 19 | A.    Finishing my prior answer, I -- none of my | 4:01:08PM |
| 20 | compensation in any case in 20-something years has | |
| 21 | been contingent on, based on, or in any way related | |
| 22 | to the outcome of litigation for a client.  This is | |
| 23 | stated in my -- in my report.  And so my answer to | |
| 24 | your question is no, but that was the rest of my | |
| 25 | answer.  So can you -- | |

Page 149

```
 1          Q.   Right.  Right.  Right.  Because you charge    4:01:34PM

 2     by the hour, right, Mr. Sedlik?

 3          A.   Yes.                                          4:01:41PM

 4          Q.   Okay.  And you've issued bills in this        4:01:42PM

 5     case to the Plaintiff, right, Mr. Sedlik?

 6          A.   Correct.                                      4:01:46PM

 7          Q.   How much have you charged the Plaintiff       4:01:47PM

 8     for your time by the hour in this case?

 9          A.   I have no idea, Counselor.  I don't deal      4:01:54PM

10     with that.  I have a bookkeeper that deals with

11     that.

12          Q.   Who inputs your time?                         4:01:59PM

13          A.   My bookkeeper, Counselor.                     4:02:04PM

14          Q.   How does your bookkeeper know how many        4:02:06PM

15     hours you have spent on this case?

16          A.   I provide her with that information.  I       4:02:10PM

17     did not receive a subpoena duces tecum from you to

18     provide --

19          Q.   Mr. Sedlik, are you answering a question I    4:02:20PM

20     didn't ask?

21          A.   You are cutting me off again and you can't    4:02:22PM

22     cut me off like that.

23          Q.   Mr. Sedlik, this deposition has lasted for    4:02:26PM

24     many hours longer than it should have.  Please

25     answer the question that is posed to you and let us
```

Veritext Legal Solutions
866 299-5127

```
 1    keep moving along.

 2              MR. OSHER:  Because you keep cutting him    4:02:35PM

 3         off.  That's why.  And he has to answer the

 4         question two or three times.

 5              MR. GROSSMAN:  Uh-huh.                      4:02:40PM

 6      BY MR. GROSSMAN:                                    4:02:42PM

 7         Q.   Will you please do that, Mr. Sedlik?       4:02:42PM

 8         A.   I provide my time to my staff.  My staff  4:02:49PM

 9    creates invoices and bills.  I don't track it

10    personally.  And I move on with my other business

11    and activity.  So I'm not aware of the amount of

12    time or fees that I have billed in this case.  And

13    you did not ask that I provide that.  Had you asked,

14    I would have provided it.

15              MR. GROSSMAN:  Move to strike everything    4:03:13PM

16         you just said.

17      BY MR. GROSSMAN:                                    4:03:17PM

18         Q.   Mr. Sedlik, Exhibit 145 in front of you    4:03:17PM

19    says, "Hey, Aaron and Steffen.  So we have a

20    question for you guys unrelated to 'Hidden,' believe

21    it or not.  We're developing a look book for our new

22    sci-fi horror series that should be going out to the

23    town shortly and we were thinking it might be nice

24    to have some accompanying concept art."

25              Are you aware, Mr. Sedlik, that this is     4:03:44PM
```

Page 151

```
 1        A.   Well, you're telling me that it's not      4:21:01PM

 2   anywhere, but I recall reading that in some --

 3        Q.   No, Mr. Sedlik, my question was, the town  4:21:05PM

 4   in "Stranger Things" is Hawkins, right?

 5        A.   Yes.                                        4:21:09PM

 6        Q.   There is no town identified in "Totem,"    4:21:10PM

 7   right?

 8        A.   There was some testimony it was based on   4:21:26PM

 9   South Bend, Indiana.

10        Q.   I'm not talking about anyone's             4:21:31PM

11   inspirations.  I'm talking about the works

12   themselves, Mr. Sedlik.  Is that what you are basing

13   your opinion on, the works themselves?

14           MR. OSHER:  Objection.  Misstates            4:21:39PM

15      testimony.

16        A.   I mean, it's -- well, there is inferences  4:21:55PM

17   you can make from the information about the setting.

18     BY MR. GROSSMAN:                                   4:22:03PM

19        Q.   Okay.                                      4:22:03PM

20        A.   There's -- wait.  Let me finish my answer. 4:22:03PM

21   I'm sensitive to time.  But there's a rail yard.

22   There's a FBI station.  You know, so in the same way

23   that in "Stranger Things," it's not a tiny,

24   one-street town.

25
```

Page 163

```
 1      by the Duffers to create "Stranger Things"?

 2           A.   I haven't testified that any particular    4:44:17PM

 3      image was appropriated by the Duffers.

 4               MR. GROSSMAN:  Move to strike.              4:44:24PM

 5        BY MR. GROSSMAN:                                   4:44:26PM

 6           Q.   Mr. Sedlik, your report states that the   4:44:26PM

 7      similarities between "Totem" and "Stranger Things"

 8      are uncanny and are indicative of Defendants'

 9      appropriation of Plaintiff's selection and

10      arrangement of elements from "Totem."

11               Do you believe that the Duffer brothers    4:44:44PM

12      took this image on Exhibit 9 of the Lynx Valley and

13      appropriated it to create "Stranger Things"?

14           A.   I need to point out that you're           4:44:55PM

15      mischaracterizing and misstating my opinions in my

16      report.  Because you've just purposefully omitted

17      the lead-in to this sentence, which says the

18      quantity -- the quantity and combination -- I don't

19      know if I mentioned selection arrangement --

20      quantity and combination of the similarities between

21      the elements, not any one picture.  In fact, I've

22      testified here today that I've not come to the

23      opinion, nor have I been asked to, nor will I, about

24      substantial similarity between any one image and any

25      other image.
```

Page 171

```
1        Q.   Is the answer no?                      4:45:48PM

2        A.   Can you ask the question again?  I'm   4:45:58PM

3   sorry.

4        Q.   Have you forgotten the question,       4:46:01PM

5   Mr. Sedlik?

6        A.   I did my best to answer it.  It's a, you  4:46:03PM

7   know -- it's a nuanced question, so I need to be

8   careful to provide you with the best, most truthful

9   and complete responses to your questions, and I'm

10  doing so.

11       Q.   I don't agree that you need to be careful  4:46:21PM

12  to provide a truthful answer.

13            Mr. Sedlik, the top image, Lynx Valley, on  4:46:26PM

14  Exhibit 9, do you believe that image was

15  appropriated by the Duffers to recreate

16  "Stranger Things"?

17            MR. OSHER:  Object to the preamble.  It's  4:46:39PM

18       argumentative and harassing.  Asked and

19       answered.

20       A.   I haven't expressed any opinion about any  4:46:44PM

21  particular image's similarity to anything in

22  "Stranger Things."

23   BY MR. GROSSMAN:                                 4:46:51PM

24       Q.   Right.  What you've said is that there's a  4:46:51PM

25  combination of similarities that leads to you
```

Page 172

```
 1        believe that the Duffers appropriated those things

 2        from "Totem" and put them in "Stranger Things."

 3        Isn't that your opinion in this case?

 4              MR. OSHER:  Misstates testimony.        4:47:04PM

 5           Misstates the evidence.

 6           A.   In combination.                       4:47:20PM

 7        BY MR. GROSSMAN:                              4:47:23PM

 8           Q.   What in combination, Mr. Sedlik?      4:47:23PM

 9           A.   It's what I've already testified.  It's   4:47:35PM

10        quantity and combination of similarities, when you

11        look at the various aspects of "Totem" that appear

12        in "Stranger Things" from plot and themes and

13        settings and mood and everything mentioned in my

14        report.  Not any one photograph.

15           Q.   Is there anything in "Stranger Things"   4:48:23PM

16        that leads you to believe that this image of the

17        Lynx Valley was appropriated by the Duffer brothers?

18              MR. OSHER:  Same objections.  Asked and   4:48:43PM

19           answered.  I haven't opined that it was.

20        BY MR. GROSSMAN:                              4:49:04PM

21           Q.   Okay.  Look at the next page, please.   4:49:04PM

22              This is an image of a Blackwolf Indian.   4:49:07PM

23        Is there anything in "Stranger Things" that leads

24        you to believe that the Duffer brothers appropriated

25        this image of concept art from "Totem"?
```

Page 173

1          A.    In combination of all the other elements      4:49:42PM

2     from "Totem" that are reflected in

3     "Stranger Things."

4          Q.    Well, I'm trying to figure out what the      4:49:56PM

5     combination of elements is, Mr. Sedlik.   Is this

6     image part of that combination of elements?

7          A.    In combination with all the other      4:50:06PM

8     elements.   For example, these Blackwolf Indians are

9     similar within the plot and the characters to

10    Demogorgon and others that act as minions of -- of a

11    Mind Flayer.   And there is actual artwork of the

12    Mind Flayer that looks very similar to artwork of

13    Azrael.

14         Q.    What season was the Mind Flayer in,      4:50:47PM

15    Mr. Sedlik?

16         A.    I suppose you could say he is represented      4:50:59PM

17    in all seasons because he ultimately is controlling

18    the Demogorgons.   They're acting as his minions.

19         Q.    I'm asking about visuals, what season can      4:51:22PM

20    you see with your eyeballs the Mind Flayer,

21    Mr. Sedlik?

22              MR. OSHER:   Objection.   Argumentative.      4:51:33PM

23         A.    I don't have the seasons memorized, but I      4:51:35PM

24    don't know that it was season one.   It might have

25    been season two.

                                                 Page 174

```
 1      looked like visually this Blackwolf Indian taken in

 2      isolation.

 3        BY MR. GROSSMAN:                            4:56:45PM

 4          Q.   Okay.  Incidentally, the list that you  4:56:45PM

 5      have on pages 18 and 19 of your expert report,

 6      Mr. Sedlik, you know the list that we were just

 7      going through?

 8          A.   Yes.                                 4:57:01PM

 9          Q.   Is there anything on that list that you  4:57:05PM

10      added that the Plaintiff hadn't already claimed was

11      a similarity between "Totem" and "Stranger Things"?

12          A.   I need to go through the list to try and  4:57:34PM

13      make that determination.

14          Q.   As you sit here right now, you can't think  4:57:40PM

15      of anything, right?

16          A.   I need to read these bullets.  And then --  4:57:44PM

17          Q.   We'll go back to that exhibit.  As you sit  4:57:47PM

18      here right now, you can't think of anything, right?

19          A.   You are not allowing me to read -- you  4:57:52PM

20      said is there anything on the list, which means I

21      have to look at the list, which begins with, for

22      example, and there are dozens of other plot points,

23      character traits, and other similarities that are

24      not in this list.  These are examples.

25          Q.   Mr. Sedlik, we're going to go back to that  4:58:09PM
```

Page 178

```
 1        connection with the creation of "Stranger Things"?

 2              MR. OSHER:  The question is vague and         5:16:56PM

 3           ambiguous.

 4              A.   Well, the image is reminiscent of, and I   5:17:02PM

 5        didn't base my opinion in my report on this

 6        particular, but the image is reminiscent of a scene

 7        in "Stranger Things" where they're in some part of

 8        the upside-down or some Vecna world and Vecna's got

 9        one of characters up against a -- some kind of

10        similar object.  Perhaps it's in kind of, like, a

11        Mars-like environment.  It's in a later -- late in

12        the series.

13              But, I mean, my opinions are, as expressed   5:17:39PM

14        in my report, is that the -- it's the combination

15        and quantity of the selection and arrangement of the

16        elements that are reflected -- elements from "Totem"

17        that are reflected in "Stranger Things."

18        BY MR. GROSSMAN:                                   5:17:57PM

19              Q.   And, Mr. Sedlik, this is not one of the   5:17:57PM

20        images that you based your opinion on, right?

21              A.   Well, I did review the image, but my     5:18:11PM

22        opinion is not directly based on any one image.

23              Q.   I didn't say that, Mr. Sedlik.  Do you   5:18:21PM

24        have my question in mind?

25              A.   Yes.                                     5:18:27PM

                                                     Page 190
```

```
 1    assignment, to make those types of determinations.

 2         Q.   Mr. Sedlik, again, you stated that the       5:27:48PM

 3    elements in "Stranger Things" caused you to believe

 4    that Defendants appropriated elements from "Totem."

 5              My question is, is this one of elements       5:28:03PM

 6    you believe the Duffers appropriated from "Totem"?

 7              MR. OSHER:  Objection.  It's overbroad.       5:28:11PM

 8         It's outside the scope of this witness's

 9         designation.

10         A.   My opinion in my report was that the         5:28:22PM

11    selection arrangement in combination of elements in

12    "Totem" is reflected in "Stranger Things."  And you

13    just --

14      BY MR. GROSSMAN:                                     5:28:40PM

15         Q.   I'm asking you about these images.           5:28:40PM

16    Please, Mr. Sedlik, these images.

17              MR. OSHER:  Is there a question pending?      5:28:47PM

18      BY MR. GROSSMAN:                                     5:28:48PM

19         Q.   There is a question pending.                 5:28:48PM

20              Are these images the basis for your claim    5:28:50PM

21    that the Duffers appropriated elements from "Totem"?

22              MR. OSHER:  Same objection.  It's            5:28:57PM

23         overbroad.  Outside the scope of this

24         designation.

25         A.   In "Totem" we have a similar house,          5:29:10PM
```

                                                    Page 196

```
 1    similar location, looking out on a similar shed from

 2    a similar room, and as appears in "Stranger Things."

 3    And when you combine that with dozens of other

 4    elements that appear -- that are in "Totem," and

 5    also reflected in "Stranger Things."

 6        BY MR. GROSSMAN:                                    5:29:44PM

 7        Q.   Are all of those elements listed in your      5:29:44PM

 8    report, Mr. Sedlik?

 9        A.   I don't think so.  That's why I used -- I      5:29:53PM

10    used the term "for example" in -- in my report.

11        Q.   What other elements that were not included    5:30:02PM

12    in your report are the basis for your opinion in

13    this case?

14        A.   So it's my understanding, it's my lay         5:30:22PM

15    understanding that my testimony in the case is going

16    to be limited to what I testified on in my report.

17    But that if I testify about those things here in

18    this deposition, that I would be allowed to testify

19    about them at trial, and I can start -- I can try

20    and give you as many as I can.  But I -- it's up to

21    you.  I can answer the question.

22        Q.   Can you please answer my question,            5:30:49PM

23    Mr. Sedlik?  Do you have it in mind?

24        A.   I do.  So in "Totem," we have the aura of     5:30:58PM

25    a character that floats upward.  In
```

