hBOREN, OSHER & LUFTMAN, LLP
Jeremy J. Osher (SBN 192109)
josher@bollaw.com
Aaron M. Gladstein (SBN 266287)
agladstein@bollaw.com
Matthew K. Tom (SBN 324298)
mtom@bollaw.com
222 N. Pacific Coast Highway, Suite 2222
El Segundo, CA 90245
Telephone: (310) 322-2021
Facsimile: (310) 322-2228

Attorneys for Plaintiff
IRISH ROVER ENTERTAINMENT, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IRISH ROVER ENTERTAINMENT, LLC, a California limited liability company,<br><br>       Plaintiff,<br><br>     vs.<br><br>AARON SIMS, an individual; MATT DUFFER, an individual; ROSS DUFFER, an individual; NETFLIX, INC., a Delaware corporation; NETFLIX STREAMING SERVICES, INC., a Delaware corporation; 21 LAPS ENTERTAINMENT, a business entity, form unknown; and DOES 1 through 50, inclusive,<br><br>       Defendants. | Case No.: 2:20-CV-06293-CBM-PLA<br>(Assigned to Hon. Consuelo B. Marshall)<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Notice of Lodging; Evidentiary Objections; Statement of Genuine Disputes of Material Facts; and Declarations of Jeremy J. Osher, Jeffrey Kennedy, Charlie Brink, John W. Rainey, and Jeffrey Sedlik filed concurrently herewith]<br><br>**<u>Hearing</u>**<br>Date:    February 7, 2023<br>Time:   10:00 a.m.<br>Courtroom: 8D |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................... 1

II.   STATEMENT OF FACTS .................................................................. 4

    A.    *Totem* And *The Chain Of Being* Series. ...................................... 4

    B.    Founding of Irish Rover. .......................................................... 5

    C.    Evergreen Films and Aaron Sims Company. ............................... 5

    D.    Termination of Evergreen and Continuing Relationship Between Plaintiff and ASC. ................................................................... 6

    E.    Sims Begins Working with the Duffers in 2013. ......................... 7

    F.    Defendants Attempt to Minimize Sims' Involvement on *Stranger Things*. .................................................................................... 9

    G.    Release of *Stranger Things*, Seasons 1 to 3. .............................. 9

    H.    The Parties' Dueling Experts on Substantial Similarity. ......................... 10

        i.    Plaintiff's Literary Expert—John W. Rainey. .................... 10

        ii.    Plaintiff's Visual Expert—Professor Jeffrey A. Sedlik .................... 11

        iii.    Defendants' Experts. .................................................... 11

III.   ARGUMENT ..................................................................................... 12

    A.    Legal Standard. ...................................................................... 12

    B.    A Genuine Dispute Exists Regarding Whether the Duffers Had Access To The *Totem* Materials Through Sims. ........................... 13

    C.    Genuine Issues of Material Facts Exist with Respect To Defendants' Independent Creation Theory ................................................... 16

    D.    A Genuine Dispute Exists Over the Substantial Similarities Between *Totem* and *Stranger Things*. ................................................... 18

        i.    Plaintiff's Infringement Claims Are Based Upon Legally Protectible Elements of *Totem*. ........................................ 19

        ii.    The Extrinsic Test. ........................................................ 20

i

a.    Plot and Sequence of Events. .....................................................20

b.    Characters. .................................................................................21

c.    Theme. ........................................................................................22

d.    Setting. .......................................................................................22

e.    Mood, Tone, and Pace. ..............................................................22

f.    Dialogue. ....................................................................................23

iii.    There Are Genuine Issues of Material Fact Regarding Substantial Similarity Under the Ninth Circuit's "Selection or Arrangement" Standard. ................................................................23

E.    There Is a Genuine Dispute Regarding Whether *Stranger Things* Infringes on Plaintiff's Concept Art. ......................................................25

IV.    CONCLUSION ...........................................................................................26

TABLE OF CONTENTS

# **TABLE OF AUTHORITIES**

**Cases**

*Alfred v. Walt Disney Co.*

    821 F.App'x 727, 729 (9th Cir. 2020) .......................................................4, 13, 23

*Anderson v. Liberty Lobby, Inc.*

    477 U.S. 242, 250 (1986) ...................................................................................12

*Berkic v. Crichton*

    761 F.2d 1289, 1292 (9th Cir. 1985) .................................................................19

    *Bernal v. Paradigm Talent & Literary Agency*

    788 F.Supp.2d 1043, 1052 (C.D. Cal. 2010) .......................................1, 12, 14, 16

*Christian v. Mattel, Inc.*

    286 F.3d 1118, 1128 (9th Cir. 2002) .................................................................16

*Counts v. Meriwether*

    No. 2:14-cv-00396-SVW-CW, 2015 WL 9594469, at *6-7 (C.D. Cal. Dec. 30, 2015)...............................................................................................................16

*Divine Dharma Meditation Int'l Inc. v. Inst. of Latent Energy Studies*.

    No. SACV 16-226-JLS, 2016 WL 7486286, at *5 (C.D. Cal. May 25, 2016).....20

*Eastman Kodak Co. v. Image Tech. Services, Inc.*

    504 U.S. 451, 456 (1992) ...................................................................................13

*Funky Films, Inc. v. Time Warner*

    462 F.3d 1072 (9th Cir. 2006) ...........................................................................21

*L.A. Printex Industries, Inc. v. Aeropostale, Inc.*

    676 F.3d 841, 846-47 (9th Cir. 2012) ...................................................14, 18, 19, 23

*Lewart v. Boiron, Inc.*

    212 F.Supp.3d 917, 937 (C.D. Cal. 2016) ......................................................4, 13

*Litchfield v. Spielberg*

    736 F.2d 1352, 1356 (9th Cir. 1984) .................................................................20

*Meta-Film Assocs., Inc. v. MCA, Inc.*

    586 F.Supp.1346, 1355-56 (C.D. Cal. 1984).................................................2, 15

*Metcalf v. Bochco*
       294 F.3d 1069, 1073-74 (9th Cir. 2002) ....................................4, 19, 24

*Moses v. Payne*
       555 F.3d 742, 756 (9th Cir. 2009) ...................................................4, 25

*Olson v. NBC*
       855 F.2d 1446 (9th Cir.1988) .............................................................20

*Shaw v. Lindheim*
       919 F.2d 1353, 1364 (9th Cir. 1990) ............................................19, 24

*Sheldon v. Metro-Goldwyn Pictures Corp.*
       81 F.32d 49,56 (2d Cir. 1936).............................................................19

*Simo v. Union of Needletrades, Indus. & Textile Employees*
       322 F.3d 602, 609 (9th Cir. 2003) ......................................................12

*Skidmore v. Led Zeppelin*
       952 F.3d 1051, 1064 (9th Cir. 2020) ...............................................2, 19

*Swirsky v. Carey*
       376 F.3d 841, 851 (9th Cir. 2004) ......................................................20

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*
       809 F.2d 626, 630 (9th Cir. 1987) ................................................12, 13

*Wilson v. Walt Disney Co.*
       No. 14-cv-01441-VC, 2015 WL 4477391 at *1 (N.D. Cal. July 30, 2015) .........19

*Zindel v. Fox Searchlight Pictures, Inc.*
       815 Fed.Appx.158, 159 (9th Cir. 2020)................................................19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TABLE OF AUTHORITIES

## I.     __INTRODUCTION__

By this action, Plaintiff Irish Rover Entertainment, LLC ("Plaintiff" or "Irish Rover") seeks to hold Defendants Aaron Sims, Ross Duffer, Matt Duffer, Netflix, Inc., Netflix Streaming Services, Inc., and 21 Laps, Inc. (collectively "Defendants') accountable for their wholesale theft of Plaintiff's copyrighted screenplay *Totem* and related concept art. To avoid liability, and despite significant evidence of their wrongdoing, Defendants resort to unwarranted and outrageous attacks on Plaintiff and its principals, accusing them of pedaling vast conspiracy theories and engaging in elaborate extortion plots. Defendants have even gone so far as to invoke Rule 11 in a misguided attempt to strongarm Plaintiff into dismissing this action by seeking monetary sanctions against both Plaintiff and its counsel of record.

