# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IRISH ROVER ENTERTAINMENT, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>AARON SIMS, an individual; et al.,<br><br>Defendants. | Case No.: 2:20-cv-06293-CBM-PLAx<br><br>**ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [83]** |

The matter before the Court is Defendants' Motion for Summary Judgment. (Dkt. No. 83.) The matter is fully briefed. (Dkt. Nos. 94, 120.)

## I.   BACKGROUND

This is a copyright infringement action arising from Defendants Aaron Sims, Matt Duffer, Ross Duffer, Netflix, Inc., Netflix Streaming Services, Inc. and 21 Laps Inc.'s (collectively, "Defendants") alleged unauthorized use of Plaintiff Irish Rover Entertainment, LLC's ("Plaintiff") copyrighted screenplay, *Totem,*

1

written by Jeffrey Kennedy ("Kennedy') in connection with the television series *Stranger Things*. The First Amended Complaint ("FAC") asserts five causes of action: (1) copyright infringement (screenplay); (2) copyright infringement (concept art and live action demo); (3) contributory copyright infringement; (4) vicarious copyright infringement; and (5) declaratory relief in the form of a judicial declaration that (a) *Stranger Things* infringes on Plaintiff's rights in the copyrighted works; (b) Plaintiff is entitled to compensation based on Defendants' infringement on Plaintiff's rights in the copyrighted works; and c) Kennedy is entitled to credit as a writer of *Stranger Things*.

## II. STATEMENT OF FACTS

### A. Background

Jeffrey Kennedy is the writer of the original feature film screenplay titled *Totem*, which was inspired by Kennedy's best friend, Clint Osthimer, who was killed in a car accident in September 2005. (Plaintiff's Statement of Undisputed Facts ("PSUF") 1.) Kennedy founded production company Irish Rover Entertainment, LLC ("Irish Rover") in November 2008. (PSUF 2.) In February 2009, Irish Rover hired production company Evergreen Films ("Evergreen") pursuant to a Development Services/Production Attachment Agreement ("Evergreen Agreement"). (*Id.* at 3.) In May 2009, Evergreen's president Pierre de Lespinois introduced Kennedy to Aaron Sims ("Sims"), a concept artist, producer, and director. (*Id.* at 4.) Thereafter, Evergreen subcontracted with Sims and his company Aaron Sims Company ("ASC") to assist in the creation of concept artwork, storyboards, a CGI character, and 3D test shoot. (*Id.*) To carry out this work, Kennedy emailed Sims *Totem* screenplays dated November 9, 2009; January 1, 2010; March 12, 2010; May 7, 2010; and June 1, 2010; and a "Prop Report" and "Set Dressing Report." (*Id.* at 5.) Between August and October 2010, Kennedy and John Norris ("Norris"), a former ASC employee, exchanged emails, and copied Sims, regarding professional coverage notes from a third-party

reader to assess *Totem's* strengths and weaknesses. (*Id.* at 9.)

In October 2013, Ross and Matt Duffer (the "Duffers") created an outline for the pilot episode of the *Stranger Things* series. (Defendants' Statement of Undisputed Material Facts (DSUF") 5.)  In the summer of 2014, the Duffers completed their script for the Series' pilot episode (then titled Montauk).  (*Id.* at 7.) To support their attempted sale of the 2014 Pilot Script to a studio, the Duffers created a "Look Book" showcasing the 1980s-era inspirations for the Series (such as E.T. and Poltergeist).  (*Id.* at 9.) In March of 2015, using the 2014 Pilot Script and Look Book, they closed a series deal with Netflix.  (*Id.* at 10.)

**B.     Overview of *Totem***

*Totem* tells the story of Jackson Chance, a military veteran in his thirties. SUF 71.  Jackson lives near a "Lynx Indian" reservation and struggles with epilepsy.  SUF 71.  Jackson's wife Autumn is a diagnosed schizophrenic in her twenties who believes she is a "mystic."  SUF 72.  In the opening scene, Jackson has a vision during an epileptic seizure, in which he defeats a group of "Blackwolf Indians" outside of a cave.  SUF 73.