Page 197

```
 1        "Stranger Things," we have Vecna, who, you know,

 2     causes characters to float upwards.

 3             In "Totem," we have dream catchers that        5:31:21PM

 4     glow to indicate the interaction with this alternate

 5     plane or spirit world.  And in "Stranger Things," we

 6     have lights that flicker to indicate the presence.

 7             In "Totem," we have tattoos, butterfly          5:31:50PM

 8     tattoos on the wrist of two characters, and they

 9     compare them.  And then in "Stranger Things," we

10     numerical tattoos, I believe number one and

11     Number 11, where they show them comparing their

12     tattoos on their wrist.

13          Q.   Mr. Sedlik, these are listed in your          5:32:19PM

14     report.  Why don't we go through your report and

15     we'll finish that and then I can ask you the same

16     question.

17          A.   Okay.                                         5:32:32PM

18          Q.   Can we go to the next page of this            5:32:34PM

19     exhibit.

20          A.   Can I ask where we are timewise, just        5:32:39PM

21     because I have to let my wife know.

22             MR. GROSSMAN:  I would guess we have two        5:32:49PM

23        more hours.

24       BY MR. GROSSMAN:                                      5:32:54PM

25          Q.   Do you see those two images?                 5:32:54PM

                                              Page 198
```

```
 1          Q.   And what expertise have you drawn upon to      5:36:50PM

 2     claim that those two things are similar?

 3          A.   This is a great example, because in            5:37:05PM

 4     both -- in both works you have a character who

 5     crashes a car and then becomes -- "possessed" is not

 6     the right word.  I think that might have been your

 7     word -- but falls under the influence of a primary

 8     antagonist in the storyline.

 9          MR. GROSSMAN:  Move to strike as                     5:37:40PM

10        nonresponsive.

11      BY MR. GROSSMAN:                                         5:37:41PM

12          Q.   What expertise of yours, Mr. Sedlik, is        5:37:41PM

13     being applied to compare these two events in two

14     different works?

15          MR. OSHER:  Asked and answered.                     5:37:57PM

16      BY MR. GROSSMAN:                                         5:37:59PM

17          Q.   Are you using your expertise as a              5:37:59PM

18     photographer?

19          A.   I'm using my training and expertise as a       5:38:07PM

20     photographer and educator and -- you know, as I

21     mentioned, you know, I took a film curriculum at the

22     ArtCenter College.  We learned how to structure a

23     story.  We learned how to structure a screenplay and

24     a script.  We learned how to storyboard.  We were in

25     the whole process -- I learned cinematography and
```

Page 201

1      film lighting.

2             And when I teach creative concepting to      5:38:31PM

3      photography students, we go first to the written

4      word and we come up with our fundamental ideas and

5      themes and the genre for the photograph.  And then

6      we take that and we expand it out and turn it into

7      the equivalent of a treatment, which photographers

8      do now.  Before we do a shoot, we have to create a

9      treatment.  I don't know how that happened, but it's

10     happened over the years.  And then you produce from

11     the treatment.

12            I personally start from the -- translate      5:39:06PM

13     the written word into visual every day that I create

14     photographs.

15           Q.  Mr. Sedlik, you've never drafted a film    5:39:19PM

16     script, right?

17           A.  I wrote -- I wrote scripts in college      5:39:32PM

18     but -- I mean, because that's what we were being

19     trained to do, but I never, as a professional,

20     drafted a film script.

21           Q.  And you've never written a television      5:39:45PM

22     pilot, correct?

23           A.  Correct.                                   5:39:55PM

24           Q.  And you've never directed a fictional      5:39:56PM

25     television series, correct?

Page 202

```
 1     Mr. Kennedy saw "Stranger Things" before I saw

 2     "Stranger Things."  I'm quite certain that had read

 3     "Totem" and then watched "Stranger Things," that I

 4     would have the same opinion, which is that totem

 5     seemed unjustified and out of place.

 6       BY MR. GROSSMAN:                              6:40:05PM

 7         Q.   What season was that in?              6:40:05PM

 8         A.   Geez.  I'm not sure.                  6:40:08PM

 9         Q.   Whose room was that in?              6:40:16PM

10         A.   I'd be guessing.                      6:40:26PM

11         Q.   How many seconds was it on the screen? 6:40:27PM

12         A.   I'm not sure.                         6:40:29PM

13         Q.   The garden gnome is something we discussed 6:40:34PM

14     earlier.  In "Totem," the garden gnome isn't a plot

15     device.  It's a portion from a line of dialogue,

16     right?

17         A.   Well, dialogue is part of -- I mean, 6:40:57PM

18     dialogue goes along with all the other elements to

19     support and build the plot.  It has to do with, you

20     know, goals and conflicts and events and all of

21     that.  Dialogue is just part of the equation.  So I

22     can't -- I can't agree with your statement.

23         Q.   Because you think that a garden gnome is a 6:41:23PM

24     plot device in "Totem"?

25             MR. OSHER:  Misstates testimony.        6:41:28PM

                                              Page 227
```

```
 1        Argumentative.

 2        A.   In scripts or in dialogue and films, the      6:41:43PM

 3   dialogue builds the audience's understanding of who

 4   that character is, what they're about, and allows

 5   the audience to connect with or be repulsed by, I

 6   suppose, that character.  It's just part of their --

 7   you know, part of the story, so to speak.  So in

 8   that sense it is.

 9     BY MR. GROSSMAN:                                       6:42:13PM

10        Q.   Well, you are not a literary expert,           6:42:14PM

11   Mr. Sedlik, so you are not testifying as to what

12   plot devices are and what work, right?

13        MR. OSHER:  Objection.  Misstates                   6:42:24PM

14        testimony.  Mischaracterizes the record.

15        A.   Well, I am -- I was trained in college on      6:42:32PM

16   drafting scripts and wrote scripts in college.  But

17   since that time, my -- I've used written

18   descriptions in the storylines and treatments to

19   describe what will ultimately be visual

20   representations consistently throughout a 35-year

21   career.

22     BY MR. GROSSMAN:                                       6:43:07PM

23        Q.   What have you done consistently throughout     6:43:07PM

24   a 35-year career?

25        A.   Worked with the interplay between the          6:43:22PM
```

Page 228

```
1      written words, in other words, literary work,

2      whether there be a brief treatment or concept piece

3      written in prose and translating that into a visual

4      work from the written work.
```

5              That's how visual -- many visual artists          6:43:46PM

6      work.  It's how I work and how I train my students

7      to work and how I was trained to work.

8          Q.   You know that there's a literary expert          6:43:53PM

9      that has been engaged by the Plaintiff in this case,

10     right?

11         A.   I haven't discussed that, but it's my           6:44:05PM

12     general understanding.

13         Q.   Yeah.  Do you know his name?                    6:44:10PM

14         A.   You mentioned it earlier today and I don't      6:44:13PM

15     know his name by heart.  Never met him.  Never spoke

16     with him.  Never communicated with him.  Assuming

17     it's a he.

18         Q.   Never reviewed his report?                       6:44:23PM

19         A.   No.                                              6:44:24PM

20         Q.   But literary analysis is his job; that's         6:44:26PM

21     your understanding, right?

22              MR. OSHER:  Objection.  It's overbroad.          6:44:33PM

23         It's vague.

24         A.   My job is described in the paragraph that        6:44:36PM

25     you read earlier.  I don't know what -- I haven't

                                                        Page 229

```
 1      Nerowe is poked with the red pin.

 2          Q.   I don't remember that scene.  Is that in a      6:56:32PM

 3      visual somewhere?

 4          A.   It's in the script.                             6:56:35PM

 5          Q.   So for this comparison, you were using the      6:56:40PM

 6      script to compare "Totem" to "Stranger Things"?

 7              MR. OSHER:  Objection.  Misstate                 6:56:48PM

 8          testimony.  Misstates the report.

 9          A.   My role here was to start from the              6:56:50PM

10      visuals, and then to further investigate by

11      reviewing the script to inform my understanding of

12      the interplay between the visual -- the visuals that

13      represented concepts in plot and character,

14      et cetera, in the script, and to opine on that

15      relationship, how it reflected similarities with

16      aspects of "Totem" that are reflected in

17      "Stranger Things."

18       BY MR. GROSSMAN:                                        6:57:23PM

19          Q.   The next bullet is "the monster's control       6:57:27PM

20      over Jackson in 'Totem' is reflected in the

21      monster's control over Will in 'Stranger Things.'"

22              When you say the monster in "Totem," are         6:57:38PM

23      you referring to Azrael?

24          A.   Yes.  Control is -- you know, when you --       6:57:47PM

25      watching either one -- or reading the script for
```

                                                      Page 236

```
 1        it's not actual income or compensation.

 2              Q.    Is that sort of, like, an evergreen        7:15:07PM

 3        retainer?

 4              A.    I suppose.  It doesn't get replenished and  7:15:11PM

 5        I just apply it against the final invoice in the

 6        matter and refund the balance.

 7              Q.    I see.  And you're saying that you haven't   7:15:17PM

 8        used yet?

 9              A.    I will not use it until I am terminated,    7:15:22PM

10        and that could be, you know, if the matter were to

11        settle or if it goes to trial and I'm done and I get

12        dismissed.

13              Q.    Okay.  We went over in your report,         7:15:39PM

14        Exhibit 150, that list of items that you put

15        together and the bullet points.  Do you know if any

16        of those items were elements that you came up with

17        on your own and that were not already in the First

18        Amended Complaint or one of the other comparisons

19        that Mr. Kennedy had created?

20              A.    When we were reviewing them, I was trying   7:16:09PM

21        to keep up with your questions and I wasn't

22        contemplating where those items came from as we were

23        reviewing them.  So I would have to go back with

24        them.  As you know, I also began to recite other

25        similarities that were not within the examples.  And
```

Page 242

1       at a certain point, you cut me off and we moved on.

2               Q.   Well, as you sit here and after going          7:16:38PM

3       through that list of a couple dozen, can you think

4       of any that you came up with that were new to

5       Mr. Kennedy?

6               MR. OSHER:   Objection.  Asked and            7:16:53PM

7          answered.

8               A.   We're in the same predicament that we were     7:16:59PM

9       before.  Now we've been through the list and I was

10      very focused on listening to your questions and

11      providing answers and not thinking about whether or

12      not those exact topics were stated in the Complaint.

13      So I don't know which of those came from my review

14      of the script and the documents and materials and my

15      watching "Stranger Things."  Certainly, they all --

16      anything that's in my report I confirmed by actually

17      watching "Stranger Things," reading the -- looking

18      visuals and reading the script.  But we would need

19      to make a pass through to make that determination,

20      of which I'm will to go do if there's still time

21      left.

22        BY MR. GROSSMAN:                                    7:17:47PM

23              Q.   Well, we just went through it.  I would        7:17:47PM

24      rather not go through it again.  I'm just asking if

25      you have in your head right now any elements that

                                                    Page 243

```
 1                    CERTIFICATE OF OATH
 2
 3
 4
 5            I, the undersigned authority, certify
 6    that JEFFREY SEDLIK remotely appeared before me
 7    and was sworn on the 5th of December, 2022.
 8              Signed this 7th day of December, 2022.
 9
10
11
12            KIMBERLY FONTALVO, RPR
              Notary Public, State of Colorado
13            My Commission No. 20214007135
              Expires: 2/23/2025
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 246

```
 1                    CERTIFICATE OF REPORTER

 2

 3      STATE OF COLORADO

 4

 5             I, KIMBERLY FONTALVO, Registered

 6      Professional Reporter, do hereby certify that I

 7      was authorized to and did stenographically report

 8      the foregoing remote videotaped deposition of

 9      JEFFREY SEDLIK; that a review of the transcript

10       was requested; and that the transcript is a true

11       record of my stenographic notes.

12             I FURTHER CERTIFY that I am not a

13      relative, employee, attorney, or counsel of any

14      of the parties, nor am I a relative or employee

15      of any of the parties' attorneys or counsel

16      connected with the action, nor am I financially

17      interested in the action.

18             Dated this 7th day of December, 2022.

19

20

21

22

23

24             KIMBERLY FONTALVO, RPR, CLR

25

                                            Page  247
```

```
 1    JEFFREY SEDLIK

 2    expert@sedlik.com

 3                                    DECEMBER 7, 2022

 4    RE: IRISH ROVER ENTAINMENT V. SIMS

 5    DECEMBER 5, 2022, JEFFREY SEDLIK, JOB NO. 5604932

 6    The above-referenced transcript has been

 7    completed by Veritext Legal Solutions and

 8    review of the transcript is being handled as follows:

 9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10        to schedule a time to review the original transcript at

11        a Veritext office.

12    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13        Transcript - The witness should review the transcript and

14        make any necessary corrections on the errata pages included

15        below, notating the page and line number of the corrections.

16        The witness should then sign and date the errata and penalty

17        of perjury pages and return the completed pages to all

18        appearing counsel within the period of time determined at

19        the deposition or provided by the Code of Civil Procedure.

20    __ Waiving the CA Code of Civil Procedure per Stipulation of

21        Counsel - Original transcript to be released for signature

22        as determined at the deposition.

23    __ Signature Waived - Reading & Signature was waived at the

24        time of the deposition.