It is not surprising that Defendants and their counsel are sparing no expense in their efforts to defeat Plaintiff's claims. *Stranger Things* remains one of Netflix's most popular series of all time and has completely changed the way Netflix does business and generates revenue. Moreover, Netflix has recently experienced significant declines in subscribership and stock price, which in turn has forced the company to consider significant changes including downsizing, advertising, and a crackdown on password sharing. A finding of infringement in connection with *Stranger Things* poses an existential threat to the company, its brand, and its bottom line.

It is against this backdrop that the Court is asked to summarily dispose of Plaintiff's claims. As demonstrated herein, the Court should deny the instant Motion because of the following genuine disputes as to several material facts preclude summary judgment:

***First***, there is a genuine dispute regarding the Duffers' access to *Totem* through their intermediary Defendant Aaron Sims ("Sims"). *See Bernal v. Paradigm Talent and Literary Agency*, 788 F.Supp.2d 1043, 1056 (C.D. Cal 2010) ("[T]o avoid summary judgment, a plaintiff must show that he submitted his work to an intermediary *who is in a position to transmit plaintiff's work to the creators of the infringing work*") (emphasis

added). Here, there is credible evidence that: (1) Sims was heavily involved in the development of *Totem*, during which he created concept art and received multiple versions of the *Totem* screenplay in 2009 to 2010 and for years after; and then (2) Sims started working with the Duffers in February 2013 on a project called *Hidden*—the same year the Duffers have stated they "came up with the initial idea for *Stranger Things*". It would be reasonable for a factfinder to infer, based on this timeline and the overwhelming number of similarities between the two works, that Sims disclosed the *Totem* scripts and concept art to the Duffers, who then copied these materials when they created *Stranger Things*. See *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) (allowing circumstantial prove up of copyright claim "[i]n the absence of direct evidence of copying").

Not surprisingly, Sims denies giving the Duffers access to the *Totem* materials, and the Duffers claim they never saw them. However, given the timeline of Sims' involvement with the Duffers, the integral role he played in the creation of both *Totem* *Stranger Things* and the similarities between the two works (as detailed in the reports of Plaintiff's experts), there are genuine disputes of material fact as to access, and the Court should not take this issue from the jury. See *Meta-Film Assocs., Inc. v. MCA, Inc.*, 586 F.Supp.1346, 1355-56 (C.D. Cal. 1984) ("[g]iven the nature of the relationship between the intermediary and the purported copier and the nature of their contacts, the '**bare denials of knowledge**' by the writers and developers of [the infringing work] were insufficient to take the access question from the jury") (emphasis added).

**Second**, there are genuine issues of material fact as to the Duffers' claim of independent creation.[1] Although the Duffers now claim that they came up with the

---

[1] Defendants' independent creation argument goes to the issue of access. See *Payne v. Anvil Knitwear, Inc.*, No. CV 06-8100 SVW, 2007 WL 1953438, at *3 (C.D. Cal. June 27, 2007) (holding that a motion for summary judgment "styled . . . as an affirmative defense of 'prior independent creation' [i]n reality . . . centers on whether there is a material issue of fact regarding [defendant's] access to Plaintiffs' registered copyrights" since designs were created "years before Plaintiffs' copyrights were fixed"). As demonstrated herein, there are genuine disputes as to access, such that there necessarily are genuine disputes as to the issue of independent creation.

"initial idea" for *Stranger Things* in 2010, this position is directly at odds with statements that the Duffers repeatedly have made to the public, both orally in writing. For example, in their Foreword to the 2018 book *Stranger Things: Worlds Turned Upside Down*, the Duffers wrote, "We came up with the initial idea for *Stranger Things* in the fall of 2013."[2] The Duffers would have this Court (and a jury) ignore their public statements, which completely undermine their theory of independent creation.

Moreover, the sole evidence the Duffers offer to support their newly minted creation story are two e-mails they wrote to themselves in November 2010 after having reviewed the Wikipedia page for the Montauk Experiments, a conspiracy theory that was the subject of a book by the author Preston Nichols.[3] A comparison of the e-mails and the Wikipedia page they reviewed reveals that in the first e-mail, they simply collected several key words that appear in the summary of the Montauk Experiments and in the second e-mail, they summarize Mr. Nichols' work. These e-mails do not evidence idea creation nor do they constitute "undisputed evidence that, in 2010, the Duffers had already created the foundational concepts and elements for the Series," particularly considering their repeated representations that they did not come up with the initial idea until Fall 2013 and Sims' statement to Kennedy in July 2019 that "it sucks when other get traction with your ideas."

***Third***, there are genuine disputes of material fact regarding the substantial similarities between *Totem* and *Stranger Things*. Given the diametrically opposed opinions advanced by the parties' literary experts, Rainey for Plaintiff and Lester A. Standiford for Defendants, and the opinions of Plaintiff's visual expert Professor Jeffrey Sedlik ("Sedlik") (to which Defendants have designated two rebuttal experts), the Court

---

[2] Similarly, in a 2017 interview with Gold Derby, the Duffers stated that the "initial kernel" of an idea for *Stranger Things* came around the time of *True Detective* (which premiered in January 2014).
[3] Ironically, after their initial pitch to Netflix, there were a number of emails between the Duffers and Netflix executives regarding the Duffers' "origin story" and the "clearance" and "rights issues" resulting from the Duffers' wholesale appropriation of ideas from a Wikipedia page regarding Mr. Nichols' book The Duffers dismissed Mr. Nichols as a sue-happy "crazy person". Osher Decl. ¶ 28 & Ex. L [DEFS 52406].

has been presented with the proverbial "battle of the experts", and the highly fact-driven issue of substantial similarity should be resolved by a jury. *See Alfred v. Walt Disney Pictures*, Case No. 18-8074-CBM-ASx (12/16/21 Order re: Defendant's MSJ re Substantial Similarity) (citing *Lewart v. Boiron, Inc.*, 212 F.Supp.3d 917, 937 (C.D. Cal. 2016), aff'd, 742 F.App'x 282 (9th Cir. 2018) ["[T]he Court is precluded from granting summary judgment in either side's favor. This case boils down to a battle of the experts, and such a battle must be left for the jury's resolution."]).

**Fourth**, even if the elements shared by the two works are too generic to warrant copyright protection—which is not the case—Plaintiff is entitled to copyright protection for *Totem* under the Ninth Circuit's "selection and arrangement" test. *See Metcalf v. Bocho*, 294 F.3d 1069, 1074 ("The particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element"). The expert opinions of Rainey and Sedlik, when stacked against Defendants' dueling experts, give rise to a genuine dispute regarding substantial similarity under the selection and arrangement test, and this disputed issue must be resolved by a jury.

**Finally**, Defendants give short shrift to the argument regarding Plaintiff's copyrighted *Totem* concept art. Defendants question Plaintiff's ownership of the concept art but ignore Plaintiff's work-for-hire agreement with Evergreen. That said, whether the concept art is substantially similar to *Stranger Things* is a question of fact for a jury. Expert testimony in this regard is not necessary as it would not concern "matters beyond the common knowledge of the average layperson," who can easily look at the *Totem* concept art and scenes from *Stranger Things* and decide whether they are substantially similar. *Moses v. Payne*, 555 F.3d 742, 756 (9th Cir. 2009)

Plaintiff requests that the Court deny Defendants' Motion in its entirety.