The story then shifts to nine days earlier, the morning Jackson brings Autumn home from a psychiatric ward.  SUF 74.  After she returns home, Autumn tells Jackson that epileptics were once revered as mystics who could talk to the "Great Spirit."  She explains that this 'spirit' told her that it has an important plan for Jackson.  SUF 75.  In the next scene, Autumn sees three wolves in the backyard, which a lightning flicker reveals to be three "Blackwolf Indians."  SUF 76.  That night, Autumn has a dream of Jackson having a seizure and Azrael, a giant English-speaking creature, covers his body in feathers.  SUF 77.

The following morning, Autumn travels to a "Lynx Indian" village.  SUF 78.  In the Lynx village, Autumn meets Kimi, a 10-year-old Lynx girl, and Thunderbear, a Lynx Shaman in his sixties, whom Kimi calls "Grandfather."  SUF 79. When Autumn selects a charred *Totem* pole tied down in a murky pond,

Thunderbear attempts to dissuade her from taking it home. SUF 80. Autumn takes the *Totem* pole home, where Jackson, his friend Dr. William Nerowe, and Autumn's childhood friend, FBI Agent Sam Miller (also in his thirties), are having a backyard barbecue. SUF 81. That afternoon, Miller reveals to Autumn that he is in love with her, a feeling she informs him is not reciprocated. SUF 82. Devastated and angry, Miller rejoins the group in the backyard, and the men plant the *Totem*. SUF 82.

Once planted, the *Totem* allows Azrael to invade the earthly realm. SUF 83. Azrael is a giant creature with six purple wings, large horns, and a skinless bison skull. He speaks English, and his stated intent is to stamp out good in the real world and to use his powers to slaughter everyone and turn their souls into "Grims." SUF 84.

Soon after the *Totem* is planted, Autumn leaves the bedroom and confronts Azrael. SUF 85. Autumn is confronted by wolves, screams, and Azrael scatters purple feathers over her body. SUF 86. Just before "[t]he light leaves Autumn's eyes," Jackson finds her. She tells him that Azrael is responsible, and to find Thunderbear and begin his "quest." SUF 87. At Autumn's funeral, an enraged Miller, who blames Jackson for Autumn's death, hits Jackson and knocks him to the ground. SUF 88. Later, at Jackson's house, Nerowe dismisses Jackson's claims of mystical forces and belief that Autumn can be rescued, before Jackson storms out. SUF 89. Jackson is then followed by Miller to a "railroad port," where Miller rams his car into Jackson's pickup. SUF 90. Thunderbear arrives and pulls Jackson from the flaming wreckage; Miller frees himself. SUF 91. Protected by glowing dreamcatchers, which render them invisible to Azrael, Thunderbear and Jackson jump into the boxcar of a freight train. SUF 92.

Thunderbear tells Jackson that only a "Medicine Man" who "believes," and not a warrior, can defeat Azrael. SUF 93. Azrael then appears to Miller and promises him that, "[w]hen the Eternal Light is extinguished, [Autumn] will be

yours." SUF 94. Miller follows and confronts Jackson on the train, and Jackson and Miller fight before Jackson jumps from the train and is arrested, at Miller's direction. SUF 95. Jackson is held in an FBI interrogation room before being transferred to Nerowe's hospital for psychiatric evaluation. SUF 96.

Nerowe is revealed to have terminal cancer, and he arrives at the hospital, where he tells Jackson that he will follow him in his quest. Nerowe then helps Jackson escape from the hospital. SUF 97. Protected by mystical dreamcatchers, the men evade the Blackwolf and travel to "The Village at the End of the World," where the Lynx tribe lives. SUF 98. There, members of the Lynx tribe take Nerowe to a sweat lodge, ostensibly to cure his cancer. SUF 99.

Thunderbear, Kimi, Nerowe, and Jackson (the latter two men now dressed in Native American "regalia") venture to the "Valley of Death," where Azrael's cave lair is located, pursued by Miller and the Blackwolf. SUF 100. Thunderbear confronts Miller which leads to Miller killing Thunderbear and shooting Kimi. SUF 101. Jackson hurls an electrified spear known as a "Silverstick" at a fiery *Totem* outside the cave. Nerowe also hurls his Silverstick at the *Totem*, and the lightning running through the silversticks cause the *Totem* to shatter into flaming pieces. SUF 102. Nerowe and Jackson, carrying the injured Kimi, enter Azrael's cave sanctuary, where a river of blood flows around a peninsula of rock. SUF 103. Outside the cave, Miller is stomped to death by an elk. SUF 104. Inside the cave, "[t]he light leaves Kimi's eyes" before Nerowe and Jackson confront Azrael. SUF 105. Azrael stabs Jackson in the abdomen with a fiery sword, mortally wounding him. SUF 106. Jackson and Nerowe nonetheless manage to overcome Azrael when Nerowe finally proclaims, "I believe." SUF 107.