25
```

Page 248

1    _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2       Transcript - The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, noting the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page  249

# Exhibit B

ERRATA

**DEPOSITION OF JEFFREY SEDLIK**

**December 6, 2022**

**Irish Rover Entertainment Inc v Aaron Sims et al.**

I, Professor Jeffrey Sedlik, have read the transcript of my testimony and the same is true and correct, to the best of my knowledge, with the exception of the corrections noted below:

| PAGE | LINE | DRAFT TEXT | CORRECTED TEXT | REASON |
|---|---|---|---|---|
| 25 | 11 | reply | replies | Transcription Error |
| 37 | 17 | engagements | engagement | Transcription Error |
| 37 | 20 | similarity | similar | Transcription Error |
| 39 | 17 | Exhibit 2 to declaration | Exhibit 9 to the First Amended Complaint, Page 19, Image 2. | Misspoke |
| 46 | 25 | Matt Duffer Defendants' deposition | Matt Duffer Defendant's deposition | Transcription Error |
| 48 | 20 | works | work | Transcription Error |
| 48 | 22 | via | "via" | Transcription Error |
| 48 | 23 | intermediary with Warner Brothers | intermediary, Warner Brothers | Transcription Error |
| 59 | 9 | put into | put me into | Transcription Error |
| 60 | 1 | ages | images | Transcription Error |
| 67 | 23 | enforcement in civil | enforcment or in civil | Transcription Error |
| 69 | 7 | comparison or that | comparison that | Transcription Error |
| 70 | 16 | objet | object | Transcription Error |
| 78 | 1 | we came to | we were retained to | Transcription Error |
| 90 | 11 | testimony | discovery | Transcription Error |
| 97 | 5 | reading in | reading that in | Transcription Error |
| 99 | 8 | character | characters | Transcription Error |
| 99 | 19 | it's recollection | it's my recollection | Transcription Error |
| 104 | 1 | words | works | Transcription Error |
| 104 | 2 | words | works | Transcription Error |
| 106 | 16 | the interview was mentioned of. Because | the date of the interview was mentioned. Because | Transcription Error |
| 111 | 22 | recalling | recall | Transcription Error |
| 115 | 9 | And the triumph of Will, about the character | And the triumph of will. Not the character Will. | Transcription Error |
| 124 | 22 | response | responding | Transcription Error |
| 126 | 1 | There's no up my sleep sleeve with | There's nothing up my sleeve with | Transcription Error |
| 130 | 7 | time by -- but | time, but | Transcription Error |
| 146 | 21 | saw in | saw that in | Transcription Error |

**DEPOSITION OF JEFFREY SEDLIK**
**December 6, 2022**
**Irish Rover Entertainment Inc v Aaron Sims et al.**

| PAGE | LINE | DRAFT TEXT | CORRECTED TEXT | REASON |
|------|------|------------|----------------|--------|
| 147 | 10 | have not opinion | have no opinion | Transcription Error |
| 148 | 21 | I mean, my office submits invoices, but I don't carry around amongst my various clients the total time spent for every client. | I mean, my office submits invoices, but I don't carry around in my head, amongst my various clients the total time spent for every client. | Transcription Error |
| 155 | 25 | access | assess | Transcription Error |
| 156 | 19 | determined | determine | Transcription Error |
| 166 | 11 | It's you have also reflected later | It's also reflected later | Transcription Error |
| 168 | 21 | i could just be confusion | i could just be confused | Transcription Error |
| 178 | 21 | begins with, for example, and | begins with," for example," and | Transcription Error |
| 180 | 2 | list, that was not a claim similarity | list that was not a claimed similarity | Transcription Error |
| 180 | 22 | was abducted or was -- not abducted. | was appropriated or was not appropriated | Transcription Error |
| 184 | 23 | anything, alternate dimension | any alternate dimension | Transcription Error |
| 185 | 8 | That, I'm sure of. | That, I'm unsure of. | Transcription Error |
| 197 | 2 | and as appears | as appears | Transcription Error |
| 211 | 25 | visual that I | visual, then I | Transcription Error |
| 212 | 22 | of that elements | of the elements | Transcription Error |
| 220 | 8 | I think, from the outside, you know, just summer in the town going --wait, they go through a tree in the forest, | I think, you know, somewhere just outside the town, they go through a tree in the forest, | Transcription Error |
| 222 | 10 | Azrael with goat face. | Azrael with a closed face | Transcription Error |
| 225 | 7 | the 'trenomenan' (phonetic) happened | the phenomenon | Transcription Error |
| 237 | 6 | the underground. | the upside-down. | Transcription Error |

Under penalty of perjury, I declare that I have read this document  and that the facts stated in it are true.

_____

Jeffrey Sedlik, January 2, 2023

# Exhibit C

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3
 4   IRISH ROVER ENTERTAINMENT,
     LLC, A CALIFORNIA LIMITED
 5   LIABILITY COMPANY,
 6            Plaintiff,          No.
                                 2:20-CV-06293-CBM-PLA
 7       vs.
 8   AARON SIMS, AN INDIVIDUAL;
     MATT DUFFER, AN INDIVIDUAL;
 9   ROSS DUFFER, AN INDIVIDUAL;
     NETFLIX, INC., A DELAWARE
10   CORPORATION; NETFLIX
     STREAMING SERVICES, INC., A
11   DELAWARE CORPORATION; 21
     LAPS, INC., A CALIFORNIA
12   CORPORATION; AND DOES 1
     THROUGH 50, INCLUSIVE,
13
              Defendants.
14
15   _____
16
17       VIDEOTAPED DEPOSITION OF JEFFREY KENNEDY
18              Los Angeles, California
19             Tuesday, August 9, 2022
20                    Volume I
21
22
23   Reported by:
     MARIA ELLERSICK
24   CSR No. 10531
     Job No. 5344681
25   PAGES 1 - 299
```

                                              Page 1

```
 1                UNITED STATES DISTRICT COURT
 2               CENTRAL DISTRICT OF CALIFORNIA
 3
 4    IRISH ROVER ENTERTAINMENT,
      LLC, A CALIFORNIA LIMITED
 5    LIABILITY COMPANY,
 6             Plaintiff,          No.
                                   2:20-CV-06293-CBM-PLA
 7        vs.
 8    AARON SIMS, AN INDIVIDUAL;
      MATT DUFFER, AN INDIVIDUAL;
 9    ROSS DUFFER, AN INDIVIDUAL;
      NETFLIX, INC., A DELAWARE
10    CORPORATION; NETFLIX
      STREAMING SERVICES, INC., A
11    DELAWARE CORPORATION; 21
      LAPS, INC., A CALIFORNIA
12    CORPORATION; AND DOES 1
      THROUGH 50, INCLUSIVE,
13
               Defendants.
14
15
16    _____
17
18
19          Videotaped Deposition of JEFFREY KENNEDY,
20    Volume I, taken on behalf of Defendants, at 10100
21    Santa Monica Boulevard, Suite 2200, Los Angeles,
22    California, beginning at 10:06 a.m. and ending at
23    6:35 p.m. on Tuesday, August 9, 2022, before MARIA
24    ELLERSICK, Certified Shorthand Reporter No. 10531.
25
```

                                                        Page  2

Jeffrey Kennedy - August 9, 2022

```
 1    APPEARANCES:
 2    For Plaintiff:
 3          BOREN, OSHER & LUFTMAN, LLP
 4          BY:  JEREMY J. OSHER
 5          Attorney at Law
 6          222 North Pacific Coast Highway, Suite 2222
 7          El Segundo, California 90245
 8          (310) 322-2021
 9          Email:  josher@bollaw.com
10
11    For Defendants:
12          LOEB & LOEB, LLP
13          BY:  DAVID GROSSMAN
14          BY:  SAFIA GRAY HUSSAIN
15          Attorneys at Law
16          10100 Santa Monica Boulevard, Suite 2200
17          Los Angeles, California 90067
18          (310) 282-2000
19          Email:  dgrossman@loeb.com
20
21    Also Present:
22          Wade Gentz
23          Alex Kohner
24    Videographer:
25          Justin Schwartz
```

                                                      Page  3

```
 1                        INDEX

 2

 3   WITNESS                            EXAMINATION

 4   JEFFREY KENNEDY

 5   VOLUME I

 6

 7         BY MR. GROSSMAN                     9

 8

 9

10     QUESTIONS INSTRUCTED BY COUNSEL NOT TO ANSWER

11                    Page     Line

12                    214      25

13                    216      19

14

15                    EXHIBITS

16   EXHIBIT                               PAGE

17   Exhibit 1    Notice of Deposition of
                  Person Most Knowledgeable

18                of Irish Rover Entertainment,
                  LLC                          12

19

     Exhibit 2    Contribution Agreement,

20                dated 12/10/18               24

21   Exhibit 3    USA Today article, "Is
                  'Stranger Things' a

22                rip-off? Aspiring
                  screenwriter sues

23                Netflix, Duffer Brothers
                  for script similarities,"

24                by Cara Kelly,
                  dated 5/25/22               46

25

                                        Page  4
```

Jeffrey Kennedy - August 9, 2022

```
 1    EXHIBITS (Continued):
 2    EXHIBIT                                      PAGE
      Exhibit 4     Plaintiff Irish Rover
 3                  Entertainment, LLC's
                    Responses to Defendant
 4                  Netflix, Inc.'s,
                    Interrogatories (Set One)      60
 5
      Exhibit 5     First Amended Complaint        83
 6
      Exhibit 6     E-mail from Jeff Kennedy
 7                  to Steffen, dated 12/3/13      90
 8    Exhibit 7     Evergreen Films, Inc.,
                    concept art for "Totem,
 9                  A Native American Ghost
                    Story"                         95
10
      Exhibit 8     Thuy Tien Nguyen's
11                  analysis of similarities
                    between "Stranger Things"
12                  and "Totem"                    122
13    Exhibit 9     "Totem, The One Sheet,"
                    Copyright 2012                 136
14
      Exhibit 10    E-mail from Jeffrey
15                  Kennedy to Michael Brown,
                    dated 7/22/13                  165
16
      Exhibit 11    E-mail from Jeffrey
17                  Kennedy to Jan Elkins and
                    others, dated 9/2/12;
18                  attachments; E-mail from
                    Jan Elkins to Jeff
19                  Kennedy, dated 10/26/19        173
20    Exhibit 12    E-mail from Bryan Crocker
                    to Elizabeth Bradley,
21                  dated 11/1/16; attachments;
                    E-mail from Bryan Crocker
22                  to Jeffrey Kennedy,
                    dated 9/18/19                  184
23
      Exhibit 13    E-mails from Jeffrey
24                  Kennedy to Cindy Holland,
                    dated 9/26/17, 8/21/17,
25                  7/5/17, 6/26/17               189


                                            Page 5
```

Jeffrey Kennedy - August 9, 2022

```
 1   EXHIBITS (Continued):
 2   EXHIBIT                                      PAGE
 3   Exhibit 14    E-mail from Jeffrey
                   Kennedy to Cindy Holland,
 4                 dated 10/16/17;
                   attachments                    194
 5
     Exhibit 15    E-mail from Irish Rover,
 6                 JK, to Cindy Holland,
                   dated 12/7/17                   195
 7
     Exhibit 16    E-mail from Jeffrey
 8                 Kennedy to Aaron Sims,
                   dated 11/14/17;
 9                 attachments                     197
10   Exhibit 17    E-mail from Jeffrey
                   Kennedy to Neville
11                 Johnson, dated 11/14/17         204
12   Exhibit 18    E-mail from Jeffrey
                   Kennedy to Cindy Holland,
13                 dated 5/1/19; E-mails from
                   Jeffrey Kennedy to Alex
14                 Kohner, dated 4/30/19,
                   2/19/18, 12/30/17               207
15
     Exhibit 19    E-mail exchange between
16                 Jeffrey Kennedy and Kate
                   Chilton, dated 6/13/19          217
17
     Exhibit 20    E-mail from Jeffrey
18                 Kennedy to Cindy Holland,
                   dated 4/30/19                   223
19
     Exhibit 21    E-mail from Jeffrey
20                 Kennedy to Pierre de
                   Lespinois, dated 7/11/19        226
21
     Exhibit 22    E-mail from Thuy Tien
22                 Nguyen to David Hyman and
                   Kate Chilton re cease
23                 and desist, dated 12/3/19       238
24   Exhibit 23    E-mail from Jeffrey
                   Kennedy to R. Hastings,
25                 dated 12/3/19                   247

                                             Page 6
```

Jeffrey Kennedy - August 9, 2022

```
 1   EXHIBITS (Continued):

 2   EXHIBIT                                    PAGE

 3   Exhibit 24    Concept Art, "Over
                   Thunderbear on Autumn
 4                 and Kim"                      269

 5   Exhibit 25    E-mail exchange between
                   Aaron Sims and the Duffer
 6                 Brothers, dated 9/1/14        270

 7   Exhibit 26    E-mail from the Duffer
                   Brothers to Aaron Sims,
 8                 dated 9/2/14                  271

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 7

Jeffrey Kennedy - August 9, 2022

```
 1    or an aura in your literal words?
 2         A    Yeah.  Yes.  Yeah, you could say that
 3    that's correct, aura, correct.
 4         Q    And when you described "Totem" to potential
 5    producers and potential investors, you told those        11:55:58
 6    people that Autumn, Jackson's wife, sacrifices
 7    herself -- sacrifices her life to Azrael; right?
 8         A    Well, I wouldn't say that I said that
 9    specifically.  In the pitch, I think that that is
10    written in various prospectuses, depending, again,       11:56:18
11    on the year, but I've never specifically made that
12    statement personally.  Is that what you mean or are
13    you talking about the prospectuses?
14         Q    I'm talking about the prospectuses that you
15    put together when you pitched your story.                11:56:31
16         A    Okay.  Yeah.  So could you repeat the
17    question again?  I'm sorry.  I'm --
18         Q    Yes.  When you pitched your story, "Totem,"
19    to third parties that may have been interested in
20    financing or producing your work, you described your     11:56:44
21    story, and you said that Autumn sacrifices her life
22    to Azrael.
23         A    Yes.  Okay.  I follow you.  So in earlier
24    scripts that -- she is taken.  But in later scripts
25    in 2013, she senses that something horrible is          11:57:02
```

Page 72

Jeffrey Kennedy - August 9, 2022

```
1

2

3

4        I, the undersigned, a Certified Shorthand

5    Reporter of the State of California, do hereby

6    certify:

7        That the foregoing proceedings were taken

8    before me at the time and place herein set forth;

9    that any witnesses in the foregoing proceedings,

10   prior to testifying, were placed under oath; that a

11   verbatim record of the proceedings was made by me

12   using machine shorthand which was thereafter

13   transcribed under my direction; further, that the

14   foregoing is an accurate transcription thereof.