## II.   STATEMENT OF FACTS

### A.   *Totem* And *The Chain Of Being* Series.

Jeffrey Kennedy ("Kennedy") was born and raised in South Bend, Indiana. Kennedy Decl. ¶ 4. In 2005, Kennedy's friend Clint Osthimer ("Osthimer") was killed

in a car accident. *Id.* ¶7. The *Chain of Being* film series was heavily influenced by real-life events from their childhood friendship. *Ibid.* Osthimer's lifelong battle with epilepsy and his childhood experiences with Kennedy served as the inspiration for the *Totem* story and screenplay. *Id.* ¶¶ 7, 18, 51. In March 2007, Kennedy wrote and copyrighted a treatment outline for the first feature film screenplay in the *Chain of Being* film series, *The Lightning Shower in Jackson Hole*. *Id.* ¶ 8. In June 2007, Kennedy wrote and copyrighted a feature film screenplay based on *The Lightning Shower in Jackson Hole* treatment outline. *Ibid.* In May 2008, he copyrighted an updated version of the feature film screenplay, which was renamed to *Chain of Being*. *Ibid.*

### B.  Founding of Irish Rover.

In November 2008, Kennedy founded Irish Rover. *Id.* ¶ 9. In December 2008, Kennedy contributed all his rights to the *Chain of Being* series to Irish Rover pursuant to a Contribution Agreement dated December 10, 2008. *Id.* ¶ 10 & Ex. A. Plaintiff's primary asset is the *Chain of Being* series and the *Totem* screenplays, live-action demo, and concept art. *Id.* ¶ 10.

### C.  Evergreen Films and Aaron Sims Company.

In February 2009, Plaintiff hired Evergreen Films ("Evergreen") to assist with the development of the *Totem* screenplay, artwork, and *Chain of Being* series. *Id.* ¶ 11 & Ex. B. Pursuant to the terms of their Development Services Agreement ("DSA"), Evergreen was to provide Plaintiff with assistance in screenplay development, a production budget, production schedules, key artwork and promotional artwork, first class storyboards, design and creation of a CGI character, remote location scouting, and a 3D test shoot featuring the CGI character. *Ibid.* The DSA states it is work-for-hire and that everything created during the agreement is owned by Plaintiff. *Ibid.*

In May 2009, Evergreen introduced Kennedy to Sims of Aaron Sims Company ("ASC"). *Id.* ¶ 14. Evergreen subcontracted Sims and ASC to create key concept art, creatures, visual effects, and a 3D test shoot for *Totem*. *Id.* ¶ 15. From May 2009 to August 2010, Sims, John Norris ("Norris", an ASC employee), and the ASC staff

created *Totem*'s creatures, concept art, and live-action visual effects. *Id*. ¶16. During that time, it is undisputed that Sims and his team received eight (8) versions of the *Totem* screenplay, including the copyrighted 2007 and 2008 versions. *Id*. ¶ 16 & Exs. C-G.

Throughout his involvement with *Totem*, Sims frequently collaborated with Kennedy and participated in multiple screenplay note sessions, during which they discussed *Totem*'s story elements, inspiration, and concept art, and *Totem's* characters, plot, settings, and dialogue. *Id*., ¶¶16-24; Osher Decl. ¶ 22 & Ex. F [DEFS 3748, 3872]. Sims was privy to Kennedy's stories from his Indiana childhood, including Osthimer's battle with his personal demon epilepsy, which inspired *Totem's* carbon copy universe and its monster Azrael. Kennedy Decl. ¶ 18. Sims personally created and designed concept artwork, storyboards, *Totem*'s "carbon-copy" universe, and *Totem*'s monster Azrael. *Id*. ¶¶ 18-19. In connection with the development of *Totem*'s monster Azrael, Sims and Kennedy discussed several creative elements for *Totem*, which have several parallels in *Stranger Things* including:

- Sims shared a version of Azrael that had a closed face and he discussed with Kennedy the idea of the monster's face opening like a flower (similar to the Demogorgon that Sims created for *Stranger Things*). *Id*. ¶ 21.

- They discussed that Azrael's demise would involve an exploding black cloud of smoke and feathers, like the Demogorgon's demise in *Stranger Things* that Sims later created for the Duffers. *Id*. ¶ 22.

### D.   Termination of Evergreen and Continuing Relationship Between Plaintiff and ASC.

In or around the end of July, Plaintiff terminated its business relationship with Evergreen. *Id*. ¶ 25. Following Evergreen's termination, Kennedy continued to discuss the *Totem* project with Sims and Norris and continued providing Sims and ASC with updated versions of the *Totem* screenplay. *Id*. ¶¶ 27-28 & Exs. S-U.

Between August and October 2010, Sims and Norris paid for two rounds of professional coverage notes from a third-party reader to assess *Totem*'s strengths and weaknesses. *Id*. ¶¶ 29-33 & Exs. V-W. In follow-up meetings regarding these notes,

Sims and Norris recommended that Kennedy revise the *Totem* screenplay to reduce the number of Native American and Christian elements and to incorporate more traditional supernatural horror elements to make the script more commercially viable. *Id*. ¶¶ 31-32. Based on those suggestions, Kennedy edited the *Totem* script in late 2010/early 2011, periodically checking in with Sims and Norris on its progress. *Id.* ¶ 34.

In May 2011, Kennedy met Sims and Norris met at ASC's Los Angeles office to discuss *Totem*'s development. *Id.* ¶ 35. Kennedy presented them with the latest version of the *Totem* screenplay, which removed the secondary "kids" storyline and further removed various Native American elements that appeared in prior versions. *Ibid.* This was at least the eleventh version of the *Totem* screenplay that was provided to Sims. *Ibid.* From 2011 to 2013, Kennedy continued to revise the *Totem* screenplay, e-mailing himself updated versions in 2011, 2012, and 2013. *Id*. ¶ 40. In March 2013, Kennedy e-mailed Sims the March 2013 version of the *Totem* screenplay and a prospectus that Kennedy prepared to market the project. *Ibid.*[4] *Id*. ¶ 112.

Although Sims claims to not recall receiving the 2013 *Totem* screenplay, ASC's Art Director Steffen Reichstadt ("Reichstadt") acknowledged that "multiple scripts" for *Totem* continued to come into ASC "over a course of years" after the relationship with Evergreen ended in July 2010. *See id*. ¶116; Osher Decl. ¶ 36 & Ex. T. Sims acknowledged that any *Totem* script received by ASC "would be archived", but Defendants chose not to produce any *Totem* scripts that ASC received after July 2010. *See* Osher Decl. ¶ 19 & Ex. C.

### E.   Sims Begins Working with the Duffers in 2013.

In February 2013, Sims was hired to work on the Duffers' film *Hidden*. M. Duffer

---

[4] Kennedy clearly recalls sending the 2013 version to Sims via email, but as explained in detail in his Declaration, various temporary folders in his personal AOL email—including those that contained his *Totem* communications account, were lost or destroyed. Kennedy has gone to great lengths to retrieve these communications because they would corroborate Plaintiff's position in this lawsuit. Plaintiff engaged, at significant expense, a third-party vendor to retrieve the lost AOL emails. Plaintiff's counsel issued subpoenas to Yahoo and Anschutz Entertainment Group, Kennedy's former employer, to try and obtain any of Kennedy's AOL emails. Unfortunately, these efforts were unsuccessful. *Id.* ¶¶ 112-117.