Upon Azrael's death, the Grims (trapped souls) in the cave – including Autumn – become celestial auras. SUF 108. Kimi, now clothed in a white robe, reveals to Jackson and Nerowe that she is the Eternal Light. SUF 109. She informs Nerowe that he will live a long life, and a dying Jackson that his quest is

complete and that he "may dwell with me in the house of the Lord forever." Jackson's aura joins Autumn's. SUF 109, 110.

### C. Overview of *Stranger Things*

Season 1 of Stranger Things is set in Hawkins, Indiana, in 1983. (DUSF 12.) It begins with twelve-year-old Will Byers being abducted by a monster while biking home one night after playing Dungeons & Dragons with friends. (*Id.* at 13.) Will's twelve-year-old friends, Mike, Dustin, and Lucas, begin investigating his disappearance. SUF 14. While looking for Will in the forest, the boys find a young girl with a shaved head wearing a hospital gown. They learn that her name is Eleven, and that she has psionic abilities. SUF 15.

While the boys and Eleven search for Will, the monster threatens other Hawkins residents. SUF 16. Mike's teenage sister Nancy attends a party where her best friend, Barb, is abducted by the monster. SUF 17. While searching for Barb, Nancy glimpses the monster running through the woods. SUF 18. Will's teenage brother, Jonathan, also captures a photo of Barb and the monster. Nancy and Jonathan team up to search for the monster in the hopes they can save Will and Barb. SUF 19.

What is initially thought to be Will's body is discovered in a quarry. SUF 20. However, Eleven proves that Will is still alive by manipulating radios to project the sound of Will's voice. SUF 21. Dustin, Lucas, and Mike learn that Will is trapped in an alternate dimension, which they name "The Upside Down." They decide to call the monster a "Demogorgon" (after a D&D character). SUF 22. After pulling together all their knowledge of the supernatural events occurring in Hawkins, Dustin, Lucas, Mike, and Eleven decide to search for a hypothetical gate to the Upside Down. SUF 23.

Meanwhile, Hawkins' police chief, Jim Hopper, who is being pressed by Will's mother, Joyce, has grown suspicious of the nearby research laboratory after findings a torn piece of Eleven's hospital gown outside the lab grounds. SUF 24.

After discovering that the body found in the quarry was not Will's, Hopper breaks into the laboratory and finds Eleven's bedroom and a massive gate to an alternate dimension. SUF 25. Throughout the first season, Eleven experiences a series of painful flashbacks – culminating in a flashback to an experiment in which Eleven was placed in a sensory deprivation tank. SUF 26. While in an altered psychic state, Eleven accidentally opened a gate to the Upside Down after making contact with the Demogorgon. *Id.*

The children and adults join forces and formulate a plan to make a sensory deprivation tank to enhance Eleven's powers, so that she can psychically view Will in, but without entering, the Upside Down. SUF 27. They break into Hawkins Middle School to set it up. SUF 28. Using the tank, Eleven discovers that Barb is dead, but that Will is alive and is hiding in a play fort near his house. SUF 29. Hopper and Joyce break into the laboratory and enter the Upside Down, discovering the monster's nest, where an unconscious Will has been strung up with a tendril extending down his throat. Hopper and Joyce detach and revive Will, and return through the gate. SUF 30.

Agents from the lab arrive at Hawkins Middle School to capture Eleven. SUF 31. After sharing a romantic moment with Mike, Eleven kills some of the agents, crushing their brains with her psionic abilities. SUF 32. The Demogorgon is attracted to the bloodshed at the school and attacks just as Eleven is about to be captured by the agents. Mike, Dustin, and Lucas escape with Eleven and hide in a classroom, but the monster finds them. Before it can harm the boys, Eleven says goodbye to Mike and telekinetically explodes the monster. Mike is left in tears as Eleven vanishes. Will is hospitalized and reunited with his family and friends. SUF 33, 34.

Season 2 begins in Hawkins in 1984, one year after Will's disappearance. SUF 35. Dustin, Lucas, and Mike are intrigued by a new girl at school named Max, and Will is struggling to return to normal life. SUF 36. Will has started

having episodes in which he freezes and sees a long-limbed shadowy monster looming over Hawkins.  This new monster is called the "Mind Flayer" (another D&D reference), and is depicted as a massive, spider-like, shadow creature.  SUF 37.