15       I further certify that I am neither

16   financially interested in the action nor a relative

17   or employee of any attorney of any of the parties.

18       IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20

21   Dated: August 19 2022

22

23

24                              MARIA ELLERSICK

                                CSR No. 10531

25

                                          Page 296
```

1

2

3                                           August 19, 2022

4    RE: Irish Rover Entertainment,Llc v. Sims, Et Al

5    8/9/2022, JEFFREY KENNEDY, JOB NO. 5344681

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, notating the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23   __ Signature Waived - Reading & Signature was waived at the

24       time of the deposition.

25

                                                          Page 297

Jeffrey Kennedy - August 9, 2022

```
 1    __ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF
 2       Transcript - The witness should review the transcript and
 3       make any necessary corrections on the errata pages included
 4       below, notating the page and line number of the corrections.
 5       The witness should then sign and date the errata and penalty
 6       of perjury pages and return the completed pages to all
 7       appearing counsel within the period of time determined at
 8       the deposition or provided by the Federal Rules.
 9    x Federal R&S Not Requested - Reading & Signature was not
10       requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 298

**Exhibit D**

# ARTWORK COMPARISON - EXHIBIT #1

## AUGUST 1, 2022

## TOTEM:  POSTER (2010)



**MONTAUK:  LOOK BOOK COVER (2014)**



**TOTEM:  POSTER TITLE (2010)**



**MONTAUK:  LOOK BOOK COVER TITLE (2014)**



**STRANGER THINGS:  POSTER AND OPENING TITLE (2016)**



**TOTEM: <u>COPYRIGHTED</u> ILLUSTRATION OF WILDERNESS SURROUNDING LYNX VALLEY**



**STRANGER THINGS: WILDERNESS SURROUNDING HAWKINS, INDIANA**



## TOTEM: <u>COPYRIGHTED</u> ILLUSTRATION OF JACKSON & AUTUMN CHANCE'S BACKYARD



## STRANGER THINGS: JOYCE & WILL BYERS' BACKYARD



## TOTEM: <u>COPYRIGHTED</u> ILLUSTRATION OF AUTUMN CHANCE LOOKING OUT TO BACKYARD



## STRANGER THINGS: WILL BYERS LOOKING OUT TO BACKYARD



**TOTEM: <u>COPYRIGHTED</u> ILLUSTRATION OF AUTUMN CHANCE SEEING A BLACKWOLF IN HER BACKYARD**



**STRANGER THINGS: WILL BYERS' POINT-OF-VIEW SEEING A DEMOGORGON IN HIS BACKYARD**



**TOTEM: <u>COPYRIGHTED</u> ILLUSTRATION OF CHANCE BACKYARD IN THE EARTHLY PLANE**



**TOTEM: <u>COPYRIGHTED</u> ILLUSTRATION OF CHANCE BACKYARD IN THE CARBON COPY PLANE**



**STRANGER THINGS: BYERS BATHROOM IN THE EARTHLY PLANE**



**STRANGER THINGS: BYERS BATHROOM IN THE UPSIDE DOWN**



**TOTEM: <u>COPYRIGHTED</u> ILLUSTRATION OF BLUE TUNNELS IN THE CARBON COPY PLANE**



**STRANGER THINGS: BLUE TUNNELS IN THE UPSIDE DOWN**



## TOTEM: JACKSON & NEROWE IN BLUE TUNNELS OF THE CARBON COPY PLANE

 

## STRANGER THINGS: HOPPER IN BLUE TUNNELS OF THE UPSIDE DOWN

 

## TOTEM: <u>**COPYRIGHTED**</u> ILLUSTRATION OF AZRAEL'S SANCTUARY



## STRANGER THINGS: SHADOW MONSTER'S LAIR



**TOTEM: <u>COPYRIGHTED</u> ILLUSTRATION OF JACKSON CHANCE, WILLIAM NEROWE & KIMI BATTLING AZRAEL**



**STRANGER THINGS: HOPPER & ELEVEN BATTLING SHADOW MONSTER**



**TOTEM: STILL PHOTO OF WOODS IN THE CARBON COPY PLANE
FROM <u>COPYRIGHTED</u> LIVE-ACTION DEMO**



**STRANGER THINGS: HOPPER AND JOYCE IN THE WOODS OF
THE UPSIDE DOWN**



**TOTEM: STILL PHOTO OF LYNX INDIAN BEING ELECTROCUTED BY AZRAEL IN <u>COPYRIGHTED</u> LIVE-ACTION DEMO**



**STRANGER THINGS: JOYCE IS ELECTROCUTED BY SUPERNATURAL CREATURE**



**TOTEM: <u>COPYRIGHTED</u> ILLUSTRATION OF ELK IN WOODS**



**STRANGER THINGS: INJURED DEER IN WOODS**



**TOTEM: STILL PHOTO OF AZRAEL IN THE WOODS OF THE
CARBON COPY PLANE FROM <u>COPYRIGHTED</u> LIVE-ACTION
DEMO**



**STRANGER THINGS: DEMOGORGON IN THE WOODS OF THE
UPSIDE DOWN**



## TOTEM: STILL PHOTO OF AZRAEL IN THE WOODS OF THE CARBON COPY PLANE FROM <u>COPYRIGHTED</u> LIVE-ACTION TEST DEMO



**TOTEM: AZRAEL IN THE WOODS OF CARBON COPY PLANE**



**STRANGER THINGS: DEMOGORGON IN WOODS OF UPSIDE DOWN**



## TOTEM: ILLUSTRATION OF AZRAEL



# TOTEM: ILLUSTRATION OF AZRAEL WITH CLOSED FACE



## TOTEM: STORYBOARD FRAMES OF AZRAEL FOR LIVE-ACTION DEMO (RIGHT HAND EXTENDED)



**STRANGER THINGS: DEMOGORGON (RIGHT HAND EXTENDED)**



## TOTEM'S ILLUSTRATIONS & STORYBOARDS OF AZRAEL ARE BASIS FOR STRANGER THINGS' DEMOGORGON



**AZRAEL CONCEPT ART   +   AZRAEL STORYBOARD   =   DEMOGORGON**

**TOTEM: AZRAEL'S OPEN MOUTH AND TEETH**

 

**STRANGER THINGS: DEMOGORGON'S OPEN MOUTH AND TEETH**



## TOTEM'S ILLUSTRATIONS & STORYBOARDS OF AZRAEL ARE BASIS FOR STRANGER THINGS' DEMOGORGON



AZRAEL CONCEPT ART    +    AZRAEL STORYBOARD    =    DEMOGORGON

## STRANGER THINGS: INITIAL DEMOGORGON SKETCH 1 (2015)



## TOTEM'S ILLUSTRATIONS & STORYBOARDS OF AZRAEL ARE BASIS FOR STRANGER THINGS' DEMOGORGON



AZRAEL CONCEPT ART    +    AZRAEL STORYBOARD    =    DEMOGORGON

## STRANGER THINGS: INITIAL DEMOGORGON SKETCH 2 (2015)



## TOTEM: ILLUSTRATION OF AZRAEL WITH CLOSED FACE



## STRANGER THINGS: DEMOGORGON SUIT (2015)



## TOTEM: ILLUSTRATION OF AZRAEL WITH CLOSED FACE



## STRANGER THINGS: DEMOGORGON SUIT (2015)



## TOTEM: ILLUSTRATION OF AZRAEL



## STRANGER THINGS: DEMOGORGON SUIT (2015)



**TOTEM: STILL PHOTO OF AZRAEL REACHING OUT WITH RIGHT HAND TO ATTACK AUDIENCE IN <u>COPYRIGHTED</u> LIVE-ACTION DEMO**



**STRANGER THINGS: DEMOGORGON REACHING OUT WITH RIGHT HAND TO ATTACK ELEVEN**



**TOTEM: AZRAEL KILLS LYNX FROM STORYBOARDS**



**STRANGER THINGS: DEMOGORGON KILLED BY ELEVEN**



**TOTEM: STILL PHOTO OF AZRAEL EXPANDING IN THE WOODS OF THE CARBON COPY PLANE FROM <u>COPYRIGHTED</u> LIVE-ACTION TEST DEMO**



**TOTEM: <u>COPYRIGHTED</u> ILLUSTRATION OF AZRAEL**



**TOTEM: STORYBOARD FRAMES OF AZRAEL EXPANDING**



**TOTEM: ILLUSTRATION OF AZRAEL EXPANDING IN THE CARBON COPY PLANE (FROM HIS ORIGINS BACKSTORY)**



**TOTEM: ILLUSTRATION OF AZRAEL LOOMING OVER THE CARBON COPY PLANE (FROM HIS ORIGINS BACKSTORY)**



**STRANGER THINGS: SHADOW MONSTER LOOMING OVER THE UPSIDE DOWN**



## TOTEM: POSTER FEATURING AZRAEL, JACKSON CHANCE & 10-YEAR-OLD KIMI (SHAVED HEAD)



**TOTEM: CLOSE UP OF CHARACTERS JACKSON CHANCE & 10-YEAR-OLD KIMI (SHAVED HEAD)**



**STRANGER THINGS: CHARACTERS JIM HOPPER & ELEVEN**




## TOTEM: POSTER FEATURING AZRAEL, JACKSON CHANCE & WIFE AUTUMN CHANCE



**TOTEM: CLOSE UP OF CHARACTERS JACKSON CHANCE & WIFE AUTUMN CHANCE**



**STRANGER THINGS: CHARACTERS JIM HOPPER & JOYCE BYERS**



## TOTEM: WINONA RYDER LIKENESS

 

## STRANGER THINGS: WINONA RYDER



## TOTEM: ILLUSTRATION OF A TOTEM



## STRANGER THINGS: TOTEM IN WILL BYERS' BEDROOM



## TOTEM: ILLUSTRATION OF SAM MILLER DELIBERATELY CAUSING A CAR ACCIDENT



## STRANGER THINGS: BILLY HARGROVE DELIBERATELY CAUSES A CAR ACCIDENT



**TOTEM: AN *AERIAL CAMERA SHOT* IS USED TO SHOWCASE THE VAST FOREST WILDERNESS WHICH SURROUNDS AUTUMN'S VEHICLE**



**STRANGER THINGS: AN *AERIAL CAMERA SHOT* IS USED TO SHOWCASE THE VAST FOREST WILDERNESS WHICH SURROUNDS JOYCE'S VEHICLE. THIS CAMERA SHOT IS ALSO USED FOR HOPPER'S VEHICLE**



**TOTEM: BROTHERS (KIDS) WITH SUPERNATURAL POWERS**



**STRANGER THINGS: SISTERS (KIDS) WITH SUPERNATURAL POWERS (2016)**

 

**TOTEM: BROTHERS (KIDS) WHO MANIFEST BUTTERFLIES**



**STRANGER THINGS: SISTERS (KIDS) WHO MANIFEST BUTTERFLIES (2016)**





**TOTEM: USING HIS SUPERNATURAL POWER, IRON LIGHTNING FIGHTS ADULT WITH ELECTRIFIED SILVERSTICK**



**STRANGER THINGS: DUSTIN HENDERSON FIGHTS ADULT WITH ELECTRIFIED CATTLE PROD**



## TOTEM: RIVERSHADOW PULLS HIS BROTHER IRON LIGHTNING OUT OF A VISION / SEIZURE



## STRANGER THINGS: MIKE WHEELER PULLS HIS FRIEND WILL BYERS OUT OF A VISION / SEIZURE



## TOTEM: RIVERSHADOW IS BELIEVED TO HAVE DROWNED, BUT IS LATER FOUND TO BE ALIVE



**STRANGER THINGS: WILL BYERS IS BELIEVED TO HAVE DROWNED, BUT IS LATER FOUND TO BE ALIVE**







## TOTEM: USING HIS SUPERNATURAL POWER, RIVERSHADOW TRANSFORMS INTO A LYNX



## STRANGER THINGS: LYNX TRANSPORTATION SECRETLY DELIVER MATERIALS TO A HIDDEN UNDERGROUND RUSSIAN BASE



## TOTEM: POSTER (TOP)



## STRANGER THINGS: FOREST DESIGN (2015)



## TOTEM: POSTER (TOP)



## STRANGER THINGS: FOREST DESIGN (2015)



**TOTEM: <u>COPYRIGHTED</u> ILLUSTRATION OF LODGE WHERE WILLIAM NEROWE SWEATS OUT CANCER**



**STRANGER THINGS: CABIN WHERE WILL BYERS SWEATS OUT SHADOW MONSTER**



**TOTEM: ALASKA LOCATION SCOUT PHOTO OF CABIN FOR SWEAT LODGE**



**STRANGER THINGS: CABIN WHERE WILL SWEATS**



**TOTEM: ALASKA LOCATION SCOUT PHOTO FOR SURROUNDING FOREST**



**STRANGER THINGS: HAWKINS, INDIANA SURROUNDING TOWN FOREST**



## TOTEM: WATCHERS IN CAVE



## STRANGER THINGS:  AGENTS IN SUITS FOR CAVE



# Exhibit E

Case 2:20-cv-06293-CBM-DbA Document 92-1 Filed 01/17/23 Page 138 of 166 Page ID
Case 1:16-cv-05439-JPO Document 61 Filed 12/22/17 Page 1 of 29
#:5433

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                             :

GLEN CRAIG,                         :   No. 16 Civ. 5439 (JPO)
                             :

          Plaintiff,         :
                             :

         -against-        :
                             :

UMG RECORDINGS, INC., KINGSID    :
VENTURES, LTD., and ESTATE OF RILEY  :
B. KING,                      :
                             :

         Defendants.       :
                             :
-------------------------------------------------------X

 

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION TO DISQUALIFY JEFFREY SEDLIK**

 

 

 

LOEB & LOEB LLP

Barry I. Slotnick
C. Linna Chen
345 Park Avenue
New York, New York 10154

*Attorneys for Defendants
UMG Recordings, Inc., Kingsid Ventures,
Ltd., and Estate of Riley B. King*

Case 2:20-cv-06293-CBM-PLA Document 92-1 6Filed-01/17/23/1 Page 139 of 166   Page ID
Case 1:16-cv-05439-JPO Document 61 Filed 12/23/17 Page 2 of 29
#:5434