Decl. ¶ 50; R. Duffer Decl. ¶ 44. Sims has stated in interviews that he first met the Duffers while working with them on *Hidden* and that ASC was hired to create designs for the characters and creatures for the project and to "save the day". Kennedy Decl. ¶¶ 62-63 & Exs. FF & GG. Reichstadt has stated in interviews that ASC and the Duffers had worked on two occasions before *Stranger Things*. *See ibid.*

In October 2013, within months of beginning work with Sims, and years after they wrote the two 2010 emails that underlie their most recent *Stranger Things* creation story, the Duffers created a skeleton outline for a television series entitled *Montauk*, which was later renamed *Stranger Things*. M. Duffer Decl. ¶ 33 & Ex. D; R. Duffer Decl. ¶ 27. It did not take long for the Duffers to go from this skeleton outline to a fully developed pilot script, which, like the outline, includes several story elements also appearing in the *Totem* screenplay.

In June 2015, Sims and ASC were hired to create concept art and visual effects for *Stranger Things*, including the Upside Down and the central monster creature in the series known as the Demogorgon. *See, e.g.,* Osher Decl. ¶¶ 19, 30, 31 & Exs. C [Sims Dep. 19:13-21:16], N & O. Incredibly, ASC completed the first round of design work for the Demogorgon in little more than one week—from which the final Demogorgon design was selected (which could lead a juror to reasonably conclude ASC recycled the *Totem* artwork for Azrael). Osher Decl. ¶ 19 & Ex. C [Sims Dep. 126:2-4]. Sims testified that he has recycled work from other projects (Osher Decl. ¶ 19 & Ex. C [Sims Dep. 43:4-12]) and, in the March 2017 presentation about *Stranger Things* at the Gnomon School, Sims again acknowledged that ASC recycles work into new projects.[5] Not surprisingly, former ASC employees have criticized Sims and ASC for illegal activity, including "painting over" and stealing from copyrighted work belonging to other artists. Osher Decl. ¶ 38 & Ex. V.

---

[5] When Sims made the comments about recycling other client's art, Reichstadt tried to walk back the admission by stating the projects are still different. Reichstadt nevertheless confirmed that ASC keeps certain designs in their back pocket for later use. Osher Decl. ¶ 26 & Ex. J [IRISH 4970].

In May 2016, Sims told the Duffers that he and his team "would love to be a part of the next season, and if so, we would love to be even more involved in lots more designs/effects aside from just the creatures." Osher Decl. ¶ 25 & Ex. I.

**F.      Defendants Attempt to Minimize Sims' Involvement on *Stranger Things*.**

Perhaps recognizing that the connection between Sims and the Duffers is problematic to their position, Defendants have attempted to minimize that connection, and to distance themselves from Sims—their intermediary and point of access for *Totem*. For example, although the Duffers told Sims in May 2016 that his work on Season 1 was "amazing!!!," and that he was "**such an integral part of this season, we feel it's important to involve you right away for next season and make you an even bigger part of the process**," (Osher Decl. ¶ 25 & Ex. I) they testified in this action that they were not satisfied with ASC's work, and Matt Duffer testified that he did not even "recall [Sims'] involvement in Season 2" and that he and his brother made the decision to part ways with him. Osher Decl. ¶ 18 & Ex. B [M. Duffer Dep. at 26:12-23].

Sims claims that he "did not create the concept art for the blue-tinted tunnels in episodes of *Stranger Things*," (Sims Decl. ¶ 25), even though Reichstadt publicly has stated that "The Duffer Brother originally came to us for the creature designs for the Demogorgon, but it turned into a lot more than that. **We ended up helping them design the whole world, the Upside Down, all the different aspects of the show**." Kennedy Decl. ¶ 62 & Ex. FF. Sims is also on record stating that "[w]e focused mainly on the creature when we were starting. We established that look, and shortly after that **we started working to develop the look of the Upside Down**." *Id*.

**G.      Release of *Stranger Things*, Seasons 1 to 3.**

*Stranger Things*, Season 1, was released in July 2016. Kennedy Decl. ¶ 43. Kennedy watched the show a few weeks after its premiere and observed that *Stranger Things*' primary storyline seemed to be "borrowing" elements from *Totem* screenplay and concept art. *Ibid.* At the time, it did not occur to Kennedy that the similarities he

saw in Season 1 was evidence of copyright infringement. *Id*. ¶ 44. In October 2017, Season 2 of *Stranger Things* was released. *Id*. ¶ 51. Shortly after its release, Kennedy watched the entire season and was convinced that the Duffers had gone beyond just borrowing elements and had copied *Totem*. *Id*. ¶¶ 51-53.

In November 2017, Kennedy spoke with Sims regarding his relationship with the Duffers and his scope of work on *Stranger Things*. *Id*. ¶ 58 & EE. Sims stated that he had only met the Duffers once, that his work on *Stranger Things* was "minimal", and suggested that the similarities Kennedy saw were merely "coincidences." *Ibid*. However, in January 2019, Kennedy watched several video interviews in which Sims and Reichstadt stated that they met the Duffers through their partnership on *Hidden* and that ASC played a significant role in the design and creation of the *Stranger Things* world. *Id.* ¶¶ 61-63 & Exs. FF-GG.

In July 2019, Season 3 of *Stranger Things* was released. *Id*. ¶ 66. Shortly thereafter, Kennedy watched the entire season and noticed that the show again incorporated numerous elements from the *Totem* screenplay and concept art. *Id.* ¶¶ 66-67; Brink Decl. ¶ 28. At this point, Kennedy wanted to determine how the Duffers gained access to the *Totem* materials. Kennedy again contacted Sims and asked whether he gave the Duffers the *Totem* script, to which Sims responded that the Duffers used a range of sourcing materials for *Stranger Things*. Osher Decl. ¶ 21 & Ex. E [Kennedy Dep. 202:4-12; 276:1-3]. Sims also confirmed that he knew the Duffers well and said he was disappointed to have not been asked to work on Season 3. Kennedy Decl. ¶ 69. Sims also stated that "it sucks when somebody else gets traction with your work" and suggested that Kennedy hire a lawyer. *Ibid*; Osher Decl. ¶ 21 & Ex. E [Kennedy Dep. 202:10-14; 275:25-276:1]; Brink Decl. ¶ 28.

### H.    The Parties' Dueling Experts on Substantial Similarity.

#### i.    Plaintiff's Literary Expert—John W. Rainey.

Plaintiff's literary expert witness, John W. Rainey, submitted a report on September 22, 2022, in which he opined:

A deep study, comparison, and evaluation of *Totem* and *Stranger Things* discloses many integral mutual story-telling components that are common to both properties including, but not limited to, the areas of character, plot, sequence of events, theme, setting, mood, tone, pace, and dialogue. As a result, I strongly believe that there are significant similarities between the two properties leading to the conclusion that one property had knowledge of the other and consciously chose to adopt elements from it. **These shared elements extend well beyond mere coincidence. It displays the impetus to conscious appropriation from one property to the other.** Rainey Decl. ¶ 24 & Ex. B at p. 3.

Rainey also opined there are numerous elements that are integral to *Totem* and that appear in *Stranger Things*, the selection and arrangement of elements of which evidence substantial similarity under relevant copyright standards. Rainey Decl. ¶ 34 & Ex. B at p. 29-34.

### ii.        Plaintiff's Visual Expert—Professor Jeffrey A. Sedlik

Plaintiff also retained Professor Jeffrey A. Sedlik, a visual expression expert, to review the two works and render opinions regarding the similarities between their visual elements. Professor Sedlik offered the following opinions in his report:

Based on my review, and on my knowledge, training and expertise, Plaintiff's selection, arrangement and combination of numerous elements in *Totem*, such as characters, plot, sequence, themes, settings, mood, and tone—as reflected in the *Totem* concept art—are also reflected, included, or referenced in scenes from *Stranger Things*. … Based on my knowledge, training and experience, the quantity and combination of similarities between elements depicted or referenced in Plaintiff's Totem concept art and elements embodied in various scenes and episodes of *Stranger Things* is uncanny, and is indicative of Defendants' appropriation of Plaintiff's selection and arrangement of elements from *Totem.* Sedlik Decl. ¶ 3 & Ex. A at pp. 18 & 20.