While Mike mourns the loss of Eleven, she is actually alive and secretly living with Hopper (who has assumed a father-figure role with her) in his cabin.  SUF 38.  Eleven struggles with being cut off from Mike, and rebels against Hopper over his strict rules, which require that she stay hidden.  SUF 39.  Dustin finds a strange-looking slug and adopts it as a pet. SUF 40. It grows large, eats Dustin's cat, and escapes; the boys learn that this "pet" is one of four juvenile demogorgons (which Dustin nicknames "demodogs") psychically linked to the Mind Flayer's hive mind.  As they grow, the demodogs terrorize Hawkins as a pack, killing and eating people and pets.  SUF 41, 42.

Will's episodes become more frequent and, during one of them, the monster sticks a tentacle down Will's throat and infects him like a parasite.  SUF 43.  After passing out, Will awakens at home acting strangely.  SUF 44.  He scribbles and demands that the house be kept cold.  SUF 45.  Joyce, Mike, and Joyce's boyfriend, Bob, piece together the scribbles to discover a map to the demodogs' underground tunnels.  SUF 46.  Joyce, Bob, Will, and Mike rescue Hopper, who had also found the tunnels but became trapped inside.  SUF 47.  Scientists from the laboratory set fire to the tunnels, causing Will to collapse in pain due to his connection to the Mind Flayer.  Will is rushed to the laboratory, but the demodogs soon arrive and start attacking.  SUF 48.  Mike deduces that the Mind Flayer can spy on them through Will, and he convinces Joyce to sedate Will to prevent the monster from tracking them. Joyce, Hopper, and Mike escape the laboratory and take Will home.  SUF 49, 50.

Meanwhile, Eleven tracks down her biological mother and discovers another young girl named Kali, who also has supernatural power, and was also

experimented on at Hawkins lab.  SUF 51.  Eleven travels to Chicago to find Kali, who helps Eleven hone her abilities.  SUF 52.  Kali is part of a vengeful street gang, and Eleven decides not to join Kali and returns home to reunite with the boys.  SUF 51, 52.  The Mind Flayer finds the group at the Byers' house and sends the demodogs to attack, but Eleven destroys them. Joyce, Jonathan, and Nancy take Will to Hopper's cabin to try and force the monster out of him by overheating it.  Nancy finally releases Will from the monster's grasp by jabbing him with a hot fire poker.  SUF 53, 54.  Hopper drives Eleven to the lab, where she closes the gate to the Upside Down.  SUF 55.

      Season 3 begins in 1984, in the Soviet Union. SUF 56. A Soviet scientist has come close, but failed to build a gate to the Upside Down, and is murdered by a Soviet general, who gives the remaining scientists one year to build the gate. SUF 57.  The story moves to Hawkins, in 1985.  The new Starcourt Mall has become the town focal point, and Mike and Eleven, Lucas and Max, and Jonathan and Nancy are dating.  Will still wants to play D&D, but the other boys are now more interested in girls.  SUF 58.

      Billy, Max's eighteen-year-old brother, gets hit by a shadowy creature while driving by the town mill and becomes possessed by the Mind Flayer.  SUF 59.  Billy abducts other Hawkins residents, who also become possessed.  SUF 60. Dustin enlists Steve, who now works with a friend named Robin at an ice cream shop, to help translate a message Dustin intercepted from the Soviets.  Dustin, Steve, and Robin translate the message and learn that Starcourt Mall is a front for the Soviets.  SUF 61, 62.

      Billy rallies the other possessed townspeople to attack Will, Mike, Lucas, Eleven, Max, Jonathan, and Nancy.  SUF 63.  Eleven saves them, injuring the Mind Flayer in the process.  SUF 64.  Meanwhile, Dustin, Steve, and Robin recruit Lucas' younger sister Erica to crawl through an air duct to break into the Soviets' loading dock at the mall.  SUF 65.  They discover an underground testing

area where Soviet scientists are trying to force open the gate to the Upside Down. SUF 66. Eleven uses her powers to find Dustin at the mall, and she, Will, Mike, Lucas, Max, Jonathan, and Nancy head there. The Mind Flayer – depicted as a massive, scaly, spider-like creature comprised of human remains, and with long tentacles – finds and attacks the group. SUF 67.