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT .............................................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 3

I.      MR. SEDLIK WAS NEVER RETAINED BY CRAIG ................................................... 3

II.     MR. SEDLIK HAD ONLY PRELIMINARY CONVERSATIONS WITH
        CRAIG AND LIEBOWITZ, AND DISCUSSED ONLY THE
        ALLEGATIONS CONTAINED IN THE PLEADINGS ...................................... 3

        a.      Craig Disclosed Only the Complaint's Allegations to Mr. Sedlik
                During the September 19, 2016 Call ................................................................ 4

        b.      Craig Did Not Discuss This Action with Mr. Sedlik During the
                September 21, 2016 Call ................................................................................. 6

        c.      Craig and Liebowitz Mainly Discussed Mr. Sedlik's Fees and Potential
                Conflict During the September 22, 2016 Call ................................................. 7

        d.      Liebowitz and Mr. Sedlik Never Discussed the Substance of this Case
                During the May 15, 2017 Call ........................................................................ 9

III.    MR. SEDLIK WAS CONTACTED AND RETAINED BY DEFENDANTS
        AFTER THE CLOSE OF FACT DISCOVERY ............................................... 10

IV.     EVEN IF CRAIG'S AND LIEBOWITZ'S ASSERTIONS REGARDING THE
        DISCLOSURES ARE TRUE – WHICH THEY ARE NOT – NO
        CONFIDENTIAL INFORMATION WAS DISCLOSED BY CRAIG ........................ 10

ARGUMENT ........................................................................................................................ 13

I.      LEGAL STANDARD ........................................................................................... 13

II.     NO CONFIDENTIAL RELATIONSHIP WAS ESTABLISHED, AND IT
        WAS NOT OBJECTIVELY REASONABLE TO EXPECT THAT A
        CONFIDENTIAL RELATIONSHIP EXISTED .................................................. 15

III.    CRAIG DID NOT DISCLOSE ANY CONFIDENTIAL INFORMATION
        THAT WOULD BE PREJUDICIAL TO CRAIG ............................................... 18

        a.      Craig Fails To Identify Any Disclosures ........................................................ 18

Case 2:20-cv-06293-CBM-DFM Document 92-1 Filed 01/17/23 Page 140 of 166 Page ID
Case 1:16-cv-05439-JPO Document 61 Filed 12/22/17 Page 3 of 29
#:5435

      b.      Even If Craig's and Liebowitz's Assertions Regarding Craig's
Disclosures Are True – Which They Are Not – Craig Still Fails To
Meet His Burden ............................................................................................19

             1.      The Vague, General Categories Identified By Craig Are
Insufficient .......................................................................................19

             2.      The Information Disclosed Was Not Confidential Or Prejudicial ............20

             3.      Craig's Case Law Is Entirely Inapposite Because He Never
Previously Retained Mr. Sedlik .......................................................21

IV.      PUBLIC INTEREST REQUIRES DENIAL OF THIS MOTION ...................................23

CONCLUSION......................................................................................................................24

Case 2:20-cv-06293-CBM-PLA  Document 22-1  Filed 01/17/23  Page 141 of 166  Page ID
#:5436
Case 1:16-cv-05439-JPO  Document 61  Filed 12/22/17  Page 4 of 29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alien Tech. Corp. v. Intermec, Inc.*,
    No. 3:06-cv-51, 2007 U.S. Dist. LEXIS 89635 (D. N.D. Nov. 30, 2007)..............................22

*In re Ambassador Grp.*,
    879 F. Supp. 237 (E.D.N.Y. 1994) ............................................................................16, 19, 21

*Auto –Kaps, LLC v. Clorox Co.*,
    No. 15 Civ. 1737, 2016 U.S. Dist. LEXIS 37097 (E.D.N.Y. Mar. 22, 2016) ........................14

*Baghdady v. Baghdady*,
    Civ. No. 05CV1494 (AHN), 2007 U.S. Dist. LEXIS 84453 (D. Conn. Nov.
    15, 2007) ............................................................................................................................16

*Eastman Kodak Co. v. Kyocera Corp.*,
    No. 10-CV-6334CJS, 2012 U.S. Dist. LEXIS 132436 (W.D.N.Y. Sept. 17,
    2012) ..................................................................................................................14, 19, 20, 22

*Gordon v. Kaleida Health*,
    No. 08-CV-378S(F), 2013 U.S. Dist. LEXIS 73334 (W.D.N.Y. May 21, 2013)..............15, 20

*Greene, Tweed of Del., Inc. v. DuPont Dow Elastomers, LLC*,
    202 F.R.D. 426 (E.D. Pa 2001) ............................................................................................21

*Hewlett-Packard Co. v. EMC Corp.*,
    330 F. Supp. 2d 1087 (N.D. Ca. 2004) ......................................................................... *passim*

*Koch Refining Co. v. Jennifer L. Bourdreax MV*,
    85 F.3d 1178 (5th Cir. 1996) ..........................................................................................16, 22

*Leonard v. Stemtech Int'l, Inc.*,
    834 F.3d 376 (3rd Cir. 2016) ............................................................................................6, 8

*Moore N. Am., Inc. v. Std Register Co.*,
    No. 98-CV-485C, 2002 U.S. Dist. LEXIS 26488 (W.D.N.Y. June 21, 2002) ......................18

*In re Namenda Direct Purchaser Antitrust Litig.*,
    No. 15 Civ. 7488 (CM), 2017 U.S. Dist. LEXIS 113356 (S.D.N.Y. July 20,
    2017), *adopted in part by*, 2017 U.S. Dist. LEXIS 134047 (S.D.N.Y. Aug. 21,
    2017) ..................................................................................................................................13

Case 2:20-cv-06293-CBM-PLA   Document 92-1   Filed 01/17/23   Page 142 of 166   Page ID
#:5437
Case 1:16-cv-05459-JPO   Document 61   Filed 12/22/17   Page 3 of 29

*In re Namenda Direct Purchaser Antitrust Litig*,
No. 15 Civ. 7488 (CM), 2017 U.S. Dist. LEXIS 134047 (S.D.N.Y. Aug. 21,
2017) ...................................................................................................................14, 15, 22

*Pellerin v. Honeywell Int'l, Inc.*,
No. 11cv1278-BEN (CAB), 2012 U.S. Dist. LEXIS 3781 (S.D.Ca. Jan. 12,
2012) ....................................................................................................................................22

*Wang Labs., Inc. v. Toshiba Corp.*,
762 F. Supp. 1246 (E.D. Va 1991) .....................................................................................15

Case 2:20-cv-06293-CBM-PLA Document 82-1 Filed 01/17/23 Page 143 of 166 Page ID
Case 1:16-cv-05489-JPO Document 61 Filed 11/22/17 Page 3 of 23
#:5438

Defendants UMG Recordings, Inc., Kingside Ventures, Ltd. and Estate of Riley B. King (collectively, "Defendants"), by and through their undersigned attorneys, respectfully submit this memorandum of law in opposition to Plaintiff Glen Craig's motion to disqualify Defendants' expert witness, Jeffrey Sedlik (Dkt. No. 55).

## PRELIMINARY STATEMENT

In an effort to gain a tactical advantage in this case, Craig seeks to disqualify Mr. Sedlik from serving as an expert witness on behalf of Defendants, based solely on the fact that Craig and his attorneys had a total of 4 short, preliminary conversations with Mr. Sedlik regarding this action, prior to his retention by Defendants. Notwithstanding the misleading declarations submitted by Craig and his counsel, Craig's motion to disqualify should fail because there was no confidential relationship, and no reasonable expectation of a confidential relationship between Craig and Mr. Sedlik, and because there is no evidence that Craig disclosed any confidential information to Mr. Sedlik that would be prejudicial to Craig.

Fatal to Craig's motion is the fact that Craig and his attorney seriously misrepresent the factual foundation upon which the motion is built. Craig claims that he had "extensive telephone conferences" with Mr. Sedlik, that he revealed "significant facts, strategies and theory of the case" to Mr. Sedlik, and that as such, he "had a reasonable expectation of confidentiality." Such statements are not true. Craig had no reasonable expectation of confidentiality, because, as explained in detail by Mr. Sedlik, they had only short, preliminary phone calls totaling a little more than an hour, and those phone calls focused on other topics. Moreover, in three of the four conversations that Mr. Sedlik had with Craig and/or his attorney, Richard Liebowitz, Mr. Sedlik specifically stated that he was not comfortable with being retained in this matter by Craig because of an ongoing business relationship that Mr. Sedlik has with the Estate.

Case 2:20-cv-06293-CBM-PLA Document 92-1 Filed 01/17/23 Page 144 of 166 Page ID
Case 1:16-cv-05439-JPO Document 61 Filed 12/22/17 Page 7 of 29
#:5439

Despite the fact that Mr. Sedlik had never been retained by Craig, Craig argues that Defendants' retention of Mr. Sedlik caused Mr. Sedlik to switch sides, and that as such, the retention is a "clear case for disqualification." However, Craig articulates no case for disqualification. Despite asserting that he "explained the whole theory of the case to Mr. Sedlik," Craig fails to identify a single, specific, and unambiguous confidential disclosure that he actually made to Mr. Sedlik. As explained in detail by Mr. Sedlik, he only generally and briefly discussed the allegations contained in the Complaint with Craig and Liebowitz, and thus the information disclosed by Craig and Liebowitz to Mr. Sedlik was known already to Mr. Sedlik through his review of publicly available documents, including the pleadings filed in this case.

Even if Craig's assertions that he disclosed certain information to Mr. Sedlik are true – which they are not – those assertions fail to meet the level of specificity required for disqualification, and such categories of information are in fact, not confidential or prejudicial to Craig. Indeed, Craig disclosed *all* of the information that he alleges to have told Mr. Sedlik in public filings, and to Defendants during the course of discovery, *prior* to Defendants' retention of Mr. Sedlik.

Finally, it should be noted that Mr. Sedlik has been engaged as a damages expert by Defendants. It is patently obvious that the tensions between Mr. Sedlik, Craig and Liebowitz had virtually nothing to do with damages. It seems equally clear that Craig contacted Mr. Sedlik mostly to complain about his lawyer, and that Liebowitz called to discuss *possible* engagement of Mr. Sedlik's expert services notwithstanding Mr. Sedlik's repeated statements that he could not and would not represent Craig in this action. There was simply no reasonable expectation of confidentiality and no sharing of confidential information.

Case 2:20-cv-06293-CBM-JPR Document 22-1 6 Filed 01/17/23 Page 145 of 166   Page ID
Case 1:16-cv-05439-JPO   Document 61   Filed 12/22/17   Page 8 of 29
#:5440

## FACTUAL BACKGROUND

### I.    MR. SEDLIK WAS NEVER RETAINED BY CRAIG

Mr. Sedlik was never retained by Craig or Liebowitz in this matter.  Declaration of Jeffrey Sedlik ("Sedlik Decl."), ¶ 39.  He never sent, signed, nor received any retention agreement, engagement letter, consulting agreement, or confidentiality agreement with Craig or Liebowitz.  *Id.*  Mr. Sedlik was never paid for any time that he spent on this matter by Craig or Liebowitz, and he never produced any preliminary reports or assessments for Craig or Liebowitz on this matter.  *Id.*

### II.   MR. SEDLIK HAD ONLY PRELIMINARY CONVERSATIONS WITH CRAIG AND LIEBOWITZ, AND DISCUSSED ONLY THE ALLEGATIONS CONTAINED IN THE PLEADINGS

Contrary to Craig's representations of "extensive" conferences, Mr. Sedlik's communications with Craig and Liebowitz were limited to four short phone calls for a total of just over an hour and a half,[1] and a few strings of emails discussing non-substantive matters.[2]  In fact, because Mr. Sedlik had no confidential relationship with Craig or Liebowitz, or any reasonable expectation of a confidential relationship with Craig or Liebowitz, when Mr. Sedlik sent Craig an email that Mr. Sedlik wanted Craig to keep confidential, Mr. Sedlik specifically requested that Craig "[p]lease do not forward this message or the attachment" on.  *Id.*, Ex. 2.

---

[1] Mr. Sedlik spoke with Craig on September 19, 2016 for 45 minutes.  Sedlik Decl., ¶ 9. On September 21, 2016, Mr. Sedlik spoke with Craig for 9 minutes.  *Id.*, ¶ 20.  On September 22, 2016, Mr. Sedlik spoke with Craig and Liebowitz for 15 minutes.  *Id.*, ¶ 24.  On May 15, 2017, Mr. Sedlik spoke with Liebowitz for 31 minutes.  *Id.*, ¶ 37.

[2] Though Mr. Sedlik, Craig and Liebowitz exchanged emails, those emails did not touch on the substance of this litigation.  *See id.*, Exs. 1-1, 1-2, 1-3, 2-9.  Rather, the email exchanges focused on setting up the calls, Mr. Sedlik's conflict with being retained by Craig in this action, and information that Mr. Sedlik sent to Craig after Craig expressed dissatisfaction with Liebowitz to Mr. Sedlik, and requested that Mr. Sedlik provide him with, among other things, referrals for alternate counsel.  *Id.*  Neither Craig nor Liebowitz sent Mr. Sedlik any documents or disclosed any confidential information in these email exchanges.  *Id.*

3

Case 2:20-cv-06293-CBM-PLA-JPO Document 83-1 6 Filed 01/17/23 Page 146 of 166   Page ID
Case 1:16-cv-05439-JPO Document 61 Filed 11/23/17 Page 9 of 26
#:5441

a.    **Craig Disclosed Only the Complaint's Allegations to Mr. Sedlik During the September 19, 2016 Call**

Craig and Mr. Sedlik first spoke on September 19, 2016.  *Id.*, ¶¶ 6-9.  The call lasted for 45 minutes, and they discussed a variety of issues.  *Id.*, ¶¶ 9-17.  During that call, Craig gave Mr. Sedlik only a brief summary of the allegations contained in the Complaint.  *Id.*, ¶ 9. Specifically, all Craig told Mr. Sedlik was that "he took multiple photographs of B.B. King, which were used on multiple releases without his knowledge or permission… that the photographs were registered with the U.S. Copyright office, and that while the infringements occurred before the registration, they are still ongoing… that he was seeking damages from UMG." *Id.*, ¶ 9.  All of this disclosed information is contained in the publicly filed complaint. Dkt. No. 1 ("Complaint" or "Cmplt."), ¶¶ 9-56, 62, 72.  Indeed, Mr. Sedlik knew all of this information prior to this conversation with Craig because he had reviewed the Complaint prior to this call.  Sedlik Decl., ¶ 17.