Professor Sedlik's opinions serve to bolster the opinions advanced by Rainey regarding substantial similarity, particularly with respect to selection and arrangement.

### iii.        Defendants' Experts.

Defendants' literary expert, Lester A. Standiford, submitted a report in which he concluded that "no substantial similarity whatsoever exists regarding the properties in question, namely (a) *Totem*, as represented in its several iterations dating from 2007

forward, and (b) *Stranger Things*, Seasons 1, 2 & 3, twenty-five episodes in toto." *See* Standiford Dec. ¶ 4 & Ex. A. Defendants designated two rebuttal experts in connection with Professor Sedlik's report. The first, Michael Knapp ("Knapp"), is a concept artist, who was employed by Netflix and continues to work on projects with Netflix. Osher Decl. ¶ 39 & Ex. W [Knapp Dep., 16:16-18:8]. Knapp opined that "there is no similarity between any of the *Totem* concept art" and any of the scenes and characters from *Stranger Things*. The second, Mr. Standiford, opines that "there is no support or analysis for Professor Sedlik's conclusions that protectable elements from Plaintiff's *Totem* were copied by Defendants in *Stranger Things*."

## III.   ARGUMENT

### A.   Legal Standard.

On a motion for summary judgment, the Court must determine whether, viewing the evidence in a light most favorable to the nonmoving party, there are any genuine issues of material fact. *Simo v. Union of Needletrades, Indus. & Textile Employees*, 322 F.3d 602, 609 (9th Cir. 2003); FRCP 56. "The moving party bears the initial burden of establishing the absence of a genuine issue of material fact." *Bernal v. Paradigm Talent & Literary Agency*, 788 F.Supp.2d 1043, 1052 (C.D. Cal. 2010). "Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify the specific facts that show a genuine issue for trial." *Id.*

Summary judgment is improper if "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In judging evidence, the Court does not make credibility determinations or weigh conflicting evidence. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." *Anderson*, *supra*, at 255. See also *Bernal, supra*, 788 F.Supp.2d at 1051. The nonmovant's "version of any disputed issue of fact . . . is presumed correct." *Eastman Kodak Co. v. Image Tech.*

*Services, Inc.*, 504 U.S. 451, 456 (1992); see also *T.W. Elec. Serv., Inc.*, *supra*, 809 F.2d at 631 ("[I]f direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact").

In copyright infringement actions like this one, where the parties have competing views on the issue of substantial similarity and each side presents dueling expert opinions on whether the works are substantially similar, "the opinions from the parties' experts thus creates a genuine issue of material fact in dispute regarding whether the works are substantially similar." *Alfred v. Walt Disney Pictures*, Case No. 18-8074-CBM-ASx (12/16/21 Order re: Defendant's Motion for Summary Judgment re Substantial Similarity) (citing *Lewart v. Boiron, Inc.*, 212 F.Supp.3d 917, 937 (C.D. Cal. 2016), aff'd, 742 F.App'x 282 (9th Cir. 2018) ["[T]he Court is precluded from granting summary judgment in either side's favor. This case boils down to a battle of the experts, and such a battle must be left for the jury's resolution."]).[6]

## B.   A Genuine Dispute Exists Regarding Whether the Duffers Had Access To The *Totem* Materials Through Sims.

In their moving papers, Defendants falsely claim that "Plaintiff's two principals ***both admitted in deposition that there is no evidence to support Plaintiff's access theory***". As an initial matter, Plaintiff's principals made no such admission; in fact, there is significant evidence of access. Equally important, Defendants are conflating direct evidence and circumstantial evidence. Importantly, the Ninth Circuit has noted that "direct evidence of copying" "is not available in most [copyright infringement

---

[6] See also *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 2005 WL 6070811, at *31 (C.D. Cal. Mar. 14, 2005), *aff'd*, 469 F.3d 978 (Fed. Cir. 2006) ["[T]he court is once again faced with conflicting expert declarations. Resolving such conflicts and the weighing of evidence are jury functions, not those of a judge"]; *Avery Dennison Corp. v. Acco Brands, Inc.*, 2000 WL 986995, at *12 (C.D. Cal. 2000) ["In light of the above conflicting evidence and expert opinions, this Court may not weigh the evidence as presented by the parties. The inferences to be drawn from the parties' evidence could weigh in favor of either party."]; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) ["at [the summary judgment] stage of the litigation, the judge does not weigh conflicting evidence with respect to a disputed material fact"]).

cases],” and that absent direct evidence of access, a plaintiff can prove access using circumstantial evidence of either (1) a 'chain of events' linking the plaintiff's work and the defendant's access, or (2) 'widespread dissemination' of the plaintiff's work.” *L.A. Printex Industries, Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846-47 (9th Cir. 2012).

In *Bernal v. Paradigm Talent and Literary Agency*, 788 F.Supp.2d 1043, 1053 (C.D. Cal 2010)*,* this Court held that “to avoid summary judgment, a plaintiff must show that he submitted his work to an intermediary *who is in a position to transmit the plaintiff's work to the creators of the infringing work.* The intermediary can be a person who (1) has supervisory responsibility for the allegedly infringing project, (2) contributed ideas and materials to it, or (3) worked in the same unit as the creators.” *Bernal, supra*, 788 F.Supp.2d at 1056 (italics in original) (internal citations omitted).

Sims satisfies the criteria of an intermediary who was able to transmit the *Totem* materials to the Duffers before they came up with the initial idea for *Stranger Things*. Sims was intimately involved in the development of the *Totem* screenplay and was responsible for the concept art throughout the period 2009 to 2010. During this time, and for years after, Sims received multiple updated versions of the *Totem* screenplay. *See* Kennedy Decl. ¶¶16-18 & Exs. C-H. There is direct evidence that starting in February 2013, Sims started working with the Duffers on the motion picture *Hidden*.[7] *See, e.g.*, Osher Decl. ¶ 37 & Ex. U. It is undisputed that Sims and ASC performed substantial work on Seasons 1 and 2 of *Stranger Things*, including creating and designing the Demogorgon and creating the whole *Stranger Things* world, including the “Upside Down”. *See, e.g.,* Osher Decl. ¶¶ 19, 30, 31 & Exs. C [Sims Dep. 19:13-21:16], N & O. Sims was involved with *Stranger* Things from the beginning, had supervisory responsibility over significant creative elements of *Stranger Things*, and

---

[7] There is also evidence that ASC worked with the Duffers on the television series *Wayward Pines*. Although Sims claims he did not work with the Duffers on any episodes (Sims Decl. ¶ 14), Reichstadt's IMDb page shows that he worked as a concept artist on 2 episodes of *Wayward Pines* that were written by the Duffers. Moreover, Reichstadt has stated publicly that ASC worked on two projects with the Duffers prior to *Stranger Things*. *See* Osher Decl. ¶¶ 39-40 & Exs. W & X.

worked directly with the Duffers on Seasons 1 and 2. *See* Osher Decl. ¶ 25 & Ex. I.

Where—as here—the "the nexus between the defendant[s] and the individual possessing knowledge of the plaintiff's work [is] sufficiently strong to raise a reasonable possibility of access by the defendant[s] to the plaintiff's work", the Court must send the access issue to the jury. *Meta-Film Assoc., Inc. v. MCA, Inc.*, 586 F. Supp. 1346, 1355-56 (C.D. Cal. 1984). Here, to minimize the nexus between Sims and both Kennedy and the Duffers, Defendants have employed a strategy of downplaying the relationship between Sims and the Duffers, suggesting they barely knew each other and hardly ever dealt with each other on the projects they worked on together. But Reichstadt credited ASC's close "personal relationship" with the Duffers as the reason they worked so well together ("We got on the show because we'd worked with . . . the Duffer Brothers on a couple of small jobs"), and the evidence reflects that ASC worked on every episode of Seasons 1 and 2. Osher Decl. ¶¶ 36-37 & Exs. W & X.