Eleven tries to protect them, but in an earlier confrontation, the Mind Flayer managed to "bite" her, infecting her with a piece of itself. Eleven uses her powers to fling the piece out of her body but, in doing so, exerts all her energy and loses her powers. SUF 68. Billy captures Eleven and offers her to the Mind Flayer, but Eleven accesses Billy's memories and manages to release him from the Mind Flayer's control. Billy sacrifices himself for Eleven as the others use fireworks to distract the Mind Flayer. SUF 69. Joyce and Hopper find the gate to the Upside Down and Hopper appears to die when Joyce closes the gate to stop the Mind Flayer. SUF 70.

### III.    LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing evidence at the summary judgment stage, "the judge does not weigh conflicting evidence with respect to a disputed material fact. Nor does the judge make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The Court must view the evidence and the inferences therefrom in the light most favorable to the non-moving party, and the moving party bears the initial burden to demonstrate the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the moving party has met its initial burden, the burden shifts to the non-moving party

to show a genuine issue for trial by establishing that the fact in contention is material (i.e. affecting the outcome of the suit under the governing law) and the dispute is genuine (i.e. the evidence is such that a reasonable jury could return a verdict for the nonmoving party). *Anderson*, 477 U.S. at 248, 251–52; *Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers*, 971 F.2d 347, 355 (9th Cir. 1987).

## IV. DISCUSSION

Defendants move for summary judgment on all of Plaintiff's causes of action. Defendants contend that there is no genuine issue of fact with respect to access, no substantial similarity between the works at issue, and Plaintiff's "concept art" claim fails.

To prevail on a copyright infringement claim, a plaintiff must demonstrate "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Funky Films, Inc. v. Time Warner Entm't Co.,* 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv.* Co., 499 U.S. 340, 361 (1991)). Plaintiff's ownership of a valid Copyright in *Totem* is undisputed for the purposes of this motion. Therefore, the only question for the Court is whether Defendants copied protected expressions from the *Totem* screenplay.

In order to establish copying, Plaintiff must either provide "evidence of direct copying" or they must show that "Defendants had 'access' to [Plaintiff's] copyrighted material and that the two works at issue are 'substantially similar.'" *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1052 (C.D. Cal. 2010) (citing *Funky Films,* 462 F.3d at 1076). Defendants move for summary judgment on the grounds that (1) they did not have access to the 2013 version of *Totem,* and (2) there are no substantial similarities between *Totem* and *Stranger Things*.

A.  **Access**

In order to show access, Plaintiff must show that Defendant had "an opportunity to view or to copy plaintiff's work." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000) (quoting *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977)).  Access is proven where "(1) a particular chain of events is established between the plaintiff's work and the defendant's access to that work (such as through dealings with a publisher or record company), or (2) the plaintiff's work has been widely disseminated." *Id.*

Defendants submit the Declaration of Aaron Sims who declared that he never received the 2013 version of *Totem* and testified that he never shared earlier versions of *Totem* with the Duffers.  Sims Decl. ¶¶ 9-10, 15 & Ex. E. Defendants also submit testimony of the Duffers that they had not read or heard of *Totem* before this lawsuit.  Matt Decl. ¶ 31 Ross Decl. ¶ 3.

In opposition, Plaintiff submits the Declaration of Jeffrey Kennedy, which states that "In or about March 2013, I emailed Sims the March 2013 version of the *Totem* screenplay and a prospectus that I had prepared to market the project.  This was at least the twelfth updated version of the *Totem* screenplay that was provided to Sims." Kennedy Decl. ¶ 40.  Kennedy also provides email correspondence between Evergreen producer John Copeland and Sims discussing and attaching the *Totem* screenplay between November 2009 and February 2010.  Kennedy Decl. ¶¶ 16-18 & Exs. C-H.  Moreover, it is undisputed that in 2013, Sims and ASC performed substantial work on Seasons 1 and 2 of *Stranger Things*, including creating and designing the Demogorgon and creating the *Stranger Things* world, including the "Upside Down." Osher Decl., Ex. C (Sims Dep. 19:13- 21:16.); Ex. O; Ex. I.

Accordingly, Sims' receipt of several drafts of the *Totem* screenplay between 2009 and 2013 coupled with his significant involvement in *Stranger*

1   *Things* present a triable issue of fact regarding the Duffers' access to the *Totem*
2   screenplay.