Craig's and Liebowitz's representations of this telephone call to the contrary are entirely false and misleading.

Mr. Sedlik denies that, during this call, he ever:

- Discussed "all aspects of the case" with Craig, Dkt. No. 58, ¶ 7;
- Heard from Craig as to "how [he] ended up taking the photographs, who else was there, who else was around those dates, [his] relationship to Changes Magazine that publishe[d] other photographs that were taken during that session", *id.*;
- Heard from Craig his "theory of the case", *id.*;
- Asked any "questions about [Craig's] employment, commissions, licensing of the images, UMG's exploitation" or any "other questions" relevant to "assess[ing] the damages in this case", *id.*;
- Represented to Craig that he was "eager to teach [Craig and Liebowitz his] method of calculating damages in this case", Dkt. No. 57, ¶ 5;
- Made "a preliminary assessment of damages," gave a "detailed assessment of damages as a preview of [Mr. Sedlik's expert opinion," or "explain[ed] [his] methodology … that exponentially grew the potential damages in this case, *id.*; Dkt. No. 58, ¶¶ 8-9;
- Offered "to speak with [Liebowitz] about [his] method of calculating" damages; *id.*, ¶ 8;

Case 2:20-cv-06293-GRB-PLA Document 82-1 Filed 01/17/23 Page 147 of 166 Page ID
Case 2:18-cv-05439-JPO Document 61 Filed 12/22/17 Page 10 of 29
#:5442

- Heard from Craig as to his explanation of "how [he] measured damages to that point" *id.*;
- Had "lengthy [or] extensive" conversations regarding the substance of this case, Dkt. No. 57, ¶ 5; or
- Held himself "out as a member of the [Craig/Liebowitz] team." Dkt. No. 58, ¶ 9.

*See* Sedlik Decl., ¶¶ 9-17.

Rather, Craig and Mr. Sedlik spent the majority of the 45 minute call discussing other matters. *Id.*, ¶ 15. First, Craig informed Mr. Sedlik that he was interviewing other attorneys to replace Liebowitz, asked for Mr. Sedlik's thoughts on the proposed substitute counsel, asked Mr. Sedlik for a referral for substitute counsel, and asked for Mr. Sedlik's opinion on Liebowitz, including for Mr. Sedlik's knowledge of Liebowitz's experience and background. *Id.*, ¶ 15. After Mr. Sedlik answered all of Craig's questions, Craig requested that Mr. Sedlik send the contact information of the attorney that Mr. Sedlik referred, as well as any information that Mr. Sedlik had on Liebowitz's other cases. *Id.*.

Second, Craig asked for Mr. Sedlik's professional experience and his qualifications as an expert. *Id.*, ¶ 16. Craig requested, and Mr. Sedlik agreed to send a copy of Mr. Sedlik's curriculum vitae for the purpose of sharing his qualifications with Liebowitz. *Id.*

Lastly, Mr. Sedlik advised Craig of a conflict: Mr. Sedlik disclosed to Craig that he had a prior relationship with UMG, and that he has an ongoing business relationship with the Estate, which he felt was a conflict that would prevent his engagement in this action. *Id.*, ¶ 13. The phone call ended thereafter, and Mr. Sedlik followed up by sending Craig the materials and information that Craig requested during the call. *Id.*, ¶¶ 18-19., Exs. 1-1, 1-2, 1-3, 2.

Case 2:20-cv-06293-GRB-PLA Document 22-1 Filed 01/12/23 Page 148 of 166
Case 2:18-cv-05439-JPO Document 61 Filed 12/22/17 Page 6 of 29 Page ID
#:5443

**b.** **Craig Did Not Discuss This Action with Mr. Sedlik During the September 21, 2016 Call**

Craig and Mr. Sedlik spoke for the second time on September 21, 2016.  *Id.*, ¶ 20.  That phone call lasted only nine minutes, during which time Mr. Sedlik and Craig had no substantive conversations regarding this matter.  *Id.*, ¶¶ 20-22.

 Contrary to Craig's and Liebowitz's assertions, Craig and Mr. Sedlik did not discuss "the legal strategies employed in this case", (Dkt. No. 58, ¶ 10), and Mr. Sedlik never offered his legal services, never offered to collect compensation for Craig, never offered to write cease and desist letters, never offered to work for a small fee, never sent Craig's contact information to any attorney, and never recommended any attorney to Craig during that call or set up any meeting for Craig to meet such an attorney (*id.*).  Sedlik Decl., ¶ 20.  Indeed, Mr. Sedlik could not have recommended the attorney to Craig during that call, because he had already recommended that attorney to Craig during the September19, 2016 call, and given that attorney's information to Craig via email prior to this call.  *Id.*, Ex. 1-2.

In fact, the nine-minute conversation focused solely on Craig's choice of counsel, Craig's potential substitution of the attorney in this matter, and whether Mr. Sedlik would, despite having a potential conflict, still be willing to have a call with Craig and Liebowitz regarding this matter.[3]  *Id.*, ¶¶ 20-22.  Mr. Sedlik agreed to speak with Craig and Liebowitz, and the call ended without any discussion of the facts or theories of the case.  *Id.*, ¶ 22.

---

[3] Craig told Mr. Sedlik that Liebowitz had read *Leonard v. Stemtech Int'l, Inc.*, 834 F.3d 376 (3rd Cir. 2016) and was impressed with the dollar amount of damages awarded in that matter.  *Id.*, ¶ 9.  This, of course, is not confidential information.

Case 2:20-cv-06298-GBD-RLP:A Document 23-1 Filed 01/17/23 Page 149 of 166   Page ID
Case 2:16-cv-05439-JFC Document 61 Filed 12/22/17 Page 42 of 59
#:5444

### c.    Craig and Liebowitz Mainly Discussed Mr. Sedlik's Fees and Potential Conflict During the September 22, 2016 Call

On September 22, 2016, Mr. Sedlik spoke to Liebowitz for the first time during a 15-minute conference call with Liebowitz and Craig.  *Id.*, ¶ 24.  They only briefly discussed this action.  *Id.*, ¶ 25.  Liebowitz gave Mr. Sedlik a general summary of the allegations of the Complaint:  he told Mr. Sedlik that "Craig had taken multiple photographs of B.B. King, … that such photographs were used on multiple releases without his knowledge or permission, … that the photographs were registered, that the infringements occurred before the registration but were ongoing, and that Craig was seeking damages, disgorged profits, and statutory damages from UMG."  *Id.*.  Again, this was all information that Mr. Sedlik already knew because he had previously reviewed the Complaint.  *Id.*, ¶¶ 24-25.

Thus, Mr. Sedlik had familiarity with all of this information, as well as with "Craig's work history," "the issues surrounding the registration with the U.S. Copyright Office," and of the "facts surrounding the case, … the legal strategy, potential issues, strengths and weakness of [the] case" (Dkt. No. 57, ¶¶ 7-8) because (a) the conversation at this preliminary consult was at a very general level, (b) the information was contained in the publicly filed complaint, answers, Craig's copyright registration, and publicly available articles containing Craig's work history, and (c) because of Mr. Sedlik's professional background, he has a professional knowledge of photography copyright issues, copyright law, and how they would generally apply to the facts as alleged in the Complaint.  Sedlik Decl., ¶ 26.  Contrary to Liebowitz's assertion, however, Mr. Sedlik did not discuss, because he had not been then made aware of, "how Craig discovered the photographs' exploitation by the Defendants."  *Id.*

Contrary to Craig's assertions, Mr. Sedlik also did not discuss legal "issues like work-for-hire, … the availability of damages and the extent of the exploitation" (Dkt. No. 58, ¶ 14) with

Craig or Liebowitz. Sedlik Decl., ¶ 28. While Mr. Sedlik did discuss the issue of statute of limitations, Mr. Sedlik brought this issue up on the call based upon his reading of the Complaint, Defendants' answers, his review of Craig's registration, and his understanding of copyright law. *Id.* There was no substantive discussion regarding this issue or any other legal issues during the call. *Id.*

In fact, the majority of the 15-minute phone call was devoted to discussion of Mr. Sedlik's background, fees, and potential conflict with the Estate. *Id.*, ¶¶ 27-30. Liebowitz stated that he was interested in retaining Mr. Sedlik as an expert on the issue of damages in this case. *Id.*, ¶ 27. Liebowitz told Mr. Sedlik that he had read *Stemtech*, and asked Mr. Sedlik if he could calculate damages in the same manner as he did in *Stemtech*. *Id.* Contrary to Craig's assertions, (Dkt. No. 58, ¶ 13), Mr. Sedlik did not provide any response with respect to the calculation of damages in this case, or discuss what methodology he would use to calculate damages in this case, because this was a very preliminary consultation, and because, as a business practice, Mr. Sedlik does not make any determinations of calculations or methodology until after he has reviewed all the relevant documents, materials, and testimony produced and filed in that matter. Sedlik Decl., ¶ 27. Rather, Mr. Sedlik simply answered, in very general terms, Liebowitz's basic and broad questions regarding Mr. Sedlik's role and opinions in *Stemtech* and in other matters in which Mr. Sedlik had served as an expert. *Id.*

Liebowitz and Mr. Sedlik then had a detailed conversation regarding Mr. Sedlik's fees, which ended when Liebowitz asked if Mr. Sedlik would work for a flat fee in this matter and Mr. Sedlik declined to do so. *Id*, ¶ 28. Mr. Sedlik also informed Liebowitz that he had a prior business relationship with UMG, and disclosed that he felt he had a potential conflict because he has an ongoing business relationship with the Estate. *Id.*, ¶ 29. Contrary to Liebowitz's and

Case 2:20-cv-06293-GBM-PLA Document 23-1 Filed 01/17/23 Page 151 of 166   Page ID
Case 2:18-cv-05439-JPO Document 61 Filed 12/22/17 Page 14 of 29
#:5446

Craig's assertions regarding Mr. Sedlik's willingness and enthusiasm to be a part of the team and to be retained (Dkt. Nos. 57, ¶ 7, 58, ¶ 13), Mr. Sedlik recalls that he specifically advised Liebowitz and Craig that he was unable to accept the engagement due to the inclusion of the Estate as a defendant, and offered to refer them to another expert. *Id.*, ¶30 . Mr. Sedlik added that he would only consider this engagement if the Estate were dropped as a defendant, and if Craig and Liebowitz were willing to pay his standard fees. *Id.*

> **d.   Liebowitz and Mr. Sedlik Never Discussed the Substance of this Case During the May 15, 2017 Call**

After almost 8 months of no contact with either Craig or Liebowitz regarding this matter, Liebowitz reached out to Mr. Sedlik on May 14, 2017 to discuss a potential retention. *Id.*, ¶ 32. Mr. Sedlik had a call with Liebowitz the following day. *Id.* ¶ 37. During that 31-minute phone call, Mr. Sedlik and Liebowitz did not have any conversations regarding the substance of this action. *Id.* Rather, they spoke only of Mr. Sedlik's conflict with the Estate, and Mr. Sedlik's fees. *Id.* Liebowitz again tried to get Mr. Sedlik to lower his fees, but Mr. Sedlik again refused to do so. *Id.* At that point, Liebowitz told Mr. Sedlik that he would no longer seek to retain Mr. Sedlik as the expert for this matter, and requested a referral for another expert, which Mr. Sedlik provided. *Id.*

The May 15, 2017 call was the last contact that Mr. Sedlik had with either Craig or Liebowitz on this matter. *Id.* Contrary to Craig's and Liebowitz's assertions that Mr. Sedlik was open to working on other cases with Liebowitz and/or Craig, Mr. Sedlik made no statements to that effect. *Id.*, ¶ 38 fn. 8. The only other conversation Mr. Sedlik had with Liebowitz was initiated by Liebowitz, seeking to potentially retain Mr. Sedlik in a different matter. *Id.* Mr. Sedlik declined to be retained in that matter because Liebowitz would not pay his standard fees. *Id.*

Case 2:20-cv-06293-GBM-PLA Document 93-1 Filed 01/17/23 Page 152 of 166 Page ID
#:5447
Case 2:18-cv-05439-JFG Document 61 Filed 12/22/17 Page 25 of 29

## III.   MR. SEDLIK WAS CONTACTED AND RETAINED BY DEFENDANTS AFTER THE CLOSE OF FACT DISCOVERY

Fact discovery closed on May 22, 2017.  Dkt. No. 36.  Defendants contacted Mr. Sedlik for the first time on July 27, 2017.  Sedlik Decl., ¶ 45. On August 25, 2017, Defendants executed a retention agreement with Mr. Sedlik.  *Id.*, ¶ 49.  Thereafter, Mr. Sedlik requested, and Defendants provided, copies of all filings made in this action, and all materials disclosed by all parties in this action during discovery, including all deposition transcripts, interrogatory responses and document productions.  *Id.*, ¶ 50.

On October 13, 2017, Defendants served Craig with Mr. Sedlik's expert report. Declaration of Barry I. Slotnick ("Slotnick Decl."), ¶ 7, Ex. F (the "Report").  As is clearly evidenced by Mr. Sedlik's extensive and numerous citations in the Report to the record, Mr. Sedlik based his opinion and report solely on assumptions provided to him by Defendants' counsel, information disclosed in this action through discovery or public filings, and his experience and expertise in the area of calculating the fair market value of the licenses for the photographs that would have been negotiated for the allegedly infringing uses.  *Id.*, ¶ 53.