Although Defendants deny that Sims provided the Duffers with access to the *Totem* scripts or concept art, "bare denials of knowledge" by parties accused of copyright infringement are not sufficient to overcome summary judgment. *See* Mtn. 13:28-14:2. Indeed, where—as here—the nexus between the intermediary and the alleged infringer are significant, "the '**bare denials of knowledge**' by the writers and developers of [the infringing work] were insufficient to take the access question from the jury." *Meta-Film Assoc.*, *supra*, 586 F.Supp. at 1355-56 (emphasis added).

Defendants heavily rely on the argument that because the Duffers sent the 2014 Pilot Script to Sims via an email (which they characterize as Sims' "initial introduction" to the *Montauk* project), it simply *cannot* be the case that the Duffers had access to *Totem* prior thereto. *See* Mtn. 16:21-24. This argument makes no sense. The fact that the Duffers may have sent Sims a Pilot Script in 2014 (after it was written) does not negate Plaintiff's contention that in 2013 (before it was written), at a time Sims and the Duffers worked together on *Hidden*, Sims shared *Totem* materials with the Duffers, who then used them to create the 2013 outline and Pilot Script.

1    Finally, Defendants' supporting cases only stand for the proposition that the "bare

2    corporate receipt" of a work, without any evidence of a nexus between the recipient of

3    the work and the alleged infringer, is not sufficient to support a theory of access, citing

4    *Bernal, supra*, 788 F.Supp.2d 1043 and *Counts v. Meriwether*, No. 2:14-cv-00396-

5    SVW-CW, 2015 WL 9594469, at *6-7 (C.D. Cal. Dec. 30, 2015). Here, the Duffers

6    worked directly with Sims, the same individual who had access to numerous versions

7    of the *Totem* script and who created the *Totem* concept art.

### C.    Genuine Issues of Material Facts Exist with Respect To Defendants' Independent Creation Theory.

10    As an initial matter, Defendants appear to be using "prior creation" and

11    "independent creation" interchangeably. Specifically, Defendants argue "prior creation

12    renders any conclusion of access or inference of copying illogical" Mtn. 14:18-19

13    (quoting *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1128 (9th Cir. 2002) (plaintiff alleged

14    that Mattel copied a doll that was created six years after Mattel's purportedly infringing

15    Barbie). Defendants also argue that they independently created the foundational

16    "concepts and elements" of *Stranger Things* in 2010 and then three years later (after

17    they started working with Sims on *Hidden*), they created an outline for the pilot

18    episode.[8] These are different doctrines, but regardless, there are genuine issues of

19    material fact as to whether Defendants created *anything*—let alone the foundational

20    concepts/elements for *Stranger Things*—at any time prior to 2013.

21    Though the Duffers claim that they came up with the idea for *Stranger Things* in

22    2010, they have also stated in multiple public interviews and publications that their

23    initial idea creation for *Montauk/Stranger Things* came in the fall of 2013 after

---

[8] Independent creation is actually an affirmative defense to copying. More specifically, a benchmark principle of copyright law is that "[b]y establishing reasonable access and substantial similarity, a copyright plaintiff creates a presumption of copying. The burden shifts to the defendant to rebut that presumption through proof of independent creation." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 486 (9th Cir. 2000) (overruled on unrelated grounds in *Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020). Arguably here, if the Court agrees that there are genuine issues of material fact as to access and substantial similarity, then it also should conclude there are genuine issues of material fact as to Defendants' independent creation argument.

16

completing work on *Hidden*:

- October 2016: The Duffers spoke to an audience at the White House, during which they stated that it was only after the failure of *Hidden* (*i.e.*, **in 2013**) that they created the story that became *Stranger Things.* Osher Decl. ¶ 26 & Ex. J [IRISH 4966].

- In an interview with Gold Derby posted on June 8, 2017, the Duffers stated the "initial kernel" of an idea for *Stranger Things* came to them around the time that HBO's *True Detective* series premiered **in January 2014**. Osher Decl. ¶ 26 & Ex. J [IRISH 4963].

- In the foreword of their October 2018 book *Stranger Things: Worlds Turned Upside Down*, the Duffers again confirm that they "came up with the initial idea for *Stranger Things* **in the fall of 2013**." Osher Decl. ¶ 17 & Ex. A [R. Duffer Dep. 76:16-83:8]; ¶ 18 & Ex. B [M. Duffer Dep. 73 :16-78 :8] & ¶ 27 & Ex. K.

- On May 17, 2019, during a speech at the closing convocation at Chapman University, Ross Duffer stated that they created *Stranger Things* **in the fall of 2013** after Warner Brothers "dumped" *Hidden* straight to DVD, which left them feeling as if their dream was over. Osher Decl. ¶ 26 & Ex. J [IRISH 4962].

In support of this new idea creation story, the Duffers offer two e-mails that they wrote to themselves in 2010 regarding the Montauk Experiments and which they now claim constitute the "foundational concepts and elements" for *Stranger Things*. *See* M. Duffer Decl. ¶¶ 26, 30 & Exs. B & C. The Duffers admittedly did nothing with these emails from 2010 to 2013, but now claim that they watched a movie called *Prisoners* in 2013 and purportedly remembered these two e-mails written years ago.

The ideas that the Duffers now claim as their own, and which they claim they developed in November 2010, come directly from Wikipedia summaries of Mr. Nichols' book and the Montauk Experiments. Osher Decl. ¶¶ 28, 33, 41 & Exs. L, Q, and Y. The 2010 emails to do not include any original ideas; rather, the Duffers simply summarize information from a Wikipedia page regarding a book called *The Montauk Project: Experiments in Time* by Preston Nichols, which is precisely what they told Netflix executives in June 2015. Osher Decl. ¶ 41 & Ex. Y.

Specifically, the Duffers stated that in 2010 they were considering a "found footage film," they reviewed a single Wikipedia page for the Montauk Experiments, but

"soon realized [they] had no interest in making a found footage film". *Ibid.* At that time, the Duffers sent the two November 2010 emails. In the first e-mail, they simply jot down a collection of key words pulled directly from the Wikipedia page; in the second, they do nothing more than prepare a synopsis of Mr. Nichols' book. As Defendants' own expert confirms, this does not constitute idea creation. Osher Decl. ¶ 20 & Ex. D [Standiford Dep. 153:16-154:4]. In a June 9, 2015 email to Netflix executives, the Duffers confirm that they reviewed the single Wikipedia page in 2010 and "[their] research honestly didn't go much further". Osher Decl. ¶ 28 & Ex. L.

And as confirmed by several internal Netflix emails during the initial development of *Stranger Things*, these direct ties to Mr. Nichols' book gave rise to significant "rights" and clearance issues. Osher Decl. ¶ 29 & Ex. M. Although the Duffers and Netflix representatives have attempted to minimize these "rights issues" by suggesting, among other things, that they pertain to people's identities, the problems clearly had to do with the fact that the Duffers were attempting to appropriate Mr. Nichols' ideas. *See ibid.* Netflix wanted the Duffers to be "careful" of their "monster description" and "time travel description", their explanation of Eleven's birth, etc. *Ibid.* Notably, the Duffers' response to the "rights issues" raised by their reliance on Mr. Nichols' Montauk Experiments was to label him a "crazy person" and to complain that "anyone can sue!" Osher Decl. ¶ 28 & Ex. L.