3   **B.     Substantial Similarity**

4         To determine whether two works are substantially similar, the Ninth Circuit
5   applies a two-part test consisting of extrinsic and intrinsic components. *Rice v.*
6   *Fox Broadcasting Co.*, 330 F.3d 1170, 1174 (9th Cir. 2003). The extrinsic test is
7   an objective comparison of the two works. The Court must consider "whether [the
8   works] share a similarity of ideas and expression as measured by external,
9   objective criteria." *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004). The
10  extrinsic test requires an "analytic dissection" of the works and is often aided by
11  expert testimony. *Id*.

12        "For summary judgment, only the extrinsic test is important." *Kouf v. Walt*
13  *Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994). "A plaintiff
14  who cannot satisfy the extrinsic test necessarily loses on summary judgment,
15  because a jury cannot find substantial similarity without evidence on both the
16  extrinsic and intrinsic tests." *Id*. Further, because the intrinsic test relies on the
17  subjective judgment of the ordinary person, it must be left to the jury. *Swirsky*,
18  376 F.3d at 845. Thus, the Court's analysis on summary judgment is limited to
19  the extrinsic test.

20        Where literary works (films, screenplays, television series, etc.) are at issue,
21  the extrinsic test is an objective evaluation of "the articulable similarities between
22  the plot, themes, dialogue, mood, setting, pace, characters, and sequence of
23  events." *Id*. In applying the test, the Court must distinguish between protectable
24  and unprotectable material, because a party claiming infringement may not rely on
25  unprotected elements. *Rice*, 330 F.3d at 1174. For example, general plot ideas are
26  not protectable and cannot give rise to a copyright infringement claim. *See Berkic*
27  *v. Crichton,* 761 F.2d 1289, 1293 (9th Cir. 1985) ("General plot ideas are not
28  protected by copyright law; they remain forever the common property of artistic

mankind."). Further, the doctrine of scenes a faire "holds that expressions indispensable and naturally associated with the treatment of a given idea 'are treated like ideas and are therefore not protected by copyright." *Rice*, 330 F.3d at 1175 (quoting *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444 (9th Cir. 1994)). Accordingly, the extrinsic test examines "not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Berkic*, 761 F.2d at 1293. Summary judgment on the issue of substantial similarity is appropriate only "if no reasonable juror could find substantial similarity of ideas and expression." *Funky Films*, 462 F.3d at 1077 (quoting *Kouf*, 16 F.3d at 1045).

There are numerous and clear disputes of material facts that preclude summary judgment. Plaintiff has presented expert testimony to establish components that are common to both works including the areas of character, plot, sequence of events, theme, setting, mood, tone, pace, and dialogue. *See* Declaration of John W. Rainey, Ex. 1. Defendants present expert testimony to establish that (1) there is no similarity in the literary elements of *Totem* and *Stranger Things*, and (2) that the plots, characters, sequences, themes, settings, moods, paces, and dialogue of these works are remarkably dissimilar. *See* Declaration of Lester A. Standiford, Ex. A. Accordingly, the Court is precluded from granting summary judgment on the issue of substantial similarity. This case boils down to a battle of the experts, and such a battle must be left for the jury's resolution. *See, e.g., Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 2005 WL 6070811, at *31 (C.D. Cal. Mar. 14, 2005) *aff'd*, 469 F.3d 978 (Fed. Cir. 2006) ("The court is once again faced with conflicting expert declarations. Resolving such conflicts and the weighing of evidence are jury functions, not those of a judge."); *Avery Dennison Corp. v. Acco Brands, Inc.*, 2000 WL 986995, *12 (C.D. Cal. Feb. 22, 2000) ("In light of the . . . conflicting evidence and expert opinions, this Court may not weigh the evidence as presented by the parties. The inferences

to be drawn from the parties' evidence could weigh in favor of either party."); *see also, e.g., Hansen Beverage Co. v. Vital Pharm., Inc.*, 2010 WL 1734960, at *8 (S.D. Cal. Apr. 27, 2010) (holding that, when confronted with conflicting expert opinions, "[b]oth VPX and Hansen have presented evidence from which a reasonable juror could find by a preponderance of the evidence that each is entitled to a verdict in its favor. Because Hansen's and VPX's materials demonstrate there is a genuine issue of material fact as to whether VPX's 7–hour duration claim is literally false, the Court denies the cross-motions for summary judgment."); *CytoSport, Inc. v. Vital Pharm., Inc.*, 894 F.Supp.2d 1285, 1300 (E.D. Cal. 2012) ("[T]he two conflicting expert opinions create a material issue of fact.); *Lewert v. Boiron, Inc.*, 212 F. Supp. 3d 917, 937 (C.D. Cal. 2016), *aff'd*, 742 F. App'x 282 (9th Cir. 2018).