## IV.   EVEN IF CRAIG'S AND LIEBOWITZ'S ASSERTIONS REGARDING THE DISCLOSURES ARE TRUE – WHICH THEY ARE NOT – NO CONFIDENTIAL INFORMATION WAS DISCLOSED BY CRAIG

Even if Craig's and Liebowitz's assertions regarding Craig's disclosures are true – which they are not – none of the information Craig disclosed was confidential or prejudicial, because Craig had voluntarily disclosed all of it to Defendants during discovery, *prior to Defendants' retention of Mr. Sedlik* in August 2017, and because Craig voluntarily disclosed at least some of the information to the public by filing the complaint in *Craig v. Getty Images (U.S.), Inc., et al.,* Case No. 17 Civ. 9916 (AJN) ("Getty Complaint") on December 19, 2017, in the United States District Court for the Southern District of New York.

Case 2:20-cv-06293-CBM-PLA Document 23-1 Filed 01/17/23 Page 153 of 166   Page ID
#:5448
Case 2:18-cv-05439-JFW Document 61 Filed 12/22/17 Page 10 of 29

First, Craig's alleged disclosures to Mr. Sedlik regarding "how [he] ended up taking the
photographs, who else was there, who else was around in those days, [his] relationship to
Changes Magazine that publishes[sic] other photographs that were taken during that session" and
"the whole narrative of what happened and … [his] theory of the case" (Dkt. No. 58, ¶ 7) were
also disclosed by Craig in his November 2016 interrogatory responses and during his March
2017 deposition – a deposition that Craig never designated as confidential.  *See* Slotnick Decl.,
Ex. A ("November 2016 Interrogatory Responses") (In response to Interrogatory No. 1,
disclosing how Craig was asked to take the photographs and his relationship to Changes
Magazine, and in response to Interrogatory No. 2, identifying the date and place of Craig's
creation of the photographs); Ex. E ("Craig Depo") at 153:13-20, 154:16-159:19, 161:21-162:6.
Craig similarly disclosed all of the above in the Getty Complaint.  Slotnick Decl., Ex. G, ¶¶ 26-
34.

Second, Craig's answers to Mr. Sedlik's questions regarding "[Craig's] employment,
commissions, licensing of the images" (Dkt. No. 58, ¶ 7) were similarly disclosed by Craig
during his March 2017 deposition and in his January 2017 interrogatory responses, and in the
Getty Complaint.  Slotnick Decl., Ex. C ("January 2017 Interrogatory Responses") (disclosing
Plaintiff's employment history at the time of the taking of the photograph); Craig Depo, 59:11-
71:22, 75:16-80:22, 89:5-16, 205:7-206:11; Ex. G, ¶¶ 24-25.  While Craig's answers regarding
"UMG's exploitations" (Dkt. No. 58, ¶ 7) obviously cannot be information confidential *to Craig*,
he disclosed to UMG such information through his interrogatories and his document production.
January 2017 Interrogatory Responses (disclosing that Craig learned of the alleged infringements
in May-June 2014); Slotnick Decl., Ex. D (Craig contacting UMG in June 2014 to request a list
of CDs of titles that his photographs allegedly appear on); Ex. B (Liebowitz promising to

11

Case 2:20-cv-06293-GBW-PLA Document 93-1 Filed 01/17/23 Page 154 of 166 Page ID
#:5449
Case 2:18-cv-05439-JPO Document 61 Filed 12/22/17 Page 47 of 59

"provide a list of all infringing items along with corresponding information of how and when [Craig] discovered these" in response to Defendants' discovery requests).

Third, Craig's disclosures of "how [he] got assigned to cover the B.B. King event, who took the photographs and gave it to UMG, how many exploitations were found during [his] investigation" (Dkt. No. 58, ¶ 23) were again, disclosed by Craig in his interrogatory responses, document production, during his non-confidential deposition, and in the Getty Complaint. November 2016 Interrogatory Responses (In response to Interrogatory No. 1, disclosing how Craig was asked to take the photographs and his relationship to Changes Magazine, and in response to Interrogatory No. 2, identifying the date and place of Craig's creation of the photographs); Slotnick Decl., Ex. G (identifying how Craig contacting UMG to request a list of CDs of titles that his photographs allegedly appear on); Craig Depo, 38:17-40:11, 197:21-199:3, 212:6-16; Ex. G, ¶¶ 26-34.

To the extent that Craig also alleges that Liebowitz, and Mr. Sedlik "touched on issues like work-for-hire, statute of limitations, the availability of damages and the extent of the exploitation" (Dkt. No. 58, ¶ 14), such statement does not show that Mr. Liebowitz had actually discussed privileged information with Mr. Sedlik. Importantly, Mr. Sedlik denies that any such disclosures ever occurred, and Liebowitz, despite having submitted a declaration in support of Craig's motion (Dkt. No. 57), fail to corroborate that such a conversation took place.

Moreover, neither Craig nor Liebowitz describe, with any specificity, the allegedly privileged and confidential information that Liebowitz disclosed to Mr. Sedlik. Despite asserting that "Mr. Sedlik had been extensively informed of confidential information," Liebowitz's declaration is devoid of any specific disclosures made, and relies solely on inadmissible hearsay

12

Case 2:20-cv-06299-CBM-PLA Document 83-1 Filed 04/17/23 Page 155 of 166 Page ID
Case 2:18-cv-05438-JFW-PLA Document 161 Filed 12/22/17 Page 28 of 29
#:5450

– statements that he heard from Craig regarding Craig's conversations with Mr. Sedlik, as well
as information that was not confidential:

- Craig's work history (Dkt. No. 57, ¶¶ 8, 17) was disclosed by Craig in his interrogatory
  responses and at his deposition, *supra*, 11;

- how Craig discovered the photograph's exploitation (*id.*) was disclosed by Craig at his
  deposition and was known by UMG because UMG aided in such discovery, *supra*, 12;

- the registration with the U.S. Copyright Office (*id.* at ¶ 8) is public knowledge and
  Craig's communications with the U.S. Copyright Office was disclosed during discovery;

- "the exclusivity, rarity and scarcity of B.B. King photographs" (*id.* at ¶ 17) is public
  knowledge in that there are hundreds of thousands of B.B. King photographs;

- "the countries where the exploitation took place" (*id.*) is listed in the Complaint.

To the extent that Craig relies on Liebowitz's assertion that "several data points that inform a
calculation of market value for the photographs" was confidential information that was
disclosed, Liebowitz fails to identify what those data points are, and fails to provide any
evidence to substantiate his claim that those data points are confidential information and were
not disclosed to Defendants during discovery.

## **ARGUMENT**

## I.  **LEGAL STANDARD**

"'[T]he instances of expert disqualification are rare,' and generally 'should not occur
where a confidential relationship existed but no privileged information was communicated, or,
alternatively, where no confidential relationship existed but privileged information was
nonetheless disclosed.'" *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15 Civ. 7488
(CM), 2017 U.S. Dist. LEXIS 113356, at *7 (S.D.N.Y. July 20, 2017) (quoting *Grioli v. Delta
Int'l Mach. Corp.*, 395 F. Supp. 2d 11, 13-14 (E.D.N.Y. 2005)), *adopted in part by*, 2017 U.S.
Dist. LEXIS 134047 (S.D.N.Y. Aug. 21, 2017).

Thus, "district courts in this Circuit have typically considered three elements in determining whether an expert should be disqualified due to his relationship with the adverse party ... (1) the existence or reasonable expectation of a confidential relationship between the movant and the expert; and (2) whether the movant in fact disclosed confidential information to the expert." *In re Namenda Direct Purchaser Antitrust Litig*, No. 15 Civ. 7488 (CM), 2017 U.S. Dist. LEXIS 134047, at \*12 (S.D.N.Y. Aug. 21, 2017) (quoting *Auto –Kaps, LLC v. Clorox Co.*, No. 15 Civ. 1737, 2016 U.S. Dist. LEXIS 37097, at \*6-7 (E.D.N.Y. Mar. 22, 2016)) (citations omitted). "To the extent the nature of the disclosures is disputed, courts also consider whether the confidential information revealed is relevant to the current litigation." *Auto –Kaps, LLC,* 2016 U.S. Dist. LEXIS 37097, at \*7. (citations omitted). "As a third element, some courts also consider whether "the public [has] an interest in allowing or not allowing the expert to testify." *In re Namenda Direct Purchaser Antitrust Litig*, 2017 U.S. Dist. LEXIS 134047, at \*12 (citations omitted).

Because "disqualification is a drastic measure that courts should impose only hesitantly, reluctantly, and rarely," *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1092 (N.D. Ca. 2004), "[t]he burden is on the [movant] to establish these elements." *In re Namenda*, 2017 U.S. Dist. LEXIS 134047, \*12 (citation omitted). Moreover, "'[t]he party seeking disqualification may not meet its burden with 'mere conclusory or ipse dixit assertions', but must identify 'specific and unambiguous disclosures that if revealed would prejudice the party.'" *Eastman Kodak Co. v. Kyocera Corp.*, No. 10-CV-6334CJS, 2012 U.S. Dist. LEXIS 132436, at \*24 (W.D.N.Y. Sept. 17, 2012) (quoting *Greene, Tweed of Del., Inc. v. DuPont Dow Elastomers, LLC*, 202 F.R.D. 426, 429 (E.D. Pa 2001) and *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1094 (N.D. Ca. 2004)).

## II. NO CONFIDENTIAL RELATIONSHIP WAS ESTABLISHED, AND IT WAS NOT OBJECTIVELY REASONABLE TO EXPECT THAT A CONFIDENTIAL RELATIONSHIP EXISTED

Craig utterly fails to meet his burden of establishing that any confidential relationship existed, or that it was objectively reasonable to expect that a confidential relationship had existed. *In re Namenda Direct Purchaser Antitrust Litig*, 2017 U.S. Dist. LEXIS 134047, at *12 (S.D.N.Y. Aug. 21, 2017).

Craig does not argue or present any evidence establishing that a confidential relationship actually existed, because it did not exist. Mr. Sedlik was never retained by Craig, never paid by Craig, and Mr. Sedlik and Craig never entered into any consulting agreement, retention agreement, confidentiality agreement, or any other agreement to memorialize any confidential relationship between them. *Supra*, 3.

Because no confidential relationship ever existed between Craig and Mr. Sedlik, Craig instead asserts that he "has satisfied the first prong" because "[he] had a reasonable expectation of confidentiality" with respect to his and his attorneys' communications with Mr. Sedlik. Dkt. No. 56, 6. Craig misapplies the law. The standard for establishing whether there was a reasonable expectation of confidentiality is not subjective. Rather, the standard is based on whether the party or its counsel was "**objectively reasonable** [in] belie[ving] that a confidential relationship existed…" *Gordon v. Kaleida Health*, No. 08-CV-378S(F), 2013 U.S. Dist. LEXIS 73334, at *23 (W.D.N.Y. May 21, 2013) (emphasis supplied); *Wang Labs., Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1249 (E.D. Va 1991) (courts may disqualify consultants where there is "persuasive evidence that a lawyer was objectively reasonable in assuming the existence of a confidential relationship and that confidential information was disclosed."). However, because it was not objectively reasonable for Craig or for his attorney to believe that a confidential relationship had existed between Craig and Mr. Sedlik, the disqualification motion must fail.

Case 2:20-cv-06293-GRB-PLA Document 23-1 Filed 01/17/23 Page 158 of 166 Page ID
Case 2:18-cv-05439-JPO Document 61 Filed 12/22/17 Page 21 of 29
#:5453

Four short conversations adding up to just over an hour and a half of time was the extent
of the communications between Mr. Sedlik, Craig and Liebowitz.  Those conversations included
a slew of other topics unrelated to the facts and theories of this case.  Moreover, as these
conversations were a general, preliminary consultation by Mr. Sedlik, Craig and Liebowitz never
discussed any facts with Mr. Sedlik beyond those that were disclosed in the Complaint.
Mr. Sedlik was never retained to, and never provided any preliminary estimates or reports for
Craig or Liebowitz.  These facts are simply not enough to sustain the legal inference of a
confidential relationship.  *See Baghdady v. Baghdady*, Civ. No. 05CV1494 (AHN), 2007 U.S.
Dist. LEXIS 84453, at *9-11 (D. Conn. Nov. 15, 2007) (no confidential relationship where the
communications were nothing "more than an informal consultation," and where the expert was
not retained or provided any documents relevant to the case, and was not requested to perform
any services); *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1093 (N.D. Cal 2004).

The cases cited by Craig are all inapposite, because the expert and the movant in those
cases had much more significant contacts.  Those cases held, *inter alia*, that it was objectively
reasonable to assume that a confidential relationship existed because the movant had previously
retained the expert.  For example, in *In re Ambassador Grp.*, 879 F. Supp. 237 (E.D.N.Y. 1994),
the court found that the Receiver, the movant, was objectively reasonable to assume a
confidential relationship with the expert, JLC, when the Receiver had initial conversations with
respect to retaining JLC to perform audit work on the Ambassador receivership, because the
Receiver had previously retained JLC to perform audit work on a prior receivership, which was
structured similarly to the Ambassador receivership, with the same individuals managing the
receivership as in Ambassador.  Similarly, the court in *Koch Refining Co. v. Jennifer L.
Bourdreax MV*, 85 F.3d 1178 (5th Cir. 1996) found that "the record support[ed] a longstanding

16

Case 2:20-cv-06293-CBM-PLA Document 83-1 Filed 01/17/22 Page 159 of 166 Page ID
Case 2:18-cv-05439-JPO Document 161 Filed 12/22/17 Page 22 of 29
#:5454

series of interactions" such that the movant had a reasonable expectation of confidentiality because the expert was previously retained by the movant in a related case, was paid $8000 by the movant, had submitted several written reports to the movant, and was listed as a will call expert for the trial in the related case. *Id.* at 1181-82.

There was no such prior retention of Mr. Sedlik by Craig or his counsel here to support a reasonable expectation of confidentiality. Indeed, in *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1093 (N.D. Cal 2004), a case cited by Craig, the court found that the movant had no reasonable expectation that a confidential relationship existed, where the expert had not previously been retained by the movant, despite the movant's declaration that "it was [his] understanding that [the expert] would hold in confidence all of [their] discussions and not disclose them without [his] permission." *Id.* at 1096. Thus, despite the movant's subjective belief, the court held that it was not objectively reasonable, and indeed, "it strain[ed] credulity to argue" that with no prior retention, and "only a few weeks after contacting an[sic] potential expert witness," that "[movant's] counsel would disclose aspects of its litigation strategy to someone who had not yet signed a confidentiality agreement and that such a conversation could have occurred in the span of a one-hour conversation in which [the expert] was alleged to have discussed his views of claims in six separate and technically complex patents." *Id.* .