### D.   A Genuine Dispute Exists Over the Substantial Similarities Between *Totem* and *Stranger Things*.

The Ninth Circuit substantial similarity recognizes that no copyright owner must prove the infringer copied the entire work. "[A] copyright defendant need not copy a plaintiff's work in its entirety to infringe the work. It is enough that the defendant appropriated a substantial portion of the plaintiff's work." *L.A. Printex*, *supra*, 676 F.3d at 852. Indeed, the court has embraced Judge Hand's maxim that "it is enough that substantial parts were lifted; no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Id.* (quoting *Sheldon v. Metro-Goldwyn Pictures Corp.*

81 F.32d 49,56 (2d Cir. 1936)).

Courts deny summary judgment when concrete similarities and substantial differences exist: "Although Disney is correct that differences exist between the works (particularly with respect to pace and mood), their plot and sequences of events have too much in common for a court to conclude that 'no reasonable juror could find substantial similarity of ideas and express.'" *Wilson v. Walt Disney Co.*, No. 14-cv-01441-VC, 2015 WL 4477391 at *1 (N.D. Cal. July 30, 2015). *See also Shaw v. Lindheim, 919 F.2d 1353, 1364 (9th Cir. 1990)* (reversing summary judgment "[d]espite these dissimilarities").

"While we cannot say that ruling as a matter of law at the pleading stage is never appropriate, **we have long held that '[s]ummary judgment is 'not highly favored' on questions of substantial similarity**.'" *Zindel v. Fox Searchlight Pictures, Inc.*, 815 Fed.Appx.158, 159 (9th Cir. 2020); see also *L.A. Printex, supra*, 676 F.3d at 848 ("'Where reasonable minds could differ on the issue of substantial similarity . . . summary judgment is improper'")).

To determine substantial similarity, the Ninth Circuit employs a two-part test, *i.e.*, the extrinsic test and the intrinsic test. *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064. The extrinsic test looks to find specific, articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events." *Berkic v. Crichton*, 761 F.2d 1289, 1292 (9th Cir. 1985). Courts do not require a plaintiff to prove similarity across all these factors to maintain infringement claims. *See e.g., Metcalf v. Bochco*, 294 F.3d 1069, 1073-74 (9th Cir. 2002) (triable issue based on similarities across setting, characters, and plot; *Shaw v. Lindheim*, 919 F.2d 1353, 1364 (9th Cir. 1990) (finding triable issue even though mood, setting, and pace "do not weigh heavily in our decision").

### i. Plaintiff's Infringement Claims Are Based Upon Legally Protectible Elements of *Totem*.

The Ninth Circuit has held that protectability, also referred to as originality, "is

broad, and originality means 'little more than a prohibition of actual copying [of a protected work]." *Swirsky v. Carey*, 376 F.3d 841, 851 (9th Cir. 2004). Notably, the "question of originality in copyright law 'is one of fact, not of law.'" *Divine Dharma Meditation Int'l Inc. v. Inst. of Latent Energy Studies*., No. SACV 16-226-JLS, 2016 WL 7486286, at *5 (C.D. Cal. May 25, 2016) (internal quotations omitted).

Defendants erroneously suggest that Plaintiff had done nothing more than "string together lists of claimed 'similarities' in the works"; lists that "Courts routinely disregard". Mtn. 17:2-7. The substantial similarity analysis provide by Rainey—summarized below—provides far greater detail, and goes well beyond the comparative lists assessing stock scenes and random similarities in the cases cited by Defendants. In *Olson v. NBC*, 855 F.2d 1446 (9th Cir.1988), the plaintiff's "list" was **not disregarded**; instead, the district court **gave less weight** to an expert's testimony because he only included a list of similarities and failed to identify any dissimilarities between the works. See *Olsen*, 855 F.2d at 1450. The plaintiff in *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984) only provided a list that "emphasize[d] random similarities scattered though the works"; here, Plaintiff, vis-à-vis Mr. Rainey, has methodically articulated countless examples of shared elements, which are infused throughout the two works and drive and animate the characters, plot, sequence, themes, etc.

## ii. <u>The Extrinsic Test.</u>

### a. <u>Plot and Sequence of Events.</u>

Defendants argue that "the broad concept of a protagonist on a quest to an alternate dimension to save a loved one is not protectable." Mtn. 19:6-7. This is an intentional mischaracterization and oversimplification of the substantially similar plot concepts at play in these works and completely ignores Rainey's opinions.[9] *See* Rainey

---

[9] Defendants also rely on inapposite case law. In *Althouse v. Warner Bros. Entm't, Inc.*, the Court did not hold that the plaintiff's work was too general "to establish similarity of protectable plot expression"; instead, it held that the two stories **only shared one plot similarity**, i.e., "both stories portray a protagonist attempting to prevent a dominant group from oppressing and annihilating a subservient group." *Althouse*, *supra*, 2014 WL 2986939, at *3 (C.D. Cal. Apr. 28, 2014). In *Basile v. Warner Bros. Entm't, Inc.*, 2016 WL 5867432 (C.D. Cal. Jan. 4, 2016) the court found that many of

20

Decl. ¶ 24 & Exs. B at p. 12-17 & C at 4-5. Here, Rainey identifies numerous comparable elements at the core of both properties which create an extremely similar plot through-line between them such that both core plots and sequences are unerringly parallel. Rainey Decl. ¶ 65 & Ex. B.

### b. Characters.

Defendants select five (5) *Stranger Things* characters, unilaterally designate them as "significant", and then summarily conclude that because Rainey acknowledged that those characters do not have counterparts in *Totem*, summary judgment must be granted. Mtn. 21:16-19. Defendants provide no explanation of or basis for the self-determined designation that these characters are "significant"—which is disputed by Plaintiff. In fact, in Rainey's report, he specifically notes that the 9 characters compared therein are those "in the primary story line of both projects". Rainey Decl. ¶ 41 & Ex. B. Notably, during their depositions, the Duffers both acknowledge that *Stranger Things* contains a primary story line. *See, e.g.,* Osher Decl. ¶ 17 & Ex. C [R. Duffer Dep. 228:22 – 229:22].

Next, Defendants argue that Rainey's report fails because a significant characters from *Stranger Things* do not have a counterpart in *Totem*, "[t]his alone defeats Plaintiff's claims." Mtn. 21:18. In *Funky Films, Inc. v. Time Warner*, 462 F.3d 1072 (9th Cir. 2006), the Court did not reject substantial similarity because the works lacked character counterparts. Rather, the Court found that "the various characters of the two works [assessed], there are very few real similarities between any of them." *Id.* 1078. Put simply, Defendants cite no authority for the proposition that to defeat summary judgment, Plaintiff must show a counterpart between every character in the two works.

Rainey's opinions with respect to characters are not solely based on "archetypes"; instead, his consideration of archetypes and story functions was part of the larger approach he took to analyze similarities between characters, including analyzing their traits, tendencies, and behaviors and their nature, psychology, and story function.

---

the alleged similarities identified by Plaintiff simply did not exist.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Rainey Decl. ¶ 40. Because of its long story-form nature, *Stranger Things* populates itself with many secondary and tertiary characters that carry secondary and tertiary plot lines. Rainey Decl. ¶ 41 & Ex. B.

### c.     Theme.

Defendants falsely claim that Rainey only identified a single similar theme between the works, *i.e.*, the "steadfast" protagonist who works with a "change ally". Mtn. 22:19-20. In fact, Rainey opines that both *Totem* and *Stranger Things* share several universal thematic subjects that are substantially similar to each other and also utilize an extremely similar personal thematic arc with the inclusion of the less popular model of the steadfast protagonist and skeptical change ally. Rainey Decl. ¶ 101. These similarities go well beyond Defendants' oversimplified "one character convincing another character to help them" description.