   Accordingly, because the parties' expert opinions create a genuine dispute of material fact regarding whether the works are substantially similar, the Court denies Defendant's Motion for Summary Judgment on the issue of substantial similarity.[1]

**C. Plaintiff's "Concept Art" Claim**

   Defendants move for summary judgment on Plaintiff's second cause of action for Copyright Infringement of *Totem*'s Concept Art. "To constitute an invasion of copyright it is not necessary that the whole of a work should be copied, nor even a large portion of it in form or substance, but that, if so much is taken that the value of the original is sensibly diminished, or the labors of the original author are substantially, to an injurious extent, appropriated by another, that is sufficient to constitute an infringement." *Universal Pictures Co. v. Harold Lloyd Corp.,* 162 F.2d 354, 361 (9th Cir. 1947) (citing *W. Pub. Co. v. Edward*

---

[1] For the same reasons that preclude the Court from granting summary judgment on Plaintiff's first cause of action, the Court cannot resolve summary judgment on Plaintiff's request for declaratory relief.

15

1 *Thompson Co.*, 169 F. 833, 854 (C.C.E.D.N.Y. 1909), *decree modified*, 176 F. 833 (2d Cir. 1910). Therefore, the Court considers whether there exists a triable issue of substantial similarity between any of the isolated artwork contained in *Totem* and *Stranger Things*, separate from the whole work.

The basic mode of analysis for comparison, *i.e.* the extrinsic test, applies to comparison of art work. *See Cavalier v. Random House, Inc.,* 297 F.3d 815, 825 (9th Cir. 2002). "[U]nprotectible elements should not be considered when applying the extrinsic test to art work." *Id.* "The subject matter, shapes, colors, materials, and arrangement of the representations may be considered in determining objective similarity in appearance." *Id.* Concept art initially establishes the visual aesthetic of a film, from the overall style, look, and feel, to specific details of the appearance of the characters, costumes, environments, props, vehicles, and action. All of these visual characteristics may be further refined or even supplanted as development and production proceed, but concept art is at minimum a visual foundation and starting point for further creative efforts.

Plaintiff submits the expert report of Professor Jeffrey Sedlik who opines that upon reviewing the concept art for *Totem*, "Plaintiff's selection, arrangement and combination of numerous elements in *Totem*, such as characters, plot, sequence, themes, settings, mood, and tone—as reflected in the *Totem* concept art—are also reflected, included, or referenced in scenes from *Stranger Things*." *See* Declaration of Jeffrey Sedlik, Ex. A.

Defendant submits the expert report of Michael Knapp who opines that Sedlik's Report "errs" in that it "merely recites alleged literary similarities between the two" works. Knapp concludes that "there is no similarity between any of the *Totem* concept art and any of the scenes and characters from *Stranger Things*." *See* Declaration of Safia Gray Hussain, Ex. M.

The opinions from the parties' experts create a genuine dispute of material fact regarding similarity between the isolated artwork contained in *Totem* and

*Stranger Things*. *See Lewert, Inc.*, 212 F. Supp. 3d at 937 ("This case boils down to a battle of the experts, and such a battle must be left for the jury's resolution."), *aff'd*, 742 F. App'x 282 (9th Cir. 2018). Accordingly, the Court denies Defendant's Motion for Summary Judgment on Plaintiff's "Concept Art" claim.[2]

## V. CONCLUSION

Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment.

**IT IS SO ORDERED.**

DATED: JUNE 30, 2023.

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

---

[2] For the same reasons that preclude the Court from granting summary judgment on Plaintiff's first and second causes of action, the Court cannot resolve summary judgment on Plaintiff's vicarious and contributory infringement causes of action. *See Religious Tech. Ctr. v. Netcom On–Line Communication Servs., Inc.,* 907 F.Supp. 1361, 1371 (N.D.Cal.1995) ("[T]here can be no contributory infringement by a defendant without direct infringement by another.").

17