Similarly here, it strains credulity to argue that (a) with no prior retention, and merely days after first contacting Mr. Sedlik, Craig and Liebowitz could have reasonably expected that a confidential relationship had been established such that it would have been safe to disclose confidential information and litigation strategy, or that (b) in the span of the 15 minute teleconference with both Craig and Liebowitz on September 22, 2016 – the first conversation that Mr. Sedlik had ever had with Liebowitz – that Liebowitz and Mr. Sedlik could have had any

Case 2:20-cv-06293-GRB-PLA  Document 83-1  Filed 01/17/23  Page 160 of 166  Page ID
Case 2:18-cv-05439-JPO  Document 61  Filed 12/22/17  Page 23 of 29
#:5455

in-depth discussions regarding any methodologies or calculations of damages, the work for hire
doctrine, the statute of limitations, *and* the applicability of damages.

Because it was not objectively reasonable for Craig to assume that a confidential
relationship had been established, the motion for disqualification must be denied. *Moore N. Am.,
Inc. v. Std Register Co.,* No. 98-CV-485C, 2002 U.S. Dist. LEXIS 26488, at *7 (W.D.N.Y. June
21, 2002) ("disqualification is likely inappropriate if either inquiry yields a negative response.")
(quoting *Wang Laboratories*, 762 F. Supp. at 1248).

## III.  CRAIG DID NOT DISCLOSE ANY CONFIDENTIAL INFORMATION THAT WOULD BE PREJUDICIAL TO CRAIG

Because "discussions between parties or counsel and experts do not carry the
presumption that confidential information was exchanged," the burden is on the movant to "point
to specific and unambiguous disclosures that if revealed would prejudice the party." *Hewlett-
Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1094 (N.D. Ca. 2004) (citations omitted).
Thus, even if it was objectively reasonable for Craig to assume a confidential relationship existed
between him and Mr. Sedlik – which it is not – the disqualification motion must still be denied
because Craig utterly fails to meet this burden.

Craig cannot meet this burden, because he relies only on conclusory, ipse dixit assertions
to support his claim that confidential information was divulged to Mr. Sedlik, and because the
information he allegedly shared with Mr. Sedlik was not confidential or prejudicial.  In fact,
Craig disclosed all of the information he allegedly shared with Mr. Sedlik, to Defendants through
discovery, and in the publicly filed Getty Complaint.

### a.  Craig Fails To Identify Any Disclosures

Craig cannot specify what confidential information he actually told Mr. Sedlik (Dkt. No.
58 ¶ 23), because, as recounted in detail by Mr. Sedlik, Craig did not actually disclose any

Case 2:20-cv-06293-GBM-PLA Document 93-1 Filed 01/17/23 Page 161 of 166 Page ID
Case 2:18-cv-05439-JPC Document 61 Filed 12/22/17 Page 24 of 29
#:5456

confidential information to Mr. Sedlik. To the extent that Craig relies on confidential

information that "[he doesn't] remember that [he] said that could have been confidential" and

"things [he had] said that [he] might not know are confidential" (Dkt. No. 57, ¶ 17) without

specifying what such confidential information is, Craig fails to meet the burden to "point to [the]

specific and unambiguous disclosures" that establish that confidential information was

exchanged. *Hewlett-Packard Co.*. 330 F. Supp. 2d at 1094; *In re Ambassador Grp.*, 879 F.

Supp. 237, 243 (E.D.N.Y. 1994) (witness's statements that "he thought he discussed

[confidential] material about Ambassador" to the expert but "did not specifically recollect what

he told [the expert]" were "vague and ambiguous and fail to support" an argument for

disqualification).

### b. Even If Craig's and Liebowitz's Assertions Regarding Craig's Disclosures Are True – Which They Are Not – Craig Still Fails To Meet His Burden

Even if Craig's and Liebowitz's assertions regarding Craig's disclosures are true – which

they are not – Craig cannot meet his burden of establishing that confidential information was

disclosed. Other than Craig's ipse dixit assertions, Craig's submissions are devoid of any

credible, specific examples to support his contention that Mr. Sedlik received any confidential

information. Moreover, to the extent that the court finds Craig's disclosures are sufficiently

specific, disqualification is still not warranted because Craig fails to establish that any

confidential and prejudicial information was disclosed to Mr. Sedlik.

### 1. The Vague, General Categories Identified By Craig Are Insufficient

Craig identifies only general categories of information that are too vague to support his

disqualification motion. Craig's assertions that he disclosed "the theory of the case" and "related

the whole narrative of what happened" to Mr. Sedlik including "how [he] ended up taking the

photographs, who else was there, who else was around in those days, [his] relationship to

Case 2:20-cv-06293-GRB-PLA Document 93-1 Filed 01/17/22 Page 162 of 166 Page ID
Case 2:18-cv-05438-JPO Document 61 Filed 12/22/17 Page 25 of 29
#:5457

Changes Magazine that publishe[d] other photographs that were taken during that session" are too vague to support a motion for disqualification. Dkt. No. 58, ¶ 7; *see* Dkt. No. 57, ¶¶ 6, 8, 17. Courts have routinely found as insufficient, such general allegations that broad categories of information were disclosed – including those in the cases cited by Craig. Specifically, in *Kyocera Corp.*, 2012 U.S. Dist. LEXIS 132436, at \*29, the court held that conclusory allegations in attorney's affidavit that confidential information regarding "Kodak's digital camera technology, and the 'components that are involved in digital camera functionality'" without describing the actual information that the expert learned was insufficient to establish that confidential information was obtained by the expert.

Similarly, in *Hewlett-Packard*, 330 F. Supp. 2d at 1097, the court denied the movant's motion to disqualify because the movant failed to establish any confidential information was disclosed where it "offered neither specific details of such [litigation strategy] discussion nor evidence contradicting [the expert's] version of the events" and because "the subject matter of the discussion was material contained in publicly available patents," and the court in *Gordon v. Kaleida Health*, No. 08-CV-3785(F), 2013 U.S. Dist. LEXIS 73334, at \*69 (W.D.N.Y. May 21, 2013) found as insufficient evidence that confidential information was disclosed to the expert, movant's declaration that he "discussed with [expert] documents' 'significance' to Defendants' defense."

    2.    <u>The Information Disclosed Was Not Confidential Or Prejudicial</u>

To the extent that the court finds Craig's disclosures are sufficiently specific, disqualification is still not warranted because Craig fails to establish that any *confidential* information was disclosed to Mr. Sedlik that would be *prejudicial* to Craig. "Confidential information essentially is information of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of the attorney-client

Case 2:20-cv-06298-GBM-PLA Document 83-1 Filed 01/17/23 Page 163 of 166 Page ID
Case 2:18-cv-05439-JFC Document 61 Filed 12/22/17 Page 20 of 29
#:5458

privilege." *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1094 (N.D. Ca. 2004) (citations and quotation marks omitted).

The record is clear that Craig did not disclose any non-public, confidential information to Mr. Sedlik. *See* 10-13. Indeed, "the fact that an individual may have access to *public* information about a product cannot be a basis to disqualify him from being an expert." *Greene, Tweed of Del., Inc. v. DuPont Dow Elastomers, LLC*, 202 F.R.D. 426, 430 (E.D. Pa 2001) (emphasis in original); *In re Ambassador Grp.*, 879 F. Supp. 237, 245 (E.D.N.Y. 1994) (denying disqualification motion, in part, because the alleged confidential information "is not confidential information").

Moreover, Craig cannot meet his burden of demonstrating that these alleged disclosures are prejudicial in any way. The information allegedly disclosed by Craig to Mr. Sedlik was disclosed *by Craig to Defendants* during discovery and publicly filed, *supra*, 3-13, and Mr. Sedlik relied only on information and documents publicly available or disclosed to Defendants through discovery to form his opinion and draft his Report. Sedlik Decl., ¶ 53.

3.      Craig's Case Law Is Entirely Inapposite Because He Never Previously Retained Mr. Sedlik

Because he could not identify any confidential information that was disclosed to Mr. Sedlik, as a last ditch effort, Craig's asserts, conclusorily and without any factual basis, that he "most likely divulged a great deal of confidential information to Mr. Sedlik in his conversation outside of the presence of counsel." Dkt. No. 56, 6. Craig bases this conclusion on the supposed facts that (a) Mr. Sedlik allegedly "switche[d] sides," and (b) due to the conversations that Craig had with Mr. Sedlik, Mr. Sedlik is incapable of separating out the confidential information he learned from Craig, and the information that he learned to form his opinion. *Id.*, 7-8. Neither assertion is supported by fact or law.

As discussed in detail *supra*, 3-13, Mr. Sedlik was never retained by Craig, and Craig divulged no confidential information to Mr. Sedlik. Even if he did, the cases that Craig cites are inapposite and distinguishable, because in *all* of those cases, the expert had previously been retained or employed by the movant, and had responsibilities during that prior employment or retention directly related to the issues being litigated – facts absent here. *See Koch Ref. Co. v. Jennifer L. Boudreau MV*, 85 F.3d 1178 (5th Cir. 1996) (disqualifying the expert where the expert had been previously retained by the movant in a related case, had written several reports for the movant in that case, and had been paid $8000 by the movant for that work); *Pellerin v. Honeywell Int'l, Inc.*, No. 11cv1278-BEN (CAB), 2012 U.S. Dist. LEXIS 3781 (S.D.Ca. Jan. 12, 2012) (same result where the expert was previously employed by the movant in the division responsible for the manufacture of the products that are at the heart of the trade secret misappropriation action); *Alien Tech. Corp. v. Intermec, Inc.*, No. 3:06-cv-51, 2007 U.S. Dist. LEXIS 89635, at \*6 (D. N.D. Nov. 30, 2007) (same result where the expert was previously a "high ranking executive" employed by movant, and was "knowledgeable of [movant's] product line, its future strategies, and its legal and intellectual planning"); *In re Namenda*, 2017 U.S. Dist. LEXIS 134047, at \*10, 14 (S.D.N.Y. Aug. 21, 2017) (same result where the expert was previously employed by movant for a period of 23 years, and movant's "conduct during the period when [the expert] was a senior … regulatory official is at issue in this case").

In fact, in *Eastman Kodak Co. v. Kyocera Corp.*, 2012 U.S. Dist. LEXIS 132436, at \*31 (W.D.N.Y. Sept. 17, 2012), a case cited by Craig in support of his position that Mr. Sedlik must be disqualified, the court denied Kodak's motion to disqualify Kyocera's expert despite the fact that Kodak had previously retained the expert in a different patent infringement case, because "Kodak has failed to point to 'specific and unambiguous disclosures' [made to the expert] that if

Case 2:20-cv-06293-CBM-PLA Document 83-1 Filed 04/17/23 Page 165 of 166   Page ID
Case 2:18-cv-05539-JPO   Document 61   Filed 12/22/17   Page 23 of 29
#:5460

revealed would prejudice' Kodak in the instant action." (quoting *Hewlett-Packard*, 330 F. Supp.
2d at 1094). Similarly here, because Craig has failed to point to any specific and unambiguous
disclosures of confidential information made to Mr. Sedlik that would prejudice Craig, Craig's
motion to disqualify must be denied.

## IV.    PUBLIC INTEREST REQUIRES DENIAL OF THIS MOTION

Public policy also weighs in favor of denying the motion. Contrary to Craig's assertions,
the photography copyright valuation expert market is not "populated with experts." Dkt. No. 56,
9. While there may well be many people purporting to be such an expert, Mr. Sedlik is only one
of a few *qualified* experts in the photography copyright space. Sedlik Decl., ¶ 55. Contrary to
Craig's assertions, Mr. Sedlik's expertise is indeed "rare" – he is the *only* photography copyright
licensing expert who has taught CLE courses to attorneys on copyright law, trained employees at
the U.S. Copyright Office, taught workshops on copyright at Stanford Law School, has served as
the President of the Advertising Photographers of America, is the current CEO of the glogal
standards body for the photography licensing industry, is a globally recognized photographer
who has been recognized as "Photography Person of the Year," among other awards, and who
has taught copyright law and copyright licensing at the college level for 21 years. Report, at 2-5
and Ex. A.

Moreover, granting Craig's motion would in fact jeopardize Mr. Sedlik's ability to earn
an essential source of income. If an expert could be disqualified on the facts of this case – where
no payments have been made, no confidentiality or other consulting or retainer agreement
signed, where only public information was disclosed, where the information allegedly disclosed
to the expert *was actually disclosed to Defendants by Plaintiff,* and where there were only a
handful of brief interactions with the movant – parties in other cases might be tempted to create a
purported conflict solely for the purpose of preventing their adversaries from using the services

Case 2:20-cv-06293-GBM-PLA Document 93-1 Filed 01/17/23 Page 166 of 166 Page ID
Case 2:18-cv-05439-JFC Document 61 Filed 12/22/17 Page 29 of 29
#:5461

of that expert, thereby jeopardizing the expert's ability to earn such income. Indeed, if "experts are too easily disqualified, unscrupulous attorneys may attempt to create relationships with numerous potential experts … hoping to preempt the ability of their adversaries to obtain expert assistance." *Hewlett-Packard*, at 1095 (quoting *Stencel v. Fairchild Corp.*, 174 F. Supp. 2d 1080, 1083 (C.D.Ca. 2000). As such, it is in the interest of public policy to deny Craig's motion for disqualification.

## **CONCLUSION**

For all of the foregoing reasons, Defendants respectfully request that Plaintiff's motion to disqualify Mr. Jeffrey Sedlik as Defendants' expert be denied, and for such other and further relief as this Court deems just and proper.

Dated: New York, New York
        December 22, 2017

                                        LOEB & LOEB LLP


                                        By:*/s/ Barry I. Slotnick*
                                            Barry I. Slotnick
                                            C. Linna Chen
                                            345 Park Avenue
                                            New York, New York 10154

                                        *Attorneys for Defendants*
                                        *UMG Recordings, Inc., Kingsid Ventures,*
                                        *Ltd., and Estate of Riley B. King*


15460074.1
210088-10006