### d.     Setting.

Defendants' highlight the purported dissimilarities between the settings in *Totem* and *Stranger Things* based on an oversimplification of the evidence before this Court. Rainey thoroughly has assessed the settings, as well as the "settings-within-the-settings," and determined there are substantial similarities between both works. Both stories are set in a small, middle-class town in rural America surrounded by forests. Rainey Decl. ¶ 121. In *Stranger Things*, as in *Totem*, the citizens are folksy and friendly with each other, and know each other's personal business. *Ibid*. Both protagonists live in humble houses surrounded by forests, have large yards like those found in a rural town, and have a backyard tool shed that become the nexus for abduction into the alternative dimension. *Id*. ¶ 122. In both stories, the respective landscapes of the alternate dimension are described as darkly rendered carbon copies of the settings of the protagonists' homes in the present dimension. *Id*. ¶ 126.

### e.     Mood, Tone, and Pace.

Defendants again attempt to downplay the clear similarities between the works in this regard by arguing that "*Totem* is a dark, spiritual, and serious morality play", but

22

they acknowledge "*Stranger Things* **does include tense scenes involving monsters**". Mtn. 23:14-16 (emphasis added). *Totem* and *Stranger Things* would both be categorized in the genre of supernatural horror. Rainey Decl. ¶ 128. In both stories, the beginning scenes are violent and bloody. *Id.* ¶ 130. Each work reflects an air of family cohesion that devolves into anxiety, desperation, and tension because of the abduction. *Id.* ¶ 132. The pace of each story accelerates when the abductions take place. *Ibid.* The distress increases in both stories when the relative protagonists are not believed. *Ibid.* Throughout both stories, the horror, the action, and the violence escalate in parallel fashion as the respective protagonists pursue their loved ones. *Id.* ¶ 134. This escalation of tension, trepidation, and violence is complemented by the suggested growing physical darkness of scenes and sequences. *Ibid.*

### f.    <u>Dialogue.</u>

Contrary to Defendants' contention, there are far more than just "snippets of allegedly similar dialogue" that exist between the two works. Mtn. 23:9. Attached as Exhibit "D" to the concurrently filed Declaration of John W. Rainey is a detailed list and explanation of more than thirty (30) different similarities in dialogue, which clearly demonstrates that there are genuine issues of material fact as to this part of extrinsic test. *See also* Rainey Decl. ¶¶ 141-146 & Exs. D & B at p. 26-29.

### iii.    <u>There Are Genuine Issues of Material Fact Regarding Substantial Similarity Under the Ninth Circuit's "Selection or Arrangement" Standard.</u>

Even if the Court concludes that the common elements between the two works are too generic to warrant copyright protection, there still is a genuine dispute—and a battle of experts—as to whether Plaintiff is entitled to copyright protection under the Ninth Circuit's "selection or arrangement" test. Copyright law recognizes that "[o]riginal selection, coordination and arrangement of unprotectable elements may constitute protectible expression." *L.A. Printex*, *supra*, 676 F.3d at 849. *See Alfred v. Walt Disney Co.*, 821 F.App'x 727, 729 (9th Cir. 2020) ("even when the individual

23

elements are not protected—their '[o]riginal selection, coordination, and arrangement . . . may be protectible expression.'"). As noted in *Metcalf v. Bocho*, 294 F.3d 1069, 1074 (9th Cir. 2002), while "the similarities proffered by [plaintiffs] are not protectable when considered individually [because] they are either too generic or constitute 'scenes à faire' . . . the presence of **so many generic similarities and the common patterns in which they arise** do help [plaintiffs] satisfy the extrinsic test" for purposes of substantial similarity." (Emphasis added.)

More specifically, "[t]he particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element." *Id*; see also *Shaw, supra,* 919 F.2d at 1363 ("Even if none of these plot elements is remarkably unusual in and of itself, the fact that both scripts contain all of these similar events gives rise to a triable question of substantial similarity of protected expression" . . . and "'[w]here plot is . . . properly defined as 'the sequence of events' by which the author expresses his 'theme' or 'idea,' it constitutes a pattern which is sufficiently concrete so as to warrant a finding of substantial similarity if it is common to both plaintiff's and defendant's works") (internal citations omitted). Thus, even if it is determined that the elements shared by *Totem* and *Stranger Things* are not protectable, genuine issues of material fact exist with respect to whether selection and/or arrangement of these elements itself is protected. Both of Plaintiff's experts have provided opinions regarding the similarities of the selection and arrangements, and these are questions that must be decided by a jury.

Both Rainey's initial and rebuttal reports reference and describe a mountain of similarities with respect to the selection and arrangement of elements in connection with the factors of the extrinsic test as well as dozens of additional similarities in plot devices, settings, and *Totem* integrals. See Rainey Report at 29-34. Sedlik reviewed *Totem* concept art, image comparisons depicting still frames from *Stranger Things*, and the *Stranger Things* series and ultimately concluded that: (1) "Plaintiff's selection, arrangement and combination of numerous elements in *Totem*, such as characters, plot,

24

sequence, themes, settings, mood, and tone—**as reflected in the *Totem* concept art**—are also reflected, included, or referenced in **scenes from *Stranger Things***"; and (2) "the quantity and combination of similarities between elements depicted or referenced in Plaintiff's Totem concept art and elements embodied in various scenes and episodes of *Stranger Things* is uncanny, and is indicative of appropriation of Plaintiff's selection and arrangement of elements from *Totem*." Sedlik Decl. ¶ 3 & Ex. A at p. 20.

**E.      There Is a Genuine Dispute Regarding Whether *Stranger Things* Infringes on Plaintiff's Concept Art.**

Defendants give short shrift to their argument that summary judgment should be granted with respect to Plaintiff's claim for infringement of the *Totem* concept art. As an initial matter, Defendants suggest that Plaintiff does not own the concept art at issue. This assertion is false and is belied by the fact that Plaintiff's work-for-hire agreement with Evergreen makes clear that all work product created during the agreement is owned by Plaintiff. *See* Kennedy Decl. ¶ 12 & Ex. B.

The issue of substantial similarity between *Stranger Things* and *Totem* concept art is a matter that must be decided by the jury. However, unlike the complex analysis of the literary components requiring application of the extrinsic test and expert testimony, the jury will not have any problem in comparing the visual components and determining whether they are substantially similar. Indeed, expert testimony on the visual similarities would not assist the jury because it does not concern "matters beyond the common knowledge of the average layperson," who can easily look at the *Totem* concept art and scenes from *Stranger Things* and decide whether they look similar or not. *Moses v. Payne*, 555 F.3d 742, 756 (9th Cir. 2009). It is for this reason that Plaintiff did not, and need not, retain an expert to opine on substantial similarity between *Totem* concept art and *Stranger Things*.[10]

---

[10] Plaintiff's visual expression expert, Jeffrey Sedlik, concluded that Plaintiff's selection, arrangement, and combination of various elements—as reflected in the *Totem* concept art—are also reflected, included, or referenced in *Stranger Things*. Contrary to Defendants' assertion, Sedlik's Expert Report provides twenty-four examples of such similarities on his independent, objective analysis. Sedlik also

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### IV. **CONCLUSION**

Plaintiff respectfully requests that the Court deny Defendants' Motion for Summary Judgment in its entirety.

Dated: January 17, 2023                BOREN, OSHER & LUFTMAN, LLP

By: /s/ Jeremy J. Osher
Jeremy J. Osher
Aaron M. Gladstein
Matthew K. Tom
Attorneys for Plaintiff
IRISH ROVER ENTERTAINMENT, LLC

---

provided deposition testimony as to additional examples. Osher Decl. ¶ 34 & Ex. R [Sedlik Dep. 196:25-198:12].

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT